1

 1          UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF FLORIDA
 2
           Case No.:  23-61772-CIV-SMITH
 3

 4   JUAN NAVARRO,                    )
                                      )
 5                    Plaintiff,      )
                                      )
 6   vs.                              )
                                      )
 7   HOLLYWOOD IMPORTS LIMITED, INC., )
     and AUTONATION, INC.,            )
 8                                    )
                      Defendants.     )
 9   _____)

10

11

12

13                 DEPOSITION OF

14                 JUAN NAVARRO

15

16     DATE TAKEN:       February 22, 2024

17     TIME:             10:05 A.M. - 5:26 P.M.

18     PLACE:            Stearns Weaver Miller
                         200 E. Las Olas Boulevard
19                       Fort Lauderdale, Florida

20

21

22     Examination of the witness before:

22                 Mia Sohn, RPR
23        Nationally Certified Stenographer

24

25

Class Action Court Reporters
(561)213-1464     service@classaxn.com

2

1    <u>APPEARANCES</u>:

2

ON BEHALF OF THE PLAINTIFF:

3

        LAW OFFICES OF POLLARD, LLC
4        BY:  CHRISTOPHER S. PRATER, ESQUIRE
        401 East Las Olas Boulevard
5        Suite 1400
        Fort Lauderdale, Florida  33301
6        (954)466-2352
        cprater@pollardllc.com

7

8    ON BEHALF OF THE DEFENDANTS:

9        LAW OFFICES OF STEARNS, WEAVER, MILLER,
        WEISSLER, ALHADEFF & SITTERSON, P.A.
10        BY:  ERIC K. GABRIELLE, ESQUIRE
        200 East Las Olas Boulevard
11        Suite 2100, Penthouse A
        Fort Lauderdale, Florida  33301
12        (954)462-9527
        egabrielle@stearnsweaver.com

13

14

15                        - - - - - -

16

17                    I N D E X

18   WITNESS:  JUAN NAVARRO                    PAGE

19   Direct Examination by Mr. Gabrielle
     Cross Examination by Mr. Prater
20   Redirect Examination by Mr. Gabrielle

21

22

23

24

25

3

E X H I B I T S

FOR DEFENDANTS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | 4/6/23 e-mail to Mr. Losk | 29 |
| 2 | Ocean Mazda documents, 5 pages | 45 |
| 3 | Charge of discrimination, 6 pages | 82 |
| 4 | 4/2/23 e-mail to Mr. Dominguez | 93 |
| 5 | Resume, 3 pages | 99 |
| 6 | AutoNation earnings statement, 2 pages | 106 |
| 7 | Ocean Mazda earnings statements, 28 pages | 131 |
| 8 | 5/15/23 e-mail string, 2 pages | 141 |
| 9 | Associate handbook, 55 pages | 168 |
| 10 | Rules of the Road, Code of Business Ethics, 1995-2022, 45 pages | 174 |
| 11 | Rules of the Road, Code of Business Ethics, 2023-2024, 45 pages | 174 |
| 12 | Text messages with Mr. Losk, 55 pages | 192 |
| 13 | Text messages with Mr. Rodriguez | 205 |
| 14 | Text messages with Manuel, 6 pages | 208 |
| 15 | Text messages with Mr. Placeres, 3 pages | 213 |
| 16 | Composite exhibit of Ocean Mazda earnings statement | 217 |

4

1    Thereupon,

2                    JUAN NAVARRO,

3    was called as a witness and, after having been

4    first duly sworn, was examined and testified as

5    follows:

6                    DIRECT EXAMINATION

7    BY MR. GABRIELLE:

8         Q.    Sir, could you please state and then

9    spell your full legal name for the record?

10        A.    Juan Navarro, J-U-A-N, Navarro,

11   N-A-V-A-R-R-O.

12        Q.    Do you have a middle name?

13        A.    P, Pablo.

14        Q.    Okay.  And people at the dealership refer

15   to you as JP from time to time, do they not?

16        A.    They call me JP.

17        Q.    Okay.  What's your date of birth, sir?

18        A.    02/01/61.

19        Q.    February 1, 1961?

20        A.    Correct.

21        Q.    You understand that the oath you just

22   took is the same oath that you'll take before the

23   judge and the jury at the trial in this case?

24        A.    I do.

25        Q.    And you're under the same obligation here

5

1    today to tell the truth and the complete truth as

2    you would be if you were in front of the judge or

3    the jury?

4          A.    I do.

5          Q.    Sir, would you mind speaking up a little

6    bit?

7          A.    Sure.

8          Q.    Thank you.

9                Are you under the influence of any

10   medication that would impair or prevent you from

11   telling the truth and the complete truth in

12   response to my questions?

13         A.    No.

14         Q.    Sir, if you would, please, let me finish

15   the question before you answer.

16         A.    Okay.

17         Q.    And that was one of the instructions I

18   was about to give you.

19               Are you under the influence of any

20   medication that would prevent you from giving

21   truthful, complete, and accurate answers to my

22   questions?

23         A.    No.

24         Q.    Is there any other reason why, as you sit

25   here today, you would be unable to give truthful,

6

1    complete, and accurate answers to my questions?

2         A.    No.

3         Q.    Have you ever given a deposition before?

4         A.    Repeat the question.

5         Q.    Yes, sir.  Have you ever given a

6    deposition before?

7         A.    No.

8         Q.    So let me go over some of the rules with

9    you.  I suspect that some, if not all of this has

10   been discussed with you already by your counsel, but

11   just for the record, we'll go over them.

12              If you would, please, wait for me to

13   fully finish my question before you begin

14   answering.  I will do my best to make sure you're

15   fully finished with your answer before I begin my

16   next question, okay?

17        A.    Yes.  Okay.

18        Q.    If I interrupt your answer inadvertently

19   and you haven't finished answering, please indicate

20   that to me so that you can give your complete answer

21   to the question, okay?

22        A.    Okay.

23        Q.    If you don't understand a question I ask

24   you in whole or in part, will you please let me

25   know?

7

1       A.    Okay.

2       Q.    If you answer a question without

3   indicating that you don't understand it, we will all

4   assume that you fully understood the question and

5   that you're giving a truthful answer, okay?

6       A.    Okay.

7       Q.    I said this off the record.  I'll repeat

8   it.  If you'd like a break at any time, please say

9   the word.  You do not need for me to suggest a

10  break.  You do not need for your attorney to suggest

11  a break, okay?

12      A.    Okay.

13      Q.    The only thing I'm going to request is

14  that we take a break between questions rather than

15  between a question and an answer, meaning that I

16  will ask you to fully finish your answer to a

17  pending question before we take a break, all right?

18      A.    All right.

19      Q.    Later on today, maybe this morning, I

20  will be showing you some documents.

21          Any document I show you, I'd like you to

22  take all the time you need to fully review the

23  document before answering any questions about it,

24  okay?

25      A.    Okay.

8

1      Q.    If I ask you a question about a document

2 before you're finished looking at it and reviewing

3 it, please say so and I'll wait for you to finish

4 before asking you the question, all right?

5      A.    All right.

6      Q.    Excluding preparations involving your

7 attorney, in other words, excluding communications

8 with your lawyer or meetings with your lawyer,

9 excluding those things, what did you do to prepare

10 for your deposition?

11      A.    Just prepared.  Just to tell the truth.

12      Q.    Did you look at any documents?

13      A.    I did.

14      Q.    What documents did you look at?

15      A.    I guess the disposition [sic] and the

16 documents that I provided to my attorney and the

17 complaint.

18      Q.    So you looked at the complaint, meaning

19 the lawsuit initiating document that was filed on

20 your behalf?

21      A.    Correct.

22      Q.    And you looked at documents that you

23 provided to your attorney?

24      A.    Correct.

25      Q.    And what was the first thing you said in

9

```
 1   response to your answer?

 2              You said the disposition or the

 3   deposition.

 4              What were you referring to?

 5       A.    To the meeting today.

 6       Q.    So you looked at the notice?

 7       A.    Correct.

 8       Q.    Okay.  The documents that you looked at

 9   that you provided to your attorney, what specific

10   documents were those?

11       A.    The complaint that I originally provided.

12   Other than --

13              Paycheck stubs, W-2s, and records from

14   my texts, and basically that's it.

15       Q.    So text messages?  You looked at text

16   messages?

17       A.    Right.

18       Q.    Any other documents that you can think of

19   that you looked at in preparation for your

20   deposition today other than what you've already

21   described?

22       A.    Again, we have been all the documents

23   that I had to answer to him and I guess would be to

24   you, questions that you were asking me, I reviewed

25   those.
```

10

1      Q.    So you may not know this.  Those are

2  referred to as interrogatories.

3            You looked at the written questions that

4  we served on you?

5      A.    Correct.

6      Q.    And the answers you provided?

7      A.    Correct.

8            MR. PRATER:  Make sure you wait until

9       he's done asking the question.

10           THE WITNESS:  Yes.

11  BY MR. GABRIELLE:

12     Q.    Other than what you've already described,

13  are there any other documents you've looked at in

14  preparation for your deposition today that you can

15  remember?

16     A.    That's it.

17     Q.    Excluding, once again, sir,

18  communications with your attorney or any of the

19  attorneys that he works with, is there anyone you

20  spoke with to prepare for your deposition?

21     A.    No one.

22     Q.    Where are you currently employed?

23     A.    Ocean Mazda.

24     Q.    And what location?

25     A.    West Kendall.

11

1          Q.     And that's located at 14000 S.W. 137th

2     Avenue in Miami?

3          A.     Correct.

4          Q.     How long have you worked there?

5          A.     Going on ten months.

6          Q.     What do you do for Ocean Mazda in West

7     Kendall?

8          A.     Salesperson.

9          Q.     Selling vehicles?

10         A.     Yes, sir.

11         Q.     Cars and trucks or just cars?

12         A.     SUVs.

13         Q.     SUVs?

14         A.     Yes, sir.

15         Q.     Are your job duties as a salesperson for

16    Ocean Mazda in West Kendall comparable to your job

17    duties while you worked as a salesperson for

18    AutoNation Honda Hollywood?

19         A.     Yes.

20         Q.     Some basic other questions for you in

21    terms of background.

22              I know you indicated you've never given

23    a deposition before.

24              Have you ever given any other kind of

25    sworn testimony in a court proceeding or in a

12

1   hearing where you were sworn in, took an oath and

2   testified?

3        A.    Yes.

4        Q.    How many times?

5        A.    Once.

6        Q.    When was that?

7        A.    Fifteen, 18 years ago.

8        Q.    Okay.  What were the general

9   circumstances?

10       A.    It was what they call --

11             What is that?

12             Jury duty.

13       Q.    Jury duty.  Okay.

14             Did you serve on the jury?

15       A.    No.

16       Q.    Have you ever been a party to a lawsuit,

17   and I'll explain what I mean by that.

18             Have you, prior to this lawsuit here

19   that we are here for today, prior to that, have you

20   personally ever sued anyone or any business?

21       A.    Never.

22       Q.    Has anyone ever sued you?

23       A.    Never.

24       Q.    Have you ever been convicted of a crime?

25       A.    No.

13

1    Q.    I'm aware of a bankruptcy proceeding that

2  you filed late 2023, so I'm already aware of that

3  one.

4          That is correct, right?  You initiated a

5  bankruptcy proceeding in approximately August of

6  2023, correct?

7    A.    Correct.

8    Q.    Prior to that, had you ever filed for

9  bankruptcy?

10   A.    Yes.  It was 20 years ago.

11   Q.    Where was that?

12   A.    That was in --

13   Q.    The state is sufficient.

14   A.    Yeah, yeah.  That would be Texas.

15   Q.    So it was a long time ago?

16   A.    Yes.

17          It could have been Illinois.  I just

18  don't remember.  It's a long time ago.

19   Q.    Okay.  So you lived in Illinois at one

20  point?

21   A.    Oh, ten years.

22   Q.    Have you ever -- and I'm aware, again,

23  sir, of a charge of discrimination you filed with

24  the United States Equal Employment Opportunity

25  Commission relating to the same things that we're

14

1    here about today.  I'm excluding that from the scope

2    of my question, so I don't mean your EEOC charge

3    against the dealership or AutoNation.

4              Prior to that, have you ever filed a

5    charge of discrimination against any prior employer

6    with any Government agency?

7        A.    Never.

8        Q.    And I used the term already, but I'm

9    calling the dealership where you worked AutoNation

10   Honda Hollywood.

11             Is that a correct phrase to use?

12       A.    Sure, yes.

13       Q.    I've heard people in the business refer

14   to vehicle dealerships also as "the store."

15             Did you hear that phrase used or have

16   you used that?

17       A.    Yeah, they use "the store."

18       Q.    So if either of us uses the word "the

19   dealership," "the store," or the phrase "AutoNation

20   Honda Hollywood," we're all talking about the same

21   business, okay?

22       A.    Yes.

23       Q.    And I will distinguish that from Ocean

24   Mazda, the dealership where you work now, okay?

25       A.    Okay.

15

1    Q.    Prior to going to work for AutoNation

2    Honda Hollywood, at any point in your adult life

3    prior to that, have you ever felt like an employer

4    has treated you unlawfully?

5    A.    No.

6    Q.    Is your current residence address

7    16808 S.W. 137th Avenue, Apartment 922, in Miami,

8    Florida?

9    A.    Yes.

10    Q.    How long have you lived there?

11    A.    Nine months.

12    Q.    Do you own that premises or do you rent?

13    A.    Rent.

14    Q.    Are there any adults that live there with

15    you?

16    A.    My wife.

17    Q.    Any other adults that live there?

18    A.    If you consider a 20-year-old adult, yes,

19    my son.

20    Q.    Well, the law considers a 20-year-old an

21    adult.  As a parent, maybe neither of us do, but

22    yes, okay.  So your wife and your son.

23         So your son is age 20.

24         You also have two younger children; is

25    that correct?

16

1       A.     Fifteen and a two.

2       Q.     So your 15-year-old is also a son?

3       A.     They're my sons, yes.  I raised them

4  since they were five and ten.

5       Q.     Okay.  So I'm not referring now to your

6  two-year-old or your 15-year-old.  We're going to

7  keep their names out of the record, okay?

8              What is the name of your 20-year-old

9  son?

10      A.     David -- Henry David.

11      Q.     And same last name as you?

12      A.     Flores.

13      Q.     Flores.

14      A.     Yeah.

15      Q.     Henry David Flores?

16      A.     No, Henry David Flores.

17      Q.     How do you spell that?

18      A.     The last name or the first name?

19      Q.     Both.

20      A.     Henry is H-E-N-R-Y.  David is like David.

21      Q.     Okay.

22      A.     And Flores, F-L-O-R-E-S.

23      Q.     Thank you.

24             And what is your wife's name?

25      A.     Dixian, D-I-X-I-A-N.

17

1        Q.    Last name?

2        A.    Eser Mejia.  Eser is her middle name,

3   E-S-E-R.  Mejia, M-E-J-I-A.

4        Q.    Thank you.

5              Prior to your current address in Miami,

6   Florida, that Apartment 922, was your previous

7   address 311 North State Road 7, No. 1203?

8        A.    That's correct.

9        Q.    In Plantation, Florida?

10       A.    I'm sorry.  Correct.

11       Q.    How long did you live there?

12       A.    One year.

13       Q.    So that would have been approximately

14   April of 2022 to April of 2023?

15       A.    Correct.

16       Q.    Prior to that address in Plantation,

17   Florida, was your previous address 21001 San Simeon,

18   S-I-M-E-O-N, Way, Apartment 110, in Miami, Florida?

19       A.    Yes.

20       Q.    How long did you live there?

21       A.    One year.

22       Q.    So that would have been approximately

23   April of 2021 to April of 2022?

24       A.    Correct.

25       Q.    Prior to that, was your address 709 N.E.

18

1    4th Court, No. 2, in Hallandale Beach, Florida?

2         A.    I'm sorry.  That's backwards.

3         Q.    Okay.  What's backwards?

4         A.    709's first.  311 is after.

5         Q.    Right.  So moving forward in time, from

6    Hallandale Beach to now, you lived in Hallandale

7    Beach, then San Simeon Way in Miami, then North

8    State Road 7 in Plantation, now on 137th Avenue in

9    Miami?

10        A.    San Simeon, Hallandale, Plantation to

11   Miami.

12        Q.    Okay.  So I did have the first two in

13   incorrect order.

14        A.    Yes.

15        Q.    So how long did you live at the

16   Hallandale Beach address?

17        A.    I would say a year.

18        Q.    One year?

19        A.    Yes.

20        Q.    Did you rent at each of those addresses?

21        A.    Correct.

22        Q.    Why did you move each year between

23   approximately 2020 and nine months ago?

24        A.    From Texas to Florida, finding out --

25   don't know anything about Florida.

19

1        Q.     Right now I'm just asking about the

2   Florida addresses.

3        A.     Okay.

4        Q.     So what reason was it that you -- and if

5   the reasons were different, explain what they were.

6              Why did you move each year four times

7   between April of 2020 and nine months ago?

8        A.     I like to be close to where I work.

9        Q.     Where you live now is only about a little

10  over 2 miles from Ocean Mazda, correct?

11       A.     Correct.

12       Q.     And your Plantation address on North

13  State Road 7, that was only about a mile or a mile

14  and a half from AutoNation Honda Hollywood, right?

15       A.     No, it's longer than that.

16       Q.     So the address at 311 North State Road 7,

17  about how close was that to AutoNation Honda

18  Hollywood?

19       A.     I believe it's about 4 to 5 miles.

20       Q.     Okay.  Which happened first, your

21  decision to relocate from Plantation, Florida to

22  where you live now, Miami, Florida, or your decision

23  to resign from AutoNation Honda Hollywood?

24       A.     You asked me two questions there, right?

25       Q.     Well, I'm asking you which occurred

20

1   first.

2            You decided to move from Plantation,

3   Florida to Miami, Florida, correct?

4        A.    Correct.

5        Q.    You also resigned from AutoNation Honda

6   Hollywood, correct?

7        A.    Correct.

8        Q.    Which decision did you make first?

9        A.    I resigned first.

10        Q.    So you resigned from AutoNation Honda

11   Hollywood before you made the decision to move?

12        A.    Correct.

13        Q.    Are you sure?

14        A.    Let me just explain this.

15            When I worked at AutoNation, I was

16   looking to get out of that place.

17        Q.    Okay.

18        A.    And therefore when I moved there, I was

19   still driving from AutoNation.  I went from here to

20   here and I still worked two weeks, about three weeks

21   there, and I drove this three weeks to Miami,

22   because I found a place over there that I wanted

23   to -- because I worked here.  I got hired and then I

24   was just -- I start driving down to my place.

25        Q.    Okay.  I just want to see if I -- I just

21

1  want to make sure I understand what you're trying to

2  explain.

3          Had you relocated already from your home

4  in Plantation to your home in Miami before you

5  resigned, meaning before you gave your resignation

6  to AutoNation Honda Hollywood?

7          A.    I was hired at AutoNation -- at Ocean.

8          Q.    Okay.

9          A.    So when I had the green light, that was

10  when I moved.

11          Q.    I see.  I think I understand.

12          Let me ask it this way.  Had you already

13  made the decision to leave AutoNation Honda

14  Hollywood before you made the decision to relocate

15  from Plantation to Miami?

16          A.    Let me think about --

17          When I resigned, I have two weeks and I

18  extended another week.  Let me follow through here.

19          Q.    Okay.

20          A.    When I get the green light that I was --

21  already had an opportunity to work there, I start

22  looking in Miami.  So I drove --

23          I got the apartment in Miami and I still

24  drove three weeks -- about two weeks, three weeks

25  from AutoNation to Miami, my new address, if that

22

1   makes any sense.  So I already had a place, so I

2   drove three weeks from Miami to AutoNation.

3        Q.    I understand.

4              So you gave AutoNation Honda Hollywood

5   your resignation and you continued to work there

6   for what ended up being another three weeks,

7   correct?

8        A.    Correct.

9        Q.    My question is this.  Had you decided you

10  were leaving AutoNation Honda Hollywood and you

11  decided you were going to resign before or after you

12  decided to move?  Which decision did you make first?

13       A.    I resigned first knowing that I had

14  another opportunity.

15       Q.    Right.  My question was did you resign --

16             Right now I'm asking just about your

17  move, your decision to move.

18             Did you resign from AutoNation Honda

19  Hollywood, did you decide to do that before or

20  after you decided you were moving from Plantation

21  to Miami?

22       A.    I guess what you're trying to find out is

23  if I --

24             Okay.  I would have never moved, but

25  they made me move.  So I made the move when I had

23

 1    the opportunity.  So I was working AutoNation,

 2    okay?  So I said I don't want to be driving three

 3    weeks, because my boss kept on telling me to stay.

 4    So I decided to just -- when they told me they was

 5    going to hire, then definitely I got an apartment.

 6    So I still drove three weeks, but they made me move

 7    because of the same situation I was going through.

 8         Q.    Okay.  Let me ask it this way.  Ocean

 9    Mazda offered you a job, correct?  Is that right?

10         A.    Yes.

11         Q.    Did you make the decision to relocate

12    your home from Plantation to Miami before or after

13    Ocean Mazda offered you a job?

14         A.    So I moved after --

15               I'm trying to put the two pieces

16    together, okay?

17               I remember I was driving from the

18    apartment in Miami to AutoNation.  So I got ahead

19    of myself.  Once I knew that I was hired, I rented

20    the apartment in Miami.  So by that time, I had

21    resigned already.

22         Q.    It's about 40 miles from where you live

23    now to AutoNation Honda Hollywood, correct?

24         A.    Correct.

25         Q.    That's why I'm asking.

24

1          It's only about 2 miles from where you

2     live now to Ocean Mazda, correct?

3          A.    Correct.

4          Q.    So what I'm trying to determine is

5     whether or not you made the decision to move from

6     Plantation to Miami, physically move, because you

7     were offered the job at Ocean Mazda or you made the

8     decision before you were offered the job at Ocean

9     Mazda.

10         A.    Getting me confused here.

11         Q.    Why did you move from Plantation to

12    Miami?

13         A.    Why?

14         Q.    Yes.

15         A.    Because they made me move.  I had another

16    job --

17                I was looking for a job already in other

18    places.  So when I got the green light here, this

19    is when I really decided to just completely say

20    okay, I'm going to find an apartment.  And I found

21    the apartment and I drove those three weeks.  So I

22    moved within the resignation.

23         Q.    Who made you move?

24         A.    The situation I was living in.

25         Q.    Again, sir, I'm hoping to move on from

25

1    this area, but the timeline is important for a

2    number of reasons.

3             Your lease was coming to an end in

4    Plantation, correct, as of April of 2023?

5        A.    Correct.

6        Q.    You made a decision not to renew that

7    lease, correct?

8        A.    At that time, I already had an offer at

9    Ocean.

10       Q.    All right.

11       A.    So I didn't renew.

12       Q.    Okay.  So you made the decision not to

13   stay at your residence in Plantation after you

14   already had a job offer from Ocean Mazda?

15       A.    I moved after that.

16       Q.    I'm not asking when you physically moved.

17   I'm asking when you made the decision.

18             Did you make the decision to relocate

19   from Plantation to Miami before or after Ocean

20   Mazda offered you a job?

21       A.    No, I moved before the offer of Ocean

22   Mazda.

23       Q.    Okay.  Did you make the decision that you

24   were leaving AutoNation Honda Hollywood, whether or

25   not you got a job at Ocean Mazda, before or after

26

1    you made the decision to move from Plantation to

2    Miami?

3         A.    I'm not following you to be honest with

4    you.

5              I'm trying to detract [sic] myself --

6    retrack myself.

7              I remember I drove about two weeks from

8    Miami already to AutoNation, because I was already

9    in the process to go to work for Ocean.  Knowing

10   that I had the green light --

11             I was in the process of drug tests and

12   backgrounds and everything, but I knew that I was

13   already -- that the job was offered.  So this is

14   the process when I moved.  So at that time, I was

15   going back and forth to AutoNation to Miami.

16        Q.    By the last day in March of 2023, you had

17   already decided you were physically moving out of

18   your Plantation home; is that correct?

19        A.    Again, when I already had the offer,

20   that's when I start looking.  And when I got the

21   apartment, I drove from Miami to AutoNation.  So I

22   remember leaving on Sunday and I start working on

23   Monday.  So I already had my apartment already set

24   up.

25        Q.    When did your lease begin at your address

27

1   in Miami?

2        A.    May 1st will be one year, so it would be

3   May, sometime in May.  That's when I moved to Miami.

4        Q.    I thought you indicated that for three

5   weeks in April, you were driving from Miami to your

6   job at AutoNation Honda Hollywood.

7        A.    Yeah, I already had the offer, so I was

8   finishing up my week notices.

9        Q.    Where were you living for the last three

10  weeks in April of 2023?

11       A.    In Miami.

12       Q.    At the address you live now?

13       A.    Yes.

14       Q.    So that means you moved in before May 1st

15  of 2023.

16       A.    I can look at my lease.  I know that my

17  lease started in May because my lease is coming in

18  May.  So it would have to be it started in May.  And

19  it would have to be April driving with those three

20  weeks.

21             Let me see how this went.  If I'm

22  already working in Ocean, but I drove two weeks to

23  three weeks, I was already in --

24             My lease started in May.  I have to

25  like -- I have to really, really, really look at

28

1   the dates.  I'm not sure on the dates, how it

2   transpired.

3           So I know for sure that I signed the

4   lease in May.  So at that time before I left, I had

5   already -- because I had my job offer, so I moved

6   to Miami.

7           So when I move in May, that's when I was

8   driving.  The last two weeks of April, this is when

9   I was driving to Miami.

10      Q.    You were driving from your home in Miami

11  to AutoNation Honda Hollywood?

12      A.    To finish up my week notices.

13      Q.    Before you gave AutoNation Honda

14  Hollywood your resignation, you had been offered a

15  job by Ocean Mazda, correct?

16      A.    No.  I made the --

17          Yes, and then I resigned because I

18  already had an offer working in Ocean Mazda.

19      Q.    So at the time you resigned, gave your

20  resignation notice to AutoNation Honda Hollywood,

21  you'd already gotten the job at Ocean Mazda?

22      A.    Not yet.  I was in the process, the drug

23  tests, the background.

24      Q.    At the time you gave your resignation to

25  AutoNation Honda Hollywood, you had already been

29

1    offered the job by Ocean Mazda, correct?

2         A.    I was looking already in there.

3               (The document referred to was

4               thereupon marked Defendants' Exhibit

5               No. 1 for identification.)

6    BY MR. GABRIELLE:

7         Q.    Sir, I'm going to show you a document

8    that's being marked as Exhibit 1 to your deposition.

9    It was produced by your counsel.  It is Bates

10   numbered, meaning the stamp in the lower right-hand

11   corner, Plaintiff-0004.  This is what purports to be

12   an e-mail from yourself to David Losk dated

13   April 6th of 2023 at 6:51 P.M.

14              Take a look, please, sir, at what I've

15   marked as Exhibit 1.  Let me know when you're

16   finished.

17              Have you finished reviewing Exhibit 1?

18        A.    I remember this, yes.

19        Q.    Is it in fact a true and correct copy of

20   an e-mail you sent to David Losk on April 6th of

21   2023?

22        A.    Now that you put this out in front of me,

23   after this, I decided to stay.

24        Q.    Right now the question is is it a true

25   and correct copy of an e-mail you sent to David

30

1    Losk?

2         A.    That's incorrect.  That's not incorrect.

3    That's correct.

4         Q.    Okay.  So Exhibit 1 is an actual copy of

5    an e-mail you sent on April 6th of 2023 to David

6    Losk?

7         A.    Yes.

8         Q.    And it reads, quote:

9                   "I'm turning in my two-week

10                  resignation.  I have found an opportunity

11                  somewhere else, but I would like to thank

12                  you and AutoNation for the opportunity

13                  working here.  I wish you well and hoping

14                  one day we will cross paths again."

15                  Have I read that correctly?

16        A.    Correct.

17        Q.    What opportunity somewhere else were you

18   referring to?

19        A.    That would have been Ocean Mazda.

20        Q.    So by the time you sent this e-mail to

21   David Losk on April 6th of 2023, had you already

22   been offered a job by Ocean Mazda?

23        A.    No.  I was looking for it.

24        Q.    So the phrase "I have found an

25   opportunity somewhere else," was that phrase

31

 1    truthful or untruthful?

 2         A.    No, it's truthful.

 3              MR. PRATER:  Object to the form.

 4    BY MR. GABRIELLE:

 5         Q.    What opportunity had you found?

 6         A.    I'm trying to remember this, because I

 7    remember I sent two e-mails.  One, I decided to stay

 8    because I was moving to Texas.  And then I stayed

 9    again, and now I remember this one right here was --

10    in this case right here would have been Ocean Mazda.

11    And then after this, I stayed three weeks.

12         Q.    Before giving this resignation on

13    April 6th, you obtained new employment with Ocean

14    Mazda; is that correct?

15              MR. PRATER:  Object to the form.

16              THE WITNESS:  What happened is it was

17           offered, but I had to wait those three weeks

18           for background and everything.  It was

19           offered to me, yes.

20    BY MR. GABRIELLE:

21         Q.    All right.  So before you gave your

22    resignation to David Losk on April 6th of 2023,

23    Ocean Mazda had offered you a job?

24              MR. PRATER:  Object to the form.

25              THE WITNESS:  I applied for, yes.

1  BY MR. GABRIELLE:

2      Q.    Had Ocean Mazda offered you the job prior

3  to you sending this resignation e-mail to David Losk

4  on April 6th?

5      A.    Yes.

6      Q.    Which happened first, your decision to

7  relocate from Plantation to Miami or Ocean Mazda

8  offering you the job?

9      A.    The offer of the job first.

10      Q.    You gave two weeks' notice on April 6,

11  2023 of your resignation, correct?

12      A.    Yes.

13      Q.    So that would be approximately through

14  April 20th of 2023, correct?

15      A.    Yes.

16      Q.    You ended up staying a bit longer,

17  correct?

18      A.    Yes.

19      Q.    Why was that?

20      A.    Because David asked for it.

21      Q.    David asked you to stay longer?

22      A.    Yes.

23      Q.    David Losk?

24      A.    Yes.

25      Q.    Was David Losk your supervisor?

33

1    A.    Correct, yes.

2    Q.    Was he your supervisor the entire time

3  you worked for AutoNation Honda Hollywood?

4    A.    Yes.

5    Q.    Was he your immediate supervisor?

6    A.    Yes.

7    Q.    To your understanding during that time,

8  who was David Losk's immediate supervisor?

9    A.    Repeat the question again.

10   Q.    Sure.

11         The entire time you worked for

12  AutoNation Honda Hollywood, David Losk was your

13  immediate supervisor, correct?

14   A.    Yes.

15   Q.    Who did you understand that David Losk

16  had to report to?

17   A.    Carl Vanderwarker.

18   Q.    Carl Vanderwarker?

19   A.    Yes.

20   Q.    And what was your understanding of

21  Mr. Vanderwarker's job title?

22   A.    GSM.

23   Q.    General --

24   A.    General sales manager.

25   Q.    Sorry.  I didn't mean to interrupt you.

34

1          GSM means general sales manager?

2     A.    Correct.

3     Q.    What was Mr. Losk's job title as you

4  understand it?

5     A.    They call it BDC manager.

6     Q.    BDC?

7     A.    Yes.

8     Q.    Do you understand what that stands for?

9     A.    They call it at Ocean Mazda BDC, but they

10 call it internet department manager.

11     Q.    So your understanding of Mr. Losk's title

12 at AutoNation Honda Hollywood was internet manager?

13     A.    It was a new internet manager.

14     Q.    So you reported to David Losk, and to

15 your understanding, David Losk reported to Carl

16 Vanderwarker, correct?

17     A.    Correct.

18     Q.    And what was your understanding as to who

19 Carl reported to?

20     A.    By the looks like it, it was not even

21 to -- it was Joe Rey, the general manager.

22     Q.    So the general manager while you were at

23 the dealership was Joe Rey?

24     A.    Correct.

25     Q.    But based on your visible reaction to the

35

1    question, you don't seem to believe that Carl

2    actually reported to Joe Rey or you're expressing,

3    at least visually, some skepticism to that.  Let me

4    ask you about that.

5              Do you not believe that Carl

6    Vanderwarker actually reported to Joe Rey?

7              MR. PRATER:  Object to the form.

8              THE WITNESS:  He did.

9              Okay.  The relationship between Joe Rey

10            and Joey Rodriguez, it looks like he was more

11            like the boss to Carl Vanderwarker and David

12            Losk.

13   BY MR. GABRIELLE:

14        Q.   Right now though I'm asking you about

15   Carl Vanderwarker and Joe Rey.

16              Your understanding was that Carl

17   Vanderwarker, as the general sales manager,

18   reported to Joe Rey as the general manager,

19   correct?

20        A.   Correct.

21        Q.   Sir, I'd like to go through some of your

22   employment history before you came to work for

23   AutoNation Honda Hollywood.

24              That was in late March of 2022; is that

25   correct?

36

1      A.    Correct.

2      Q.    Did you have a job somewhere else at the

3   time you were hired by AutoNation Honda Hollywood?

4      A.    No.

5      Q.    How long prior to March of 2022 had it

6   been that you had worked at another job?

7            Let me ask it better.

8            What was the last job you had prior to

9   going to work at AutoNation Honda Hollywood?

10     A.    I was selling boats in Miami.

11           Oh, what's the name of that place?

12     Q.    Sundance Marine?

13     A.    Correct.

14     Q.    When did you last work for Sundance

15   Marine, and you can use as a frame of reference the

16   fact that you were hired by AutoNation Honda

17   Hollywood in late March of 2022.

18     A.    I don't recall.

19     Q.    Did you work for Sundance Marine at all

20   in calendar year 2021?

21     A.    It was in 2020 that I worked there.

22     Q.    So did you work for Sundance Marine at

23   all in the calendar year of 2021?

24     A.    I was in Honduras.

25     Q.    So the answer to the question is no, you

37

1    did not, correct?

2         A.    I didn't, yes.

3         Q.    Did you work anywhere in Honduras?

4         A.    No.

5         Q.    So did you work at all at any location in

6    calendar year 2021?

7         A.    No.

8         Q.    How long -- approximately, if you don't

9    know exactly -- did you work for Sundance Marine?

10        A.    Could be around six, eight months.

11        Q.    Prior to Sundance Marine, where did you

12   work?

13        A.    Gulf Coast Marine.  I was in Texas.

14        Q.    That's Hitchcock, Texas, correct?

15        A.    Correct.

16        Q.    Also boat sales?

17        A.    Correct.

18        Q.    Gulf Coast Marine became Finish Line

19   Marine, correct?

20        A.    No.

21        Q.    Okay.  Do you recognize the business name

22   Finish Line Marine?

23        A.    That's right next to it.

24        Q.    Did you ever work for Finish Line Marine?

25        A.    The place that I --

38

1          Gulf Coast Marine was in the property of

2    Finish Line Marine.

3          Q.    Did you ever work for an employer named

4    Finish Line Marine?

5          A.    I don't know if you call that because he

6    reported to --

7                In other words, Mike was the owner of

8    Finish Line Marine, rented to the owner of Gulf

9    Coast Marine.  So we worked together back and

10   forth.  I had to report to Mike about sales.  So

11   you could say yes, but my boss was the owner of

12   Gulf Coast Marine.

13         Q.    Prior to Gulf Coast Marine, where did you

14   work?

15         A.    Ron Hoover Marine.

16         Q.    Also boat sales?

17         A.    Right, and RVs, yes.

18         Q.    And RVs, recreational vehicles?

19         A.    Right.

20         Q.    And that was in Galveston, Texas,

21   correct?

22         A.    Correct.

23         Q.    Prior to Ron Hoover, where did you work?

24         A.    I worked for myself.

25         Q.    Doing what?

39

1       A.      I was doing remodeling homes.

2       Q.      Did you have your own business?

3       A.      Correct.

4       Q.      What was your business called?

5       A.      New Horizon Homes.

6       Q.      Is that also in Texas?

7       A.      Yes.

8       Q.      And again, sir, I know I'm asking you

9   about some time quite some time ago, but you

10  mentioned you lived in Illinois.

11          Approximately when was that?

12      A.      Ten years, '82 to '92.

13      Q.      1982 to 1992?

14      A.      Correct.

15      Q.      What area in Illinois?

16      A.      Aurora, Illinois.

17      Q.      Were you involved in selling RVs as well

18  as selling boats at Ron Hoover?

19      A.      Correct.

20      Q.      Excluding RVs, recreational vehicles,

21  prior to going to work for AutoNation Honda

22  Hollywood, did you ever work in any other kind of

23  vehicle sales like cars and trucks?

24      A.      1992.

25      Q.      1992?  Where was that?

1       A.      Houston, Texas.

2       Q.      What was the name of that employer?

3       A.      Charlie Thomas Chevrolet.

4       Q.      Charlie Thomas Chevrolet.

5               And that was car and truck sales?

6       A.      Correct.

7       Q.      When you began working at AutoNation

8    Honda Hollywood, what expectations did you have for

9    your annual compensation, meaning what did you

10   expect you would be earning per year there?

11      A.      Over $100,000.

12      Q.      What was your source of expectations,

13   meaning what led you to that conclusion?

14      A.      Because I am -- since I got into sales,

15   that's what I was averaging when I got into mobile

16   home business, RVs.  So you don't expect to go to

17   work somewhere else for less money.

18      Q.      But you hadn't worked at all for at least

19   a year prior to going to work for AutoNation Honda

20   Hollywood, correct?

21      A.      Correct.

22      Q.      So where did you get your expectation for

23   what you'd be earning?

24      A.      For what you used to make.

25      Q.      So what you're used to making?

41

1      A.    Correct.

2      Q.    What you're accustomed to making?

3      A.    Correct.

4      Q.    All right.  Did your compensation, the

5  actual compensation you received at AutoNation Honda

6  Hollywood, meet those expectations?

7      A.    Didn't.

8      Q.    Did not?

9      A.    Did not.

10     Q.    On an annualized basis -- and I realize

11  you worked from approximately early April of 2022

12  through the end of April of 2023, about 13 months,

13  correct?

14           You started in late March of 2022 at

15  AutoNation Honda Hollywood, correct?

16     A.    '22 to '23.

17     Q.    Yes.  You started in late March, so I'm

18  not counting the month of March.

19           In terms of full months, you worked 13

20  full months at AutoNation Honda Hollywood, correct?

21     A.    Correct.

22     Q.    Did your overall compensation during that

23  time frame meet your expectations?

24     A.    It didn't.

25     Q.    It did not?

42

1      A.     It did not.

2      Q.     So it was less than your expectations?

3      A.     Correct.

4      Q.     What expectations do you have for your

5  annual compensation at Ocean Mazda?

6      A.     The same.

7      Q.     Over 100,000?

8      A.     Over 100,000.

9      Q.     And that's based on your experience?

10      A.     Correct.

11      Q.     Has anyone from Ocean Mazda given you any

12  verbal or written assurances of compensation at that

13  level?

14      A.     In this business, to get you there, they

15  tell you that.

16      Q.     Okay.

17      A.     I got a lot of experience and I know what

18  I'm capable of doing.

19      Q.     Do you expect to receive more on an

20  annual basis at Ocean Mazda than you did at

21  AutoNation Honda Hollywood?

22      A.     I don't think so.

23      Q.     Do you expect to receive less?

24      A.     Correct.

25      Q.     Before getting into the reasons for your

43

1    resignation, and I assure you we will do that today,

2    you resigned from AutoNation Honda Hollywood to

3    accept a position at Ocean Mazda with the

4    expectation that your annual compensation would be

5    lower; is that correct?

6         A.    Not lower, but more.

7         Q.    Well, I guess I'm confused then by your

8    prior answer.

9              When you resigned from AutoNation Honda

10   Hollywood, did you expect that your compensation at

11   Ocean Mazda would be higher than that you received

12   at AutoNation Honda Hollywood?

13        A.    Yes, you expect.

14        Q.    So at least what you believed at the time

15   that you gave your resignation to AutoNation Honda

16   Hollywood was that you'd be making more money at

17   Ocean Mazda?

18        A.    Yes.  I believe that every place I've

19   been, to make more money.

20        Q.    But specifically you believed that to be

21   true as of April of 2023, correct?

22        A.    Yes.

23        Q.    Did it turn out that way?

24        A.    Not yet.

25              David Losk -- David Losk told me I would

44

1   make over 100 grand.

2            I asked, "Do you think I can make more

3   than 100?"

4            "Oh, yes."

5       Q.    Well, if you look at your annualized

6   compensation at AutoNation Honda Hollywood, if you

7   look at a 12-month period, it was over 100 grand,

8   wasn't it?

9       A.    It could have been, but under the

10  environment -- the hostile environment, I don't

11  think so.

12      Q.    You have substantial personal debt, sir;

13  isn't that correct?

14      A.    I don't now.

15      Q.    You don't have any personal debt?

16            MR. PRATER:  Object to the form.

17  BY MR. GABRIELLE:

18      Q.    Did you ever discuss with David Losk the

19  idea of you moving from Florida to Texas, back to

20  Texas more accurately?

21      A.    Yes.

22      Q.    Did you discuss with David Losk as part

23  of that conversation the fact that housing costs in

24  Texas were significantly less than they are in South

25  Florida?

                                                45

1       A.     Correct.

2       Q.     So I think anecdotally, we all know that

3   to be true, but did you actually have that

4   discussion with David Losk?

5       A.     Yes.

6       Q.     How many times?

7       A.     I don't recall how many times, but a few

8   times.

9       Q.     Is your monthly rent where you live now

10  in Miami less than your monthly rent when you lived

11  in Plantation?

12      A.     The same.

13      Q.     The same.  Okay.

14             (The document referred to was

15             thereupon marked Defendants' Exhibit

16             No. 2 for identification.)

17  BY MR. GABRIELLE:

18      Q.     Sir, I'm showing you a document.  Really

19  it's a group of documents together that I've labeled

20  as Defendants' Exhibit 2.

21             I will represent to you, and your

22  counsel already knows this because he's already

23  seen them, that these are documents that we have

24  received from Ocean Auto Center II, Incorporated,

25  which you know as Ocean Mazda, in response to a

1    subpoena that we served on that entity.  They are

2    Bates numbered Ocean Auto Center II,

3    Incorporated-0001 through 0005.  They consist of an

4    e-mail from Adriana Larrea, L-A-R-R-E-A, to an

5    e-mail address I believe is yours dated April 7th

6    of 2023 at 1:02 P.M.

7             They consist of what appears to be an

8    offer letter dated April 3rd of 2023 to you in what

9    purports to be signed by you on that same date.

10   Next, an e-mail exchange between you and Adriana

11   Larrea on April 28th of 2023, a second copy of that

12   same e-mail which was produced to us in that way by

13   Ocean Auto Center II, and then finally an e-mail

14   that you may never have seen from someone named

15   Sindi, S-I-N-D-I, Parets, P-A-R-E-T-S, dash,

16   Sanchez to Anthony Diaz with you as the subject.

17             I'm not going to ask you any questions

18   necessarily about that e-mail, but I'd like you to

19   take a look at the entire group of documents that

20   I've marked as Exhibit 2 and let me know when

21   you're finished.

22             MR. PRATER:  After this set of

23        questions, do you mind if we take a short

24        break?

25             MR. GABRIELLE:  Oh, sure.  Just remind

47

1          me if I --

2               MR. PRATER:  No worries.

3    BY MR. GABRIELLE:

4          Q.    Sir, have you finished reviewing what

5    I've marked as Exhibit 2?

6          A.    Yes.

7          Q.    If you could turn, please, to the second

8    page, that being the page that in the lower

9    right-hand corner is identified as 0002.

10              That appears to be a copy of a letter to

11   you dated April 3, 2023 from Adriana Larrea, signed

12   also by you on the same day.

13              Do you recognize your signature?

14         A.    Yes.

15         Q.    Is that your handwriting for where the

16   date is located of April 3rd?

17         A.    Yes.

18         Q.    Do you recall whether or not you signed

19   this document on April 3rd of 2023?

20              And here's why I'm asking, sir.  The

21   e-mail before that, the first page of Exhibit 2

22   numbered 0001, appears to be transmitting to you an

23   offer letter.  And these are the -- this is the way

24   these documents were produced to us.

25              The offer letter -- the next page of the

48

1    document appears to be that offer letter, but the

2    e-mail from Ocean Automotive Group is dated

3    April 7th of 2023, and your signature on the offer

4    letter is dated April 3rd of 2023.  So I'm trying

5    to figure out why that might be and I'm hoping you

6    might know.

7         A.    I don't know.  5/17, 4/3.  I don't recall

8    why do they do that.

9         Q.    But you had been verbally offered this

10   job before April 7th, correct?

11        A.    Yes.  This is when the notice came in.

12        Q.    They had verbally made the job offer to

13   you before you got the e-mail on April 7th, correct?

14        A.    I don't remember.  I don't recall.

15        Q.    Did you know anyone at Ocean Mazda?  Were

16   you acquainted with anyone personally before you

17   began inquiring about a job there?

18        A.    Yes.

19        Q.    Who?

20        A.    Henry.

21        Q.    What is Henry's last name?

22        A.    Henry Placeres.

23        Q.    Okay.  And what job does Henry Placeres

24   have at Ocean Mazda?

25        A.    A finance manager.

49

1        Q.      How did you know Henry?

2        A.      At AutoNation.

3        Q.      So Henry Placeres used to work for

4   AutoNation?

5        A.      Correct.

6        Q.      At AutoNation Honda Hollywood?

7        A.      Correct.

8        Q.      Was he the finance manager there?

9        A.      He was finance.

10       Q.      Do you recall when Henry left that

11   dealership?

12       A.      Don't recall.

13       Q.      Do you recall how long prior to your

14   departure in April 2023?

15       A.      I don't remember.

16       Q.      Did you reach out initially to Henry

17   about the job or did Henry reach out to you?

18       A.      It was not -- no, I don't recall him.  It

19   was more like Manuel, another employee, that worked

20   there before.

21       Q.      Okay.  Let me ask it more broadly and

22   then we'll take a short break.

23               Who contacted who first?  Did someone

24   from AutoNation Mazda [sic] contact you about the

25   job or did you contact Ocean Mazda about the job?

50

1      A.    Repeat the question again.

2      Q.    Sure.

3            You have a job at Ocean Mazda, correct,

4  now?

5      A.    Yes.

6      Q.    What was the first step in that process?

7  Did you contact Ocean Mazda about a job or did

8  someone from Ocean Mazda contact you?

9      A.    I contacted Manuel.

10     Q.    At Ocean Mazda?

11     A.    Correct.

12     Q.    Is there any answer you've given up to

13  this point in your deposition you'd like to correct,

14  clarify, or change?

15          MR. PRATER:  Object to the form.

16          THE WITNESS:  I know that talking to

17       Manuel, then he told me, "Why don't you talk

18       to Henry."  So I started talking to Henry.

19  BY MR. GABRIELLE:

20     Q.    All right.  But your first contact with

21  Ocean Mazda was Manuel?

22     A.    Manuel.

23     Q.    Is there any answer up to this point in

24  your deposition before we break that you'd like to

25  correct, clarify, or change?

```
 1        A.    No.
 2              MR. PRATER:  Object to the form.
 3              MR. GABRIELLE:  We're off the record for
 4         a break.  Thank you.
 5              (Recess from 11:11 A.M. to 11:20 A.M.)
 6   BY MR. GABRIELLE:
 7        Q.    Sir, could you look again at Exhibit 2?
 8              So the first person you recall reaching
 9   out to you on behalf of Ocean Mazda was Manuel; is
10   that right?
11        A.    Yes.
12        Q.    What is his last name?
13        A.    I don't recall.
14        Q.    What is his position?
15        A.    Salesperson.
16        Q.    Salesperson?
17        A.    Yes.
18        Q.    Did you know Manuel already?
19        A.    At AutoNation.
20        Q.    Okay.  Did Manuel, the salesperson at
21   Ocean Mazda, also previously work at AutoNation
22   Honda Hollywood?
23        A.    Correct.
24        Q.    When do you recall, in terms of time
25   frame, Manuel from Ocean Mazda reaching out to you?
```

52

1                MR. PRATER:  Object to the form.

2    BY MR. GABRIELLE:

3        Q.    About the position at Ocean Mazda.

4                MR. PRATER:  Object to the form still.

5                MR. GABRIELLE:  Basis?

6                MR. PRATER:  Misstates prior testimony.

7    BY MR. GABRIELLE:

8        Q.    Did you contact Manuel or did Manuel

9    contact you?

10       A.    Manuel contacted me.

11       Q.    Okay.  And that's Manuel, the salesperson

12   at Ocean Mazda?

13       A.    Correct.

14       Q.    When did that happen?

15       A.    It would have to be around March.

16       Q.    Of 2023?

17       A.    Correct.

18       Q.    What did you and Manuel discuss?

19       A.    He had the same complaint, so he said,

20   "Why do you stay there?  Why are you staying there?

21   Why don't you just come here?"

22                That's the discussions that were

23   happening.

24       Q.    Did Manuel tell you there was an

25   available sales position at Ocean Mazda?

53

1      A.    It's a brand new sales center.

2      Q.    Manuel told you there was a brand new

3 sales center?

4      A.    Correct.

5      Q.    Is that the West Kendall location?

6      A.    Correct.

7      Q.    So to your understanding, Ocean Mazda was

8 opening up a new dealership?

9      A.    Correct.

10      Q.    And your understanding is that Manuel

11 contacted you about that?  That's what happened,

12 right?

13      A.    Correct.

14      Q.    Who was the first person who you

15 communicated with who was acting on behalf of Ocean

16 Mazda at a management level?

17      A.    No one.

18           MR. PRATER:  Object to the form.

19 BY MR. GABRIELLE:

20      Q.    Did anyone that is a manager level

21 employee of Ocean Mazda ever talk to you about the

22 position there before you went to work there?

23      A.    We're still at the subject with Manuel?

24      Q.    Manuel's a salesperson, right?

25      A.    Correct.

54

1      Q.    He's not to your understanding a member

2  of management at Ocean Mazda, correct?

3      A.    Correct.

4      Q.    Who is the first person that you

5  understood to be a member of management at Ocean

6  Mazda who you communicated with?

7      A.    It would be Ossi, Ossi Ferrufino.

8      Q.    Is that Osmand?

9      A.    Yes, same name.

10     Q.    So how do you spell the name you're

11  using?

12     A.    Ossi is O-S-S-I.

13     Q.    And that is the person whose legal name

14  is Osmand Ferrufino, correct?

15     A.    Correct.

16          MR. PRATER:  Remember, take a beat in

17      between after he asks the question.

18  BY MR. GABRIELLE:

19     Q.    What is your understanding of what

20  Mr. Ferrufino's position is with Ocean Mazda?

21     A.    GSM.

22     Q.    General sales manager.

23          Did you known Mr. Ferrufino before he

24  contacted you?

25     A.    Never.  Never.

55

1    Q.    When is the first time Mr. Ferrufino and

2  you communicated about a position for you at Ocean

3  Mazda?

4    A.    After this letter.

5    Q.    So the first time you spoke to

6  Mr. Ferrufino, the general sales manager, is after

7  you signed the offer letter?

8    A.    I don't recall.  It was --

9          Okay.  It had to be before that, I'm

10  sorry, before this letter, over the phone.

11    Q.    It would make sense, sir, that someone in

12  management at Ocean Mazda spoke with you about a job

13  before you accepted the job.

14    A.    Correct.

15    Q.    Do you recall who that was?

16    A.    Ossi.

17    Q.    Okay.  And that was a telephone call?

18    A.    Yes.

19    Q.    What did you and Ossi Ferrufino discuss?

20    A.    About the job.

21    Q.    The job at Ocean Mazda?

22    A.    Correct.

23    Q.    Did you talk with Mr. Ferrufino then or

24  at any other time about your work environment at

25  AutoNation Honda Hollywood?

56

1       A.    No.

2       Q.    Did you talk with Manuel, whose last name

3   you don't recall, at Ocean Mazda at any time about

4   the work environment at AutoNation Honda Hollywood?

5       A.    After he left.

6       Q.    Yes.  Did you?

7       A.    I didn't, but he did.  That's why he

8   left.

9       Q.    So Manuel spoke to you and communicated

10  to you his impressions of the work environment at

11  AutoNation Honda Hollywood at some point after he

12  left?

13      A.    Correct.

14      Q.    You did not communicate to Manuel your

15  impressions of the work environment?

16      A.    I am very private about my things.

17      Q.    Did you communicate with anyone at Ocean

18  Mazda, whether in management or non-management,

19  about the work environment at AutoNation Honda

20  Hollywood?

21      A.    No.

22      Q.    Did anyone acting on behalf of Ocean

23  Mazda ever ask you why you wanted to leave

24  AutoNation Honda Hollywood?

25      A.    It was not asked.

57

1      Q.    Did you ever tell anyone from Ocean Mazda

2   why you wanted to leave AutoNation Honda Hollywood?

3      A.    No, I didn't.

4      Q.    So just to be clear, before you were

5   actually hired by Ocean Mazda and began working

6   there, nobody from Ocean Mazda asked why you wanted

7   to leave what was then your current job; is that

8   correct?

9      A.    Correct.

10     Q.    And you never communicated to anyone at

11  Ocean Mazda why you wanted to leave?

12     A.    Correct.

13     Q.    Were you asked to fill out an employment

14  application by Ocean Mazda?

15     A.    Yes.

16     Q.    Did the employment application why you

17  wanted to leave or your reason for leaving

18  AutoNation Honda Hollywood?

19     A.    They asked.

20     Q.    In the application?

21     A.    Yes.

22     Q.    Did you write anything?

23     A.    Better opportunity.

24     Q.    Better opportunity.

25           So in your job application to Ocean

58

1   Mazda, you indicated that the reason you were

2   leaving AutoNation Honda Hollywood was a better

3   opportunity?

4        A.    If I recall, yes.

5        Q.    Is there anyone else who works at Ocean

6   Mazda that at least to your understanding was

7   formerly employed at AutoNation Honda Hollywood

8   other than Henry and Manuel?

9        A.    Any longer.  They don't work for Ocean

10  Mazda anymore.

11       Q.    Okay.  I'm just going to explain to you

12  what I'm asking about this question.  Since you've

13  began working --

14            I'm not going to ask you the question

15  yet, but here's what I'm trying to get to.  During

16  the time that you've worked for Ocean Mazda, did

17  you work with anyone who previously worked at

18  AutoNation Honda Hollywood?  Did your employment at

19  Ocean Mazda overlap with anyone else who was

20  employed by AutoNation Honda Hollywood?

21            So I'll ask the question.  I'm trying to

22  determine whether or not, sir, there were any

23  people that you work with at Ocean Mazda other than

24  Henry Placeres and Manuel who also worked at

25  AutoNation Honda Hollywood.  So I'll ask you that,

59

1    and here's the question.  At any point since you

2    first became employed at Ocean Mazda, have you

3    worked with anyone who was, to your understanding,

4    previously employed at AutoNation Honda Hollywood

5    other than Henry Placeres and Manuel, the

6    salesperson?

7         A.    No.

8         Q.    Did either Henry Placeres or Manuel, the

9    salesperson, ever talk with you about Joey

10   Rodriguez?

11        A.    Manuel did.

12        Q.    What did you and Manuel talk about with

13   respect to Joey Rodriguez?

14        A.    Manuel talked to me about it.

15        Q.    And what did he say?

16        A.    His behavior.

17        Q.    Specifically, what did Manuel say to you

18   about Joey Rodriguez?

19        A.    "He's crazy.  He shouldn't be doing that.

20   Why don't you do something about it," and I always

21   kept to myself.

22        Q.    Based on what you've described, sir,

23   about what Manuel said to you, one could get the

24   impression that you spoke with Manuel about Joey

25   Rodriguez and your own experiences with him.

60

1    A.    He spoke to me about it.  I didn't talk

2    to him about it.

3    Q.    What did you say to Manuel prior to him

4    saying what you've just described to you about Joey

5    Rodriguez?

6         MR. PRATER:  Object to the form.

7         THE WITNESS:  I didn't say nothing.

8    BY MR. GABRIELLE:

9    Q.    So you've never spoken to Manuel, the

10   salesperson at Ocean Mazda, about any of the

11   negative experiences you had with Joey Rodriguez?

12   A.    No.

13   Q.    That's correct?

14   A.    Correct.

15   Q.    So what did you understand Manuel to be

16   referring to when he said to you about Joey

17   Rodriguez, "He shouldn't be doing that"?

18   A.    I don't know, sir.

19   Q.    Sir, if you could turn to the second page

20   of Exhibit 2.  That, again, is the offer letter

21   dated April 3rd and signed by you April 3rd, and I'm

22   not sure if I asked this question clearly or not.

23         Is that your signature at the bottom of

24   the page?

25   A.    Yes.

61

1      Q.    And is that your handwriting with the

2  date of April 3rd of 2023?

3      A.    Yes.

4      Q.    The position itself in this letter

5  indicates that it was starting April 10th of 2023,

6  correct?

7      A.    Mm-hmm.

8      Q.    Yes?

9      A.    Yes.

10      Q.    On April 6th of 2023, you e-mailed your

11  resignation to David Losk with two weeks' notice,

12  but this offer letter has you starting a week after

13  the offer letter date.  It has you starting on

14  April 10th.

15           What happened with that?  Did you

16  indicate to Ocean Mazda that you would not be

17  starting on April 10th?

18      A.    Correct.

19      Q.    Why did you give AutoNation Honda

20  Hollywood two weeks' notice if you already had the

21  job lined up for a week later?

22      A.    Because David asked me to help out.

23      Q.    Who asked you to help out?

24      A.    David Losk.

25      Q.    Did you tell David Losk verbally prior to

62

1    e-mailing him your resignation on the evening of

2    April 6, 2023 that you were resigning?

3         A.    Yes.

4         Q.    You did?

5         A.    Yes.

6         Q.    You told him verbally?

7         A.    Yes.

8         Q.    When did you tell him verbally?

9         A.    Before the letter.

10        Q.    What letter?

11        A.    My e-mail to him.

12        Q.    So you told David Losk verbally that you

13   were resigning prior to sending him the e-mail on

14   April 6th?

15        A.    Correct.

16        Q.    How much before?

17        A.    Don't remember.

18        Q.    Same day?

19        A.    Don't recall.

20        Q.    Did David Losk ask you to stay for two

21   weeks?

22        A.    Yes.  Longer.

23        Q.    So your testimony is that the reason you

24   stayed through the end of April was that David Losk

25   asked you to?

63

1      A.    Yes.

2      Q.    Did he give you a reason why?

3      A.    He needed help.

4      Q.    Why didn't you say no?

5      A.    David's a good character, and when he

6  said he needed help, I'm always to help.  He thought

7  I was kidding.  He always told me, "You're kidding.

8  You're not going nowhere.  You're not going

9  nowhere."

10          He always considered me a good employee.

11          Asking me that, I said, "I'll help you

12  out."

13      Q.    So you delayed your start date with Ocean

14  Mazda by what ended up being about 20 days, correct,

15  or longer?

16      A.    On April -- April or May.  I don't

17  remember the exact day.

18      Q.    To be clear, page 2 of Exhibit 2 is an

19  offer letter signed by you from Ocean Mazda offering

20  you the position of salesperson starting April 10th.

21          You continued, however, to work for

22  AutoNation Honda Hollywood through the end of

23  April, correct?

24      A.    Yeah, I delayed that.

25      Q.    You had a job with Ocean Mazda beginning

64

1    April 10th of 2023, correct?

2         A.    Correct.

3         Q.    You continued to work for another 20 days

4    of April 2023 at AutoNation Honda Hollywood,

5    correct?

6         A.    Correct.

7         Q.    You did not work at Ocean Mazda during

8    those 20 days, correct?

9         A.    No.

10         Q.    And the reason you stayed for those extra

11   20 days was that David Losk asked you to?

12         A.    Correct.

13         Q.    How did you communicate to Ocean Mazda

14   that you would not be starting on April 10th of

15   2023?

16         A.    On the phone.

17         Q.    Who did you tell?

18         A.    Ossi.

19         Q.    Mr. Ferrufino?

20         A.    Mr. Ferrufino.

21         Q.    What, if any, response did he have to

22   that?

23         A.    He just said, "Why?"

24               I just said, "I need extra time."

25         Q.    So Mr. Ferrufino asked you why you would

65

1    not be starting on April 10th, and you told him you

2    need extra time?

3         A.    Correct.

4         Q.    Did you and he have any further

5    communications about that?

6         A.    No.

7         Q.    Were there unpaid commissions that were

8    owed to you as of April 7th of 2023 that you were

9    concerned you would not receive if you left on

10   April 10th?

11        A.    I wasn't concerned.

12        Q.    I'm sorry?

13        A.    I was not concerned.

14        Q.    You were not concerned about receiving

15   them?

16             MR. SINGER:  Object to the form.

17             MR. GABRIELLE:  I'll rephrase that

18        question.  That objection is a fair one.

19   BY MR. GABRIELLE:

20        Q.    You did not stay for the extra 20 days

21   for purposes of making sure you got all your

22   commissions; is that correct?  That wasn't a reason

23   why you stayed?

24        A.    No, no.

25        Q.    Okay.  Have you ever been fired from a

66

1   job?

2        A.     No.

3        Q.     Have you ever been asked to resign from a

4   job?

5        A.     No.

6        Q.     Ocean Mazda indicated to you that before

7   you started there, a background check and a drug

8   test were required, correct?

9        A.     Correct.

10        Q.     Did you take the drug test before or

11   after you received the offer letter from Ocean

12   Mazda, and what I mean by that is did they offer you

13   the job contingent on the drug test or did you take

14   the drug test before they gave you the offer?

15        A.     I don't recall.

16        Q.     Do you recall when you took the drug

17   test?

18        A.     I don't.  I don't recall.

19        Q.     Do you recall whether it was in the month

20   of March or April?

21        A.     I don't remember the dates.

22        Q.     Did you ever get results from the drug

23   testing agency of the drug test?

24        A.     I didn't.  They did.  I don't remember

25   the dates.

1          Q.    So you don't recall whether or not you

2    had been offered the job by Ocean Mazda at the time

3    you took the drug test, correct?

4          A.    I don't recall.  That's first before they

5    offer you a job I guess.

6          Q.    You don't remember whether or not you

7    were offered the job verbally before or after you

8    took the drug test?

9          A.    That's correct.

10         Q.    And you don't recall what month it was in

11   2023 that you took the drug test?

12         A.    Could have been -- could have been April,

13   the beginning of April, you know?

14         Q.    By the end of March of 2023, you knew you

15   were leaving AutoNation Honda Hollywood, correct?

16         A.    By the end of March, correct.

17         Q.    I'm going to ask just because it's on my

18   list.

19               Do you recall where you took the drug

20   test?

21         A.    I can tell you it was Miami.

22         Q.    Okay.  You don't remember the name of

23   the --

24         A.    No, don't remember.

25         Q.    -- agency or office?

68

1    A.    No, don't remember.

2    Q.    I know you indicated you filled out a job

3  application for Ocean Mazda.

4          Did you ever provide a resume to Ocean

5  Mazda?

6    A.    No.

7    Q.    Sir, I'm showing you a document.  I'm not

8  going to mark it as an exhibit because it's already

9  in the record of the case.  It's the complaint, the

10 lawsuit that was filed on your behalf initiating the

11 proceeding for which we are here today.  It is

12 docket entry 1 dated September 13th of 2023.

13         I have only a couple of questions now,

14 but you're welcome to take all the time you need to

15 look through the complaint before I ask them.  And

16 to make it easier for you, the paragraph I'm going

17 to ask you about is paragraph 28.

18         Sir, paragraph 28 of the complaint in

19 the second sentence reads, and I quote:

20              "In early April 2023, he," and that

21              refers to you, sir, "called AutoNation's

22              human resources department and left a

23              voicemail asking that someone return his

24              call.  Nobody responded," period, close

25              quote.

69

1           Have I read the second and third

2   sentences of paragraph 28 correctly?

3       A.    Correct.

4       Q.    Can you tell us what day in early April

5   of 2023 you called AutoNation's human resources

6   department?

7       A.    This happening -- I was already on my way

8   out when I called.

9       Q.    So we looked at your resignation e-mail

10  to David Losk on April 6th of 2023 at 6:51 P.M., and

11  you've testified that sometime before that, whether

12  it was that day or a different day, you verbally

13  resigned to David Losk.

14          So my question is using April 6, 2023 as

15  a reference point, Thursday, April 6th of 2023, did

16  you call AutoNation's human resources department

17  before or after or on April 6th?

18      A.    After.

19      Q.    After.

20          So you had already given your

21  resignation to David Losk verbally and in writing

22  before you called AutoNation's human resources

23  department?

24      A.    Correct.

25      Q.    And separately, you've provided us the

1    phone number that you contacted -- that you used to

2    contact human resources department.  I have several

3    questions for you about the call.

4            When you called, did a live person

5    answer?

6        A.    No.

7        Q.    Was there a voicemail recording?

8        A.    A voicemail.

9        Q.    Was it a male or a female voice?

10       A.    Female.

11       Q.    Did the voice message identify the

12   individual whose phone number it was?

13       A.    Repeat the question again.

14       Q.    I'll ask it better.

15           If you call my direct line, sir -- and

16   you're not going to, but as an example, when you

17   call my direct line and you get my voicemail, it

18   identifies me, "I'm Eric Gabrielle.  This is Eric

19   Gabrielle.  You've reached Eric Gabrielle," that

20   sort of thing.

21           When you called that human resource

22   number in early April of 2023 after tendering your

23   resignation, even if you don't recall the name of

24   the individual, did an individual identify herself?

25       A.    I recall it, yes.

71

1      Q.    Do you recall the name?

2      A.    Don't remember the name.

3      Q.    Is it possible you would have written it

4   down anywhere?

5      A.    I don't recall the name.

6      Q.    Did you leave a message?

7      A.    I don't recall if I did or not, but I

8   think I did.

9      Q.    Are you certain?

10     A.    Not certain.

11           MR. PRATER:  Object to the form.

12   BY MR. GABRIELLE:

13     Q.    I'm sorry, sir?

14     A.    Not certain.

15     Q.    You're not certain whether you left a

16   voicemail or not?

17     A.    Right.

18     Q.    Did you make any follow-up phone calls to

19   that number or any other number in AutoNation's

20   human resources department?

21     A.    I did not.

22     Q.    Paragraph 29 of your complaint indicates

23   that you drove to AutoNation's headquarters in

24   downtown Fort Lauderdale; is that correct?

25     A.    Correct.

72

1       Q.    When did you do that?

2       A.    Don't recall the time.

3       Q.    What date?

4       A.    Don't recall the date.

5       Q.    It was after you made the phone call

6   though, correct?

7       A.    Correct.

8       Q.    And so the phone call and you driving to

9   AutoNation's headquarters in downtown

10  Fort Lauderdale, both of those occurred after you

11  gave your resignation to David Losk?

12      A.    Correct.

13      Q.    When you visited AutoNation's

14  headquarters in downtown Fort Lauderdale, you were

15  wearing an AutoNation shirt; is that correct?

16      A.    Correct.

17      Q.    Is that because you were working that

18  day?

19      A.    I don't recall if I was or not.  I think

20  it was a type of lunch perhaps that they did.  I

21  drove there, but don't recall if I was working.

22      Q.    Do you recall if the day you drove there

23  was a weekday or a weekend?

24      A.    Weekday.

25      Q.    Does it seem to you more likely, given

1    that you've indicated you were wearing an AutoNation

2    shirt when you went to the AutoNation corporate

3    headquarters in downtown Fort Lauderdale that day --

4         A.    Yes.

5         Q.    -- that it was a workday?

6         A.    Yes.

7         Q.    You're not in the habit of wearing an

8    AutoNation shirt on days you don't work, are you?

9         A.    No.

10        Q.    Do you recall anything about any

11   individual you spoke with when you visited the

12   AutoNation corporate headquarters in downtown

13   Fort Lauderdale, in other words, what you said and

14   what they said?

15        A.    There was two gentlemen and a female.

16        Q.    Were they all security guards?

17        A.    Yes.

18        Q.    Do you recall any of their names?

19        A.    No.

20        Q.    And just for purposes of attempting to

21   identify the day, can you describe them for me in

22   terms of their size -- they're obviously two men and

23   one woman -- their race, anything about them that

24   would help us identify who might have been the

25   security guards there that day?

74

1      A.    I remember it was two black guys.

2      Q.    Okay.

3      A.    I don't remember if she was Hispanic or

4  black.  That's all I remember.

5      Q.    Okay.  Do you remember anything about

6  their ages or their sizes?

7      A.    Don't recall that.

8      Q.    All right.

9      A.    Don't know that.

10     Q.    What is your best estimate, given that

11  your resignation was tendered on the evening of

12  April 6th, of the day you visited the AutoNation

13  corporate headquarters in downtown Fort Lauderdale?

14     A.    That's a long question.  Repeat that

15  again.

16     Q.    Sure.

17           We've agreed that the day you made the

18  phone call to the voicemail was after you tendered

19  your resignation, correct?

20     A.    Correct.

21     Q.    And we've agreed that the day you visited

22  the corporate headquarters was after you made the

23  phone call, correct?

24     A.    Correct.

25     Q.    The last day you worked at the dealership

75

1   was April 30th of 2023, correct?

2          A.      Correct.

3          Q.      With those things in mind, April 7th

4   through April 30th, can you make any estimate at all

5   as to the day you visited the AutoNation corporate

6   headquarters?

7          A.      Could have been on like a Thursday or

8   Friday.

9          Q.      Did you tell any of the security guards

10  that you spoke with why you were there?

11         A.      Yes.

12         Q.      What did you say?

13         A.      "I want to speak with someone in human

14  resources."

15         Q.      Anything else?

16         A.      That's it.

17         Q.      What did they say in response?

18         A.      That I need an appointment.

19         Q.      Did you ever make an appointment?

20         A.      No, I didn't.

21         Q.      Why not?

22         A.      Because I was wearing an AutoNation

23  shirt.  I'm an employee.

24         Q.      I guess my question, sir, is you felt it

25  important enough to drive from Plantation, correct,

1   to downtown Fort Lauderdale to speak to someone in

2   human resources, correct?

3        A.    Correct.

4        Q.    You were told you needed to make an

5   appointment in order to do that, correct?

6        A.    Correct.

7        Q.    Why didn't you ultimately make the

8   appointment?

9        A.    It was a waste of time to me, what I've

10  seen in the past.

11       Q.    Did you tell any of the security guards

12  that the reason you wanted to speak to someone in

13  human resources was because you felt you were being

14  mistreated?

15       A.    Not at all.

16       Q.    You did feel that you were being

17  mistreated though, correct?

18       A.    That's the reason I went.

19       Q.    Yes, sir.  You did feel that way, but you

20  didn't tell the security guards that?

21       A.    Not at all.

22       Q.    Okay.  In May, you sent an e-mail after

23  resigning to someone named Cary Pacheco.

24             Do you recall that?

25       A.    Correct.

77

1        Q.    Had you met Ms. Pacheco prior to sending

2   her the e-mail?

3        A.    Personally?

4        Q.    Yes.

5        A.    No.

6        Q.    How did you know she was someone you

7   should communicate with about your work environment

8   at AutoNation Honda Hollywood?

9        A.    That was the e-mail sent to her.  She's

10  human resources.

11       Q.    Right.  How did you know she was someone

12  you should contact?

13       A.    Because she repeatedly was at the

14  AutoNation for reasons of safe environment.

15       Q.    My question though, and maybe I'm not

16  asking it well, is you sent the e-mail to Cary

17  Pacheco in early May, correct?

18       A.    Yes.

19       Q.    How did you know she was someone that

20  should receive an e-mail like that?

21       A.    Because they, at employees, that's what

22  they said.  That's the lady with human resources.

23       Q.    So it was communicated to you at some

24  point that Cary Pacheco was the appropriate

25  recipient for that e-mail?

78

1      A.    Correct.

2      Q.    When?

3      A.    In the course of working there.

4      Q.    Was she specifically identified as a

5   human resource representative for AutoNation Honda

6   Hollywood?

7      A.    When she went to the sales center?

8      Q.    What I'm getting at, sir, is you didn't

9   find her name and e-mail address on the internet.

10  You already knew she was someone you should contact.

11     A.    Sure.

12     Q.    How did you know?

13     A.    Employees always said that.  She was a

14  human resources manager or something.

15     Q.    Okay.  So you knew Cary Pacheco existed

16  while you worked for AutoNation Honda Hollywood,

17  correct?

18     A.    Correct.

19     Q.    And you had been told she was someone you

20  could complain to about your work environment?

21     A.    Correct.

22     Q.    Why did you not do that during your

23  employment there?

24     A.    That's a good question, because she

25  repeatedly was there at the sales center for the

1    same reason of environment and nothing was done.

2        Q.    My question to you though, sir, was why

3    you didn't reach out to Cary Pacheco while you were

4    still working at the dealership.

5        A.    I didn't.  I just didn't.

6        Q.    I know you didn't, but you did reach out

7    to her after you left, correct?

8        A.    Correct.

9        Q.    Well, if you reached out to her after you

10   left, why didn't you reach out to her while you were

11   there?

12       A.    What I explained to you, to me it was a

13   waste of time.

14       Q.    Had you ever met Cary Pacheco?

15       A.    Met personally?

16       Q.    Yes.

17       A.    No.

18       Q.    Even if you hadn't met her physically,

19   had you ever spoken to her before?

20       A.    No.

21       Q.    What made you believe that it would be a

22   waste of time for you to communicate concerns to

23   Cary Pacheco?

24       A.    Because of what I saw at the AutoNation

25   Honda.

80

1    Q.    And what specifically about what you saw

2    as relating to Cary Pacheco made you feel that it

3    would be a waste of time for you to communicate with

4    her?

5    A.    Because other employees complained about

6    yelling and screaming, and everybody would say,

7    "Man, human resources is here.  Human resources is

8    here," but there was no disciplinary happened.  No

9    disciplinary things happened there, so a waste of

10   time.

11   Q.    To your knowledge, did anyone at

12   AutoNation Honda Hollywood ever complain about

13   sexual harassment by Joey Rodriguez?

14   A.    I don't recall that.  I don't remember

15   that.

16   Q.    You were working, if I understood your

17   testimony just now, at AutoNation Honda Hollywood on

18   days when someone mentioned to you that human

19   resources was there that day; is that correct?

20   A.    Correct.

21   Q.    Did you ever meet with anyone from human

22   resources other than Cary Pacheco?

23   A.    No.

24         MR. PRATER:  Object to the form.

25

81

1    BY MR. GABRIELLE:

2         Q.    Did you ever see a person who was

3    identified to you while you were at AutoNation Honda

4    Hollywood as being from human resources?

5         A.    No.

6         Q.    So someone else who worked at the

7    dealership mentioned to you on a day that you were

8    also working that someone from human resources at

9    AutoNation was there that day; is that correct?

10        A.    Everybody knew, yes.

11        Q.    How many times did that happen?

12        A.    Three or four times.

13        Q.    Over the 13 months that you worked there?

14        A.    Correct.  That I know of.

15        Q.    And you never on any of those occasions

16   tried to find that person and communicate with them

17   about Joey Rodriguez?

18        A.    Not at all.

19        Q.    I'm aware that your attorney's trying to

20   obtain your phone bills from your cell phone

21   carrier.  He's made me aware of that.

22              Other than your cell phone bills for

23   April of 2023, can you think of anything we can

24   look at to determine when you might have made the

25   call after resigning to the AutoNation's human

1   resources phone number?

2        A.    Just the phone call.

3        Q.    Just the phone bill, right?

4        A.    Yes.

5        Q.    Is there anything else you could think of

6   that we could look at?

7        A.    No.

8        Q.    Do you have a diary or a journal or a

9   date book of any kind?

10       A.    No, sir.

11       Q.    Did you ever, during the time you were

12  working at AutoNation Honda Hollywood, ever make a

13  written record of any kind of how Joey Rodriguez was

14  treating you?

15       A.    No, sir.

16            (The document referred to was

17            thereupon marked Defendants' Exhibit

18            No. 3 for identification.)

19  BY MR. GABRIELLE:

20       Q.    Sir, I'm showing you a document that's

21  been marked as Exhibit 3, really Composite Exhibit 3

22  in this action.  It is Bates numbered EEOC-0001

23  through 0006.  I will represent to you, sir, that it

24  is the following:  A charge of discrimination or a

25  copy thereof that you filed with the United States

83

1    Equal Employment Opportunity Commission on June 9th

2    of 2023.  It appears to bear your electronic

3    signature as well as Attachment A to that charge,

4    and then a separate document called a dismissal and

5    notice of rights that is two pages from the EEOC

6    addressed to your address at 137th Avenue, a second

7    page copied to Cary Pacheco, Deaken Shuler and

8    myself, and then some additional pages, those being

9    the fifth and sixth pages of the document that

10   relate to that dismissal and notice of rights and

11   thereafter.

12           Really, sir, mostly what I'm going to

13   ask you about is what appears on pages 1 and 2 of

14   Exhibit 3, but take the time you need to look

15   through it and let me know when you're finished.

16           Have you finished reading Exhibit 3,

17   sir?

18       A.    Yes, sir.

19       Q.    Directing your attention, please, if I

20   could --

21           Well, the first two pages, and I'll

22   accept a stipulation from your counsel, are they a

23   true and correct copy of your charge of

24   discrimination that was filed on your behalf with

25   the EEOC on June 9th of 2023?

84

1      A.      Yes.

2      Q.      For right now before we break, I just

3 want to ask you about a couple things on the second

4 page, the page that's labeled "Attachment A."

5      A.      Okay.

6      Q.      If you look at the second-to-last

7 paragraph, the one that begins with the words "As a

8 result," and I'll read that sentence, quote:

9              "As a result of the humiliation and

10             disrespect from management, Claimant, a

11             top producer, left the company.  He

12             e-mailed HR, but to this day no one has

13             contacted him," period, close quote.

14             Have I read those two sentences

15 correctly?

16     A.      Correctly, yes.

17     Q.      What does the phrase "a top producer"

18 mean?

19     A.      Top producer means it's the one who's

20 doing the job.

21     Q.      Right.  In the context of your employment

22 at AutoNation Honda Hollywood, what does the phrase

23 "top producer" mean?

24     A.      Top producer.  I mean performing all the

25 time, every month, month in, month out.

85

1      Q.    And that's your view, correct?

2      A.    Correct.

3      Q.    Are you basing that on your own personal

4  view of your effort or are you basing it on results,

5  visible results or posted results or both?

6      A.    Results.

7      Q.    And I believe this is not uncommon at

8  vehicle dealerships.

9            Were your sales results posted for

10 yourself and others to see --

11     A.    Correct.

12     Q.    -- or otherwise shared?

13     A.    Yes.

14     Q.    So how often was that?

15     A.    Every Friday.

16     Q.    And how were they posted?  Were they put

17 up on a board?  Were they e-mailed?

18     A.    On a board.

19     Q.    On a board.

20           And so it's your testimony that you were

21 at or near the top every Friday?

22     A.    Every Friday.

23     Q.    How many other individuals were on the

24 list approximately?

25     A.    Okay.  Employees, general?

86

1      Q.    Well, when I'm asking about the phrase

2    "top producer," I'm asking who you are comparing

3    yourself to.

4          So who are you comparing yourself to

5    with that phrase?

6      A.    Not mentioning names.  I just look at the

7    numbers.

8      Q.    Okay.  But are you comparing it to all

9    salespeople or only salespeople in different

10   divisions or departments?

11     A.    No, all salespeople.

12     Q.    So you were the top producer of all

13   salespeople at the dealership?

14         MR. PRATER:  Object to the form.

15   BY MR. GABRIELLE:

16     Q.    In your opinion.

17     A.    Top producers, there's a few.  I am one

18   of them.

19     Q.    Was that true the entire time you worked

20   there?

21     A.    All the time.

22     Q.    So you were one of the top producers for

23   the entire period of your employment at AutoNation

24   Honda Hollywood?

25     A.    Correct.

87

1      Q.    How many other producers would you

2 consider to be among the top producers?

3      A.    I would say within five more.

4      Q.    Out of a total group of approximately how

5 many?

6      A.    Total employees?

7      Q.    Well, total producers.

8      A.    Total employees were like 21, 22.

9      Q.    So you were regularly, if not always,

10 within the top five or six of 20 or 21 total

11 producers?

12      A.    Correct.

13      Q.    The second sentence of the paragraph I

14 just read about e-mailing HR, that's a reference to

15 the e-mail you sent to Cary Pacheco in May of 2023,

16 correct?

17      A.    Yes.

18      Q.    You did not e-mail HR prior to that,

19 correct, about your work environment?

20      A.    Correct.

21      Q.    If you could give me this back for now.

22 We'll come back to it later.

23           All right.  Just a few questions before

24 we break for lunch.

25           When you first began working at

88

1    AutoNation Honda Hollywood, you took online

2    training on various topics, correct?

3         A.    Correct.

4         Q.    One of those online training modules was

5    on sexual harassment, correct?

6         A.    Correct.

7         Q.    And you took and you completed that

8    module, correct?

9         A.    Correct.

10        Q.    You were aware, if not as a result of

11   that training module, then just in general that

12   someone physically touching you or speaking to you

13   in a way that made you feel uncomfortable was

14   improper, correct?

15        A.    Correct.

16        Q.    You were aware of that even before you

17   got training on that, right?

18        A.    Correct.

19        Q.    You knew what Joey Rodriguez was doing

20   was wrong, correct?

21        A.    Correct.

22        Q.    Were you aware of that before you came to

23   work at the dealership, that that kind of behavior

24   was improper?

25        A.    Yes.

89

1          Q.      When you received the online training,

2    were you given information about what you should do

3    if you felt you were being harassed?

4          A.      Correct.

5          Q.      And one of those things was to contact

6    corporate, correct?

7          A.      Immediate supervisor.

8          Q.      You were given several options, one of

9    which was your immediate supervisor, correct?

10         A.      Correct.

11         Q.      That would have been David Losk?

12         A.      Correct.

13         Q.      And one of the other options was to

14   contact human resources at corporate, correct?

15         A.      Go through the channel.

16         Q.      Sorry?

17         A.      David Losk, then Vanderwarker, Joe Rey,

18   human resources.

19         Q.      Your belief was that you were required to

20   go through those channels before contacting human

21   resources?

22         A.      Correct.

23         Q.      What is the source of that belief?

24         A.      What they tell us and what they say in

25   the training.

90

1      Q.    Were you also aware of something called

2  an alert line?

3      A.    I don't remember alert line.

4      Q.    Were you aware of a toll-free number you

5  could call if you were unhappy with your work

6  environment?

7      A.    I don't recall seeing the number, but

8  yeah, now that you mention it, yes, a toll-free

9  number, correct.

10      Q.    It's posted at the dealership, correct?

11      A.    I didn't see it at the dealership.  It

12  was in the training.  I saw it was in the training.

13      Q.    So in the training you took at the

14  beginning of your employment, you were made aware of

15  the alert line, correct?

16      A.    Correct.

17      Q.    Did you ever call the alert line for any

18  reason?

19      A.    I didn't.

20      Q.    The online training, was that a

21  separate --

22            I'm just trying to determine the

23  materials.

24            Was that a separate training module that

25  you took at the same time as the overall training

1    or was it part of one larger training module?

2        A.    It was after.  You have to go through

3    training first for the product.  That's kind of

4    intensive.  And if I recall this, I remember taking

5    the classes, which they made everybody take the

6    classes.  And then I start thinking in my mind how

7    can this big of a company put us to study that, but

8    I see all these things around me?

9            I'm a very private person and this is

10   what I noticed.

11       Q.    You were already made aware by the

12   training modules that what Joey Rodriguez was doing

13   with respect to you was improper before he started

14   doing those things, correct?

15       A.    Correct.  I knew it.  They knew it.

16   Everybody knew.

17       Q.    Did anyone at AutoNation Honda Hollywood

18   other than Joey Rodriguez sexually harass you?

19       A.    No.

20       Q.    Is there any answer you've given up to

21   this point in your deposition that you would like to

22   correct, clarify, or change?

23            MR. PRATER:  Object to the form.

24            THE WITNESS:  I don't think so.

25

92

1    BY MR. GABRIELLE:

2         Q.    In fairness to you, I don't know whether

3    you and your attorney are planning on having lunch

4    together or not, and it's none of my business, and

5    anything you talk about with your attorney is none

6    of my best.

7              I will make you aware that any documents

8    you look at during the break separate and apart

9    from anything your attorney shows you -- and I

10   don't suspect that he'll show you anything -- I'm

11   going to ask you about.  So I just need you to know

12   up front that when you get back, I'm going to ask

13   you if you looked at any documents during the break

14   and what they were, okay?

15        A.    No problem.

16             MR. GABRIELLE:  Okay.  Off the record

17        for lunch.

18             (Recess from 12:18 P.M. to 1:15 P.M.)

19   BY MR. GABRIELLE:

20        Q.    Mr. Navarro, did you look at any

21   documents during the lunch break?

22        A.    No, sir.

23        Q.    Okay.

24             (The document referred to was

25             thereupon marked Defendants' Exhibit

93

1          No. 4 for identification.)

2     BY MR. GABRIELLE:

3          Q.    Sir, I'm showing you a document I'm

4     marking as Exhibit 4 to your deposition.  It is a

5     document that was produced in this case.  This is

6     labeled Plaintiff-0100.  It appears to be an e-mail

7     sent to someone at AutoNation whose last name is

8     Dominguez by Dr. Louisa Rogers at Florida Atlantic

9     University and also to you from your AutoNation

10    e-mail address to your personal e-mail address.

11         So take a look at it, please, what I

12    marked as Exhibit 4.  Let me know when you're

13    finished.

14         Have you had a chance to fully review

15    Exhibit 4?

16         A.    Yes.

17         Q.    Do you know who this is, Louisa Rogers?

18    Is this a regular customer, private customer of

19    yours?

20         A.    Correct.

21         Q.    Okay.  So was she a customer of yours

22    before April 2nd of 2023?

23         A.    Not at all.

24         Q.    Okay.  Do you know who the Dominguez,

25    D-O-M-I-N-G-U-E-Z-B, is that this e-mail is

94

1    addressed to?

2         A.    I heard of a couple times being the boss

3    of, you know, the locations.

4         Q.    Do you know if it's Benny Dominguez?

5         A.    Yeah, Dominguez.

6         Q.    Do you know how Dr. Rogers got Benny

7    Dominguez's e-mail address?

8         A.    I don't know, sir.

9         Q.    Okay.  How did you get this e-mail?

10             I see you received this e-mail on your

11   AutoNation e-mail address and you forwarded it to

12   your personal e-mail address, which is

13   understandable, but it doesn't look like it was

14   addressed or copied to you.

15             How did you get it?

16        A.    I don't recall.  I think it was -- David

17   Losk sent it to me or something.  I don't remember,

18   because I was actually called.  They said I did a

19   good job.

20        Q.    And Dr. Rogers' e-mail to Dominguez,

21   maybe Benny Dominguez, is quite complimentary of

22   you, correct?

23        A.    Yes.

24        Q.    Would Dr. Rogers' experience with you be

25   consistent with what you believe to be your own

1   performance at AutoNation Honda Hollywood?

2        A.    Correct.

3        Q.    Did you ever get a performance evaluation

4   or a performance appraisal at AutoNation Honda

5   Hollywood?

6        A.    If I recall, they did it one time.

7        Q.    You remember it being one time?

8        A.    Yes.

9        Q.    Was it in writing?

10       A.    Yeah, they do it in writing.  David Losk

11   did that.  I remember that.

12       Q.    He went over it with you?

13       A.    Yes.

14       Q.    Do you recall whether it was favorable or

15   unfavorable?

16       A.    Yeah, it was favorable.

17       Q.    Do you remember when that was?

18       A.    I don't recall the date.

19       Q.    Was anyone in management at the

20   dealership, AutoNation Honda Hollywood, ever, that

21   you can recall, critical of your job performance,

22   saying anything negative about your job performance?

23            I'm not suggesting that it happened.

24   I'm asking, because the next question I'm going to

25   ask is whether anyone was particularly

1    complimentary of your job performance.

2              So was anyone at the dealership in

3    management ever critical of your job performance?

4         A.    David Losk was my immediate supervisor,

5    so he did -- he never actually said anything

6    derogatory about my performance, but Carl

7    Vanderwarker, no matter what you did, he would say

8    that -- you know, that I wasn't doing enough, I was

9    stupid, for no reason.  But other than that, that's

10   what I remember.

11        Q.    Carl Vanderwarker was critical of lots of

12   people though, correct?

13        A.    Correct.

14        Q.    Was anyone in management at the

15   dealership, AutoNation Honda Hollywood that is, ever

16   particularly complimentary about your job

17   performance?

18        A.    Not really.

19        Q.    If you had to look at the entire

20   13 months of your employment at AutoNation Honda

21   Hollywood and you had to give yourself an evaluation

22   of your job performance overall covering that entire

23   time frame, what would it be?

24        A.    I would say a number 10, from one to ten.

25        Q.    Ten being the best?

97

1      A.      Ten being the best.

2      Q.      Has your job performance at Ocean Mazda

3  been among those of the top producers as well?

4      A.      Repeat the question.

5      Q.      Sure.

6              You considered yourself -- and it sounds

7  like there was posted documentation to that effect.

8              You considered yourself one of the top

9  producers at AutoNation Honda Hollywood, correct?

10     A.      Yes.

11     Q.      You've now been at Ocean Mazda for

12  roughly nine months.

13             How has your performance been there?

14     A.      It's been good.

15     Q.      Is it as good as it was at AutoNation

16  Honda Hollywood?

17     A.      No, not at all.

18     Q.      Why not?

19     A.      Because it's a new dealer, but I'm more

20  at peace to work there.

21     Q.      So you consider the results to be less

22  favorable because of the fact that it's a new

23  dealership?

24     A.      I would say so, yes.

25     Q.      Have you been able to keep any customers,

98

1    any customers for vehicle sales that you had while

2    you were at AutoNation Honda Hollywood, and bring

3    them to Ocean Mazda?

4         A.    Not one.

5         Q.    Have you tried to?

6         A.    No.

7         Q.    Did you ever communicate directly with

8    Dr. Louisa Rogers about her sending this e-mail?

9         A.    No.

10        Q.    So you didn't ask her to send it?

11        A.    No.

12        Q.    Something she did on her own?

13        A.    Correct.  I remember Joe Rey called me

14   about this letter saying you did a good job.

15        Q.    So you're aware that Joe Rey, the general

16   manager, became aware of this as well?

17        A.    Correct.

18        Q.    Do you have a sense, based on your

19   experience in the industry, approximately how long

20   it will take for the Ocean Mazda West Kendall

21   dealership where you work now to become established?

22        A.    I'd say about three years.

23        Q.    Ocean Mazda has another dealer point; is

24   that correct?

25        A.    Correct.

99

1      Q.    Where is that?

2      A.    In Doral.

3      Q.    Have you ever performed any services

4 there?

5      A.    Not at all.

6            (The document referred to was

7            thereupon marked Defendants' Exhibit

8            No. 5 for identification.)

9 BY MR. GABRIELLE:

10     Q.    Sir, I'm showing you a document that's

11 been produced in this action on your behalf by your

12 counsel.  It is labeled Plaintiff-0001 through 0003.

13 It appears to be a resume created by you sometime in

14 or after March of 2023.  Well, I guess after March

15 of 2023.

16           Take a look at it.  Please let me know

17 when you're finished looking at it so I can ask you

18 some questions.

19           MR. PRATER:  You can let him know when

20      you're done.

21 BY MR. GABRIELLE:

22     Q.    And if I haven't been doing that, I

23 apologize.  Typically I say that, but I've

24 forgotten.  So with any exhibit I show you, once

25 you're finished, you can just say "I'm finished."

100

1      A.      Okay.

2      Q.      Have you fully reviewed Exhibit 5?

3      A.      Yes.

4      Q.      Is this a resume that you prepared after

5   your employment with AutoNation Honda Hollywood

6   ended?

7      A.      No.  This has been on record for a long

8   time.

9      Q.      When you say on record for a long time,

10   what do you mean?

11      A.      Meaning when you try to apply, you kind

12   of want to, you know, review and redo it, but it's

13   something that's in Indeed.  And now that you

14   mention this, this is why David got in contact with

15   me, David Losk.

16      Q.      But the time frame on your position at

17   AutoNation Honda says March 2022 to March 2023.

18   That's what makes me ask the question.

19              Is this something -- and maybe you

20   prepared it, but is this something you updated

21   after you left AutoNation Honda Hollywood?

22      A.      Yeah, correct, perhaps.  I don't recall,

23   but --

24      Q.      The reference in the first paragraph

25   under your name and contact information, the last

1    sentence says:

2                    "Consistently exceeds goals and wins

3              sales contests."

4              Is that a reference to your experience

5    at AutoNation Honda Hollywood or --

6         A.    Excuse me.  Where are you at?

7         Q.    I'm sorry.  I should have been clearer.

8              At the top of the first page of

9    Exhibit 5, there's your name, your e-mail address,

10   your phone number or a phone number, and then a

11   paragraph that begins "Personable and persistent

12   sales associate."

13        A.    Correct.

14        Q.    The last sentence of that paragraph

15   reads, quote:

16                    "Consistently exceeds sales goals

17             and wins sales contests," period, close

18             quote.

19             Were those things true at AutoNation

20   Honda Hollywood?

21        A.    This, no.  This was nothing related to

22   AutoNation.  This was something about relating to my

23   previous jobs.  I was always on trips, winning, you

24   know, places.

25        Q.    Did you have sales goals at AutoNation

102

1   Honda Hollywood?

2        A.    They set the goals for you and you tried

3   to reach them.  And I can say yes, I did reach those

4   goals, but they put so many units you gotta sell a

5   month.

6        Q.    But you regularly met or exceeded the

7   sales goals set for you at AutoNation Honda

8   Hollywood?

9        A.    Sometimes, yeah.  Most of the time, yeah.

10       Q.    Did they have sales contests there?

11       A.    No.  They used to.  Not anymore.

12       Q.    Did they have them during your

13  employment?

14       A.    No, what I'm saying is the sales

15  experience that I've done, they used to.

16       Q.    In your prior experiences?

17       A.    Yes.  Nobody does that anymore.

18       Q.    Okay.  Does the language that falls under

19  "Sales Associates," and it says "Automation Honda."

20  I think you meant AutoNation Honda.

21            Does that describe accurately or

22  summarize accurately your job duties at AutoNation

23  Honda Hollywood?

24       A.    That's correct.

25       Q.    Is this a copy of a resume that you

103

1    posted on the Indeed web site?

2         A.    Okay.  At what point are you referring

3    to, after or before AutoNation?

4         Q.    At any point.

5         A.    Okay.  So this could have been working at

6    AutoNation.

7         Q.    I'm asking you, sir, because one of the

8    things that we've asked in this case for is efforts

9    made by you to find employment alternative to your

10   employment at AutoNation Honda Hollywood, and this

11   is a document that we were given, so I'm assuming it

12   correlates to that request.  And so my question is

13   based on that which is is this resume, Exhibit 5,

14   connected to your efforts to find employment other

15   than AutoNation Honda Hollywood?

16        A.    Yeah, that could have been for Ocean

17   Mazda.

18        Q.    But is this something that you posted

19   somewhere on Indeed or otherwise?

20        A.    Not posted it.  It's just -- it's more or

21   less working with your resume.

22        Q.    Where did this resume go?  Who was it

23   sent to?  Who was it provided to?

24        A.    This is what I'm saying.  David Losk

25   found me through here.  And going back to try to

104

1    find a different opportunity, I guess I had adjusted

2    my experience with AutoNation.

3         Q.    I understand, but one thing we know for

4    sure, do we not, is that Exhibit 5 was created after

5    you were hired at AutoNation Honda Hollywood?

6         A.    I don't recall.

7         Q.    Well, it has you there from March 2022 to

8    March 2023, right?

9         A.    Right.

10        Q.    So can we assume correctly that Exhibit 5

11   was created in or after March of 2023?

12        A.    Yeah, it would have been after.

13        Q.    Why is there no employment listed for the

14   period of time between January of 2003 and March of

15   2022?

16              That's about 19 years.

17              Why is there nothing listed on your

18   resume for that?

19        A.    2003?

20        Q.    If you look, sir, at Exhibit 5, you see

21   that the position listed below the AutoNation job is

22   retail sales associate, Nationwide Mobile Homes,

23   Houston, Texas, and the dates listed are June 2001

24   to January 2003.  And the only employment listed

25   after that chronologically, but above it on the

105

1    document, is your position at AutoNation Honda

2    Hollywood which began in March of 2022.  So there's

3    no employment listed between or after January of

4    2003 and before March of 2022.  That's actually over

5    19 years.

6          A.   Correct.  I told David --

7               David asked me the same question and I

8    told him, "David, I'm sorry, but my resume is all

9    messed up," because I worked --

10              I was on my own from 2001 to about --

11   2001, at least about seven years I will say.

12              So he asked me, "Why is this different

13   days?"

14              I said, "It's just screwed up.  It's all

15   screwed up."

16              So I missed --

17              Even the days, they're confusing, same

18   thing I told David.

19              He says, "Don't worry about it.  It's

20   okay.  Don't worry about it."

21        Q.   So you had a conversation with David Losk

22   before you were hired at AutoNation Honda Hollywood

23   during which the issue of these days came up?

24        A.   Yeah, because if I stated this, this was

25   something that I corrected it.  But this right

106

 1   behind it, it was also happened a long time ago, so

 2   I never fixed it.

 3        Q.    Okay.

 4        A.    So it was a confusion there.

 5        Q.    At any point between March of 2022 and

 6   now, why didn't you fix your resume so that there

 7   was not a 19-year gap showing in your employment?

 8        A.    I didn't pay attention to that to be

 9   honest with you.

10        Q.    Do you think that a 19-year gap on a

11   resume posted on Indeed might discourage employers

12   from hiring you?

13        A.    Possible.

14             MR. PRATER:  Object to the form.

15   BY MR. GABRIELLE:

16        Q.    Because you did have multiple periods of

17   employment in that 19 years, correct?

18        A.    Yeah, I had, correct.

19             (The document referred to was

20             thereupon marked Defendants' Exhibit

21             No. 6 for identification.)

22   BY MR. GABRIELLE:

23        Q.    Sir, I'm showing you a document I've

24   marked as Exhibit 6.  It is, again, a document

25   produced through your attorney's office in this

107

1    action.  It seems to be a composite, but it is

2    numbered Plaintiff-0101 and 0102.  The first page is

3    an e-mail exchange between yourself and someone

4    named Daniele Snyder, D-A-N-I-E-L-E, S-N-Y-D-E-R,

5    and it's a snapshot if you will of one of your

6    earnings statements.  And then the second page of

7    Exhibit 6, which is really what I want to ask you

8    about, is an e-mail chain, and in particular the one

9    I'm asking you about is at the bottom of the second

10   page.  It's an e-mail from yourself to Ms. Snyder on

11   Friday, March 31st of 2023 at 8:29 P.M.

12          So take all the time you need to look

13   through Exhibit 6.  Let me know when you're

14   finished.

15       A.    Okay.

16       Q.    Finished reviewing Exhibit 6?

17       A.    Yes.

18       Q.    Directing your attention to the e-mail I

19   mentioned, that being at the bottom of page 0102, in

20   particular the e-mail --

21          This is in fact an e-mail you sent to

22   Daniele Snyder on Friday, March 31st of 2023,

23   correct?

24       A.    Correct.

25       Q.    And it reads, and I quote:

108

1              "This Juan Navarro" --

2              I think you meant "This is Juan

3     Navarro."

4                    "This is Juan Navarro from

5                    AutoNation Honda Hollywood.  I want to

6                    request my vacation hours since I'm in

7                    need of funds.  I'm moving and I would

8                    like for you to cash out my hours.  If it

9                    is possible to appreciate it."

10             And I think part of that's cut off, but

11    I'm not going to ask you about that part.

12             On March 31st of 2023, you asked for

13    your vacation hours to be cashed out, correct?

14        A.    Correct.

15        Q.    What does that mean?

16        A.    I didn't take -- meaning I needed the

17    funds instead of taking the vacations.

18        Q.    And that was something that was permitted

19    you could do?

20        A.    Yes.

21        Q.    Was there a particular time of year that

22    that was permitted?

23        A.    No.  It's just you can ask anytime.

24        Q.    So, in other words, you accrue vacation

25    hours over a period of time, and if you don't use

109

1    them, you can request that they be turned into cash?

2          A.     Correct.

3          Q.     And that's what you did on March 31st of

4    2023?

5          A.     Correct.

6          Q.     Did you do that because you knew you'd be

7    leaving the dealership?

8          A.     Yeah, it was in the works.

9          Q.     You make reference on March 31st of 2023

10   to being in need of funds.

11               Why was that?

12         A.     To move.

13         Q.     So as of March 31st of 2023, you'd

14   already decided you would also be moving residences,

15   correct?

16         A.     Correct.

17         Q.     Going back to something we've talked

18   about earlier in your deposition today, you were not

19   employed at all during the calendar year of 2021,

20   correct?

21         A.     No.

22         Q.     That's correct?

23         A.     Correct.

24         Q.     Why not?

25         A.     I was nine months in Honduras.

110

1      Q.    Why were you there?

2      A.    My wife was there.

3      Q.    And I'm asking this, sir, because it's

4  pertinent.

5            How were you supporting yourself for a

6  full year without any income?

7      A.    I sold a property in Texas.

8      Q.    A property that you owned?

9      A.    Yes.

10     Q.    And the income from that was sufficient

11 to support you for that length of time?

12     A.    Well, credit cards.

13     Q.    Did you ever tell David Losk that you'd

14 incurred a lot of debt or money or credit cards

15 while you were living in Honduras?

16     A.    I don't recall.

17     Q.    Did you ever communicate anything along

18 those lines to David Losk, meaning that you had

19 substantial debt that you had incurred while you

20 were living in Honduras?

21     A.    Possible that I --

22           I don't recall the dates.  I don't

23 remember.

24     Q.    And that would be a phrase, something

25 like "living off credit cards, I'm living off credit

111

1    cards," meaning I'm using credit cards to fund my

2    life, did you ever communicate that sort of thought

3    that you can recall to David Losk?

4        A.    I recall telling him that I had a

5    property in Texas and I sold it, so that was part of

6    the expenses that I had in Honduras.  You don't need

7    much money in Honduras, but I had about $35,000 that

8    I was able --

9            My son was born.  I have a two-year-old

10   child.  So that's why I was nine months staying

11   with him and with my wife.  Took me three and a

12   half years to bring them here, so --

13       Q.    Meaning your wife and your son?

14       A.    And her two kids.

15       Q.    Okay.  Sir, the consumer debt that you

16   had accumulated that was the subject of the

17   bankruptcy proceeding that you filed, has that debt

18   been resolved?

19       A.    Yes.

20       Q.    How?

21       A.    Creditors just zeroed everything out.

22       Q.    Was your bankruptcy proceeding completed?

23       A.    It was completed, but it didn't go

24   through.  I decided just to go -- not to go forward.

25       Q.    So your understanding or your belief I

112

1   should say is that your creditors have simply

2   abandoned the claims against you?

3        A.    Apparently.

4        Q.    Have you received anything in writing

5   from any creditor indicating that?

6        A.    No.

7        Q.    Going back to the time that you first

8   became employed at AutoNation Honda Hollywood, if

9   you can recall, is David Losk the first person who

10  contacted you about a job there?

11       A.    Correct.

12       Q.    Do you remember that discussion in any

13  way?

14       A.    Just made an appointment to come and see

15  him and talk to him.

16       Q.    To your knowledge and understanding, is

17  David Losk the person who made the decision to hire

18  you?

19       A.    In my mind, yes.

20       Q.    Did David Losk ever say or do anything

21  during your employment with AutoNation Honda

22  Hollywood that you considered to be improper?

23       A.    He never said anything like that.

24       Q.    Did David Losk ever do anything toward

25  you or in your presence that you considered to be

113

1    improper?

2          A.    Not at all.  Not at all.

3          Q.    I realize that there are others, most

4    particularly Joey Rodriguez, who you contend act

5    improperly.  I'm not asking you about him now.  We

6    will discuss him.

7          A.    Sure.

8          Q.    Right now just about David Losk.

9                At any point during your employment at

10   AutoNation Honda Hollywood, did David Losk, your

11   immediate supervisor, ever say or do anything to

12   you or in your presence that you thought was

13   improper?

14         A.    No.

15         Q.    Did you ever speak to David Losk about

16   any of the conduct by Joey Rodriguez that you

17   thought was improper?

18         A.    Yes, I did.  Not in detail, but I did.

19         Q.    How many times?

20         A.    I would say four times.

21         Q.    When was the first time?

22         A.    Don't recall the dates.

23         Q.    What is your best estimate given that you

24   began your employment at the dealership in late

25   March of 2022?

114

1        A.     June, July perhaps, August.

2        Q.     Okay.  Sometime within the first six

3    months?

4        A.     I would say so, yes.

5        Q.     Did you ever communicate in writing --

6    and by in writing, I include text messages and

7    e-mail addresses -- to David Losk about any of the

8    conduct by Joey Rodriguez that you thought was

9    improper?

10       A.     I texted David Losk about the treatment,

11   not in detail, about Joey Rodriguez.

12       Q.     Have you provided all of those text

13   messages between yourself and David Losk in this

14   case?

15       A.     Yes.

16       Q.     Did Joey Rodriguez ever send you anything

17   in writing, and by in writing, I include text

18   messages and e-mail addresses --

19       A.     No.

20       Q.     You've got to let me finish the question.

21       A.     Sorry.

22       Q.     By in writing, I mean e-mails and text

23   messages.

24              Did Joey Rodriguez ever send you

25   anything in writing, including e-mails and text

115

1    messages, that you thought was improper?

2         A.    No.

3         Q.    What is your best recollection of what

4    you said or communicated verbally to David Losk the

5    first time you spoke with him about conduct by Joey

6    Rodriguez that you thought was improper?

7         A.    Within the same month that I just

8    mentioned to you, June, July, August.

9         Q.    I'm not asking when.  I'm asking what did

10   you communicate?

11        A.    Oh, just, again -- I repeat again, not in

12   detail, but the behavior.  I couldn't work there

13   anymore.

14        Q.    I'm specifically asking you to describe

15   the content of what you said to David Losk.

16        A.    "David, I cannot work here anymore."

17        Q.    Anything else?

18        A.    "Why?"

19              "Because I just -- I feel myself like

20   I'm being mistreated and I'm uncomfortable working

21   here."

22        Q.    Did you give any examples or details to

23   David Losk to support those characterizations?

24        A.    I didn't go in detail, but David always

25   said, "Relax.  Don't worry about it."

116

1    Q.   Did you ever tell David Losk in that

2  conversation or at any other time that Joey

3  Rodriguez had touched you physically in a way you

4  felt was wrong?

5    A.   I didn't.  He saw things.  I didn't.

6    Q.   I'm asking right now specific questions,

7  sir, and I'd appreciate specific answers.

8         At any time, did you ever tell David

9  Losk that Joey Rodriguez had touched you physically

10 in a way that you felt was improper?

11   A.   No.

12   Q.   At any time, did you tell David Losk that

13 Joey Rodriguez had said things to you or spoken

14 things to you that you felt were improper?

15   A.   No.

16   Q.   You did communicate by text message to

17 David Losk about Carl Vanderwarker, correct?

18   A.   Correct.

19   Q.   And some things that Carl Vanderwarker

20 had done and said, correct?

21   A.   Correct.

22   Q.   Both or more particularly about David

23 Losk, correct?

24   A.   There was back-and-forth communication,

25 yes.

117

1      Q.    Did you ever speak with Carl Vanderwarker

2  about any physical conduct by Joey Rodriguez that

3  you felt was improper?

4      A.    I didn't.

5      Q.    Did you ever speak with Carl Vanderwarker

6  about any verbal conduct by Joey Rodriguez toward

7  you that you felt was improper?

8      A.    No.

9      Q.    Did you ever speak to Joe Rey, the

10  general manager of the dealership, about any

11  physical conduct by Joey Rodriguez that you felt was

12  improper?

13      A.    No.

14      Q.    Did you ever speak to Joe Rey about any

15  verbal conduct by Joey Rodriguez that you felt was

16  improper?

17      A.    No.

18      Q.    One of the things mentioned in your

19  papers in this lawsuit is you believe there's a

20  relationship, meaning a relative, a blood

21  relationship that exists between Joe Rey and Joey

22  Rodriguez; is that correct?

23      A.    Correct.

24      Q.    What is it that you believe to be true

25  about that?  In other words, what do you think that

118

1   relationship is?  Even if you're not certain, what

2   is it that you believe it to be?

3       A.   Salespeople saying Joe Rey was -- got

4   into the business or somehow that way through Joey

5   Rodriguez's dad.  So that's one of the reasons there

6   was nothing being done there.  It's never been done.

7          And when I mentioned to you that HR was

8   there, I saw her all the time talking to Joe Rey,

9   but --

10         Everybody knew they were there.  As a

11   matter of fact, they were saying that, "HR is in

12   the office.  HR is in the office."

13         So I saw a blond lady that was sitting

14   with Joe Rey.  But after those instances that I saw

15   her in there with Joe Rey, nothing happened.

16       Q.   But you don't know what she was there

17   talking to Joe Rey about, do you?

18       A.   I don't know what they're talking about.

19       Q.   I'm sorry, sir.  You gotta let me finish

20   the question.

21         Do you know what the blond lady from HR

22   was talking to Joe Rey about?

23       A.   No.

24       Q.   So going back to the question, what you

25   believe to be true is that Joe Rey got into the

119

1    vehicle sales business as a result of Joey

2    Rodriguez's father?  That's what you believe that

3    relationship to be?

4         A.    I believe.

5         Q.    Okay.  You don't know for sure?

6         A.    I don't know for sure.  It's what

7    everybody says, you know?

8         Q.    So you were not told of any blood

9    relationship that may or may not exist between the

10   two of them, that they're relatives in some way?

11        A.    No, the salespeople always spoke about

12   that, "Why is it Joey gets away with all these

13   things he's doing?"

14              "Oh, maybe you don't know this."

15              "Well, what do you mean?"

16              "Well, Joe Rey and his dad, you know,

17   got some communication or some friendship," blah,

18   blah, blah.

19              That's what I was listening.

20        Q.    So what you had heard was that there was

21   some kind of a friendship that existed, not a blood

22   relationship; is that correct?

23        A.    Correct.

24        Q.    Did you ever talk with Joey Rodriguez or

25   Joe Rey about that specific subject?

120

1      A.    No.

2      Q.    Did either of them ever say anything in

3   your presence that would acknowledge the accuracy of

4   the assertion that Joe Rey got the job as a result

5   of Joey Rodriguez's father?

6      A.    No, but I did see that his dad came at

7   one time and was sitting right in the desk.  As a

8   stranger, he was sitting in the back, and Joey was

9   there and said, "Look, this is my dad."

10      So Joe Rey is here and his dad is here,

11   so they're behind the counter.  So when they're all

12   talking, I'm concluding that this is the

13   relationship they had.

14      Q.    So on one day in the dealership, Joey

15   Rodriguez pointed out his father who was sitting at

16   a desk or sitting at the desk with Joe Rey?

17      A.    Yes.  He said it in front of a few

18   salespeople there.

19      Q.    Did you ever meet a person that was

20   identified to you or pointed out to you as Joey

21   Rodriguez's girlfriend or fiancée?

22      A.    No.

23      Q.    Did anyone ever refer to your knowledge

24   or recollection to Joey Rodriguez as having either a

25   girlfriend or a fiancée?

121

1      A.     I don't recall.

2      Q.     Mr. Navarro, one of the forms of relief

3    you're suing for in this case -- and I'm just

4    explaining this to you so you'll understand the next

5    series of questions -- is mental and emotional

6    distress or mental and emotional harm.  There are

7    various different phrases that are referred to to

8    describe that form of relief being sought.

9           So I want to confirm a couple things and

10   then I want to ask you questions about a couple of

11   things.  And I'd like you to listen very carefully

12   to the questions because I only want you to answer

13   what's asked and not beyond those questions unless

14   I follow-up.

15          I'm trying to adhere to a set of rules

16   about what is and what is not proper that I can ask

17   you about.

18          So I don't want you to volunteer

19   anything, okay?

20     A.     Okay.

21     Q.     I want you to answer the questions

22   completely and truthfully, but if I have follow-up

23   questions, I will ask them, okay?

24     A.     Okay.

25     Q.     At any point in the five years and three

122

1    months between 2016 and March of 2022, so 2016, '17,

2    '18, '19, '20, '21, or the first three months of

3    2022, at any point during that

4    five-year-and-three-month period, have you ever seen

5    any psychiatrist, psychologist, social worker,

6    therapist, counselor or mental health professional

7    of any kind?

8         A.    No.

9         Q.    During the time frame between March of

10   2022 and today, without disclosing to me the kind of

11   medical provider, have you seen a physician or a

12   nurse practitioner or medical provider of any kind?

13        A.    I have.

14        Q.    Without telling me the nature of the

15   provider or the reason why, approximately how many

16   such visits or occasions have there been between

17   March of 2022 and today?

18        A.    Six.  About six, seven times.

19        Q.    Of those six or seven times, how many of

20   them would have been between March of 2022 and the

21   end of your employment at the end of April of 2023

22   at AutoNation Honda Hollywood?

23        A.    Six to seven times.

24        Q.    Okay.  So that means you've seen no

25   medical provider of any kind since the end of April

123

1   of 2023; is that correct?

2        A.    Okay.   Repeat the question again.

3        Q.    Sure.

4            What I was trying to determine was how

5   many medical providers or how many different visits

6   you had between March of 2022 and today, and you

7   indicated six or seven.

8        A.    Correct.

9        Q.    And then I asked you of those six or

10  seven, how many were in the period of March of 2022

11  until the end of April of 2023.

12           So of those six or seven, how many would

13  have been during the time frame of your employment

14  at AutoNation Honda Hollywood?

15       A.    Those six times.

16       Q.    Okay.   So that would mean then that you

17  have not seen a medical provider of any kind in the

18  nine months since your employment ended at

19  AutoNation Honda Hollywood; is that correct?

20       A.    Okay.   I just saw a doctor.

21           Repeat the question again.

22       Q.    Let me break it down a little better.

23       A.    Okay.

24       Q.    Between March of 2022 and the end of

25  April of 2023, what would be your estimate as to how

124

1  many visits you had with medical providers in that

2  period?

3      A.    Okay.  Six times.  Six, seven times.

4      Q.    Approximately six or seven times?

5      A.    Approximately.

6      Q.    Since May 1st of 2023 right up until

7  today, how many?

8      A.    May '23 to present, right?

9      Q.    Yes, sir.

10      A.    Okay.  That would have been probably

11  about three times.

12      Q.    On those approximately nine or ten

13  occasions, did you speak with any of those health

14  care providers about any mental, physical, or

15  emotional distress you were experiencing as a result

16  of what happened at AutoNation Honda Hollywood?

17      A.    No.

18      Q.    And am I correct that you've not seen at

19  any point from 2016 to the present any psychiatrist,

20  psychologist, social worker, therapist, counselor,

21  or mental health professional for any reason,

22  correct?

23      A.    Correct.

24      Q.    During your employment with AutoNation

25  Honda Hollywood, were you actively seeking different

125

1   employment?

2   　　　A.　　Right about six months, yes.

3   　　　Q.　　What were you doing about six months into

4   your employment at AutoNation Honda Hollywood -- so

5   that would be roughly October of 2022 -- what were

6   you doing to actively seek new employment?

7   　　　A.　　What was I doing?

8   　　　Q.　　Yes.  How were you seeking new

9   employment?  How were you going about it?

10   　　　A.　　Internet searching, see if something will

11   pop out, to inquire about it, that kind of source.

12   　　　Q.　　Other than Ocean Mazda, did you have any

13   job interviews?

14   　　　A.　　Yes.

15   　　　Q.　　With whom?

16   　　　A.　　With Clayton Homes.

17   　　　Q.　　Clayton Homes?

18   　　　A.　　Yes.

19   　　　Q.　　When was that job interview?

20   　　　A.　　Just two, three weeks ago.

21   　　　Q.　　Let me see if I can ask the question

22   better.

23   　　　　　Right now, the time frame I'm talking

24   about is only the time frame that you were employed

25   at AutoNation Honda Hollywood, okay?

126

1      A.     Mm-hmm.

2      Q.     So during the time frame that you were

3  employed at AutoNation Honda Hollywood, including

4  roughly six months into that time frame when you

5  began actively seeking new employment, other than

6  Ocean Mazda, did you have a job interview with

7  anyone?

8      A.     No.

9      Q.     Did you send a resume to anyone other

10  than Ocean Mazda?

11      A.     I don't recall.  If I did, I did it one

12  time, but they said they wanted an interview and I

13  didn't go.

14      Q.     So they set up an interview, but you

15  didn't go?

16      A.     Yes, because it was a different type of

17  job, so --

18      Q.     Did you send any communications, again,

19  during the time frame of your employment at

20  AutoNation Honda Hollywood, to any prospective

21  employers?

22      A.     No.

23      Q.     Did you fill out any job applications?

24      A.     No.

25      Q.     Well, what then were you doing to

127

1    actively seek employment?

2         A.    Why?

3         Q.    What?  What were you doing?

4         A.    Oh.  Trying to get more free time.

5         Q.    Anything else?

6         A.    And trying to see if I could improve my

7    income.

8         Q.    How?

9         A.    By searching for jobs.

10        Q.    How mechanically were you doing that,

11   sir?

12        A.    Through Indeed.

13        Q.    So you posted your resume on Indeed,

14   correct?

15        A.    That was already done.

16        Q.    And again, sir, I'm trying to understand.

17              You indicated that about six months into

18   your employment at AutoNation Honda Hollywood, you

19   were actively seeking work elsewhere; is that

20   correct?

21        A.    Correct.

22        Q.    How were you doing that?  How were you

23   actually mechanically seeking work?

24        A.    Searching through the internet.

25        Q.    Anything else?

128

1      A.      Indeed.  Never sent an application, but

2  that's the source of it.

3      Q.      Did anyone contact you during that period

4  about job opportunities?

5      A.      That one that I mentioned to you that I

6  declined.

7      Q.      Anyone else?

8      A.      No, that I recall.  I don't recall.

9      Q.      Did you go around to any of the other

10 vehicle dealerships in the area where you lived to

11 see if there were job opportunities?

12     A.      No.

13     Q.      You mentioned -- and you mentioned this

14 in your papers too -- that you recently had a job

15 interview with Clayton Homes?

16     A.      Correct.

17     Q.      What kind of job was that?

18     A.      Sales.  Mobile home sales.

19     Q.      Did you get a job offer?

20     A.      No.

21     Q.      Did you get a no?

22     A.      I got a no.

23     Q.      Were you given a reason?

24     A.      No.  They just -- they said they just --

25 they were looking for --

129

1          "Keep on searching," that was the

2   answer, okay?

3          Q.   Are you actively seeking employment now?

4          A.   No.

5          Q.   Other than the job interview at Clayton

6   Homes --

7               Had you ever worked there before?

8          A.   Where?

9          Q.   Clayton Homes.

10         A.   Yeah, in the past, a long time ago,

11   15 years ago, maybe longer.

12         Q.   Other than that job interview, since you

13   began working at Ocean Mazda, have you had any

14   interviews or job opportunities?

15         A.   No.

16         Q.   Have you sought any?

17         A.   No.

18         Q.   In the business that you were in at

19   AutoNation Honda Hollywood and that you're in now at

20   Ocean Mazda, are there any particular times of year

21   or months of the year that you expect to make more

22   money than you do at any other times, meaning is the

23   business and your end of the business in sales

24   cyclical in any way?

25               MR. PRATER:  Object to the form.

130

1            THE WITNESS:  What months?

2  BY MR. GABRIELLE:

3      Q.    Right.  My question is, sir, are there in

4  general better months of the year for car and

5  vehicle sales than others?

6            MR. PRATER:  Object to the form.

7  BY MR. GABRIELLE:

8      Q.    In your experience.

9      A.    I think, yeah, March, April, May through

10  summer.

11     Q.    Those are good months or bad months?

12     A.    The good months.

13     Q.    Do you have any understanding of why that

14  is?

15            MR. PRATER:  Object to the form.

16            THE WITNESS:  I would say March because

17       tax season, April.  And during summertime, I

18       guess it's more -- people are more free out

19       there too to get out.

20  BY MR. GABRIELLE:

21     Q.    Did you get a pay stub last Friday?

22     A.    I get paid once a month.

23     Q.    You get paid once a month at Ocean Mazda?

24     A.    Correct.

25     Q.    Has that always been the case?

131

1      A.    Always.

2            (The document referred to was

3            thereupon marked Defendants' Exhibit

4            No. 7 for identification.)

5    BY MR. GABRIELLE:

6      Q.    Sir, I'm showing you a group of documents

7    that have been produced by your attorney through his

8    office in this action.  They are what appear to be

9    earnings statements issued by ADP on behalf of Ocean

10   Auto Center II, Incorporated doing business as Ocean

11   Auto Mazda West Kendall.  They are Bates numbered

12   Plaintiff-0152 through 0179, and they appear to be

13   earnings statements issued for you about every two

14   weeks between the period beginning April 24th of

15   2023 and the period ending January 28th of 2024.

16           Again, those are collectively marked as

17   Exhibit 7.  Take a look at them, please, and let me

18   know when you're finished.

19     A.    Okay.

20     Q.    Sir, are these truthful and accurate

21   copies of pay statements you've received from Ocean

22   Mazda for the period of April 24, 2023 through

23   January 28, 2024?

24     A.    Correct.

25     Q.    These appear to be issued twice a month,

132

1  sir; is that correct?

2      A.    Correct.

3      Q.    So having now had the opportunity to look

4  at these pay stubs, do you still maintain that

5  you're only paid once a month?

6      A.    Okay.  Let me elaborate.

7            They pay as a draw, pay to salespeople

8  once a month.

9      Q.    How often do you get these pay stubs?

10     A.    Every two weeks.

11     Q.    Did you get a pay stub last Friday?

12     A.    If it falls on the 5th --

13           Every two weeks we get paid.  So if I

14  did, yes.  I probably did, yes, that's correct.

15           MR. GABRIELLE:  If you can get it for me

16        before we adjourn today, we can save

17        ourselves some trouble.

18           MR. PRATER:  I'll do my best.  I'm

19        trying.

20  BY MR. GABRIELLE:

21     Q.    Sir, if you would, please, take a look at

22  the last page of Exhibit 7, page 0179.

23           This is a pay stub for the period

24  beginning January 15, 2024 and ending January 28,

25  2024, correct?

133

1      A.    Correct.

2      Q.    And it, like a lot of these pay stubs,

3  has your earnings for that pay period and then it

4  has a column labeled "Year to Date," which it does

5  here in the center of the page, correct?

6      A.    Correct.

7      Q.    So for this pay statement, this

8  particular one ending January 28, 2024, it shows you

9  received gross pay for the year to date in 2024 of

10  $12,153.62.

11         Do you see that?

12     A.    I see it.

13     Q.    Is that representative of your monthly

14  pay?

15     A.    Doesn't say --

16         Remember, that's income from January --

17  from December.  I'm sorry.  December.  It rolls

18  over to the next pay.  That's why it shows so much

19  money.

20     Q.    Okay.  So why would the month of

21  December, for which you were paid in January, why

22  would that not be representative of what you would

23  earn on a go-forward basis?

24     A.    Because if you look at December the 30th,

25  for instance, the commission there is paid, again,

134

1    once a month, so on the 7th, 8th, or 9th, and then

2    it rolls over.

3        Q.    Okay.  What I see though is that in your

4    recent pay stubs from Ocean Mazda, you are making

5    significantly more than you were in your earlier pay

6    stubs; is that correct?

7              Your overall monthly pay has gone up

8    significantly; is that correct?

9              MR. PRATER:  Object to the form.

10             THE WITNESS:  I don't see it.

11   BY MR. GABRIELLE:

12       Q.    Well, for example -- and you've indicated

13   and I understand that your pay stub that you

14   received at the end of January is for commissions

15   that were earned in December, okay, $9,503.62 in

16   particular.

17             You also had commission income in the

18   entire year of 2023 of $9,503.62, and you did not

19   work for Ocean Mazda for that entire period,

20   correct?

21             You only worked there beginning in May

22   of 2023, correct?

23       A.    Correct.

24       Q.    So you received a commission for the

25   month of December of 2023 that was more than the

135

1    total earnings of commissions you received for the

2    eight months before that; is that right?

3         A.    If you look at year to date, from the

4    time of AutoNation and Ocean, it relates to.  So

5    when I worked at AutoNation, it was about $89,000

6    for March in nine months.

7               When I went to Ocean Mazda, it was

8    $53,000.

9         Q.    What I'm asking you specifically is this.

10   What shows on page 0177 for the period ending

11   December 31, 2023 for Ocean Mazda is year to date

12   commissions of $9,503.62, correct?

13        A.    Correct.

14        Q.    That would be all the commissions you

15   earned at Ocean Mazda between May 1st of 2023 and

16   December 31st, at least that were paid, correct?

17              That's what year to date means, right?

18              The total commissions they paid you for

19   that eight-month period were $9,503.62, correct?

20              MR. PRATER:  Object to the form.

21   BY MR. GABRIELLE:

22        Q.    Actually, that's incorrect.  I'm sorry,

23   sir.

24              I'm trying to understand something.

25              If you look at page 0175, you see

136

1    year-to-date commissions for Ocean Mazda of

2    $39,180.30, right?

3         A.    175?

4         Q.    0175.

5              Let me see if I can clear this up.

6    Here's what I'm trying to figure out.  According to

7    this pay stub, as of the period ending

8    December 17th of 2023, you'd earned roughly $39,000

9    in commissions for Ocean Mazda between May 1st of

10   2023 and that pay date.

11             That's what this document says, right?

12        A.    So what you're looking at here is you are

13   referring to 12/04 to 12/17.

14             You're saying that I made $39,000?

15        Q.    No, sir.  If you look at the column in

16   the middle of the page, that's year-to-date pay.

17             The paycheck that we're looking at only

18   shows that you were paid $800 for that period, but

19   then there's column in the center of the page that

20   says "Year to Date," right, and it shows that you

21   were paid regular earnings is the way it's

22   characterized of $13,600 on year to date.  You were

23   provided longevity earnings of $662.50.  You were

24   provided commissions of $39,180.30, and you were

25   provided a SPIFF, S-P-I-F-F, and I know what that

137

1    is, for $3,025, leading to total gross pay of

2    $56,467.80.

3              You see the numbers I'm referring to,

4    right, on page 0175?

5         A.    Yes.

6         Q.    So the total commissions you were paid

7    through the period ending December 17th of 2023,

8    gross, was $39,180, correct?

9         A.    Commissions, 39, yes.

10         Q.    Yes.  So that's for a roughly

11    seven-and-a-half-month period, correct?

12         A.    Correct.

13         Q.    May 1st of 2023 through December 17th of

14    2023, correct?  Right?

15         A.    Correct.

16         Q.    $39,000 for seven and a half months.

17              Now, if you look again at where we

18    started, the last page of the exhibit,

19    Plaintiff-0179, just in the calendar year of 2024,

20    you've received commissions of $9,503.62, correct?

21         A.    Correct.

22         Q.    That's approximately one-fourth -- a

23    little less than one-fourth of the total commissions

24    you received for the seven and a half months before

25    that, correct?

138

1          Is your income not going up?

2          MR. PRATER:  Object to the form.

3          THE WITNESS:  I'm not seeing it the way

4     you're digesting it, but I just can only tell

5     you that at the end of this December is what

6     I can actually more or less understand.  But

7     this 1/15 to 1/28, that's part of the

8     commission rolled over for the first.  That's

9     why I'm showing that I made nine grand in

10    here.

11  BY MR. GABRIELLE:

12    Q.    I understand the part that you were

13  explaining, that what you were paid in February 2nd

14  of 2024 covering the period of the last two weeks in

15  January of 2024 were commissions earned in December

16  of 2023.  I understand that.  That would mean your

17  sales efforts resulted in commissions to yourself of

18  $9,503.62 in December of 2023.

19          My point though, sir, is that that's

20  roughly one-third to one-fourth of the total

21  commissions you earned in the seven and a half

22  months before that, correct?

23    A.    I see what you're saying here.  All I

24  know is that, yes, I did have a good month within --

25  we're in February -- December and January, so --

139

1       Q.    Is the economic results of your

2   performance improving over time at Ocean Mazda?

3       A.    I can't gauge it right now.  It has to be

4   gauged at the end of the year.

5       Q.    Does David Losk speak Spanish?

6       A.    Yes.

7       Q.    Is he from Honduras?

8       A.    Yes.

9       Q.    And you're from Honduras?

10       A.    Yes.

11       Q.    Did you know David Losk before you came

12   to work at AutoNation Honda Hollywood?

13       A.    No.  No, sir.

14       Q.    Okay.  I realize of course that not

15   everyone from Honduras knows everyone else from

16   Honduras.  I was just asking.

17       A.    It was a shock to me when he told me he

18   was from Honduras.

19            MR. GABRIELLE:  Off the record.

20            (Discussion off the record.)

21            MR. PRATER:  You want to take a minute

22       and I'll see if --

23            MR. GABRIELLE:  Yes.

24   BY MR. GABRIELLE:

25       Q.    Sir, is there any answer you've given up

140

1    to this point in your deposition that you'd like to

2    correct, clarify, or change?

3                MR. PRATER:  Object to the form.

4                MR. GABRIELLE:  The basis?

5                MR. PRATER:  It anticipates that he's

6           recalling every word that he said, and he's

7           not waiving his right to do an errata.

8                MR. GABRIELLE:  And I'm not suggesting

9           that.

10   BY MR. GABRIELLE:

11       Q.    Is there any answer you've given up to

12   this point in your deposition that you'd like to

13   correct, clarify, or change?

14               MR. PRATER:  Object to the form.

15               THE WITNESS:  After lunch?  What we said

16          after lunch?

17   BY MR. GABRIELLE:

18       Q.    The entirety of today.

19       A.    Well, as I mentioned, not knowing

20   Ms. Pacheco personally, but I saw her at the

21   dealership, because we touched on that after you

22   told me about the relationship between Joe Rey.  So

23   I never spoke with her, but that's how I know that

24   she was Ms. Pacheco.

25       Q.    Okay.  Anything else?

141

1    A.    No.

2              MR. GABRIELLE:  Okay.  Off the record.

3              (Recess from 2:25 P.M. to 2:50 P.M.)

4              MR. GABRIELLE:  I'll note for the record

5         counsel provided me a couple additional pay

6         stubs.  I certainly have sufficient time left

7         to print them and discuss them with you, but

8         I won't do it now.  We'll come back to it at

9         the end, but we're certainly satisfied that

10        those documents were produced in a way that

11        allows us to use them today, so no problems

12        there.

13             (The document referred to was

14             thereupon marked Defendants' Exhibit

15             No. 8 for identification.)

16   BY MR. GABRIELLE:

17        Q.    Sir, I'm showing you a document I'm

18   marking as Exhibit 8 to your deposition.  It is,

19   again, a document produced through your lawyer's

20   office.  It is Bates numbered Plaintiff-0115 and

21   0116.  It appears to be a combination of two

22   e-mails, one sent by you to Cary Pacheco on May 14,

23   2023 at 7:58:11 P.M. and her response the next

24   morning at 7:16 A.M., that being Monday, May 15,

25   2023.

142

1          Take a look at what I've marked as

2    Exhibit 8.  Let me know when you're finished,

3    please.

4          A.    Okay.

5          Q.    Have you had a chance to fully review

6    Exhibit 8?

7          A.    Yes.

8          Q.    And is it a true and correct copy of an

9    e-mail exchange between yourself and Cary Pacheco on

10   the dates and times indicated?

11         A.    Yes.

12         Q.    There's a typographical error in the

13   first sentence of your e-mail, correct?

14               You indicate that you got hired on

15   March 28th of 2021.

16               You meant the year 2022; is that

17   correct?

18         A.    That's correct.

19         Q.    The second sentence of that paragraph

20   states, quote:

21                    "In the beginning I found everyone

22               friendly and nice, but after few days I

23               started noticing very nasty attitudes off

24               management but I have no choice to stay

25               quiet and keep working to feed my family,

143

1           keep up with rent and necessary daily

2           needs," period, close quote.

3           What very nasty attitudes off management

4   were you referring to in that sentence?

5       A.    Calling names and the behavior from

6   management.

7       Q.    Specifically, what individuals are you

8   referring to?

9       A.    Vanderwarker and Joey Rodriguez.

10      Q.    Carl Vanderwarker and Joey Rodriguez?

11      A.    Mm-hmm.

12      Q.    Yes?

13      A.    Yes.

14      Q.    Anyone else?

15          Again, referencing just the language

16  "very nasty attitudes off management."

17      A.    Yes.

18      Q.    So what happened in the first few days of

19  your employment at AutoNation Honda Hollywood that

20  you would characterize as very nasty attitudes?

21      A.    Screaming at other employees, gestures of

22  a sexual -- and, like I say, screaming at employees

23  and the jokes and the sexual things that I was

24  experiencing.

25      Q.    And that all happened in the first few

144

1    days?

2          A.    In a few days, yeah.

3          Q.    The next sentence reads:

4                      "It's not easy for me to write this

5                e-mail to you and I'm literally

6                embarrassed.  I thought a thousand times

7                to disclosed the abuse I suffered at

8                AutoNation Honda Hollywood but finally I

9                found another job and now I don't have

10               any fear to tell you what happened at

11               AutoNation Honda Hollywood," period,

12               close quote.

13               Is that phrase literally true, that a

14   thousand separate instances over the 13 months of

15   your employment you considered raising these issues

16   with Cary Pacheco?

17         A.    Not necessarily with her, but with human

18   resources, yes.

19         Q.    But you never did?

20         A.    Never did.

21         Q.    The next sentence, it's the first

22   reference in this e-mail to Mr. Rodriguez.

23               The Joey referred to in this e-mail is

24   Joey Rodriguez, correct?

25         A.    Correct.

145

1      Q.    It states, and I'm only reading a portion

2   now:

3                  "... my manager Joey started to

4            violated my personal space and started

5            hugging me from my back, I ignored it for

6            fear of losing my job," period, close

7            quote.

8            Was Joey Rodriguez your manager?

9      A.    He was a manager too.

10     Q.    Your direct manager was David Losk?

11     A.    Correct.

12     Q.    Did you report in any way to Joey

13   Rodriguez?

14     A.    To tell him about the behavior?

15     Q.    No.  In other words, did you have any

16   reporting responsibilities to Joey Rodriguez as a

17   manager?

18     A.    Yes, he was another manager.

19            David Losk, Joey Rodriguez, and at that

20   time Randy was another manager, Randy.  Those three

21   managers reported to Carl Vanderwarker.

22     Q.    I understand.

23     A.    So they have the same title.

24     Q.    But your supervisor, your manager was

25   David Losk?

146

1      A.    For the department, but he was also my

2  supervisor.

3      Q.    Joey Rodriguez was also your supervisor?

4      A.    Correct, yes.

5      Q.    Did Joey Rodriguez give you feedback on

6  your job performance?

7      A.    No.  David Losk.

8      Q.    Did you communicate with Joey Rodriguez

9  about your job performance?

10      A.    No, I didn't.

11      Q.    To your knowledge, did Joey Rodriguez

12  have any input on your compensation?

13      A.    Compensation --

14            Okay.  Try to word it differently.

15      Q.    Did Joey Rodriguez, to your knowledge,

16  have any ability to control the compensation, pay

17  that you received at AutoNation Honda Hollywood?

18      A.    Sure.

19      Q.    How?

20      A.    By giving deals to somebody else instead

21  of you, getting preference from one salesperson to

22  another salesperson.  So that happened a lot at the

23  dealership.

24            So control, that's part of what -- I

25  can't really probably say that, but directly like

147

1   he would pay me, no.

2        Q.    Can you identify any particular deal that

3   Joey Rodriguez steered away from you and to somebody

4   else?

5        A.    I don't remember.

6        Q.    Can you identify any particular time

7   frame when Joey Rodriguez did that?

8        A.    I don't remember times.

9        Q.    Can you say whether or not Joey Rodriguez

10  ever steered any particular customer in your

11  direction or away from you?

12       A.    I don't recall.

13       Q.    The first incident that you describe

14  regarding Joey Rodriguez in this particular e-mail,

15  Exhibit 8, is Joey sending you to the second floor

16  to bring some paper for the printer and you say,

17  quote:

18              "... while I was there, he followed

19         me and grabbed me from my back, and I

20         said, 'WTF.'  He said, 'I like you so

21         much.'  Then he said, 'Just give me five

22         minutes,'" period, close quote.

23       Does that accurately describe the

24  incident that it's reflecting?

25       A.    Yes.

148

1      Q.    Is that the first incident of what you

2  considered to be improper physical conduct by Joey

3  Rodriguez toward you?

4      A.    Yes.

5      Q.    If your employment began in late March of

6  2022, when did that incident happen?

7      A.    I don't recall dates.

8      Q.    What is the best you can do in terms of

9  the month or year that it happened?

10     A.    June, July, August.

11     Q.    Of 2022?

12     A.    (Witness moves head up and down.)

13     Q.    So your best recollection right now is

14  that that particular incident, the first incident of

15  what you consider to be improper physical conduct by

16  Joey Rodriguez toward you, occurred in June, July,

17  or August of 2022?

18     A.    Yes.

19     Q.    And I understand the abbreviation WTF.

20           Did you use the full phrase?

21     A.    Yes.

22     Q.    And for purposes of the record, that's

23  what the fuck, correct?

24     A.    Yes.

25     Q.    What did you say or do in response to

149

1    Mr. Rodriguez's statement, "I like you so much.

2    Just give me five minutes"?

3         A.    "You're crazy."

4         Q.    That was the statement you made?

5         A.    Yes.

6         Q.    Did you understand that those two

7    comments or that behavior combined with the comments

8    to be a sexual advance by Mr. Rodriguez towards you?

9         A.    Yes.

10        Q.    What, if any, response did he make to

11   your statement, "You're crazy"?

12        A.    The respond he did back to me?

13        Q.    Yes, after you said, "You're crazy."

14        A.    Oh, he just smiled and I walked away.

15        Q.    And was that the end of that particular

16   episode?

17        A.    Yes.

18        Q.    Did you report that episode to anyone?

19        A.    No, sir.

20        Q.    I ask this in context of the overall

21   allegations made.

22              Did Joey Rodriguez ever indicate to you

23   expressly that he was homosexual?

24        A.    He didn't, no.

25        Q.    You inferred that from his behavior,

150

```
 1   correct?

 2        A.    Correct.

 3        Q.    The next sentence says:

 4              "Then it happened multiple times

 5              after that and I told Joey I'm married

 6              with three kids and not his kind,"

 7              period, close quote.

 8              When after June, July, or August of 2022

 9   after the first incident of improper physical

10   conduct by Mr. Rodriguez toward you did the second

11   such incident occur?

12        A.    On those months from June/July and

13   forward to when I left.

14        Q.    What I'm asking you to do though is

15   identify a particular time frame for the second

16   incident.

17        A.    Don't recall times or frames.

18        Q.    So can you say whether or not it was

19   within June, July, or August of 2022 or a different

20   time?

21        A.    June, July, August and forward.

22        Q.    What I'm saying though is if the first

23   incident happened in June, July, or August of 2022,

24   what is your best estimate as to when the second

25   physical incident happened?
```

151

1     A.     It would be June again.  It happened in

2  June again.

3     Q.     And you know that how?

4     A.     Oh, he became touching.

5     Q.     So what is the second incident of

6  improper physical conduct by Joey Rodriguez toward

7  you?

8     A.     Repeat the question again.

9     Q.     Sure.

10         You described the incident at or near

11  the copy machine as the first incident, correct?

12     A.     Correct.

13     Q.     What was the second one?

14     A.     That would be downstairs all over the

15  dealership.

16     Q.     I'm asking you specifically to describe

17  the second instance of improper physical conduct by

18  Joey Rodriguez toward you.

19     A.     I don't recall the place and time.

20     Q.     What happened?

21     A.     Grabbed my nipples.

22     Q.     Where did that happen?

23     A.     I don't recall where and when it

24  happened.

25     Q.     Can you give any time frame whatsoever?

152

1    A.    July, August.  June, July, August.  It

2   was happening repeatedly.

3    Q.    Can you give any approximation of how

4   much time went by, meaning days, weeks or months,

5   between the first incident you've described and the

6   second incident?

7    A.    I don't recall.

8    Q.    Did anyone witness the first incident?

9    A.    Everybody saw that.

10    Q.    Everybody saw Mr. Rodriguez grab you by

11   the copier?

12    A.    Well, not by the copier.  After.

13    Q.    Sir, you need to listen carefully to my

14   questions.

15         The first incident you described, the

16   one that's relayed in the middle of your e-mail

17   here, describes Joey sending you to the second

18   floor to bring you some paper for the printer, and

19   you described in your e-mail and to us today what

20   happened where you said, "What the fuck," where

21   Joey responded, according to you, "I like you so

22   much.  Just give me five minutes," and you

23   responded, "You're crazy," that incident, did

24   anyone else witness that incident?

25    A.    No.

153

1      Q.   Sir?

2      A.   No.

3      Q.   Okay.  How many specific occasions can

4  you recall -- and if you need to give an estimate,

5  give an estimate -- between June of 2022 and the end

6  of April of 2023 did Joey Rodriguez physically

7  actually touch you -- not attempt to touch you, but

8  actually touch you in a way that you felt was

9  improper?

10     A.   Time frame, I can't recall dates, but it

11  was happening right after that.

12     Q.   I didn't ask about dates though in this

13  instance.  I asked specifically for the entire

14  period.

15          You identified the first instance of

16  physical conduct in June, July, or August of 2022,

17  so I said June.

18          So beginning in June of 2022 through the

19  end of your employment at AutoNation Honda

20  Hollywood at the end of April of 2023 including the

21  incident by the copier on the second floor,

22  including that incident, how many times did Joey

23  Rodriguez actually physically touch you in a way

24  that you felt was improper?

25     A.   Twelve, 13, 14, 15, 16 times.

154

1       Q.    Is that your best estimate?

2       A.    Yes.

3       Q.    So 12 to 16 times over an approximately

4   12-month period?

5       A.    Correct.

6       Q.    When was the last incident, the last time

7   Joey Rodriguez touched you in a way that you felt

8   was improper?

9       A.    When I put my notice, and, again, that

10   could have been -- whatever the day was that I put

11   the notice.  I think I noticed a difference when it

12   stopped.

13       Q.    Again, to ask the question clearly, when

14   was the last time that Joey Rodriguez touched you in

15   a way that you felt was improper?

16       A.    I don't recall the date and time.  It

17   could have been November, December, just right

18   before me to exit, you know?  I don't recall a time

19   and month.

20       Q.    It could have been November or December

21   of 2022?

22       A.    '22.

23       Q.    That would mean that at no point in the

24   first four months of 2023 did Joey Rodriguez touch

25   you in a way that you felt was improper; is that

155

1    correct?

2          A.    Correct.

3          Q.    So the 12 to 16 times between

4    approximately June, July, or August of 2022 through

5    the end of 2022, Joey Rodriguez physically touched

6    you in a way that you felt was improper?

7          A.    Correct.

8          Q.    And the last such time would have been in

9    the year 2022?

10         A.    Or '23.

11         Q.    You're the one that indicated the end of

12   2022.

13         A.    November, December.  Again, I don't

14   recall dates and times.

15         Q.    I'll ask you this way.  Can you identify

16   any specific instance in the calendar year of 2023

17   when Joey Rodriguez physically touched you in a way

18   that you felt was improper?

19         A.    It would be January.

20         Q.    What time frame in January?

21         A.    I don't recall that day and time.

22         Q.    What specifically happened in January of

23   2023?

24         A.    Whisper in my ear, sniffing my neck.

25         Q.    Anything else, again, in this specific

156

1    instance that we're talking about.

2         A.    Trying to touch me on my genitals.

3         Q.    Is the month of January 2023 the last

4    time that Joey Rodriguez touched you or attempted to

5    touch you in a way that you felt was improper?

6         A.    Yes.

7         Q.    At any point during your employment, did

8    you report Joey Rodriguez's improper touching of you

9    to anyone?

10        A.    No.

11        Q.    Did anyone ever tell you or indicate to

12   you that they had seen, actually witness Joey

13   Rodriguez touch you improperly?

14        A.    I don't recall nobody seeing it, but we

15   were in the room and there was a few people in

16   there.  So it's obvious everybody was seeing it.

17        Q.    I guess my question to you is did anyone

18   ever say anything to you that you would consider to

19   be an indication that they had witnessed Joey

20   Rodriguez's improper physical conduct toward you?

21        A.    I don't recall.

22        Q.    Did you ever make -- and I'm going to

23   explain what I mean before I ask this question.

24              Did you ever make a physical response to

25   Mr. Rodriguez's touching of you or attempt to touch

1   you including pushing him away, threatening him,

2   responding in any way physically to his improper

3   attempts to touch you and his improper touching of

4   you?

5        A.    No.

6        Q.    Why not?

7        A.    Afraid, what I've seen before

8   complaining, because I remember that I told David

9   about the behavior, not necessarily pointing to that

10  case, but I remember Joey came and told me in my

11  ear, "You little pussy."  So I just didn't -- I

12  never said anything, and it was embarrassing for me

13  to go in details and say it.  I just wanted to just

14  move on and that's why I was looking for a job, just

15  to disappear, just walk away.

16       Q.    Okay.  But if you felt that it was

17  improper, his touching of you and his attempting to

18  touch you, and David Losk was your immediate

19  supervisor and you've talked to David Losk and

20  communicated with David Losk about other personal

21  things, why did you not bring it up with David Losk?

22       A.    I guess because David was in the same

23  room and he was seeing all these things.

24       Q.    Did David Losk ever indicate to you that

25  he had actually seen Joey Rodriguez act physically

158

1    in a manner that was improper toward you?

2         A.    Of course not.

3         Q.    The next portion of your e-mail,

4    Exhibit 8, to Ms. Pacheco reads, quote:

5              "I thought about calling HR and I

6              did call HR!  At phone number

7              (954)769-6133 and I left a message but no

8              one called me back about my complaint,"

9              period, close quote.

10             Are you referencing the phone call to HR

11   after you tendered your resignation to David Losk?

12        A.    I don't recall if it was after or before.

13        Q.    Earlier today under oath you testified

14   that it was after.

15             Are you referencing that phone call in

16   this e-mail to Ms. Pacheco?

17        A.    If I recall right, it could have been

18   after I left, because I see that right here, the

19   response, and it was already too late.

20        Q.    Let me be clear.

21             You make a reference in your e-mail to

22   Ms. Pacheco of calling HR and you identify the

23   phone number that you called.

24             My question is the call that you made to

25   HR, are you referring to a call that you made that

159

1     we already discussed today after you gave your

2     resignation to David Losk?

3            A.     After resignation.

4            Q.     So the call you're referring to in your

5     e-mail to Ms. Pacheco is the same phone call to HR

6     we discussed earlier today?

7            A.     Correct.

8            Q.     The next sentence reads, quote --

9                   If you look at the next sentence,

10    there's a typo in there.

11                  You meant to say "quiet" instead of

12    "quite," right?

13                  Just before I read the sentence into the

14    record, I want to read it correctly as you intended

15    it.

16                  The sentence reads right now at the

17    beginning:

18                        "After that, I decided to stay

19                  quite..."

20                  I'm assuming you meant "quiet," right?

21           A.     Quiet, yes.

22           Q.     You meant to type "quiet," correct?

23           A.     Correct.

24           Q.     So I'll read it the way you intended it:

25                        "After that, I decided to stay quiet

160

1          and Joey kept on doing what he was doing

2          to me sexually for months without my

3          consent," period, close quote.

4          Sir, if the phone call to HR was made

5    after you tendered your resignation and if the last

6    improper physical conduct by Joey Rodriguez toward

7    you was in January of 2023, what does that mean?

8         A.    Not recalling times.  I wasn't that

9    person taking notes this day happened, this day

10   happened.  This is just what happened, but I can't

11   recall dates and times.

12         You're asking for more or less days or

13   months.  So everything was June, July, August and

14   forward until I left.

15        Q.    But, sir, the sentence that we just read

16   starts with "After that."

17         Anyone reading that would interpret you

18   evening after the phone call to HR, correct?

19         MR. PRATER:  Object to the form.

20         THE WITNESS:  If you read it that way.

21   BY MR. GABRIELLE:

22        Q.    Are you intending to communicate to

23   Ms. Pacheco that the phone call you made to HR after

24   you tendered your resignation to Mr. Losk was

25   followed by more physical conduct by Joey Rodriguez

161

1    or am I misreading that?

2        A.    You misread it.  Yeah, it can be misread,

3    because this is what -- I'm giving the story what

4    happened all this time.

5        Q.    Understood.

6              So there was no physical conduct by Joey

7    Rodriguez toward you after you made the phone call

8    to HR after your resignation, correct?

9        A.    I don't recall, like I say.  I mean this

10   is just constantly happened.  If I say January,

11   because I left in April, it didn't stop.

12             What I'm trying to do here, I'm not good

13   at writing, but if you read it, that's what you

14   think happened after, but this is a recollection of

15   what I went through at AutoNation since this

16   started.  This is what this is.

17       Q.    Here's what we're trying to do today,

18   sir.  This is the forum that we have to ask you

19   about your version of events and what your words

20   mean when you put them into writing.

21             You have testified here today that the

22   last incidence of improper physical conduct by Joey

23   Rodriguez toward you occurred in approximately

24   January of 2023.

25             Do you stand by that?

1      A.     Yes.

2      Q.     You've also testified that the call that

3  you made to HR was after you tendered your

4  resignation to Mr. Losk in the evening of April 6th

5  of 2023; is that correct?

6      A.     Yes.

7      Q.     It is not correct to read your e-mail to

8  Ms. Pacheco to mean that after your phone call to

9  HR, Joey Rodriguez's improper physical conduct

10  continued?  That's a misreading of that, correct?

11      A.     Yes.

12      Q.     You were not intending to communicate

13  that particular fact, were you?

14      A.     After I resigned, again, no.

15      Q.     Okay.  The next sentence reads:  "I have

16  multiple witnesses for these incidents when people

17  saw Joey grab me from the back.  He touched my ass.

18  He grabbed my nipples and kissed me on my neck and

19  told me he loved me.  People who saw it included the

20  GM Joe Rey, GSM Carl Vanderwarker and the sales

21  manager David Losk and salesperson," and then there

22  are a list of names below that.

23          Did any of the individuals you've

24  identified there, Joe Rey, Carl Vanderwarker, David

25  Losk, or any of those salespeople you've identified

163

1  by first name ever indicate to you that they had

2  witnessed Joey Rodriguez act improper physically

3  toward you?

4       A.    No.

5       Q.    I realize some time has gone by, but I'm

6  going to try to see if you can identify for me who

7  these individuals are for whom only first names are

8  listed, and you've identified all of them I think as

9  salespeople, correct?

10       The list starting with Mark and ending

11  with Asim and Nick, are those all salespeople?

12       A.    All salespeople, yes.

13       Q.    Do you have any recollection of who the

14  Mark was that you're referring to?

15       A.    I don't recall the last name.

16       Q.    How about Patrick?

17       A.    Don't recall last names.

18       Q.    And I've just got to ask you about each

19  one, and if that's the answer for each one, we can

20  do it that way.

21       Sara.  Do you recall Sara's last name?

22       A.    No, sir.

23       Q.    Esmeralda.  Do you recall Esmeralda's

24  last name?

25       A.    No.

164

1      Q.    Manuel.  Would that be the same Manuel

2  that went to work for Ocean Mazda?

3      A.    Correct.

4      Q.    Carolina.  Do you recall Carolina's last

5  name?

6      A.    Carolina.  No.

7      Q.    Carolina.  Excuse me.

8            Do you recall Carolina's last name?

9      A.    No.

10     Q.    Jimmy.  Do you recall Jimmy's last name?

11     A.    No.

12     Q.    Eddy.  Do you recall Eddy's last name?

13     A.    Eddy Gomez.

14     Q.    Eddy Gomez?

15     A.    Mm-hmm.

16            MR. GABRIELLE:  And Eddy, Madam Court

17       Reporter, is E-D-D-Y.

18  BY MR. GABRIELLE:

19     Q.    Mary.  Do you recall Mary's last name?

20     A.    No.

21     Q.    The next name listed is Wassem,

22  W-A-S-S-E-M.

23            Do you recall who that is?

24     A.    Wassem Asim.

25     Q.    I'm sorry?

1        A.    Wassem Asim.

2        Q.    Wassem Asim?

3        A.    Yeah, the one below, same name.

4        Q.    Oh, Wassem Asim is the same person?

5        A.    Correct.  They call him Sam.

6        Q.    I see.  Sam Faizan, that's who that is,

7   right?

8        A.    Correct.

9        Q.    So the names Wassem and Asim are

10   referring to the same person who was known to you as

11   Sam Faizan, correct?

12       A.    Yes.

13       Q.    And Nick.  Do you recall Nick's last

14   name?

15       A.    No, sir.

16       Q.    How do you know that each of those

17   individuals witnessed improper physical conduct by

18   Mr. Rodriguez toward you?

19       A.    They all worked in the same room that we

20   always all were there.  Imagine this is the room

21   where we worked.  So everybody is just talking to

22   each other.  They walked in, everybody would see

23   everything what was happening.

24       Q.    Did you ever yourself witness Joey

25   Rodriguez act improperly physically toward anyone

166

1    else?

2         A.    With Manuel.

3         Q.    What did you witness?

4         A.    The same thing he was doing with me, by

5    going by the ears and sniffing around my neck.

6         Q.    So you witnessed Joey Rodriguez acting in

7    a manner toward Manuel in a way that was consistent

8    with the way that Joey Rodriguez had acted toward

9    you?

10        A.    Correct.

11        Q.    Anyone else?  Did you ever witness Joey

12   Rodriguez physically act improperly toward anyone

13   else besides yourself and Manuel?

14        A.    There was a gentleman right next to me

15   that he worked for a while.  His name was Winston,

16   and he would do things like that too.

17        Q.    Winston would do things or Mr. Rodriguez

18   would do things toward Winston?

19        A.    The same thing.

20        Q.    No, my question was was Winston acting

21   improperly or was Mr. Rodriguez acting improperly

22   toward Winston?

23        A.    Joey Rodriguez acting improperly

24   towards --

25        Q.    Do you recall Winston's last name?

1      A.    No.

2      Q.    So the Manuel you're describing, that

3  individual was a salesperson at both AutoNation

4  Honda Hollywood and Ocean Mazda, correct?

5      A.    Correct.

6      Q.    Do you recall, at least while he was a

7  sales associate at AutoNation Honda Hollywood, who

8  Manuel reported to?

9      A.    To David Losk.

10     Q.    Is there anything you could do or look

11  at --

12           You work with Manuel now, right?

13     A.    Not any longer.

14     Q.    Oh, that's right.  I'm sorry, sir.  You

15  already indicated that.

16           Anything you could do or look at to

17  determine what Manuel's last name is?

18           MR. PRATER:  Object to the form.

19  BY MR. GABRIELLE:

20     Q.    In other words, do you have it written

21  down anywhere?  Is it in your phone?  Is it anywhere

22  where you could determine what Manuel's last name

23  is?

24     A.    I don't recall.

25           When you're in the Armed Forces, they

168

1    call you by your last name.

2              When you're in sales, they call you by

3    first name.

4         Q.   Sir, I'm not criticizing you.  It's just

5    he's not on my list anywhere and I'm trying to

6    figure out who you're referring to.  That's all.

7         A.   Right.

8         Q.   No, I get it.  No one expects you to

9    remember the names of two dozen people you worked

10   with two years ago.

11             (The document referred to was

12             thereupon marked Defendants' Exhibit

13             No. 9 for identification.)

14   BY MR. GABRIELLE:

15        Q.   Sir, I'm showing you a document that's

16   been marked as Exhibit 9 to your deposition.  It is

17   Bates numbered Plaintiff-0005 through 0059.  It

18   appears to be the AutoNation associate handbook, and

19   under that, human resources policies and procedures,

20   and this was a version produced through your

21   attorney.

22             So take a look at it.  You're welcome,

23   as I've said, to read the entire thing.  Just so

24   you know in advance, what I'm going to be asking

25   you about are pages 12, 13, 14, 15, and 16.  But

169

1    you are entitled to read the entire document should

2    you so choose.  12 through 16 is what I'm going to

3    be asking you about.

4                MR. PRATER:  You can take your time and

5            read it.

6    BY MR. GABRIELLE:

7        Q.    Have you finished reviewing what I've

8    marked as Exhibit 9?

9                MR. PRATER:  I think if you want to just

10           point him to the specific things you're

11           asking him about.

12   BY MR. GABRIELLE:

13       Q.    Yeah, I'm asking about the specific pages

14   I've identified.

15               Have you finished reviewing those pages?

16       A.    I reviewed them.

17       Q.    Okay.  Where did you get this associate

18   handbook from?

19       A.    I believe I had a copy when I first --

20               I don't recall if I provided to him

21   or --

22               I don't really recall how I got it.

23       Q.    But you had a copy during your

24   employment?

25       A.    I don't think they provided it, which is

170

1      the web site.

2          Q.    You had access to a copy during your

3      employment?

4          A.    Correct.

5          Q.    And there's an internal web site that

6      AutoNation Honda Hollywood used that had policies

7      and procedures including this associate handbook

8      available, correct?

9          A.    Correct.

10         Q.    So going to the information on pages 12

11     through 16, and in particular, the policies and

12     standards of conduct listed there, you had been

13     aware that these policies and standards of conduct

14     existed, correct?

15         A.    Aware, no.  Knowing, yes.

16         Q.    What do you mean?

17         A.    Let me explain.  This was done, the

18     training that we went through the -- it happened six

19     months after I was already employed.

20              At that point, I said, "Wow, how can

21     actually they put us" -- and it was mandatory for

22     everybody, managers, salespersons, parts,

23     everybody.

24              How is it possible that this is the

25     paper, but they're not following it?

171

1          So to me, this right here, it's just,

2    excuse my language, a bunch of crap.

3          Q.    You had access to these policies and

4    procedures from the first day of your employment,

5    correct?

6          A.    I don't recall to be honest with you.

7          Q.    The first time Joey Rodriguez said or did

8    anything that you thought was not proper, did you

9    undertake to see if there were any policies or

10   procedures in place that you could use to do

11   something about it?

12         A.    Every company has policies, every one of

13   them.

14               Do they follow?

15               Maybe not.

16         Q.    The question that I asked though, sir,

17   was the first time that Joey Rodriguez said or did

18   anything improper toward you, did you look to see

19   whether there were policies or procedures in place

20   that would allow you to do something about it?

21         A.    I didn't look then, but going through the

22   training --

23               I just went through the training, but I

24   kept my mouth shut.  I never said anything about

25   it.

1    Q.    So you said you went through the training

2  about six months after you started your employment?

3    A.    Yes.

4    Q.    So that would be sometime in October of

5  2022, correct?

6         You began your employment at the end of

7  March of 2022, and the training was about six

8  months later.  That would be sometime in October of

9  2022, correct?

10    A.    Could have been September, October.

11    Q.    Between then, after you went through the

12  training, and when you sent the e-mail to Cary

13  Pacheco on May 7, 2023, why didn't you complain?

14    A.    Fear.  Afraid.

15    Q.    Were you aware of anyone who worked for

16  the dealership, AutoNation Honda Hollywood that is,

17  who complained about their treatment and were

18  terminated or treated negatively as a result?

19    A.    Eddy Gomez is the one that kept -- he

20  just didn't care.  He would call, because the

21  treatment we were getting is yelling and screaming,

22  and Eddy is a real tall man.  He was the one -- I

23  noticed he's the one that would call HR all the

24  time.  I can think of only him calling HR.  I

25  didn't.

173

1      Q.   And I understand that you didn't.  When I

2  asked you why, you indicated fear.  And so what I'm

3  asking now is whether or not that fear was based on

4  anything in particular happening to someone else who

5  complained about their treatment at the dealership.

6      A.   Repeat the question again, sir.

7      Q.   Sure.

8           You indicated that the reason why you

9  didn't complain after you received the training and

10 before you sent the e-mail after your employment

11 ended to Ms. Pacheco, the reason why you didn't

12 complain during that time frame, you just testified

13 it was fear.  And so what I want to know now is

14 whether or not that fear was based on some

15 experience that you witnessed someone else having

16 where they complained and something bad happened to

17 them as a result.

18     A.   I can't really say that, but you could

19 see the difference towards the employee.  That's why

20 I didn't really say anything.

21     Q.   Are you aware of anything tangible,

22 anything material, monetary or otherwise, bad

23 happening to someone who complained about their work

24 environment at AutoNation Honda Hollywood?

25          MR. PRATER:  Object to the form.

174

1          THE WITNESS:  I haven't seen it.

2          (The documents referred to were

3          thereupon marked Defendants' Exhibit

4          Nos. 10 and 11 for identification.)

5    BY MR. GABRIELLE:

6       Q.   Sir, I've marked for purposes of the

7    record as Exhibits 10 and 11 the following

8    documents.  They appear to be the same set of

9    policies and rules, but for slightly different time

10   frames.

11          Exhibit 10 are captioned "Rules of the

12   Road, Code of Business Ethics" for the time frame

13   of 1995 to 2002, and they are Bates numbered

14   Plaintiff-0241 through 0285.

15          Exhibit 11 is captioned the same way,

16   "Rules of the Road, Code of Business Ethics," for

17   the years 2023 and 2024, and Exhibit 11 is Bates

18   numbered Plaintiff-0286 through 0330.  And these,

19   again, are documents produced through your attorney

20   in this case.

21          Please look through Exhibits 10 and 11.

22   Let me know when you're finished.  I don't have

23   detailed questions.  I just want to ask you some

24   things about them.

25          MR. PRATER:  Just to clarify, I think

1       you said '95 to 2002.

2               MR. GABRIELLE:  Excuse me.  Thank you.

3       Correction.  1995 to 2022.  If I did, I

4       misspoke.  Exhibit 10 is 1995 to 2022.

5               Exhibit 11 would be 2023 and 2024.

6   BY MR. GABRIELLE:

7       Q.    Sir, you've looked at Exhibits 10 and 11?

8       A.    Yes, sir.

9       Q.    From your view and the way you looked at

10  things, AutoNation, as an organization, the overall

11  organization, AutoNation, was responsible for the

12  policies and procedures that governed your work at

13  AutoNation Honda Hollywood, correct?

14      A.    Correct.

15      Q.    So you would look to the human resources

16  department of AutoNation corporate and its policies

17  and procedures to determine what the rules were,

18  correct?

19      A.    Correct.

20      Q.    Did you ever look you through either of

21  these sets of business ethics for the time frame of

22  1995 through 2022 or the time frame of 2023 and 2024

23  to see whether or not there were policies and

24  procedures against the kinds of things that Joey

25  Rodriguez was saying and doing toward you?

176

1      A.    Yes.

2      Q.    And did you see that in the codes of

3  business ethics that covered the whole period, there

4  were policies and procedures prohibiting what he was

5  doing?  You saw that?

6      A.    Correct.

7      Q.    You were aware during your employment at

8  AutoNation Honda Hollywood that the AutoNation

9  corporate policies and procedures prohibited what

10 Joey Rodriguez was doing, correct?

11     A.    Correct.

12     Q.    And prior to coming to work at that

13 dealership, you had never had a similar experience

14 at any other employment where you'd ever been

15 sexually harassed, correct?  That was the first time

16 that ever happened, correct?

17     A.    Yes.

18     Q.    Sir, I'm sorry.  I've got to take you

19 back to Exhibit 8.  I did not ask you about some

20 things on the second page.

21          Going back to Exhibit 8, and in

22 particular the second page of the exhibit,

23 Plaintiff-0116, there is a reference at the top of

24 that page to you being one of the top producers.

25          You're referring to the area that we

177

1   discussed earlier, right, you being among the top

2   producers of the 20 or so salespeople at the

3   dealership, correct?

4        A.    Correct.

5        Q.    The next paragraph starts with this

6   phrase, quote:

7                    "I discussed it with my wife and she

8               tried to stop me for writing to HR

9               because we don't want our kids to know

10              because we are teaching them good morals

11              and be respectful," period, close quote.

12        When is the first time you discussed

13   with your wife any of the physical or verbal or

14   other improper treatment by Joey Rodriguez toward

15   you?

16        A.    Right before this letter right here.

17        Q.    So to be clear, during the entire period

18   of your employment at the dealership, did you ever

19   have any communications with your wife about how

20   Joey Rodriguez was acting toward you physically,

21   verbally, or otherwise?

22        A.    I didn't.

23        Q.    Okay.  It was only after you resigned

24   your employment that you discussed with your wife

25   reporting these concerns to HR; is that correct?

178

1    A.    She knew more about the screaming and

2  yelling, and this is what I said I discussed this

3  with my wife.

4         In details about what -- the

5  embarrassment, I didn't want to go there with her.

6    Q.    Did you consider any of the screaming and

7  yelling by Carl Vanderwarker or Joey Rodriguez to be

8  sexual harassment?

9    A.    From Joey, yes.  From Carl, I didn't.

10    Q.    You did not.

11         So you did not consider Carl

12  Vanderwarker's screaming and yelling toward you to

13  be sexual harassment, correct?

14    A.    I don't think so, no.

15    Q.    Did you tell your wife at any time during

16  or after your employment that you considered the

17  conduct by Joey Rodriguez toward you to be

18  harassment?

19    A.    I didn't disclose anything to my wife.

20    Q.    I'm trying to determine, because I don't

21  want to ask about conversations between you and your

22  wife that don't have anything to do with this case,

23  okay?  I'm not entitled to, nor am I seeking to.

24         I just want to ask you about

25  conversations between you and your wife that have

179

1    something to do with this case, and I want to know

2    about all of those, but nothing else.  What you and

3    your wife talk about is protected and I'm not

4    entitled to invade that protection.  But if it has

5    something to do with this case, I want to ask about

6    that.

7              You understand that, correct?

8        A.    Understood.

9        Q.    At any point during your employment at

10   AutoNation Honda Hollywood, did you ever make your

11   wife aware that Joey Rodriguez was saying or doing

12   anything that you considered to be harassment toward

13   you?

14       A.    No.  Harassment, sexual.  Harassment,

15   mistreatment.

16       Q.    You consider the phrase --

17       A.    You say harassment.  So harassment could

18   be yelling at me.  But if you said sexual

19   harassment, then no.

20       Q.    So during your employment at AutoNation

21   Honda Hollywood, did you communicate to your wife

22   that you felt that you were being mistreated by Joey

23   Rodriguez?

24       A.    By Joey Rodriguez, yes.

25       Q.    And are you seeking relief in this action

180

 1    for that mistreatment?

 2         A.    Sure, yes.

 3         Q.    What specifically did you communicate to

 4    your wife during your employment at AutoNation Honda

 5    Hollywood regarding the mistreatment by Joey

 6    Rodriguez that you were referring to when you were

 7    talking about that with her?

 8         A.    The screaming and yelling.

 9         Q.    Anything else?

10         A.    Screaming and yelling.

11         Q.    Did you give your wife any specifics

12    about the screaming and yelling, any examples or

13    descriptions of what was being screamed and yelled?

14         A.    No.

15         Q.    What was the screaming and yelling about?

16         A.    Calling me names, yelling in my face.

17    It's hard to take that for my age, but I didn't go

18    in detail with my wife because my wife will keep on

19    asking and asking and asking, and I just --

20              I'm real private.  Some things I'll

21    discuss.  Some things I won't.

22         Q.    Did you witness Joey Rodriguez screaming

23    and yelling at other people?

24         A.    Yes.

25         Q.    How many other people?

181

1      A.     I would say for the most part, everybody.

2      Q.     Did you witness Joey Rodriguez screaming

3  and yelling at people in a manner that was different

4  than the manner in which he was screaming and

5  yelling toward you?

6      A.     It was about the same.

7      Q.     That would include both men and women?

8      A.     Women, it would be different.

9      Q.     How?

10     A.     Softer.

11     Q.     So Joey Rodriguez's screaming and yelling

12  toward men was harder or harsher than his screaming

13  and yelling toward women in your view?

14     A.     I will say yes, different, but it was

15  hard to approach --

16            What I would hear was very hard towards

17  women, but not yelling.

18            With us, it would be yelling.

19     Q.     So, in other words, Joey Rodriguez spoke

20  harshly to women and he spoke harshly to men, but

21  when he spoke harshly to men, it was in the form of

22  yelling; is that right?

23     A.     Correct.

24     Q.     Did he speak more harshly to any

25  particular person -- any particular male person than

182

1  any other particular male person?

2       A.    I don't recall that.

3       Q.    Setting aside what you've described as

4  Joey Rodriguez's improper physical and verbal

5  conduct toward you, was his screaming and yelling

6  toward yourself and the other men in the dealership

7  consistent, meaning did he scream and yell at you in

8  the same way and in the same manner as he did the

9  other men in the dealership?

10      A.    I will say it was a little different with

11  me.

12      Q.    How?

13      A.    Harder.

14      Q.    In what way?  Can you explain that for

15  us?

16      A.    I will say like he will tell me, "What

17  the fuck?  What's wrong with you?  You think you

18  know it all," things like that.

19            I mean I've been around for a lot of

20  years in sales, but I never felt the way that he

21  was treating me, and I think this is why I really,

22  really was -- when I was feeling more like --

23      Q.    Have you finished your answer?

24      A.    No.

25            -- more personal with me.

183

1    Q.    Okay.  Sir, I'm not discounting the

2    impact that a person screaming and yelling could

3    have on another person when I ask this next

4    question, but what is it about the way that Joey

5    Rodriguez was screaming and yelling toward you that

6    was different in nature than the way he was

7    screaming and yelling toward other men in the

8    dealership?

9    A.    When he started using nationality names,

10   where you have Haitian people or different parts of

11   the country, that when they start calling me

12   directly, "You stupid Mexican," things like that,

13   that's different.

14   Q.    Did you ever hear Joey Rodriguez refer to

15   the national origin of other people in the

16   dealership?

17   A.    I didn't hear any names.

18   Q.    Did Joey Rodriguez refer to you as a

19   Mexican?

20   A.    Yes.

21   Q.    You're not Mexican?

22   A.    No.

23   Q.    Do you consider that an insult?

24   A.    Yes.

25   Q.    To be referred to as Mexican?

184

1          A.    Of course.

2                MR. PRATER:  Object to form.

3    BY MR. GABRIELLE:

4          Q.    Why?

5          A.    Because I'm not from Mexico, especially

6    when it's been very derogatory.

7          Q.    I guess my question is is being referred

8    to with reference to your national origin any more

9    or less offensive based on that national origin

10   being correctly or incorrectly identified?  Do you

11   know what I'm saying?

12               And I'm not meaning to be insulting, but

13   if someone has referred to you as a stupid

14   Honduran, would that be any more or less offensive

15   to you than being referred to as a stupid Mexican?

16         A.    It would be offensive.  You don't have to

17   use stupid, but you can use you're Honduran.

18         Q.    Right.  My question to you is the fact

19   that the country of origin is being referred to the

20   offensive part or is the offensive part being

21   referred to as being stupid?

22               MR. PRATER:  Object to the form.

23               THE WITNESS:  Correct.

24   BY MR. GABRIELLE:

25         Q.    Which is it?

185

1        A.      Stupid.

2        Q.      And did you hear Joey Rodriguez referring

3    to others at the dealership as stupid?

4        A.      No.

5        Q.      So you're the only person he referred to

6    as stupid --

7        A.      Correct.

8        Q.      -- that you're aware of?

9        A.      All this started when Vanderwarker

10   started calling me stupid Mexican.  Them being

11   buddies, he started using those words towards me.

12       Q.      Did you ever respond to either Carl

13   Vanderwarker or Joey Rodriguez referring to you as

14   Mexican or stupid Mexican?

15       A.      Ask me again.

16       Q.      You indicated just now in your testimony

17   that Carl Vanderwarker referred to you as a stupid

18   Mexican, correct?

19       A.      Correct.

20       Q.      Did you ever respond to that?

21       A.      Oh, just, "Why are you calling me like

22   that?  Don't call me like that."

23       Q.      And did Mr. Vanderwarker respond?

24       A.      He didn't care.

25       Q.      Mr. Vanderwarker also referred harshly to

186

1    David Losk; is that correct?

2         A.    Yes.

3         Q.    So going back to the second page of

4    Exhibit 8 before we move on, the discussion with

5    your wife that's being referred to in this e-mail on

6    page 2 of Exhibit 8 where you indicate that you've

7    discussed it with your wife and she tried to stop

8    you from writing to HR, that discussion occurred

9    after your employment at the dealership ended,

10   correct?

11        A.    During the employment when all this

12   started, I would not disclose to my wife the sexual

13   harassment, but more like how they were treating me,

14   "Why don't you quit?  Why don't you do that?"

15             I have responsibilities.  So that's when

16   you asked before, if I'm seeking other employment,

17   I was doing that, so --

18        Q.    Sir, here's what I'm asking you.  The

19   implication from the sentence we are looking at now

20   in Exhibit 8, the implication is that you would have

21   contacted human resources earlier, but your wife

22   tried to stop you from doing that; is that correct?

23        A.    Yes.

24        Q.    When did your wife discourage you from

25   communicating --

187

1      A.    During the --

2      Q.    Sir --

3      A.    I'm sorry.  I'm sorry.

4      Q.    When time frame-wise did your wife

5 discourage you from contacting human resources?

6      A.    During employment.

7      Q.    At that point, you had still not told her

8 about the sexual mistreatment, physical mistreatment

9 by Joey Rodriguez, correct?

10      A.    Correct.

11      Q.    Did your wife ever come to the

12 dealership?

13      A.    No.

14      Q.    To your knowledge, has your wife ever

15 witnessed anyone at the dealership acting improperly

16 toward you?

17      A.    No.

18      Q.    So the only things that your wife will

19 know about in terms of your experience will be what

20 you told her, correct?

21      A.    Correct.

22      Q.    And your wife was not aware as far as you

23 know during your employment with the dealership that

24 Joey Rodriguez was acting in a way toward you that

25 was physically improper, correct?

188

1       A.      Correct.

2       Q.      Because the only way she would know that

3  would be if you told her, correct?

4       A.      Correct.

5       Q.      And was your wife made aware by you

6  during your employment at the dealership that Joey

7  Rodriguez was making verbal sexual advances toward

8  you?

9       A.      No.

10       Q.      Sir, if you were already gone for two

11  weeks from the dealership as of May 14th of 2023,

12  why did you send the e-mail to Ms. Pacheco?

13       A.      I felt not threatened no more.

14       Q.      But what is it that you wanted to happen?

15       A.      A change to that location, a change to

16  the locations.  I can't speak for nobody else, but I

17  can speak for what was happening, so that.

18       Q.      So two weeks after you were gone, you

19  wanted there to be a change to the location; is that

20  correct?

21       A.      Correct.

22       Q.      Excluding from the scope of your answer,

23  because I'm excluding it from the scope of my

24  question, any communications you've had with any

25  lawyers including your own lawyer --

189

1      I'll ask the question more clearly. I'm

2  not asking you to tell me about any discussions you

3  ever had with a lawyer. You understand?

4      Other than your wife, have you ever

5  discussed your experiences at the dealership, and

6  in particular, Joey Rodriguez's physical and verbal

7  improper advances toward you with any person?

8      MR. PRATER: Object to the form.

9      THE WITNESS: I remember seeking for

10      help, but it was done on the web site, but

11      they never responded back to me.

12  BY MR. GABRIELLE:

13      Q.    So excluding any lawyer who you spoke to

14  including your current lawyers, but not just them,

15  excluding them and excluding your wife, is there any

16  other person that you've spoken to about Joey

17  Rodriguez's harassment toward you?

18      A.    No, sir.

19      Q.    One of the things you've mentioned is

20  that Joey Rodriguez watched porn at the dealership;

21  is that correct?

22      A.    Correct.

23      Q.    How did you witness that exactly?

24      A.    When we approach the bench -- we call it

25  bench, but it's the sales desk. That's when a few

1    other people saw that.

2         Q.    What device was he watching it on, a

3    phone, a computer, what?

4         A.    His phone.

5         Q.    Cell phone?

6         A.    Correct.

7         Q.    Was there anyone else watching it with

8    him?

9         A.    I don't recall who was right next to me,

10   but there was always salespeople working deals and

11   it was done regularly, but I can't recall who was

12   right next to me.

13        Q.    Can you recall anyone who was watching it

14   on Joey Rodriguez's phone while Joey Rodriguez was

15   watching it?

16        A.    No.

17        Q.    Did you look at what he was watching long

18   enough to determine that it was pornography?

19        A.    Well, you can tell, you know, if you're

20   here, you look at his phone looking at women.

21        Q.    Was he looking at pictures?  Was he

22   watching video?  Which was it?

23        A.    Pictures.

24        Q.    So when you say Joey Rodriguez was

25   looking at pornography on his phone, you mean

191

1  photographs of women?

2       A.    Correct.

3       Q.    Unclothed?

4       A.    Correct.

5       Q.    Did you ever see Joey Rodriguez looking

6  at photographs of men on his phone?

7       A.    No.

8       Q.    I have to ask, sir, because it's

9  marginally relevant I suppose.  The photographs that

10 you witnessed Mr. Rodriguez looking at, were they of

11 women engaged in any particular act or were they

12 pictures of women without clothing and nothing else

13 happening?

14      A.    Just porno.  You know, I don't -- I can't

15 tell because you're looking at it and they put it

16 down right away, but you look and it's porno.  I

17 mean --

18      Q.    My question to you specifically though,

19 given there have been allegations made in documents

20 you've authored, is what did you see?  Did you see

21 pictures of naked women or did you see pictures of

22 naked women engaged in physical acts?

23      A.    Naked women with naked men.

24      Q.    And these were photographs?

25      A.    Photographs.

192

1        Q.    How many different photographs would you

2   estimate you'd seen?

3        A.    I don't recall that.

4        Q.    Did you ever speak to Joey Rodriguez or

5   anyone else about that?

6        A.    Not at all.

7        Q.    Did you ever see Joey Rodriguez looking

8   at pornographic videos?

9        A.    I don't recall that, just what I just

10  mentioned.

11             MR. PRATER:  Before you jump into the

12       next set, five minutes?

13             MR. GABRIELLE:  Yes.

14  BY MR. GABRIELLE:

15       Q.    Is there any answer you've given up to

16  this point in your deposition you'd like to correct,

17  clarify, or change, sir?

18       A.    No.

19             MR. GABRIELLE:  Off the record.

20             (Recess from 4:07 P.M. to 4:17 P.M.)

21             (The document referred to was

22             thereupon marked Defendants' Exhibit

23             No. 12 for identification.)

24  BY MR. GABRIELLE:

25       Q.    Sir, I've marked as Exhibit 12 to your

1   deposition a series of text messages that I believe

2   are between yourself and David Losk.  They were

3   produced through your lawyer's office in this case.

4   They are numbered Plaintiff-0185 through 0238.

5           I am not going to ask you about every

6   text message.  I'm going to go through them and

7   identify particular ones by page and date and time,

8   if necessary.

9           So just take a look.  Let me know when

10  you're finished and you're comfortable answering

11  some questions and I'll go through and ask them.

12          Sir, have you had a chance to look at

13  Exhibit 12?

14      A.    Yes.

15      Q.    First of all, these are in fact printed

16  out copies of text messages between yourself and

17  your immediate supervisor, David Losk, correct?

18      A.    Correct.

19      Q.    And your text messages are those that

20  appear on the right-hand side of the screen and his

21  are those that appear on the left-hand side, yes?

22      A.    Yes.

23      Q.    So looking at the bottom of page 0185,

24  there's a text message bubble there in Spanish, and

25  translated, it says, quote:

1              "Incidents that happen like that

2                   with Carl are the ones that make me move

3                   to another store here or back to Texas."

4              Is that a correct English translation of

5    what's typed there?

6         A.    You're doing good.

7         Q.    Well, I'd love to take credit, sir, but

8    it was actually the lady you just saw stick her head

9    in the door.

10             Have I correctly translated that into

11   English or at least fairly translated it?

12        A.    Yes.

13        Q.    Do you recall -- and this appears to have

14   been on September 6th of 2022.

15             Do you recall the incident that that

16   message refers to?

17        A.    About the screaming and yelling.  This is

18   what I was talking to him, because that was on the

19   phone when I said, Incident like this with Carl is

20   what makes me move for another store or back to

21   Texas, because he would always yell or scream at me

22   for any reason.  I mean he just --

23             So that's why I would complain to him in

24   these instances.  And David was there all the time,

25   so he knew what was going on.

195

1        Q.    The implication from that language though

2   is that Mr. Losk is already aware of something that

3   you are referring to in the text message.

4              So my question is what had occurred that

5   you were referring to, what specific incident, if

6   you remember?

7        A.    The yelling and screaming from Carl.

8        Q.    But do you recall what that yelling and

9   screaming was in reference to?

10       A.    It would have been about working a sale,

11  because that's what -- all the time that happened.

12       Q.    And Mr. Losk's response to you on the

13  following page, 0186, translated is:

14                 "Relax.  We're under a lot of stress

15             here at the desk.  Not your fault."

16             Well, the last part's in English, but

17  have I accurately translated the Spanish portion of

18  those communications?

19       A.    Yes.

20       Q.    Turn to page 0187 if you would, please,

21  sir.

22             Under the date of Friday, September 9,

23  2022 on page 0187, there's a photograph that you

24  sent to Mr. Losk, correct?

25       A.    Yes.

196

```
 1        Q.    Who are the people in that photograph?

 2        A.    That's Miguel that was the finance

 3   director and Jorge, the finance manager too.

 4        Q.    Okay.  Who is the taller one?

 5        A.    Miguel.

 6        Q.    And who was the other one?

 7        A.    That's Jorge.

 8        Q.    Do you recall why you sent this picture

 9   to --

10        A.    It was just to --

11        Q.    Sir, you gotta let me finish the

12   question.

13        A.    Sorry.

14        Q.    Do you recall why you sent this picture

15   to Mr. Losk?

16        A.    I don't recall.

17        Q.    Turn to page 0188, please.

18        A.    Can I digress here?

19        Q.    Sure.

20              MR. PRATER:  There's no question.

21   BY MR. GABRIELLE:

22        Q.    If there's something you need to correct,

23   please do.

24        A.    Page 186.

25        Q.    What is it about page 186 that you'd like
```

197

1    to speak about?

2         A.    That was related to the message on top

3    when David told me to walk, and that's when I was

4    complaining to him.

5         Q.    So in the reference in the middle of

6    page 186 where your text message says:  "David, I

7    had enough with Carl.  I will be looking" -- I think

8    the word you meant was for --

9         A.    For.

10        Q.    -- "a transfer to another sale center

11   soon," and then you ask him:  "Are you here?  Are

12   you outside," correct?

13        A.    Yes.

14        Q.    And that reference is to the same event

15   or incident that you were referring to on the prior

16   page, correct?

17        A.    Correct.

18        Q.    Did you ever take any steps to pursue a

19   transfer to another AutoNation dealership?

20        A.    Yeah, I thought about it.

21        Q.    Did you ever take any steps beyond

22   thinking about it?

23        A.    No, I don't recall it.  No, I don't think

24   so, no.

25        Q.    So on page 0188, which is what appears to

198

1   be the first text message from Saturday,

2   September 10, 2022, you communicate to Mr. Losk,

3   quote:

4                    "He said fifth time.  He is lying.

5              And he called you a motherfucker,"

6              period, close quote.

7              What is that in reference to?

8        A.    If I can recall, that was when David was

9   off the day before and Carl, Joey, they were talking

10  in the front desk, and he was saying -- like he

11  would say, "That motherfucker didn't do what I" --

12  along the lines, "didn't do what I told him."  So he

13  would call David Losk that.

14       Q.    I guess my question, sir, is based on

15  page 0187 and 0188, it's not clear what your text

16  messages that I just read that you are referring to

17  or who it's referring to.

18              Was there something on the preceding

19  page like the picture that you could have been

20  referring to?

21       A.    No.

22       Q.    There's no context for that --

23       A.    Correct, because that was on the phone

24  talking to David.

25       Q.    I see.

199

```
1              So you had had a telephone conversation
2    with David Losk followed up by this text message?
3         A.    Correct.
4         Q.    And the "he" in the text message you're
5    referring to is Carl Vanderwarker?
6         A.    Correct.
7         Q.    And you are indicating here that Carl
8    Vanderwarker called David Losk a motherfucker?
9         A.    Correct.
10        Q.    But not while David Losk was present?
11        A.    Correct.
12        Q.    Page 0190, there's a text message from
13   you to David Losk on September 19, 2022 where you
14   ask him, quote:  "Did you fire Quick," and Quick is
15   capitalized.  The Q is capitalized.
16              Are you referring to an individual named
17   Quick?
18        A.    190?
19        Q.    0190.
20        A.    0190.  Oh.
21              I don't recall the conversation.
22        Q.    Okay.  Do you recall an individual named
23   Quick?
24        A.    No.
25              Oh, okay.  Yes.  That was a salesperson
```

200

1   called Quick.

2       Q.    Okay.  So you were asking Mr. Losk if he

3   fired somebody named Quick?

4       A.    Yeah, because -- yeah, correct.

5       Q.    Did that turn out to have happened?

6       A.    Yeah, they let him go.

7       Q.    Turn to page 0194.

8             You had had a discussion with Mr. Losk

9   about your wife working in some part of the beauty

10  or cosmetic industry, correct?

11      A.    Correct.

12      Q.    And Mr. Losk sent you a picture and a

13  reference to a web site in the middle of the page to

14  someone who was running a business that was his

15  customer, correct?

16      A.    Correct.

17      Q.    You did not interpret that photograph to

18  be improper, did you?

19      A.    No, not at all.

20      Q.    Mr. Losk wanted me to make sure about

21  that.

22            Can you turn to page 0203, please?

23      A.    02 --

24      Q.    03.  203.  0203.

25            There's a message, and in the top third

201

1    of the page where you say:  "Thank you David.  I

2    don't care what Carl says about you," and then

3    there's a smiley face emoji followed by:  "Just

4    kidding."

5             That was a joke, correct?

6        A.   Correct.

7        Q.   Below that and below his response emoji

8    is your text message saying:  "Thank you David.  For

9    real, you will be a great GSM and/or a great GM,"

10   and you're referring there to general sales manager

11   or general manager, correct?

12       A.   Correct.

13       Q.   Was this a reference to any discussion

14   that you were aware of of David Losk becoming a GSM

15   or GM or are you just giving him a general

16   compliment?

17       A.   A compliment.  He's a hard worker and the

18   way they were treating him.  So this is what -- I

19   complimented him all the time.

20       Q.   You intended that as a true statement,

21   did you not?

22       A.   Yes.

23       Q.   Turning to the next page, page 0204, the

24   message in the middle of that page, quote:

25               "David, I don't really like when

202

```
 1                Carl screams at you the way he did it
 2                today.  We could hear him through the
 3                wall how he was talking to you!  You are
 4                too good for him to do that and Joey
 5                doesn't do anything to earn his pay.  He
 6                doesn't talk to Joey like that!  Why?"
 7                And some remaining messages there, but
 8      we'll touch on that in a minute.
 9                Do you recall the specific event or
10      incident this is a reference to?
11           A.    If I recall right, there was a -- it was
12      related -- again, it was related to a sale and they
13      blame it on him.  So he took him into the -- behind
14      our office, and you could hear through the wall how
15      he was yelling at him, I mean real loud, and that's
16      the way sometimes he would do also in the showroom
17      floor.  Everybody would hear it.  So that's what
18      this conversation was coming from.
19           Q.    So this was an example of Carl
20      Vanderwarker treating David Losk harshly?
21           A.    Correct.
22           Q.    That same message continues on, and your
23      counsel and I addressed this and he produced to me
24      separately the rest of that message, so I'd like to
25      include that as part of Exhibit 12.
```

203

1      So I'm going to give you a single page

2  labeled Plaintiff-0240, ask you to take a look at

3  that, and then without objection from your counsel,

4  supplement Exhibit 12 to include page 0240.

5           MR. PRATER:  No objection.

6  BY MR. GABRIELLE:

7      Q.    I'm going to just ask you to confirm,

8  Mr. Navarro, something that I believe is obvious

9  which is that the remainder of the message that

10  begins on page 0204 continues and concludes on

11  page 0240.

12           That's part of the same message,

13  correct, sir?

14      A.    Yes, correct.

15      Q.    All right.  The Joe on page 0240 that's

16  referenced there, is that Joey Rodriguez?

17      A.    Correct.

18      Q.    Can you turn to page 0220, please, sir,

19  0220 of Exhibit 12, in particular, the message that

20  appears in the middle of the page on December 16,

21  2022, quote:

22           "David.  You know what Carl said

23           it's just to talk bullshit.  Jason and I

24           are always here.  If we are not is

25           because we have customers, but I didn't

204

```
 1                    say anything because Carl will not let
 2                    me," period, period, close quote.
 3                    Do you recall what that communication is
 4       in reference to, what event or incident?
 5            A.    I apologize.  What page would that be,
 6       022 --
 7            Q.    Zero.
 8            A.    Oh.
 9                    I remember the conversation.
10            Q.    What particularly do you remember --
11                    The Carl there is Carl Vanderwarker,
12       correct?
13            A.    Correct.
14            Q.    And what do you recall Carl Vanderwarker
15       saying that you characterized as bullshit?
16            A.    He called David telling him there was
17       nobody -- there was no one in the internet
18       department.  So he was kind of like mad.  And this
19       is what I told him, "David, you know Carl is just
20       talking bullshit.  Jason and I were here."
21                    Jason no longer worked there.
22                    In other words, we had customers.  This
23       is what I'm referring to him.
24                    Then he says, "Just take it easy."
25       That's all it was.
```

205

1      Q.    Page 0238 if you could, please.

2            There is a text message from Thursday,

3   April 20, 2023 from you to David Losk, quote:  "I'm

4   sick again.  My stomach is hurting.  I think I'm

5   going to go to the hospital," and then it continues

6   on from there, close quote.

7            Did you go to the hospital on April 20th

8   of 2023?

9      A.    I went to the doctor.

10     Q.    On that day?

11     A.    Yeah.

12     Q.    Okay.  We're finished with Exhibit 12

13  unless you want to look at it for fun.

14           MR. PRATER:  I'm going to clip this on

15       the back.

16           MR. GABRIELLE:  Yes.  Thank you.

17           (The document referred to was

18           thereupon marked Defendants' Exhibit

19           No. 13 for identification.)

20  BY MR. GABRIELLE:

21     Q.    Sir, I'm marking as Exhibit 13 to your

22  deposition a single page produced in this action

23  through your lawyer.  It is labeled Plaintiff-0239.

24  I believe it to be a text message or a series of

25  text messages, but one in particular I want to ask

206

1    you about from you to Joey Rodriguez on December 22,

2    2022.

3              Take a look at it.  Let me know when

4    you're finished, please.  And this, again, is

5    Exhibit 13.

6         A.    Yes.

7         Q.    Have you finished looking at Exhibit 13?

8         A.    Yes, yes.

9         Q.    Is this in fact a series of text messages

10   sent by you to Joey Rodriguez?

11        A.    No, because he call in --

12             He said to everybody that he was sick or

13   something, his stomach or whatever.  So as a good

14   citizen, that's why I sent around the message.

15        Q.    The only question I asked though is what

16   is depicted on Exhibit 13 text messages sent by you

17   to Joey Rodriguez?

18        A.    Correct.

19        Q.    Do you have any other text messages that

20   you've saved from --

21        A.    No.

22        Q.    Sir --

23        A.    Sorry.

24        Q.    -- from yourself to Joey Rodriguez or

25   from him to you?

1        A.      No.

2        Q.      Just this one?

3        A.      Yes.

4        Q.      And as of December 22, 2022, according to

5   the testimony you provided earlier, Mr. Rodriguez

6   has engaged in inappropriate physical conduct toward

7   you at least a dozen times, correct?

8        A.      Correct.

9        Q.      Perhaps as many as 18 times, correct?

10       A.      Correct.

11       Q.      And you nevertheless sent that message to

12   him, correct?

13       A.      No.

14       Q.      You did not?

15       A.      This message?

16       Q.      Yes.

17       A.      I did send it to him.

18       Q.      Okay.  So as of December 22, 2022, you

19   sent the following text message to Joey Rodriguez,

20   quote:

21              "I hope and I play God you are doing

22              good.  You were in my prayers last night

23              asking God to give you strength and help.

24              I hope you are doing better this morning

25              and hoping you will get well right away.

208

1          May the Lord richly bless you and protect

2          you," period, close quote.

3          I've read that correctly?

4     A.    Correct.

5     Q.    You sent that text message to someone who

6  had engaged in improper physical conduct toward you

7  anywhere between 12 and 18 times already, correct?

8     A.    Correct.

9          (The document referred to was

10         thereupon marked Defendants' Exhibit

11         No. 14 for identification.)

12  BY MR. GABRIELLE:

13    Q.    Sir, I'm marking as Exhibit 14 a series

14  of text messages produced through your lawyer in

15  this action.  They are labeled as Plaintiff-0395

16  through Plaintiff-0400.  I believe them to be text

17  messages between yourself and Manuel at Ocean Mazda.

18         Please take the time you need to look at

19  what I've marked as Exhibit 14 and let me know when

20  you're finished so I can ask you some questions.

21         Have you finished looking at Exhibit 14?

22    A.    Yes, sir.

23    Q.    Okay.  Are these in fact copies of text

24  messages between yourself and Manuel at Ocean Mazda?

25    A.    Yes.

209

1      Q.    Do some of these text messages concern a

2   time frame that Manuel was employed at AutoNation

3   Honda Hollywood?

4           If you can tell from the context.

5   That's why I'm asking.

6      A.    No, he was still there.

7      Q.    The photo that appears on page 0395,

8   that's a photo that Manuel sent to you, correct?  In

9   other words, his messages are on the left side and

10  yours are on the right side, correct?

11     A.    Yes.

12     Q.    Do you remember why he sent you that

13  photo?

14     A.    The office was empty.

15     Q.    So he's commenting on the fact that

16  nobody's at work that day?

17     A.    (Witness moves head up and down.)

18     Q.    I see.

19           Is that picture a picture of your work

20  area?

21     A.    Yeah.  It's those and it's across.

22     Q.    Did you have your own specific work

23  station in that room?

24     A.    Yes.

25     Q.    Is one of them depicted on here or is

210

1    yours on the other side?

2         A.    On the other side.

3         Q.    Turn if you will to page 0396.  There's a

4    message at the bottom of the page that reads, if I'm

5    translating correctly, quote:

6              "The only way I'll stay is if they

7              offer me finance and they're not going

8              to, so I'm out," period, close quote.

9              Is that a message from Manuel to you or

10   from you to Manuel?

11        A.    Manuel to me.

12        Q.    Turn to page 0398, please.  And I'm not

13   sure if there's a typo in the top message, the one

14   that appears next to 10:02 P.M., but will you

15   translate that message, please?

16        A.    "Carl is a rat."

17        Q.    Are you referring to Carl Vanderwarker?

18        A.    Yes.

19        Q.    So you're communicating that to Manuel?

20        A.    Correct.

21        Q.    And the next message --

22              And he says:  "Yes," right?  His

23   response is:  "Yes"?

24        A.    Correct.

25        Q.    And your next message is:  "He just talks

211

1    shit every Friday"?

2         A.    Yes.

3         Q.    There's a message that's on the bottom of

4    page 0398 in part, but it appears in full on

5    page 0399.  So I'm going to ask you to look at 0399

6    and translate your message at 10:06 P.M. to Manuel.

7              Here's what I'm asking you.  Is there a

8    typo in the middle?  Are you intending to say

9    "Carl" and you instead typed C-A-T-L?

10        A.    Correct.

11        Q.    So with that correction made, it would

12   read:  "But brother I've been saying about Carl and

13   Joey and he can't do anything"; is that correct?

14        A.    Correct.

15        Q.    What are you referring to there?

16        A.    About David.

17        Q.    That's a reference to David being unable

18   to do anything?

19        A.    Correct.

20        Q.    And later on, the third message from the

21   bottom on that same page 0399, you say:  "David

22   doesn't have balls," correct?

23        A.    Correct.

24        Q.    On page 0399, the bottom message reads,

25   if translated:

212

1           "I even told him to find another
2           sales center that would help him and I
3           would leave with him."
4           Have I translated that correctly?
5      A.   Correct.
6      Q.   What are you referring to there?
7      A.   About the same scenario of being
8  mistreated like I was.
9           David was in the corporate office for a
10 long time.  So there was a few things -- a few
11 message there that he doesn't respond because he
12 doesn't want to respond to me, because when I
13 vented to David, David would come and tell Joey or
14 Carl, and then that's why I decided not to speak at
15 all.  I was just quiet.
16          So when I saw that they were mistreating
17 David, I was telling Manuel, "Man, I had told him
18 to find another sales center.  He could be a GM
19 along the lines and I would move with him."
20     Q.   So that text message is reference to
21 conversations you had, one or more than one, with
22 David Losk?
23     A.   Yeah, this right here is referring to
24 David Losk.
25     Q.   Yes, sir.

213

```
 1        A.    Yes.

 2        Q.    Thank you.

 3              (The document referred to was

 4              thereupon marked Defendants' Exhibit

 5              No. 15 for identification.)

 6  BY MR. GABRIELLE:

 7        Q.    Sir, I've marked as Exhibit 15 some text

 8  messages produced through your counsel by you

 9  numbered Plaintiff-0401 through 0403.  Again, that's

10  Exhibit 15.

11              Take a look at it.  Let me know when

12  you're finished.

13        A.    Yes.

14        Q.    Sir, are these text messages exchanged

15  between yourself and Henry Placeres of Ocean Mazda?

16        A.    Yes.

17        Q.    There's a message on Friday, March 31,

18  2023 that says:

19              "How are you, Henry?  Look, bro, I

20              think you're giving too much importance

21              on something irrelevant.  What can you

22              do, bro?  I appreciate you.  You're about

23              to sign," and then it says, "apartment

24              that's irrelevant for Kendall."

25              Do you have any idea what that's in
```

214

1    reference to?

2         A.    Yes.  I was still in AutoNation and I was

3    asking here that I was paying attention, because I

4    had an issue, a driver's license, like seven years

5    ago.  And they were saying they were checking the

6    insurance.  So just like on the conversation, we

7    went on to say -- kind of just explained to them

8    that it was not a big deal.  So I'm about to --

9    about to sign the apartment.  So more or less I was

10   ready to move, but I was still in AutoNation there.

11        Q.    All right.  So you were at the point with

12   Ocean Mazda where they were checking your driver's

13   license history and you were communicating to Henry

14   Placeres about that?

15        A.    Correct.

16        Q.    The next text message makes a reference

17   to you doing a drug test on Monday.

18            That would have been Monday, April 3rd

19   of 2023, correct?

20            I'm sorry.  I'm on the wrong page.

21            If you turn to page 0402, the first full

22   message on that page makes reference to you having

23   done a drug test on Monday, correct?

24        A.    Mm-hmm.

25        Q.    Is that right?

215

1      A.      Yeah, this is what I sent to --

2              Yes.  In other words, I was waiting on

3    the drug test.

4      Q.      But the reference would be that you took

5    the drug test on Monday, and in context, that would

6    be Monday, April 3rd of 2023, correct?

7      A.      Well, the one before is April 5th.

8      Q.      Right.  Your text message is sent on

9    Wednesday, April 5th and you refer to Monday.

10             Was that a reference to Monday,

11   April 3rd?

12     A.      I don't really recall the date there,

13   but.

14     Q.      You were following-up again with him

15   about the drug test on April 6th, correct?

16     A.      Correct.

17     Q.      And on April 9th of 2023, in the middle

18   of the page at 10:55 A.M. --

19             Sorry.  I took you to the wrong page.

20             Page 0402.  On Thursday, April 6, 2023,

21   you send a message to Henry Placeres of Ocean Mazda

22   saying:  "Henry, how are you?  I'm here to give my

23   resignation, but I haven't heard from Ossi,"

24   correct?

25     A.      Correct.

216

1    Q.    And that was a reference to giving your

2  resignation to AutoNation Honda Hollywood, correct?

3    A.    Correct.

4    Q.    And that reference to Ossi was a

5  reference to Mr. Ferrufino, correct?

6    A.    Correct.

7         MR. GABRIELLE:  If you can give me ten

8       minutes to look through my notes, that will

9       probably expedite the last 15 or 20 minutes

10       of the deposition.

11         MR. PRATER:  Of course.

12  BY MR. GABRIELLE:

13    Q.    Is there any answer you've given up to

14  this point in your deposition you'd like to correct,

15  clarify, or change?

16         MR. PRATER:  Object to the form.

17         THE WITNESS:  I think I corrected

18       already when I told you that -- you asked me

19       if I knew --

20         I forgot her name.

21  BY MR. GABRIELLE:

22    Q.    Ms. Pacheco?

23    A.    That I saw her.  I knew who she was when

24  she was at the sales center, but I never spoke with

25  her.

217

1       Q.    Okay.  You never spoke with her while she

2  was at the sales center?

3       A.    Correct.

4       Q.    Meaning the dealership?

5       A.    Correct.

6       MR. GABRIELLE:  Okay.  Off the record.

7       (Recess from 4:59 P.M. to 5:11 P.M.)

8       (The documents referred to were

9       thereupon marked Defendants' Composite

10      Exhibit No. 16 for identification.)

11  BY MR. GABRIELLE:

12       Q.    We've got a couple more documents.  I

13  just want to confirm they're accurate.  This is

14  Composite Exhibit 16.  It is documents produced by

15  the Plaintiff.  The are Plaintiff-0404 and 0405.

16       I'm just confirming, sir, that these are

17  true and correct copies of pay records from your

18  current employer, Ocean Mazda, and that at least as

19  of the period ending February 11, 2024, you've

20  earned gross pay there for the year of about

21  $23,680, that that reflects your gross pay for the

22  year so far; is that correct?

23       A.    Correct.

24       Q.    Did you ever live in Galveston County,

25  Texas, Mr. Navarro?

218

1      A.    Twenty-nine years.

2      Q.    For nine years?

3      A.    Twenty-nine years.

4      Q.    Twenty-nine years.

5            Sir, in 2016, were you convicted by a

6  jury of boating while intoxicated?

7      A.    Yes.

8      Q.    When I asked you near the beginning of

9  your deposition today if you've ever been convicted

10  of a crime, you said no.

11           Why did you not mention that?

12     A.    Too old I guess.

13     Q.    What's too old?

14     A.    The conviction.  That happened in '15.

15     Q.    Did my question have any particular time

16  frame attached to it?

17           MR. PRATER:  Object to the form.

18           THE WITNESS:  No.

19  BY MR. GABRIELLE:

20     Q.    Are there any other crimes that you've

21  been convicted of?

22     A.    There was another one in early -- early

23  '90s in Houston, Houston, Texas.

24     Q.    And what was that offense?

25     A.    That was a DUI.

1      Q.    Driving while intoxicated?

2      A.    Yes.

3      Q.    Were you convicted of that as well?

4      A.    Yes.

5      Q.    Any others?

6      A.    That's it.

7      Q.    Are there any other answers you've given

8  to any questions that I've asked you today that will

9  change based on the time frame I asked about?  Have

10 you qualified the accuracy or truthfulness of any of

11 your answers based on time frame?

12     A.    What I remember, yeah, it's accurate.

13           MR. GABRIELLE:  I don't have anything

14       further.

15           I have an instruction that I always put

16       on the record about the transcript.

17           MR. PRATER:  I have just a couple brief

18       questions.

19           You want to do your instruction after?

20           MR. GABRIELLE:  At the end.

21           MR. PRATER:  Okay.  Fair.

22                 CROSS EXAMINATION

23 BY MR. PRATER:

24     Q.    Sir, did any of Mr. Joey Rodriguez's

25 inappropriate sexual comments or touchings happen in

220

1    front of other managers?

2         A.    Yes.  It happened in front of Carl

3    Vanderwarker, Joe Rey, David Losk, yes.

4         Q.    And if you can remember, can you please

5    describe what specific things you believe happened

6    in front of other managers?

7         A.    Related to against me?

8         Q.    With respect to Joey Rodriguez and sexual

9    words or actions.

10        A.    Coming behind me and grabbing my ears

11   and, you know, whispering on my neck.  They saw

12   that, doing the funny things, you know, the sexual

13   thing in front of them.  So if you ask me why didn't

14   I, they should have done it.  It was done in front

15   of them.

16              That's what I said before, did I have a

17   manual, did I have this, and that's what I said.

18   If this company is based on being disciplinary and

19   strict, why are they doing it?

20              I never said anything about it.

21        Q.    When you were responding just now, you

22   said he was doing sexual things in front of them,

23   you made some gestures.

24              Could you describe what sexual things

25   you were referring to in that statement, please?

221

1      A.     He had been with his hands doing, you

2  know, funny things like acting --

3             I'm sorry.

4      Q.     It's okay.  I know it's embarrassing, but

5  you can tell us for the record, please.

6             MR. GABRIELLE:  Objection to form.

7             THE WITNESS:  I think, you know, it's

8        like having kissing the females organs and

9        acting like opening his legs in front of

10       management, in front of salespeople, acting

11       that way.  I mean putting his hands on his

12       genitals and his behind, you know, those

13       things happened right in front of everybody.

14  BY MR. PRATER:

15     Q.     And do you think that the managers who

16  saw and heard Mr. Rodriguez make these sexual

17  comments and gestures and actions should have

18  reported those things or done something about it?

19             MR. GABRIELLE:  Objection to form and

20        foundation.

21             THE WITNESS:  They should have.

22  BY MR. PRATER:

23     Q.     Why?

24             MR. GABRIELLE:  Same objections.

25             THE WITNESS:  They're managers.

222

```
 1   BY MR. PRATER:

 2       Q.    What do you think the managers who you

 3   think observed Mr. Rodriguez say and do sexually

 4   inappropriate things should have done about his

 5   conduct?

 6            MR. GABRIELLE:  Same objections.

 7            THE WITNESS:  Should have called --

 8         should have apprehend him or called HR to

 9         stop.

10   BY MR. PRATER:

11       Q.    And when you spoke to Mr. Losk regarding

12   Joey Rodriguez's conduct which I believe you

13   testified about earlier today, do you believe that

14   he understood you were also complaining about the

15   sexual conduct and statements by Mr. Rodriguez?

16            MR. GABRIELLE:  Objection to form and

17         foundation.  Mischaracterizes the testimony.

18            THE WITNESS:  He was right next to me,

19         so he saw everything, saw it all.

20   BY MR. PRATER:

21       Q.    And so when you talked to Mr. Losk about

22   Mr. Rodriguez's conduct, right, you said that that

23   occurred?  You had a conversation or some

24   conversations with Mr. Losk about Mr. Rodriguez's

25   conduct?
```

223

1          MR. GABRIELLE:  Same objections.

2          THE WITNESS:  Yes, yes, I did.

3    BY MR. PRATER:

4     Q.    Did you have conversations with Mr. Losk

5    regarding Mr. Rodriguez's conduct?

6          MR. GABRIELLE:  Same objections.

7          THE WITNESS:  The conduct, yes.

8    BY MR. PRATER:

9     Q.    And what conduct were you referring to

10   when you spoke to Mr. Losk about Mr. Rodriguez?

11         MR. GABRIELLE:  Same objections.

12         THE WITNESS:  The yelling and screaming,

13         what I provided information before, perhaps

14         isn't in close detail because he saw

15         everything because he was right next to me

16         all the time.

17         MR. PRATER:  I have nothing else.

18                  REDIRECT EXAMINATION

19   BY MR. GABRIELLE:

20    Q.    Mr. Navarro, the transcript will bear out

21   what it bears out.

22         I had understood you testifying earlier

23   today that you never spoke to David Losk about any

24   physical conduct by Joey Rodriguez toward you.

25         Did you ever speak to David Losk about

224

1    any physical conduct by Joey Rodriguez toward you?

2         A.    Physical conduct, I said no, but it was

3    behavior.

4         Q.    Did you ever tell David Losk that you

5    felt that Joey Rodriguez was treating you physically

6    in a way that was improper?

7         A.    Repeat the question again.

8         Q.    Sure.  I'm asking you the same version of

9    a question I asked you earlier today.

10             Did you ever tell David Losk that you

11   felt Joey Rodriguez was treating you improper in a

12   physical way?

13             MR. PRATER:  Object to the form.

14             THE WITNESS:  As I said, not directly,

15        but about the whole behavior, yes.

16   BY MR. GABRIELLE:

17        Q.    Tell me specifically what you said to

18   David Losk and when.

19        A.    Yelling at me, calling me names, calling

20   me pussy, "You little pussy."

21        Q.    Okay.  Did you ever tell David Losk that

22   Joey Rodriguez had made physical or verbal sexual

23   advances toward you?

24        A.    I did not say that.

25        Q.    Did you ever use any other words to

225

```
 1    describe that conduct with David Losk?

 2         A.    I didn't.

 3         Q.    And that's also true of Carl Vanderwarker

 4    and Joe Rey, correct?

 5         A.    Correct.  They saw everything though.

 6         Q.    At any point, did any of those

 7    individuals -- and by those individuals, I'm

 8    referring to Joe Rey, Carl Vanderwarker, David Losk,

 9    or Joey Rodriguez -- ever change your job duties?

10              MR. PRATER:  Object to the form.

11              THE WITNESS:  No.

12    BY MR. GABRIELLE:

13         Q.    Did any of them ever change your work

14    schedule in a way you found objectionable?

15              MR. PRATER:  Object to the form.

16              THE WITNESS:  No, it was -- no, it was

17        the same.

18    BY MR. GABRIELLE:

19         Q.    Was your pay structure always the same?

20         A.    Not all the same.

21         Q.    I don't mean your pay that you received

22    all the same, but was your compensation schedule,

23    the way your compensation was structured, always the

24    same?

25         A.    No, it was not the same.
```

226

1    Q.    When did it change?

2    A.    It's all the time, because you don't have

3  control what happened when they have a trade-in, a

4  car coming in, so how you investigate that?

5         So you don't have a way to know my pay's

6  going to be this much.

7         Now, on the other hand, yes, they had a

8  commission sheet, but there was not a way to find

9  out what actually transpired with the trade-ins and

10  everything.

11    Q.    Are you aware of any compensation that

12  you believe you were entitled to at AutoNation Honda

13  Hollywood that you did not receive?

14    A.    No, I don't believe that.

15    Q.    Did you always work in the same physical

16  location in the room that you described earlier?

17    A.    Yes.

18    Q.    Without being dismissive of the verbal

19  and physical conduct by Joey Rodriguez toward you,

20  without intentionally disregarding the significance

21  of that, sir, I want to ask you the question, did

22  any other aspect of your job change?

23    A.    No.

24         MR. GABRIELLE:  Nothing further.

25         Sir, as you've undoubtedly noticed, our

1    court reporter has been typing up your

2    testimony.  Since you've never given a

3    deposition before, I'll explain to you what

4    happens next.

5         A transcript will be prepared of your

6    testimony, what you said, what I said, what

7    your attorney said.  A copy will be furnished

8    to you almost certainly by your attorney or

9    through his office.

10        You have the right to read the

11   transcript and make sure that everything that

12   was recorded by our court reporter has been

13   accurately transcribed.  You can choose to

14   read the transcript or you can waive the

15   right to do so.  Your lawyer will indicate in

16   a moment which option you're selecting.  I

17   just need you to understand and acknowledge

18   that it is your responsibility if you choose

19   to read the transcript to make sure that

20   everything has been accurately transcribed.

21        If when you do read the transcript you

22   notice something that has not been accurately

23   transcribed, your lawyer can explain to you

24   what to do about that, okay?

25        THE WITNESS:  Okay.

228

1          MR. GABRIELLE:  Thank you for your time.

2          MR. PRATER:  He will read.

3          MR. GABRIELLE:  Thank you.

4          (Thereupon, the taking of the deposition

5      was concluded at 5:26 P.M.)

6          (Reading and signing not waived.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF OATH

2

3   STATE OF FLORIDA :

4   COUNTY  OF  PALM BEACH:

5

6

7

8          I, the undersigned authority, certify

9       that JUAN NAVARRO personally appeared before

10      me, presented their Florida driver's license,

11      and was duly sworn.

12

13

14          WITNESS my hand and official seal this

15      7th day of March, 2024.

16

17

18                      /s/ Mia Sohn, RPR
                        _____
19                      MIA SOHN, RPR
                        Notary Public – State of
20                      Florida
                        My Commission No.:  HH131022
21                      Expires:  Aug. 30, 2025

22

23

24

25

230

1            REPORTER'S DEPOSITION CERTIFICATE

2

3            I, MIA SOHN, Shorthand Reporter, certify

4       that I was authorized to and did

5       stenographically report the deposition of

6       JUAN NAVARRO; that a review of the transcript

7       was requested; and that the transcript is a

8       true and complete record of my stenographic

9       notes.

10           I further certify that I am not a

11      relative, employee, attorney or counsel of

12      any of the parties, nor am I a relative or

13      employee of any of the parties' attorney or

14      counsel connected with the action, nor am I

15      financially interested in the action.

16

17           DATED this 7th day of March, 2024.

18

19

20                   /s/ Mia Sohn, RPR
                     _____
21                   MIA SOHN, RPR
                     Notary Public – State of
22                   Florida
                     My Commission No.:  HH131022
23                   Expires:  Aug. 30, 2025

24

25

231

ERRATA SHEET

F.R.C.P. Rule 1.310 provides in part:
     (e)"...Any changes in form or substance that
the witness wants to make shall be entered upon a
separate correction page by the officer with a
statement of the reasons given by the witness for
making them..."

Page/Line          Change/Correction          Reason

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Under penalties of perjury, I declare that I have
read my deposition transcript, and it is true and
correct subject to any changes in form or substance
entered here.


_____     _____
Date                    Signature

232

1  | 3/7/24

2  | Juan Navarro
   | c/o Christopher S. Prater, Esquire
3  | Pollard, PLLC
   | cprater@pollardllc.com

4  |

5  | RE       :  Navarro v. AutoNation
   | DEPO OF :  Juan Navarro
6  | TAKEN   :  February 22, 2024

7  | Dear Mr. Navarro:

8  | This letter is to advise you that the transcript of
   | your deposition is completed and is available for
9  | reading and signing.

10 | Please contact our office at (561)213-1464 to make
   | arrangements to read and sign, or sign below to
11 | waive review of this transcript.  If the reading and
   | signing has not been completed within 30 days or
12 | before the start of the trial of this matter, we
   | shall conclude that you have waived the reading and
13 | signing of the deposition transcript.

14 | Your prompt attention to this matter is appreciated.

15 |

   | Sincerely,
16 |

   | Mia Sohn, RPR, Stenographer
17 | Class Action Court Reporters

18 | cc:  Eric K. Gabrielle, Esquire

19 | Waiver:

20 | I, _____, hereby waive the reading and
   | signing of my deposition transcript.

21 |

22 | _____          _____
   | Deponent Signature              Date

23 |

24 |

25 |