1                 UNITED STATES DISTRICT COURT
                   SOUTH DISTRICT OF FLORIDA
2                   FORT LAUDERDALE DIVISION

3   JUAN NAVARRO,

4             Plaintiff,

5        v.                    CASE NO.: 0:23-cv-61772-CIV-SMITH

6   HOLLYWOOD IMPORTS LIMITED, INC.
    and AUTONATION, INC.,
7
             Defendants.
8

9


10            VIDEOCONFERENCE DEPOSITION OF

11                   BIBI BICKRAM

12                  March 13, 2024

13                   11:03 a.m.

14

15                 Remote Proceeding
            Fort Lauderdale, Florida 33301

16

17

18

19

20

21

22

23                 Gary Siffort
24                Digital Reporter
            Commission No. HH 328484
25



```
 1              APPEARANCES OF COUNSEL

 2    On behalf of Juan Navarro, Plaintiff:

 3        Christopher S Prater, ESQ.
          Pollard, PLLC
 4        401 E Las Olas Blvd
          Ste 1400
 5        Fort Lauderdale, Florida 33301
          954-332-2380
 6        cprater@pollardllc.com
          APPEARED VIA VIDEOCONFERENCE
 7

 8    On behalf of Hollywood Imports Limited, Inc.,
      and AutoNation, Inc., Defendants:
 9
          Eric Keith Gabrielle, ESQ.
10        Stearns Weaver Miller
          200 E Las Olas Blvd
11        Ste 2100
          Fort Lauderdale, Florida 33301
12        954-462-9527
          egabrielle@stearnsweaver.com
13        APPEARED VIA VIDEOCONFERENCE

14

15    Also present:

16         Jill Bilanchone

17

18

19

20

21

22

23

24

25
```



```
 1                      INDEX TO EXAMINATION

 2   EXAMINATION OF BIBI BICKRAM                          PAGE

 3   Direct Examination by MR. PRATER                       11

 4   Cross-examination by MR. GABRIELLE                     98

 5   CERTIFICATE OF OATH OF WITNESS                        101

 6   CERTIFICATE OF REPORTER                               102

 7   CERTIFICATE OF TRANSCRIPTIONIST                       103

 8   ERRATA SHEET                                          104

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



BIBI BICKRAM
NAVARRO vs HOLLYWOOD IMPORTS LIMITED

March 13, 2024
4

1
INDEX TO EXHIBITS

2
PLAINTIFF EXHIBITS FOR IDENTIFICATION:

3 | NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 4 | Exhibit 1 | Lisa Esparza | 41 |
| 5 | Exhibit 2 | Michael Manley | 43 |
| 6 | Exhibit 3 | Complaint | 77 |
| 7 | Exhibit 4 | Emanuel Fuentes | 94 |

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1    THE REPORTER:  We are now on the record.  The

2    time is 11:03 a.m.  Eastern Standard Time.  The date is

3    March 13th, 2024.  We are here to take the deposition

4    of Bibi Bickram in the case of Juan Navarro versus

5    Hollywood Imports Limited, Inc., and AutoNation, Inc.

6         My name is Gary Siffort, notary public and

7    digital reporter for Esquire Deposition Solutions here

8    in the state of Florida.  And I will be capturing the

9    verbatim record of today's proceedings using electronic

10   audio equipment, a computer, and specialized recording

11   software, which is not a form of stenography.  And the

12   witness is currently located in Fort Lauderdale,

13   Florida, and has confirmed her identity with me through

14   driver's license issued by Florida Department of Motor

15   Vehicle.

16         Will everyone in attendance please identify

17   yourselves for the record and state who you represent.

18        MR. PRATER:  Good morning.  Chris Prater from

19   Pollard PLLC, and I represent the plaintiff.

20        MR. GABRIELLE:  Good morning.  Eric Gabrielle

21   from Stearns Weaver.  I represent both defendants.

22        Mr. Court Reporter, did you say you were --

23   that the method of reporting you're using is not a form

24   of stenography or is a form of stenography?

25        THE REPORTER:  It's not a form of stenography.



 1            MR. GABRIELLE:  It's not a form of

 2   stenography.  All right.

 3            THE REPORTER:  Correct.

 4            MR. GABRIELLE:  That's a new experience.  So

 5   in my end to just, you know, reserve objections to that

 6   as -- as appropriate, if there are any.

 7            MR. PRATER:  Yeah.  Can you -- can you explain

 8   what -- what you mean by not a form of stenography?

 9            THE REPORTER:  Okay.  So what I am is a

10   digital reporter.  So I am annotating, as well as

11   recording the audio.  So I'm also capturing audio as

12   well as -- as I'm typing.

13            MR. PRATER:  Okay.

14            THE REPORTER:  So I'm not on a -- what do you

15   call it, a -- a steno.  I am on a laptop.

16            MR. PRATER:  Okay.

17            THE REPORTER:  And I'm using recording

18   software to capture everything that's being said.

19            MR. PRATER:  Okay.  All right.  Okay.  Are we

20   good to go?

21            MR. GABRIELLE:  Yes.

22            MR. PRATER:  Okay.  All right.  Good morning,

23   ma'am.  As you heard, my name is Chris Prater.

24            THE REPORTER:  Whoa, I haven't -- I haven't

25   sworn her in yet.



```
 1              MR. PRATER:  Oh, okay.  Sorry.
 2              THE REPORTER:  Okay.  All right.  And absent
 3    any objections at this time, counsel and witness agree
 4    to my remote administration of the oath to this witness
 5    and that the final transcript may be used for all
 6    purposes allowed by the Local Rules of Civil Procedure.
 7              MR. PRATER:  Agreed.
 8              MR. GABRIELLE:  Agreed with -- obviously, no
 9    objection to the oath being administered remotely.  And
10    just note the prior objection is not different or
11    expanded as it concerns the method of reporting.
12              MR. PRATER:  And, Eric, just to clarify, are
13    you -- you're saying that -- I'm just trying to
14    understand the objection here, you know.
15              MR. GABRIELLE:  I -- I was not aware from the
16    notice, and I don't -- I don't -- it doesn't seem like
17    you were either -- that we were not going to be using a
18    traditional stenographer.  This is my first experience
19    with something other than a traditional stenographer.
20    I am just simply unaware of whether or not that method
21    of reporting is acceptable in the Southern District of
22    Florida.
23              My objection would -- to be clear, would only
24    be to the extent that it is an unauthorized method.  I
25    don't have -- if the method is authorized, I have no
```



1   objections.  If the method is not authorized, I am

2   preserving those objections.

3           MR. PRATER:  Okay.

4           MR. GABRIELLE:  And it's simply because I was

5   unaware of the method, and I'm just not aware of

6   whether or not the federal courts find this to be an

7   acceptable method or not.

8           MR. PRATER:  Okay.

9           MR. GABRIELLE:  If -- if it's acceptable,

10  those objections are withdrawn.  If it's not, they're

11  preserved.

12          MR. PRATER:  All right.  Obviously, the last

13  thing I want to do is have to take this deposition

14  twice, all right?  So you want to take a few minute

15  break here, and try -- let's try to figure it out

16  before we waste everybody's time?

17          MR. GABRIELLE:  It's up to -- I mean --

18          MR. PRATER:  I mean, look, obviously he's

19  recording the audio and going to be able to record

20  every word.  But --

21          THE REPORTER:  I do this in the courtrooms.

22  I've been doing this for a while now.  So, you know, in

23  the court, it's acceptable.

24          MR. GABRIELLE:  I -- I understand.  I mean,

25  it's entirely up to you.  Again, if -- if this is an



 1  acceptable method, my objections would be irrelevant.

 2  And if it's not, then they're preserved.  It's, you

 3  know -- if it's an acceptable method, I don't have

 4  objection.  I'm just unaware that it -- that it is.

 5  That's all.  And I'm not sure if we'd be able to

 6  determine that immediately.  So --

 7          MR. PRATER:  Yeah.  Let's take a few minutes.

 8  I'm going to try to figure it out.  Again, I -- I don't

 9  want to waste everybody's time and having to do this

10  again.

11          MR. GABRIELLE:  I agree.

12          MR. PRATER:  So --

13          MR. GABRIELLE:  I agree.

14          MR. PRATER:  Yeah.  Okay.  So we'll go.

15          (An off-the-record discussion was had.)

16          THE REPORTER:  All right.  So let's try --

17          MR. GABRIELLE:  All right.

18          THE REPORTER:  Let's try this again.

19          MR. GABRIELLE:  So -- yes, this is Eric

20  Gabrielle, counsel for defendants.  With reference to

21  the prior colloquy on the transcript, during the break,

22  I checked 28 United States Code 753, which doesn't

23  specifically answer the question.

24          However, it has been represented to both

25  myself and counsel for Mr. -- Mr. Navarro that an audio



 1   recording of today's deposition will be made available

 2   as part of the delivery of the court reporter's product

 3   as -- as such.

 4          And based on that representation, the

 5   defendants will withdraw their objections to the method

 6   of recording and the method of recording not being

 7   identified in the scope of the notice because the

 8   remedy of having available, the recording should

 9   satisfactory -- satisfactorily address any concerns I

10   have.  So that's -- that's my statement on the record.

11          THE REPORTER:  Okay.  Anything else, Counsel?

12          MR. GABRIELLE:  No.  Not from me.

13          MR. PRATER:  Okay.  I'm not sure if you were

14   sworn in or not?

15          THE REPORTER:  I haven't gotten to that point

16   yet.

17          MR. PRATER:  Okay.  Perfect.  All right.

18          THE REPORTER:  All right.  Let me go ahead and

19   swear her in.

20          Ms. Bickram, can you please raise your right

21   hand.

22                    BIBI BICKRAM,

23   having been first duly sworn, testified as follows:

24          THE REPORTER:  Okay.

25          MR. PRATER:  All right.



BIBI BICKRAM                                          March 13, 2024
NAVARRO vs HOLLYWOOD IMPORTS LIMITED                          11

```
 1              THE REPORTER:  You may begin.
 2                     DIRECT EXAMINATION
 3    BY MR. PRATER:
 4         Q.  All right.  Good morning, ma'am.  As I started
 5    say a little while ago, my name is Chris Prater.  I
 6    work at the Law Offices of Pollard, PLLC, and my office
 7    represents Mr. Navarro in this case against AutoNation,
 8    Inc., and Hollywood Imports Limited, Inc., Could you
 9    please state your full name and home address.
10         A.  Bibi Bickram, 4020 Willow Bay Drive, Winter
11    Garden, Florida 34787.
12         Q.  Okay.  And do you have a middle name?
13         A.  Fheleeza Ali.
14         Q.  Okay.  Can you spell that for us, please?
15         A.  F-H-E-L-E-E-Z-A A-L-I.
16         Q.  And Winter Garden, that's in the Orlando area?
17         A.  It is.
18         Q.  Okay.  And you're currently in what city?
19         A.  Fort Lauderdale.
20         Q.  Okay.  Have you ever had your deposition taken
21    before, ma'am?
22         A.  I have.
23         Q.  Okay.  How many times?
24         A.  I -- I really don't recall.  A -- a few, for
25    sure.
```



 1       Q.   More than five, you think?

 2       A.   I honestly don't know.  I don't -- I don't

 3   think so, but I'm not -- I'm not positive.

 4       Q.   Okay.  When was the last time you had your

 5   deposition taken?

 6       A.   If it was not last year, it was the year

 7   prior.  So somewhere between '22 and '23.

 8       Q.   Okay.  So just a few things to keep in mind as

 9   we go forward here today.  First of all, obviously,

10   Mr. Siffort is the court reporter here today, so it's

11   important that we use verbal responses.  Your head

12   shakes and things like uh-huh, huh-uh, may be difficult

13   to include on the transcript later.  So please

14   verbalize any of your responses, okay?

15       A.   Okay.

16       Q.   All right.  If you do not understand a

17   question that I ask, please just let me know.  I'll do

18   my best to rephrase it or to clarify, okay?

19       A.   Okay.

20       Q.   All right.  And if you need a break, just let

21   me know.  I just ask that if there's a question pending

22   that you answer that before we go on the break.

23       A.   Sounds good.

24       Q.   All right.  Thank you.  Did you do anything to

25   prepare for today's deposition?  Other than -- sorry.



1   Other than speaking with your counsel, did you do

2   anything to prepare for today's deposition?

3        A.  I did not.

4        Q.  Okay.  Did you look at any documents?

5        A.  I looked at a document that Counsel

6   provided -- or shared with me.

7        Q.  Okay.  What was that document?

8        A.  It was Mr. Navarro's e-mail.

9        Q.  Which e-mail?

10       A.  It was an e-mail about the -- the

11  harassment -- the alleged harassment.

12       Q.  Do you recall the date of that e-mail?

13       A.  I do not.

14       Q.  Would you recognize the e-mail if you saw it

15  again?

16       A.  I would.

17       Q.  Okay.  Did you look at any other documents

18  besides that one e-mail?

19       A.  I did not.

20       Q.  Okay.  Was the e-mail you looked at just

21  Mr. Navarro's e-mail, or was there any other messages

22  in the chain?

23       A.  There was a response from Cary Pacheco to

24  Mr. Navarro in the e-mail chain.

25            MR. GABRIELLE:  Chris, I'm happy to represent



1  to you what she looked at if you want.  It's entirely

2  up to you.

3          MR. PRATER:  I mean, if you know a Bates

4  number, that would just -- I could --

5          MR. GABRIELLE:  I do.  It was Defendant's

6  Exhibit 8, which is Bates numbered Plaintiff 0115 to

7  0116.  I mean, you can obviously confirm with her

8  that's the one she saw, but --

9          MR. PRATER:  Sure.  No, I appreciate that,

10  sir.  Thank you.

11  BY MR. PRATER:

12      Q.  Okay.  Had you ever seen that e-mail chain

13  prior to when it was provided by counsel?

14      A.  I believe I saw it once before when -- when

15  there was the demand letter that may have been attached

16  to it.  I'm not 100 percent sure.  Give me one second.

17  Something just popped up on my computer that I've never

18  seen before.  Okay.  Sorry.

19      Q.  It's okay.  Okay.  So you think you saw the

20  e-mail chain in connection with the demand letter that

21  was sent by -- or on Mr. Navarro's behalf?

22      A.  I may have, yes.

23      Q.  Okay.  Had you seen it any other times?

24      A.  No.

25      Q.  Okay.  Did you -- other than counsel, did you



 1   discuss today's deposition with anyone?

 2        A.  No.  I did not.

 3        Q.  Okay.  The last deposition that you sat for,

 4   you said if not last year, then the year prior, what

 5   was the subject matter of that deposition?

 6        A.  It's a little fuzzy.  It's -- it's been a

 7   while, but I believe it was something around a FMLA

 8   case.

 9        Q.  Do you recall what jurisdiction that case was

10   pending in?

11        A.  It was based out of Baltimore, Maryland.

12        Q.  Federal court or state court?

13        A.  I do not know.

14        Q.  What were the names of the -- any parties to

15   that case?

16        A.  I do not remember.

17        Q.  Do you know if AutoNation, Inc., was a party

18   to that case?

19        A.  No.  It was specific to a dealership.

20        Q.  Okay.  Prior to that deposition, when was the

21   next most recent one that you've sat for?

22        A.  I honestly don't recall.

23        Q.  Okay.  Do you recall the subject matter of the

24   last one before the --

25        A.  No.  I'm sorry.



 1     Q.  Do you recall the subject matter of any other

 2  depositions you sat for?

 3     A.  No.  There may have been one other one,

 4  another FMLA case.  But again, it's fuzzy.  It's been

 5  a -- it's been a while.

 6     Q.  Okay.  Who is your current employer, ma'am?

 7     A.  I work for Eastern Region Management.

 8     Q.  Is that the full legal name of that entity, or

 9  is there, like, an, Inc., or LLC or something at the

10  end?

11     A.  It may have an LLC, but I cannot say for sure.

12     Q.  Okay.  How long have you been employed by

13  Eastern Region Management?

14     A.  Maybe five or six years.  It changed from

15  Florida Region Management at one point to Eastern

16  Region.  But collectively 18 or so years.

17     Q.  So for five or six years, your employer has

18  been Eastern Region Management?  And for 12 or 13 years

19  prior to that, your employer was Florida Region

20  Management?

21     A.  Yes.  There was a shift between the Florida

22  and Eastern.  I just don't have a specific timeline for

23  you.

24     Q.  Okay.  Did anything other than the name

25  change?



BIBI BICKRAM                                                    March 13, 2024
NAVARRO vs HOLLYWOOD IMPORTS LIMITED                                        17

```
 1        A.  There --
 2            MR. GABRIELLE:  Object to form.
 3            Ma'am, my objections are for the record.
 4    They're not intended to instruct you how to answer or
 5    whether to answer.  So if you know the answer to the
 6    question and you understand it, please give it.
 7            THE WITNESS:  Can you repeat the question,
 8    please?
 9    BY MR. PRATER:
10        Q.  Yeah.  Other than the name change between --
11    from Florida Region Management to Eastern Region
12    Management, did anything else change from your
13    perspective?
14        A.  I am not sure.
15        Q.  But for the last five or six years, your
16    paychecks have come from Eastern Region Management?
17        A.  Yes.  I believe so.  I don't -- like I said, I
18    don't know if it's got the LLC.  I just don't pay that
19    much attention.
20        Q.  Okay.  All right.  Do you have an office?
21        A.  I do.
22        Q.  Where is your office located?
23        A.  I sit at Audi South Orlando.
24        Q.  Do you have any other offices?
25        A.  I do not.
```



1    Q.  Since you've been employed by Eastern Region

2  Management, have you -- has your office been at any

3  other locations?

4    A.  Yes.  It was at Mercedes Benz of Orlando at

5  one point.

6    Q.  Anywhere else?

7    A.  Under Eastern Region Management?  No.  I

8  believe just Mercedes Benz of Orlando.

9    Q.  Okay.  And under Florida Region Management,

10  did you have an office or offices?

11    A.  I did.  At AutoNation Ford Sanford.

12    Q.  That's also in the Orlando area?

13    A.  Yes.  It is.

14    Q.  Okay.  Was that your only office in while you

15  were employed by Florida Region Management?

16    A.  Yes.

17    Q.  Okay.  Do you know what Hollywood Imports

18  Limited, Inc., is?

19    A.  It's one of the dealerships.

20    Q.  One of the dealerships for what?

21    A.  In Florida and in the South Florida area.

22    Q.  When you say one of the dealerships, that

23  implies that there are other dealerships under some

24  other umbrella.  Is that what you're saying?

25    A.  Yes.  It's -- it's one of the dealerships



 1  under the AutoNation umbrella.

 2      Q.  Okay.  And what is the relationship between

 3  Eastern Region Management and Hollywood Imports

 4  Limited, Inc.?

 5          MR. GABRIELLE:  Object to form and foundation.

 6          Again, ma'am, my objections are for the

 7  record.  And if you understand the question and you

 8  know the answer, please provide it.

 9          THE WITNESS:  And the question was: What is

10  the relationship with Eastern Region Management and

11  Hollywood, Inc.?

12  BY MR. PRATER:

13      Q.  Hollywood Imports Limited, Inc.

14      A.  Okay.  It's -- Eastern Region is just another

15  one of the entities under the AutoNation umbrella.

16      Q.  Have you ever seen an organization chart that

17  shows where Eastern Region Management is in that

18  umbrella with respect to Hollywood Imports Limited,

19  Inc.?

20      A.  No.  I have not.

21      Q.  Okay.  Does -- what does Eastern Region

22  Management do?

23      A.  I don't know that I understand the question.

24  What do they do?

25      Q.  Yeah.  What -- what type of business is it?



1      A.   It's just -- it is one of the entities.   And

2   like I said, I'm -- I work through Eastern Region

3   Management, and so we support the dealerships,

4   franchise, non-franchise locations within the Eastern

5   Region Management Group.

6      Q.   How many dealerships are within the Eastern

7   Region Management Group?

8      A.   Roughly 105.

9      Q.   And in what ways does the Eastern Region

10   Management provide support to those dealerships?

11      A.   So from my perspective, in an HR, we're -- or

12   we operate in a consultative manner to provide support

13   to each of the dealerships.

14      Q.   What does that mean?

15         MR. GABRIELLE:   Object to form.

16   BY MR. PRATER:

17      Q.   You can answer.

18      A.   I'm -- I'm thinking about --

19      Q.   Okay.   Sorry.

20      A.   We provide HR support in all aspects to

21   associates, if they need help, if there are issues,

22   concerns, if they need help with benefits, if they need

23   help with paperwork, if a manager needs support with

24   coaching, counseling, performance management.   So

25   it's -- it's a variety of HR functions that we provide



 1  support.

 2      Q.  Any other ways in which Eastern Region

 3  Management supports the dealerships that you can think

 4  of?

 5      A.  From an HR perspective?

 6      Q.  We'll start with that.

 7      A.  I mean, like I said, it's sort of all the

 8  things within the HR function from every associate

 9  within the dealership.  So anything that we can help.

10  And if we can't help, we redirect to where they can

11  find the answer.

12      Q.  Does the Eastern Region Management set

13  policies or procedures or standards for dealerships?

14          MR. GABRIELLE:  Object to form.

15          THE WITNESS:  No.  We do not.  There are, you

16  know, practices that we will help with.  But each

17  dealership, there's sort of an umbrella set of -- of

18  policies or procedures.  But they -- they do have the

19  flexibility to -- to make their own processes,

20  policies.

21  BY MR. PRATER:

22      Q.  All right.  So I think you said there's an

23  umbrella set of policies.  Are you saying -- did that

24  come from -- from where?  What --

25      A.  There's the AutoNation umbrella, so there's



BIBI BICKRAM                                           March 13, 2024
NAVARRO vs HOLLYWOOD IMPORTS LIMITED                          22

 1   the AutoNation handbook, and there's those general
 2   guidelines, using the handbook as an example.  However,
 3   let's dig in a little further.  Within the handbook,
 4   there may be a dress code policy general guideline.
 5   But the store has the flexibility to implement
 6   something a little different or stricter or maybe not
 7   as strict.  So there's a general guideline that they
 8   can follow or they can -- they can tweak, if needed.
 9       Q.  Okay.  Is there a written policy regarding
10   what policies or guidelines or standards that the
11   dealerships can change or tweak from what comes down
12   from AutoNation.
13       A.  And the -- I'm sorry, repeat the first part of
14   the question.
15       Q.  Yeah.  I'm trying to understand, is there
16   something in writing that explains which of these
17   guidelines or policies, standards that the dealerships
18   can change or tweak, make stricter or less strict, I
19   think, is what you said at the store level?
20           MR. GABRIELLE:  Object to form.
21           THE WITNESS:  No, there is not.
22   BY MR. PRATER:
23       Q.  Okay.  So AutoNation has its own handbook and
24   guidelines, and then the stores can -- the individual
25   dealerships can follow those or modify them in any way



1    that they want?

2           MR. GABRIELLE:  Object to form.

3           THE WITNESS:  Within -- within reason.  I

4    mean, there's things such as harassment, no

5    retaliation, which are followed.  There are things that

6    they -- they can tweak or -- or, you know, implement

7    slightly different using -- going back to the -- the

8    dress code.  You may have one dealership that may allow

9    maybe jeans.  Another location may not.  But then they

10   may say it's, you know, premium luxury, you need to

11   dress in a suit.  So there are things that within

12   reason are acceptable to make changes, yes.

13   BY MR. PRATER:

14      Q.  Okay.  Who determines what is a reasonable

15   change from the AutoNation policies and guidelines?

16          MR. GABRIELLE:  Object to form.

17          THE WITNESS:  The general manager could --

18   could make that with some consultation from the human

19   resources.

20   BY MR. PRATER:

21      Q.  If a dealership wants to modify any guidelines

22   or policies that come from AutoNation, Inc., do they

23   need to have approval?  Do they need to get that

24   approved by someone or some entity?

25      A.  It would largely --



```
 1              MR. GABRIELLE:  Same ob --

 2              Sorry to interrupt.  And -- and if you could

 3    let him finish his question, and then let me get an

 4    objection in if I have one, and then proceed forward.

 5    And even if I don't have an objection, let him finish

 6    this question.

 7              Objection to form.

 8              THE WITNESS:  It would largely depend on the

 9    situation.

10    BY MR. PRATER:

11       Q.  I appreciate that, ma'am.  I'm just trying to

12    understand what it depends on and how a dealership is

13    supposed to know I can modify this guideline or

14    procedure, but not this one.  Is there anything that

15    details that or provides any guidance to the

16    dealerships about which AutoNation policies they need

17    to actually follow and which ones they can modify?

18       A.  No.  There's no policy or procedure that says

19    what they can or cannot do.

20       Q.  But you said that there are some policies and

21    guidelines that must be followed that are issued by

22    AutoNation, Inc., right?

23       A.  There are guidelines.  So I use the handbook

24    as an example.  You know, the no harassment, the

25    discipline, or the -- the misconduct, those are
```



 1   things -- the retaliation policy, zero tolerance,

 2   those -- those will be followed.

 3          There are certain things like the dress code

 4   or maybe the attendance policy where one dealership

 5   determines, okay, if you're late three times, then it's

 6   discipline.  Another dealership may say, if you're late

 7   one time, it's discipline.  But there's a general

 8   guideline within some of those areas that they can

 9   tweak or modify.

10      Q.  Do you know what the code of business ethics

11   is for AutoNation?

12      A.  Yes.

13      Q.  What is it?

14      A.  So our business ethics program, code of

15   conduct, policies, procedures.

16      Q.  Okay.  And that code of business ethics, do --

17   does that apply to the individual dealerships?

18      A.  Yes.  It does.

19      Q.  And are the dealerships permitted to modify

20   any of the guidelines or provisions of the code of

21   ethics from AutoNation?

22          MR. GABRIELLE:  I'm sorry.  I -- I missed the

23   question, Chris.  I -- can you repeat it?  I'm sorry.

24          MR. PRATER:  Sure.

25   BY MR. PRATER:



1      Q.  I said, are the dealerships -- are the
2    individual dealerships permitted to modify or not
3    comply with any aspects of the code of business ethics
4    that comes from AutoNation, Inc.?
5      A.  Not that I'm aware of, no.
6      Q.  So I'm just trying to understand.  So the code
7    of business ethics, that needs to be followed by the
8    dealerships without modification.  Is that your
9    testimony?
10      A.  It is not, to my knowledge, that that can be
11    modified, no.
12      Q.  Okay.  But the AutoNation handbook, that can
13    be modified by the individual dealerships?
14          MR. GABRIELLE:  Objection to form.
15          THE WITNESS:  I gave you two examples of
16    things that can be tweaked.  But I -- I simply can't go
17    through and say what can and cannot be modified.  But
18    there are general guidelines that should be followed.
19    BY MR. PRATER:
20      Q.  Should be, but are not required to?  I'm
21    just -- we need to be clear on this.
22          MR. GABRIELLE:  Same objection.
23          THE WITNESS:  Are we -- can you clarify if
24    you're speaking specifically to the handbook or --
25    BY MR. PRATER:



 1      Q.  Yeah.  Let's talk about that.  Yeah.  With
 2  respect to the handbook, is it your testimony the
 3  dealerships should follow that, but they're not
 4  required to?
 5          MR. GABRIELLE:  Objection to form and
 6  foundation.
 7          THE WITNESS:  I can't speak to if a dealership
 8  does or does not follow it.  Those are the guidelines
 9  that -- that should be followed.
10  BY MR. PRATER:
11      Q.  Is the dealership subject to any repercussions
12  from Eastern Region Management or any other entity for
13  not following AutoNation guidelines?
14          MR. GABRIELLE:  Same objections.
15          THE WITNESS:  I'm not sure I understand the
16  question.
17  BY MR. PRATER:
18      Q.  We need to be clear on this.
19          MR. GABRIELLE:  Same objection.
20  BY MR. PRATER:
21      Q.  AutoNation sets guidelines --
22      A.  Clarify if you're speaking --
23      Q.  -- and the code of business ethics, right?
24      A.  Yes.
25      Q.  The guidelines are contained in the AutoNation



BIBI BICKRAM                                    March 13, 2024
NAVARRO vs HOLLYWOOD IMPORTS LIMITED                        28

 1  handbook?
 2      A.  Policies and procedures are in the AutoNation
 3  handbook.
 4      Q.  Okay.  Perfect.  Are there -- beyond the
 5  AutoNation handbook and the code of business ethics,
 6  does AutoNation issue any other guidelines, standards,
 7  policies, procedures that apply to the dealerships?
 8          MR. GABRIELLE:  Object to form.
 9          THE WITNESS:  Yes.  They do.
10  BY MR. PRATER:
11      Q.  Okay.  What are they?
12      A.  I -- I simply cannot name them all.  In every
13  line of the business, there are car-buying policies,
14  procedures, selling guidelines, finance guidelines.
15      Q.  What are others that you're aware of?
16      A.  Service guidelines.  In -- in every part of
17  the business, there are guidelines.
18      Q.  Any others that you can think of?
19      A.  Not off the top of my head, no.
20      Q.  Okay.  And so clarifying here, the code of
21  ethics -- or code of business ethics, excuse me, that's
22  one that you -- you said the dealerships need to follow
23  without modification.
24      A.  So I don't -- I'm not really sure.  Those are
25  the code -- the code of conduct, code of business



1   ethics, those guidelines need to be followed.  I gave
2   you an example in the AutoNation handbook of
3   something -- a -- a policy that can be tweaked.  But I
4   can't go through every guideline or policy and tell you
5   if it must be followed or if there can -- if there is a
6   slight, you know, modification to it or a change.
7        Q.  What would you do to determine whether
8   everything in the -- or what aspects of the code of
9   business ethics must be followed versus those which can
10  be tweaked or modified?
11            MR. GABRIELLE:  Objection to form and
12  foundation.
13            THE WITNESS:  I don't know.
14  BY MR. PRATER:
15       Q.  Is there anybody you would ask?
16            MR. GABRIELLE:  Same objections.
17            THE WITNESS:  No.  I -- I really don't know.
18  BY MR. PRATER:
19       Q.  Okay.  Are there any documents you could refer
20  to to tell you what of the code of business ethics
21  needs to be followed by the dealerships versus not?
22            MR. GABRIELLE:  Same objections.
23            THE WITNESS:  I would assume they should all
24  be followed and are followed.
25  BY MR. PRATER:



BIBI BICKRAM                                          March 13, 2024
NAVARRO vs HOLLYWOOD IMPORTS LIMITED                             30

```
1        Q.  I appreciate that, ma'am, but I'm not asking

2   about your -- your assumptions.  I'm just --

3        A.  Then I don't --

4            MR. GABRIELLE:  There's no question pending.

5   He can -- he can re-ask the question if he has a

6   follow-up question.

7   BY MR. PRATER:

8        Q.  You can please answer the question that I --

9   that I asked: What documents -- are there any --

10           MR. GABRIELLE:  Well, what is the --

11           MR. PRATER:  Excuse me.

12           MR. GABRIELLE:  Go ahead.

13  BY MR. PRATER:

14       Q.  Are there any documents that you would refer

15  to at all to let you know whether any aspects of the

16  code of business ethics must be followed versus not be?

17           MR. GABRIELLE:  Objection to form and

18  foundation.

19           THE WITNESS:  No.

20  BY MR. PRATER:

21       Q.  What's your current title, ma'am?

22       A.  The Vice President, People Partners.

23       Q.  Since when have you held that title?

24       A.  February of '24.

25       Q.  Okay.  And what was your title prior to that?
```



1      A.  Vice President of Human Resources, Eastern

2  Region.

3      Q.  And how long did you hold that title?

4      A.  About six years.

5      Q.  Was that your entire time with Eastern Region

6  Management prior to February 2024?

7      A.  I can't say.  I am not sure.

8      Q.  Okay.  What was your title prior to Vice

9  President, Human Resources, Eastern Region?

10      A.  Human Resources Director.

11      Q.  And from when to when did you hold that title?

12      A.  Goodness.  I -- I am not 100 percent sure.  I

13  held it for a couple of years prior to the vice

14  president title.

15      Q.  Was your title actually Regional Human

16  Resources Director?

17      A.  Possibly, yes.

18      Q.  Okay.  Does late 2012 to the middle of 2017

19  sound about right?

20      A.  Definitely 2017.  Between 2012, it was --

21  prior to that, it was Regional HR manager.  So yes,

22  that sounds about right.

23      Q.  What are your duties and responsibilities as

24  Vice President, People Partners?

25      A.  I'm responsible for supporting the human



 1  resources function at the dealership, franchise,

 2  non-franchise level across the organization.

 3       Q.  And the -- the 105 dealerships that you --

 4  approximately 105 dealerships you said are -- are

 5  within Eastern Region Management, geographically

 6  speaking, are they all East Coast dealerships?

 7       A.  They -- they're along Eastern.  From the

 8  northeast, we go across to Minnesota, Illinois, Ohio,

 9  and then down along -- along the East Coast to south --

10  to Florida.

11       Q.  Okay.  Any other duties and responsibilities

12  as Vice President, People Partners?

13       A.  I mean, supporting the human resources

14  function for the stores that -- that would -- along

15  with my team.

16       Q.  And when you say supporting HR functions for

17  the dealerships across the organization, what -- what

18  does that entail?

19       A.  So it could be anything from a manager who

20  needs to perform his managements and associates.  It

21  could be an associate who has a concern or simply needs

22  help with benefits or systems.  It could be

23  investigations.  It could be someone who's hurt.

24       Q.  Okay.  Anything else?

25       A.  There's lots of duties within the HR.  I -- I



BIBI BICKRAM                                          March 13, 2024
NAVARRO vs HOLLYWOOD IMPORTS LIMITED                          33

1  don't know that I can list them all, you know, at this

2  moment in thinking through them all, but that was

3  high-level support.

4       Q.  Do you have a written job description?

5       A.  Sure, I do.

6       Q.  Have you ever seen it?

7       A.  It's been a while.  I've been -- I've -- it

8  has been a while, but I'm sure there is one, yes.

9       Q.  When in February did you accept the position

10  of Vice President, People Partners.

11       A.  February 1st.

12       Q.  So did you see a written job description since

13  February -- at any time since February 1st?

14       A.  No.  I have not.

15       Q.  Who do you report to, currently?

16       A.  Lisa Esparza.

17       Q.  Spell her last name, please?

18       A.  E-S-P-A-R-Z-A.

19       Q.  Okay.  And what's her title?

20       A.  Chief Human Resources Officer.

21       Q.  As Vice President, People Partners, you're

22  within the Human Resources Department?

23       A.  Yes.

24       Q.  Okay.  And Ms. Esparza is the highest ranking

25  employee in the Human Resources Department for Eastern



```
 1   Region Management?

 2       A.  Yes.

 3           MR. GABRIELLE:  Chris, we're getting some

 4   noise from the room next door.  Is that bothering you?

 5   You want me to go tell them to be quiet or --

 6           THE WITNESS:  Oh, no.

 7           MR. GABRIELLE:  Are you guys hearing it or

 8   not?

 9           THE WITNESS:  No.

10           MR. PRATER:  I can't hear it at all.

11           MR. GABRIELLE:  Is it --

12           THE WITNESS:  I'm fine.

13           MR. GABRIELLE:  Okay.  As long as it's -- as

14   long as it's not interfering with your ability here or

15   hers, then I'm okay.

16           MR. PRATER:  Appreciate the -- the check-in.

17   I'm okay.  I haven't heard anything at all.

18           MR. GABRIELLE:  Okay.

19   BY MR. PRATER:

20       Q.  Who does Ms. Esparza report to?

21       A.  The CEO.

22       Q.  I'm sorry.  You said the CEO?

23       A.  Yes.

24       Q.  Okay.  Who's that?

25       A.  Mike Manley.
```



1        Q.   M-A-N-L-Y?

2        A.   L-E-Y.

3        Q.   L-E-Y. Thank you.   And what company is he the

4   CEO of?

5             MR. GABRIELLE:   Object to form and foundation.

6             THE WITNESS:   I don't know what he works

7   under.

8   BY MR. PRATER:

9        Q.   Okay.   In your current role as Vice President,

10  People Partners, how many people report to you?

11       A.   I believe approximately ten, currently.

12       Q.   Are all of your direct reports employed by

13  Eastern Region Management?

14       A.   No.   They are not.

15       Q.   Okay.   Tell me the companies that your reports

16  are employed by, please.

17       A.   Eastern Region Management and I do not know

18  the Western Region's corporate -- or LLC designation.

19       Q.   Are you saying that there's another entity

20  called Western Region Management or something --

21            MR. GABRIELLE:   Object to form.

22            MR. PRATER:   -- like that?

23            THE WITNESS:   I do not know the -- the name.

24  BY MR. PRATER:

25       Q.   Okay.   How many of your direct reports are



1  employed by Eastern Region Management?

2       A.   Two.

3       Q.   What are their names?

4       A.   Kristy Phillips and Gloria Yun, Y-U-N.

5       Q.   Do all of your direct reports have the same

6  title?

7       A.   No.

8       Q.   Okay.  Can you let me know what their -- what

9  the titles are --

10      A.   Kristy --

11      Q.   -- of your direct reports?  Yeah.

12      A.   Yes.  All right.  Kristy Phillips is Senior

13 Manager, People Partners.  Gloria is simply People

14 Partner.

15      Q.   And you're not sure what the entity is called

16 that the other eight or so of your direct reports work

17 for is called?

18      A.   No.

19      Q.   Okay.  What were your duties and

20 responsibilities as Vice President, Human Resources,

21 Eastern Region?

22      A.   They were everything I listed as the People

23 Partner but only for the Eastern Region at that time.

24      Q.   And -- and back to your current position, when

25 you said responsible for supporting human resources



1  functions at the dealership levels across the

2  organization, what -- what organization are you

3  referring to?

4       A.  Across AutoNation.

5       Q.  Inc.?  AutoNation, Inc.?

6            MR. GABRIELLE:  Object to form.

7            THE WITNESS:  Across the entities that are

8  under the AutoNation umbrella.

9  BY MR. PRATER:

10      Q.  So that means entities nationwide, coast to

11  coast?

12      A.  Yes.

13      Q.  Okay.  What about outside of the United

14  States?  Does AutoNation have any dealerships outside

15  of the US?

16      A.  No.

17      Q.  Okay.  When you were Vice President, Human

18  Resources, Eastern Region, who did you report to?

19      A.  I reported to the region president.

20      Q.  Who is that?

21      A.  Nick Schnelle.

22      Q.  Spell the last name for us, please.

23      A.  S-C-H-N-E-L-L-E.

24      Q.  Okay.  Well, you said he was Region President,

25  Eastern Region?



 1        A.   Yes.

 2        Q.   Okay.  And how many direct reports did you

 3   have as Vice President, Human Resources, Eastern

 4   Region?

 5        A.   Two.

 6        Q.   Who were they?

 7        A.   Kristy Phillips and Jennifer Strohauer.

 8        Q.   One more time and the spelling.

 9        A.   Sure.  S-T-R-O-H-A-U-E-R.

10        Q.   Okay.  What were their titles?

11        A.   Both were senior managers.

12        Q.   Eastern Region, Senior -- sorry, Senior

13   Managers, Eastern Region?

14        A.   Senior Regional Managers, I believe it's

15   titled.

16        Q.   Also within the Human Resources Department of

17   Eastern Region Management?

18        A.   Yes.

19        Q.   And were those -- were both of those

20   individuals, Ms. Phillips and Ms. Strohauer, they were

21   both your direct reports the entire time you were Vice

22   President, Human Resources, Eastern Region?

23        A.   Yes.  They were -- you -- can you repeat the

24   question?  Were they both my --

25        Q.   Direct reports the whole time you were Vice



1   President, Human Resources of the Eastern Region?

2        A.  No.  Kristy Phillips, I promoted her somewhere

3   halfway through my -- my time.

4        Q.  Is that sometime prior to 2022 that

5   Ms. Phillips was promoted?

6        A.  Yes.  I believe so.

7        Q.  Okay.  You hold any -- any degrees?

8        A.  I have a Bachelor's of Arts.

9        Q.  In what subject?

10       A.  Organizational behavior.

11       Q.  Okay.  Where did you get that degree?

12       A.  Rollins College.

13       Q.  Where is that located?

14       A.  Winter Park, Florida.

15       Q.  Oh, okay.  All right.  Any other degrees?

16       A.  No.  Well --

17       Q.  Okay.  Do you hold -- oh.

18       A.  -- I have an AA, but I guess that comes with

19   the BA.

20       Q.  Okay.  Is there a subject for the -- that's an

21   associate's degree?

22       A.  Correct.

23       Q.  Okay.  Subject matter or field?

24       A.  I think just field.  It's been a while.

25       Q.  Okay.  And do you hold any professional



 1  certificates or licenses?

 2       A.  I do not.

 3            MR. PRATER:  Okay.  I'm going to take just a

 4  couple of minutes here.

 5            MR. GABRIELLE:  Do you want to just take a

 6  break now?  I was going to ask for one in about five

 7  minutes anyway, so --

 8            MR. PRATER:  Yeah.  Yeah.  Perfect.

 9            MR. GABRIELLE:  Okay.  We -- and we can't talk

10  off the record about the substance of your testimony.

11            THE WITNESS:  Understood.

12            MR. GABRIELLE:  Five minutes or so?

13            MR. PRATER:  Yeah.  Yeah.  That's fine.

14            MR. GABRIELLE:  What are you going to -- while

15  I've got you, what -- what are you going to want to do

16  about lunch?  Do you want to maybe go until 1:00 and

17  break, or do you think you'll be finishing shortly

18  thereafter?

19            MR. PRATER:  I don't think it's going to last

20  much longer than that.

21            MR. GABRIELLE:  Okay.  All right.  Five

22  minutes.  We'll be back --

23            MR. PRATER:  Depending on how -- depending on

24  how it goes.  If we get to 1:00, then it's like, oh,

25  we're --



BIBI BICKRAM                                           March 13, 2024
NAVARRO vs HOLLYWOOD IMPORTS LIMITED                          41

```
 1           MR. GABRIELLE:  I'm not going to -- you know,
 2   I -- I can't enforce it, anyway, so --
 3           MR. PRATER:  No.  I -- I'll try to be accurate
 4   with that, but thank you.  Okay.  So about five minutes
 5   will be all right.
 6           MR. GABRIELLE:  Okay.  Bye.
 7           THE WITNESS:  Thank you.
 8           THE REPORTER:  Okay.  We are now off the
 9   record at 12:12 p.m.  Eastern Standard Time.
10           (A recess was taken.)
11           THE REPORTER:  We are now back on the record
12   at 12:23 p.m.  Eastern Standard Time.  You may proceed.
13           MR. PRATER:  All right.  Thank you.
14   BY MR. PRATER:
15       Q.  Going back to Ms. Esparza, who do you think
16   she is employed by, if you know?
17       A.  I do not know.
18       Q.  Okay.  Share my screen with you here.  So this
19   will be Exhibit 1 to the deposition.
20           (Plaintiff's Exhibit 1 was marked for
21   identification.)
22   BY MR. PRATER:
23       Q.  At the bottom, you can see the website where
24   this was collected,
25       A.  Yes.
```



 1        Q.  -- report directly to?  Okay.  All right.
 2   And --
 3            MR. GABRIELLE:  She was reading it.
 4            Were you reading it to try to confirm it?  I
 5   mean, it seems likely that --
 6            MR. PRATER:  Wasn't that --
 7            MR. GABRIELLE:  Were you rea --
 8            MR. PRATER:  No.  She -- she -- I'm sorry.
 9   Were you -- did you --
10            MR. GABRIELLE:  She was reading it.  I wasn't
11   sure if she was --
12            THE WITNESS:  Yes.
13            MR. GABRIELLE:  -- reading it to answer your
14   question or not, so --
15            MR. PRATER:  Oh, I thought she already did
16   answer.
17   BY MR. PRATER:
18        Q.  So is this the Lisa Esparza that you testified
19   you report directly to?
20        A.  Yes.
21        Q.  Okay.  Perfect.
22            MR. GABRIELLE:  Would you -- Chris, would you
23   mind just forwarding a copy of this -- that document so
24   I can have it?
25            MR. PRATER:  Yeah.  Of course.



BIBI BICKRAM                                          March 13, 2024
NAVARRO vs HOLLYWOOD IMPORTS LIMITED                          43

```
 1              MR. GABRIELLE:  We'll be -- yeah.

 2              MR. PRATER:  Yeah.  There's one more here and

 3   I'll --

 4              MR. GABRIELLE:  I don't need it -- I don't

 5   need it during the depo, but -- but at the conclusion

 6   of the depo.

 7              MR. PRATER:  Well, of course.  Yeah,

 8   absolutely.

 9   BY MR. PRATER:

10       Q.  So -- okay.  And share one more here with you.

11   This will be Exhibit 2 to the deposition.

12              (Plaintiff's Exhibit 2 was marked for

13   identification.)

14   BY MR. PRATER:

15       Q.  Again from the

16   investors.autonation.com/governance/boardofdirectors

17   website here.  And this is Michael Manley, Chief

18   Executive Officer and Director.  Is this the individual

19   you referred to that Ms. Esparza reports directly to?

20       A.  Yes.

21              MR. GABRIELLE:  Same request with Exhibit 2,

22   please.

23              MR. PRATER:  Of course.  Yeah, I'll -- I'll

24   send all exhibits to you when -- when --

25              MR. GABRIELLE:  Okay.
```



```
 1            MR. PRATER:  -- we're done here.
 2   BY MR. PRATER:
 3       Q.  In your role as Vice President, Human
 4   Resources, Eastern Region, did you receive any training
 5   or education from your employer?
 6       A.  We receive ongoing training.
 7       Q.  Okay.  Is that training online, in person,
 8   both, something else?
 9       A.  Both.
10       Q.  Okay.  So both in person and online, right?
11       A.  Yes.
12       Q.  Okay.  Is there -- are there records
13   maintained of the training that you've participated in?
14            MR. GABRIELLE:  Object to form and foundation.
15            Ma'am, again, same instructions.  If you
16   understand the question and you know the answer, please
17   provide it.
18            THE WITNESS:  If there is online training,
19   some of those are in our transcripts, depending on the
20   training.
21   BY MR. PRATER:
22       Q.  So some of the training is -- sorry, strike
23   that.
24            In your transcripts.  What do you mean by --
25   what are you referring to with transcripts?
```



1      A.  So if there's any online training through our

2  training platform, it's listed if it has been completed

3  on a transcript.

4      Q.  Okay.  What about in-person trainings?  Is

5  there any record of in-person trainings you've

6  attended?

7      A.  In -- when you say record, just -- what do you

8  mean?  Some sort of --

9      Q.  Examples could be a notation on -- in your

10  personnel file or on this transcript you referred to,

11  sign-in sheets that you filled out whenever you arrived

12  at the training.

13      MR. GABRIELLE:  Note my objection to form and

14  foundation.

15      THE WITNESS:  None that I'm aware of.

16  BY MR. PRATER:

17      Q.  What's the platform that online training is

18  conducted through?

19      A.  Ignite Performance.  I don't know the actual

20  platform.  That's just our renamed version of it

21  that -- that's escaping me at the moment.

22      Q.  Okay.  And you have a login to get into the

23  Ignite Performance platform?

24      A.  I do.

25      Q.  Okay.  Is Ignite -- is the Ignite Performance



1   platform also utilized for training of people within

2   the individual dealerships?

3       A.  Yes.

4       Q.  Has the Ignite Performance platform been used

5   since the beginning of 2022?

6       A.  Yes.

7       Q.  Any other online training platforms that have

8   been used since then?

9       A.  There are all types of training platforms at

10  the dealerships specific to manufacturers, but I -- I

11  couldn't tell you what they are.

12      Q.  By manufacturers, you're -- you're referring

13  to automotive manufacturers?

14      A.  Yes.

15      Q.  Okay.  But from a AutoNation or Eastern Region

16  Management perspective, is Ignite Performance the

17  training platform that's used, or are there others?

18          MR. GABRIELLE:  Object to the form.

19          THE WITNESS:  I'm not sure if there are

20  others.

21  BY MR. PRATER:

22      Q.  Okay.  And to clarify, I'm saying from an

23  AutoNation and Eastern Region Management perspective

24  with respect to training regarding AutoNation, Eastern

25  Region Management policies, procedures, standards,



1  codes of conduct, beyond Ignite Performance, is -- is

2  there any other platform or system used for online

3  training?

4      A.  Not that I'm aware of, but I -- I can't say

5  for certain.

6      Q.  In your current role as Vice President, People

7  Partners, are you responsible in any way for training

8  and education of employees at the dealership level?

9      A.  Yes.  At times my team does do training at the

10 dealership level.

11     Q.  Does your team also require certain trainings

12 be completed by employees at the dealership level?

13     A.  If there is a situation that warrants a

14 specific training that I am asking it to be completed,

15 yes.  But any of the training that's required at the

16 dealership level, that's -- the general manager is

17 requiring that of the associates.

18     Q.  So, like, say, for example, during -- is there

19 an orientation whenever employees at the dealership

20 level are -- are hired?

21     A.  Yes.

22     Q.  And that orientation includes some training

23 regarding AutoNation policies and codes of conduct,

24 standards?

25     A.  Yeah.



1    Q.  And does AutoNation or Eastern Region

2  Management require that the employees at the dealership

3  level complete those trainings during orientation?

4    A.  It's required by the general manager of the

5  dealership, yes.  That orientation is not handled by my

6  team.

7    Q.  Okay.  So if a general manager at the

8  dealership does not want to put employees at the

9  dealership level through any training during

10  orientation, that's their discretion?

11        MR. GABRIELLE:  Object to form.

12        THE WITNESS:  Are you specifically asking

13  about new hire orientation?

14  BY MR. PRATER:

15    Q.  Yes.  At the moment.

16    A.  Yes.  I suppose that would be at the general

17  manager's discretion.

18    Q.  Okay.  Is there any training for employees at

19  the dealership level that is required by AutoNation

20  or -- or Eastern Region Management?

21    A.  Sure.  So there are trainings that we go

22  through.  And again, I can't specifically name them

23  all.  But for example, anti-harassment as -- is

24  required for all associates to go through.

25    Q.  Required by whom?



1        A.  By AutoNation, the -- or the -- the entities

2    under -- it's -- really, it's required by the store,

3    the general manager, and all of the entities within the

4    AutoNation umbrella, yes.

5        Q.  Okay.  So again, I'm not -- I'm not asking

6    about what the individual dealerships require at the

7    moment.  I'm asking about what AutoNation, Inc., and

8    Eastern Region Management require at the dealership

9    level.  Do AutoNation, Inc., and Eastern Region

10   Management require any trainings for dealership-level

11   employees?

12       A.  There is training that is required by the

13   associates, and it does, you know, go through the

14   AutoNation umbrella to all of the entities that, hey,

15   sexual harassment -- or, excuse me, anti-harassment

16   training is -- is coming up, and it's due.  But it's

17   the general manager's responsibility to ensure their

18   employees are completing the course.

19       Q.  Do the general managers have discretion to not

20   put their employees through that training?

21       A.  I suppose they do.

22       Q.  Are you aware of any general managers that

23   have chosen to exercise that discretion and not put

24   their employees through the discrimination and

25   harassment training?



1    A.  I can't think of any off of the top of my head

2  at this moment.

3    Q.  Okay.  Why does Eastern Region -- or well,

4  first of all, where does that directive of here's

5  sexual harassment or -- or harassment training, and

6  it's coming due and needs to be completed by a certain

7  date.  That's what you said.  That's kind of how it's

8  communicated to the dealerships?

9    A.  Correct.

10    MR. GABRIELLE:  Objection to form.

11  BY MR. PRATER:

12    Q.  So who is telling the dealerships this

13  harassment training is coming up, and it's due on this

14  day.

15    A.  Sure.  I don't -- I don't know that I

16  understand the question.  It's --

17    Q.  Is it -- is -- does your office tell the

18  dealerships, harassment training is coming up due.

19  Employees need to complete it by this certain day.  Or

20  does that come from a different department or somebody

21  else?

22    A.  Our business -- it comes from -- in the

23  Business Ethics Committee that, of course, is coming

24  due, and it goes out to the associates.

25    Q.  Is the Business Ethics Committee part of a



 1  corporate entity?

 2       A.  I don't know that I can answer that question.

 3  I'm not entirely sure.

 4       Q.  Do you know anybody that's on the Business

 5  Ethics Committee currently?

 6       A.  I do.

 7       Q.  Who's that?

 8       A.  Jill Bilanchone.

 9       Q.  That's the individual who's on the deposition

10  here today?

11       A.  Yes.

12       Q.  Anybody else who's on the committee?

13       A.  I do not know who else is on the committee,

14  no.

15       Q.  Do you know why GMs are -- or strike that.

16           Do you know why GMs have discretion to not put

17  their dealership-level employees through courses that

18  the Business Ethics Committee say they should complete?

19           MR. GABRIELLE:  Objection to form and

20  foundation.

21           THE WITNESS:  I do not.

22  BY MR. PRATER:

23       Q.  Do individual dealerships under the AutoNation

24  umbrella have their own HR departments?

25       A.  They do not.



 1        Q.  Why not?

 2             MR. GABRIELLE:  Object to form.

 3             THE WITNESS:  I do not know.

 4    BY MR. PRATER:

 5        Q.  So for individual dealerships within the

 6    Eastern Region, for example, the 105 or so that you

 7    told me about earlier, right?  If they have HR issues,

 8    they contact Eastern Region Management?

 9        A.  There's -- there are a lot of avenues if an

10    associate's under Eastern Region, if they had issues,

11    could contact -- they could contact Human Resources.

12    They could go to their general manager.  They could

13    contact the Alertline.  They could contact our Legal

14    Department.  They could -- they could reach out to him.

15    At least as far as -- if they chose.  So there are a

16    lot of different avenues they could reach out for an

17    issue.

18        Q.  Okay.  And when you say that they could

19    contact HR, you're talking about the Human Resources

20    Department at Eastern Region Management?

21        A.  Yes.  And I'm referring to my team.

22        Q.  Okay.  And you said they could also contact

23    the Alertline.  What do you mean by that?

24        A.  The Alertline is a third-party company that we

25    have posters within the dealerships that if there is,



1  you know, concern, they need to report something, they

2  could call the 800 number.  They could report it

3  anonymously.  They could -- they could go online to a

4  website and report it.  And -- and that's how they can

5  report an issue or concern.

6       Q.  Okay.  And assuming it's an entity, a

7  dealership that's within Eastern Region Management,

8  that's where -- that's where I'm going to focus for

9  the -- the rest of today's deposition, so within those

10  105 or so dealerships, okay?

11      A.  And the question again was?

12      Q.  No.  So with respect to those entities, so say

13  somebody calls the Alertline from one of those

14  dealerships, does it get -- does that complain or -- or

15  call or report, where does it go after the Alertline in

16  that third-party company?

17      A.  So it goes from dealer line or -- or -- I

18  can't think of the name of the company.  Then it goes

19  to our Legal Department who reviews it and then filters

20  to the HR Department, the appropriate HR person to

21  address it -- or I should say investigate it.

22      Q.  And the Legal Department you're referring to,

23  is that a Legal Department for Eastern Region

24  Management or some other company?

25          MR. GABRIELLE:  Object to form.



 1          THE WITNESS:  It is the Legal Department under
 2    the AutoNation umbrella.
 3    BY MR. PRATER:
 4       Q.  Are you saying for AutoNation, Inc.?
 5          MR. GABRIELLE:  Object to form.
 6          THE WITNESS:  For AutoNation, I -- I don't
 7    know what entity they are under.
 8    BY MR. PRATER:
 9       Q.  Is the Legal Department part of Eastern Region
10    Management, though?
11       A.  No.
12       Q.  Okay.  You said the Legal Department reviews
13    it -- if it comes in through -- if the report comes
14    into -- through the Alertline, you said the Legal
15    Department reviews it and then filters it to the
16    appropriate HR person to investigate, right?
17       A.  Correct.
18       Q.  Okay.  What's the title of the HR person who's
19    going to be -- who would do such an investigation -- or
20    titles, if there's multiple?
21       A.  It would depend on the investigation, the
22    complexity, the nature, and that it would be a human
23    resources manager under the Eastern Region Management
24    or one of the senior managers.  And at times, could --
25    could be me.



1    Q.  Can you -- can you -- I -- I know you've told

2    me titles of various folks here, but can you tell me,

3    from your current position, the titles of the folks

4    below you so I can have an understanding of the kind of

5    chain command there.

6    A.  Sure.

7         MR. GABRIELLE:  Object to form.

8         THE WITNESS:  You said current position?

9    BY MR. PRATER:

10   Q.  Uh-huh.  Yes.

11   A.  And the titles --

12   Q.  Or -- or actually, I'm sorry.  As the -- from

13   when you were Vice President, Human Resources, Eastern

14   Region as well.

15        MR. GABRIELLE:  Same objection.

16        THE WITNESS:  And repeat the question?

17   BY MR. PRATER:

18   Q.  Yeah.  When you were Vice President, Human

19   Resources, Eastern Region, what were the titles of the

20   positions below you?

21        MR. GABRIELLE:  Same objection.

22        THE WITNESS:  Senior manager, senior regional

23   manager, and market HR manager.

24   BY MR. PRATER:

25   Q.  Okay.  And so when you said that an Alertline



1  report goes to the Legal Department and then to the

2  appropriate HR person, which could be a human resources

3  manager, that would be the market HR manager?

4       A.  It always comes to me, and then I filter it to

5  the appropriate HR manager.

6       Q.  And to clarify, you said it always goes to

7  you.  You mean when you were Vice President, Human

8  Resources for the Eastern Region?

9       A.  Yes.

10      Q.  Okay.  Perfect.  Okay.  And when you say human

11 resources manager, the -- the formal title for that is

12 market human resources manager?

13      A.  Yes.

14      Q.  Okay.  And when you say senior manager, you

15 mean senior regional human resource -- senior regional

16 human resources manager?

17      A.  Yes.

18      Q.  Okay.  And senior manager, that means senior

19 human resources manager?

20      A.  It's one and the same.  I apologize.

21 Senior --

22      Q.  Oh.

23      A.  -- regional HR manager, yep.

24      Q.  Okay.  Okay.  All right.  So it's you as VP of

25 Human Resources, Eastern Region, senior regional human



1  resources managers, and then market human resource

2  manager?

3       A.  Yes.

4       Q.  Okay.  Any other positions?

5       A.  Any other positions?

6       Q.  Below that -- below the market human resources

7  manager?

8       A.  No.

9       Q.  Okay.  I believe you told me you had two

10 senior regional managers while you were the VP of Human

11 Resources in the Eastern Region, right?

12      A.  Correct.

13      Q.  Okay.  How many market human resources

14 managers did you have?

15          MR. GABRIELLE:  Object to form.

16          THE WITNESS:  Over the years, it varied from

17 as many as nine down to six.

18 BY MR. PRATER:

19      Q.  Okay.  Were any of those individuals assigned

20 specific dealerships that they were responsible for?

21      A.  Yes.

22      Q.  Okay.  How -- how did the assignments go?  Was

23 it, like, by county or just kind of random assignments?

24      A.  It was by market.  So geographically broken up

25 by market.



1      Q.  Okay.  Do you know which market Hollywood

2  Imports Limited, Inc., falls within?

3      A.  I do, the South Florida market.

4      Q.  Okay.  How many dealerships are in that

5  market?

6      A.  Approximately 23.

7      Q.  Okay.  And how many market human resources

8  managers were assigned to the South Florida market

9  while you were Vice President of Human Resources,

10  Eastern Region.

11      A.  Two.

12      Q.  Okay.  Who -- who were those individuals?

13      A.  Cary Pacheco, Melissa Johns.

14      Q.  Were they both assigned to the South Florida

15  market at all times from the beginning of 2022 through

16  May of '23?

17      A.  No.  They were not.

18      Q.  No?  Okay.  Who was assigned during that time

19  period to the South Florida market?

20      A.  It was Melissa and Cary.  But at a period of

21  time, and I don't recall when, Melissa was reassigned,

22  and so it was just Cary.

23      Q.  You think that may have happened sometime

24  during 2022?

25          MR. GABRIELLE:  Object to the form.





1          THE WITNESS:  No.  It happened sometime in --
2   let me think, June or July of '23, I think.
3   BY MR. PRATER:
4        Q.  Was Melissa Johns assigned to the South
5   Florida market as a market human resources manager from
6   the beginning of 2022 through approximately June or
7   July of 2023?
8        A.  I cannot be certain, but I think so, yes.
9   Okay.
10       Q.  And Ms. Cary Pacheco was assigned to the South
11  Florida market during all of 2022?
12       A.  Yes.
13       Q.  Is she still assigned to that market?
14       A.  She is.
15       Q.  Okay.  And has been all of '22 and all of '23?
16       A.  Yes.
17       Q.  Okay.  Thanks.  And did Ms. Johns and
18  Ms. Pacheco split up the dealerships within the South
19  Florida market?
20       A.  They did.
21       Q.  Okay.  How was that division -- or what was
22  the breakdown?
23       A.  So it was sort of the south part of -- so
24  Miami and -- I don't know where the line of demarcation
25  was -- the -- all the way south up to maybe Broward was



 1  Cary Pacheco, and then north to Palm Beach was Melissa

 2  Johns.

 3       Q.  And that was true from the beginning of 2022

 4  through May of 2023?

 5       A.  I can't be certain.  But like I said, Melissa

 6  was reassigned at some point in '23.  From what I

 7  remember, I believe that's true.

 8       Q.  Okay.  Where was Melissa Johns reassigned to?

 9       A.  Illinois, Tennessee, Ohio, Minnesota.  I

10  believe those were the four states.

11       Q.  Okay.  Did somebody take her position in the

12  South Florida market?

13       A.  No.  Well, Cary did.  Cary Pacheco assumed

14  full responsibility.

15       Q.  If a dealership-level employee reports

16  misconduct in the dealership, regardless of how it's

17  reported, is there -- does your department create a

18  record of that report?

19            MR. GABRIELLE:  Objection to form.

20            THE WITNESS:  I'd like to think there is some

21  sort of record if something is, but reports come in, in

22  all forms.  It could be a simple phone call and

23  something that's a -- a quick resolution.  Would there

24  always be a record of that?  No.

25  BY MR. PRATER:



1          Q.  If a manager in a dealership receives a

2     complaint of misconduct by a dealership-level employee,

3     is the manager required to convey that report or

4     complaint to your department?

5               MR. GABRIELLE:  Same objections.

6               THE WITNESS:  They have a duty and obligation

7     to report any type of misconduct to Human Resources,

8     yes.

9     BY MR. PRATER:

10         Q.  Is that written down somewhere?  And by that,

11    I mean the duty and obligation you just referred to.

12         A.  I'm not 100 percent sure, but it may be in the

13    handbook.

14              MR. PRATER:  I think we lost Jill, Eric.  I

15    don't know if I should pause or something.

16              MR. GABRIELLE:  She may have gotten off on --

17    on purpose, so she'll text me if there's a problem and

18    she wants to get back on.  But don't worry about it.

19    You can proceed.

20              MR. PRATER:  Okay.  Thank you.

21              MR. GABRIELLE:  She's -- I got a text message

22    from her.  Let me just -- no, it's okay.  Go ahead.

23              MR. PRATER:  Okay.  All right.  Thank you.

24    BY MR. PRATER:

25         Q.  Okay.  Is there any policy or procedure or



 1  standard, anything in writing that details what sort of

 2  records are supposed to be created regarding employee

 3  complaints or reports?

 4      A.  If an Alertline is reported, there is --

 5  depending on the level, there is a formal report that

 6  is created and -- but other than that, no.

 7      Q.  So am I correct then that market human

 8  resources managers have discretion about whether to

 9  document or report -- or document or log complaints or

10  reports by dealership-level employees that they

11  receive?

12          MR. GABRIELLE:  Objection to form and

13  foundation.

14          THE WITNESS:  There is no requirement for them

15  to document or log.  There's just the requirement that

16  it's addressed.

17  BY MR. PRATER:

18      Q.  Where is the requirement that it be --

19          MR. GABRIELLE:  Chris, before we -- I just --

20  Chris, before you go further, what are we going to do

21  about lunch?  I just want to make sure the witness gets

22  a chance to have a lunch break.  So it's 1:00.

23          MR. PRATER:  Sure.

24          MR. GABRIELLE:  Do you have some sense -- if

25  you only have a couple of minutes left, that's one



 1  thing.  But I --

 2        MR. PRATER:  Yeah.  No, it's definitely gone a

 3  little bit longer than I anticipated.  If I can just do

 4  a few more questions here, then we can take a -- a

 5  short break if that's all right.

 6        MR. GABRIELLE:  Okay.  So yeah, let's -- when

 7  you're done with the topic area relative to --

 8        MR. PRATER:  Yeah.

 9        MR. GABRIELLE:  I just want the witness to get

10  a chance to have a lunch break is all.

11        MR. PRATER:  Understood.  I -- I don't mean to

12  hold anybody hostage here.  I'm just -- yeah, I'll

13  finish this line here, and then we can go.  I don't

14  have a tremendous amount left by any means, but I

15  understand the lunch.  No problem.

16        MR. GABRIELLE:  Okay.

17  BY MR. PRATER:

18     Q.  So you said that there's no requirement the

19  market -- market HR managers document and log reports

20  or complaints, but there is a requirement that the

21  report or complaint be addressed, right?

22     A.  Correct.

23     Q.  The requirement that reports and complaints be

24  addressed, is that written down somewhere?

25        MR. GABRIELLE:  Object to form.



```
1          THE WITNESS:  It is a requirement by -- by me
2   as their supervisor that every complaint is addressed.
3   BY MR. PRATER:
4       Q.  Again, is there anything in writing that says
5   they are required to address complaints or reports?
6       A.  I do not know if there is anything documented
7   in the handbook.
8       Q.  Even outside the handbook, is there any other
9   requirement?
10      A.  It -- it could be in the business ethics.  I
11  do not know off the top of my head.
12      Q.  Did you ever e-mail your market HR managers
13  and say, you must address every complaint or report
14  that comes in?
15          MR. GABRIELLE:  Object to form.
16          THE WITNESS:  I -- I can't answer that over --
17  I mean, I've had my team for a very long time, and
18  whether it was verbal or in writing, I'm -- they --
19  they understand what our roles and responsibilities
20  are.
21  BY MR. PRATER:
22      Q.  Okay.  How do you monitor whether market HR
23  managers are addressing complaints and reports that
24  come in?
25      A.  If an associate's complaint has not been
```



1    addressed, I would assume they would go to another

2    avenue to report it.  They could report it directly to

3    me.  They could report it through the Alertline.  And

4    if there's -- if there's any notation that they've

5    reached out to their human resources manager and it was

6    not addressed, then I would address it with that HR

7    manager.

8        Q.  So other than associates who complain a second

9    time or make a second report, is there any other way

10   that you are monitoring whether that you or Eastern

11   Region Management is monitoring whether HR market

12   managers are addressing complaints and reports by

13   employees?

14           MR. GABRIELLE:  Object to form.

15           THE WITNESS:  Anything that I am aware of, I

16   ensure there's closure.

17   BY MR. PRATER:

18       Q.  But an HR -- a market HR manager may receive a

19   complain or report, right, without you being involved,

20   correct?

21       A.  Correct.

22       Q.  Okay.  And if the market HR manager does not

23   address a complaint or report, you're not doing

24   anything as their superior to monitor whether they are

25   actually addressing every complaint or report that



1  comes in, correct?

2          MR. GABRIELLE:  Objection to form.

3          THE WITNESS:  If I am made aware that

4  something wasn't addressed, I would address it with the

5  human resources manager.

6  BY MR. PRATER:

7     Q.  Okay.  But unless someone brings it to your

8  attention that it's not been addressed, is there any

9  other -- other than someone bringing it directly to

10  your attention or a second report or complaint being

11  made by the associate, is there any other way in which

12  you monitor whether market HR managers are addressing

13  complaints and reports by dealership-level employees?

14          MR. GABRIELLE:  Object to form.

15          THE WITNESS:  Not that I can think of.  I -- I

16  trust in the HR managers that they're doing what they

17  need to do unless I'm told otherwise.

18          MR. PRATER:  Okay.  All right.  We can go on

19  lunch.  How long do you guys want to take?

20          MR. GABRIELLE:  30 minutes, 35 minutes?

21          MR. PRATER:  Yeah, sure.

22          MR. GABRIELLE:  All right.

23          MR. PRATER:  Whatever you need.  That's fine.

24  So --

25          MR. GABRIELLE:  Let's just say 1:45.  We'll



1  come back at 1:45?

2         MR. PRATER:  Okay.  No problem.

3         MR. GABRIELLE:  Okay.  We're going to have to

4  obviously push our call, Chris, you and me, but we can

5  do that.  I -- I'm free this afternoon.  So --

6         MR. PRATER:  Perfect.  Okay.

7         MR. GABRIELLE:  Okay.

8         MR. PRATER:  Yeah.  I appreciate it.  Thanks,

9  Eric.

10         MR. GABRIELLE:  Thanks.

11         THE WITNESS:  Thanks.

12         MR. PRATER:  All right.

13         THE REPORTER:  All right.  We are now off the

14  record at 1:06 p.m.  Eastern Standard Time.

15         (A recess was taken.)

16         THE REPORTER:  We are now back on the record

17  at 1:46 p.m.  Eastern Standard Time.

18         You may proceed, Counsel.

19         MR. PRATER:  Thank you.

20  BY MR. PRATER:

21     Q.  Ma'am, is -- the current position that you

22  occupy and when you were Vice President of Human

23  Resources for the Eastern Region, both of those

24  positions are part of the same Human Resources

25  Department; is that correct?  The same Human Resources



1  Department?

2       A.  Yes.

3       Q.  Okay.  So you're the same Human Resources

4  Department?

5       A.  Yeah.

6       Q.  Okay.

7       A.  Yes.

8       Q.  Okay.  Does -- does your department maintain

9  personnel files for employees working at the individual

10  dealerships?

11      A.  No.  We do not.

12      Q.  Do you have access to personnel files for the

13  employees working at the individual dealerships?

14      A.  Yes.  We do.

15      Q.  Okay.  So who's responsible for maintaining

16  those personnel files?

17      A.  The dealership.

18      Q.  Okay.  How do you access personnel files?

19  Like, how do folks in your department access personnel

20  files?

21      A.  Electronically, through a site.

22      Q.  What's that site?

23      A.  Electronic Content Management.

24      Q.  Is that a third-party company?

25      A.  No.  I guess when I say a site, through a link



 1  on our Intranet.
 2      Q.  Okay.  And are people in your department able
 3  to add things to the personnel files for individuals
 4  working at individual dealerships?
 5      A.  Yeah.  Let me -- let me back up an answer,
 6  though.  Most do or some do.  Not everyone has access.
 7      Q.  You're saying most of the people in the Human
 8  Resources Department, which you're part of, have access
 9  to the personnel files but not everybody?
10      A.  Correct.
11      Q.  Okay.  Do more have access or not have access?
12      A.  I -- that I can't answer.  I don't know.
13      Q.  Okay.  Do the market human resources managers
14  have access to personnel files?
15      A.  They do to their specific markets.
16      Q.  Okay.  So for example, Cary Pacheco would have
17  access to personnel files for the individuals working
18  at dealerships in the South Florida market?
19      A.  Correct.
20      Q.  Okay.  Okay.  Going back to complaints and
21  reports that -- that come in from individual
22  dealerships.  If documents are created in connection
23  with any of those complaints or reports by individuals
24  in your Human Resources Department, where are those
25  documents or records maintained?



1          MR. GABRIELLE:  Object to form.

2          THE WITNESS:  So can you repeat the question?

3   BY MR. PRATER:

4      Q.  Sure.  Sure.  If -- if a complaint or report

5   is made by someone from an individual dealership,

6   right, and your Human Resources Department receives

7   that complaint or report, and let's assume for a second

8   that documents or a record is created regarding that

9   report.  Where are those records maintained?

10          MR. GABRIELLE:  Same objection.

11          THE WITNESS:  It could vary, maybe depending

12   on what the document is.  It could get uploaded into

13   the personnel file.  It could be saved on a shared

14   drive on Dealer Central, which is our Intranet.  It

15   could be saved by the human resources manager in a -- a

16   file.

17   BY MR. PRATER:

18      Q.  And by saved by human resources manager in a

19   file, are you -- are you saying in a file which they

20   individually maintain off of the --

21      A.  It could be.

22      Q.  Okay.

23      A.  It -- it could be, yes, or the shared --

24      Q.  And -- and the -- okay.  Sorry, I didn't mean

25   to cut you off.  And so an HR manager may create a



 1  record and save that record locally on their devices

 2  or -- and not save it on any sort of shared drive or

 3  personnel file?

 4          MR. GABRIELLE:  Object to form.

 5          THE WITNESS:  There's a possibility, but over

 6  the years, we've -- we've really moved over to saving

 7  things under shared files.  But I -- I can't say for

 8  certain it always happens.

 9  BY MR. PRATER:

10    Q.  Okay.  If documents are generated regarding a

11  complaint or report about a specific employee, are

12  those materials put in that employee's personnel file?

13          MR. GABRIELLE:  Object (audio interruption)

14  foundation.

15          THE WITNESS:  I'd like to think they would,

16  but I can't say for sure.  I don't know.  Depends on

17  the dealership and if they -- they save it to the

18  personnel file.  As I said, it's their responsibility.

19  BY MR. PRATER:

20    Q.  But also your HR managers could save it in the

21  personnel file as well, right?

22    A.  Sure.

23    Q.  But they're not required to; is that correct?

24    A.  No.  We are not the keepers of the personnel

25  file.



1      Q.  Okay.  And the individual dealerships are also

2   not required to save documents regarding complaints or

3   reports about employees in the personnel files either?

4   That's discretionary?

5            MR. GABRIELLE:  Object to form.

6            THE WITNESS:  I don't know what they upload or

7   what they do not upload to the employee personnel file.

8   BY MR. PRATER:

9      Q.  Okay.  I believe you testified earlier that

10  managers at the individual dealerships have a duty and

11  obligation to report misconduct to HR; is that right?

12     A.  Yes.

13     Q.  Does that include if -- does -- do managers at

14  individual dealerships have a duty and obligation to

15  report misconduct that they observe or witness with

16  their own ears or eyes?

17            MR. GABRIELLE:  Object to form.

18            THE WITNESS:  If they feel that there is an

19  issue or there's some sort of misconduct that they need

20  to report, yes, they should report it.

21  BY MR. PRATER:

22     Q.  If a manager to individual dealership observes

23  conduct or hears communications that violate the code

24  of business ethics from AutoNation, okay, are they

25  required to report that to HR and your department?



 1        A.  As a manager, they have a duty to.

 2        Q.  So that's a yes?

 3        A.  They should report it.  I can't tell them to

 4   report it.  But as a manager, they do have that duty to

 5   report anything they -- they view as being a violation

 6   of business ethics or the handbook.

 7        Q.  If an employee reports any sort of misconduct

 8   of a sexual nature, what's supposed to happen from HR's

 9   perspective?

10             MR. GABRIELLE:  Objection to form and

11   foundation.

12             THE WITNESS:  So if an employee reports a

13   concern, HR should gather the information and conduct

14   an investigation.

15   BY MR. PRATER:

16        Q.  What are the ways in which HR can gather

17   information?

18        A.  Well, as part of the investigation, they can

19   speak to witnesses, speak to others if there are

20   witnesses named.  Do a general check-in with the

21   location to understand, you know, if there have been

22   others who have seen or overheard.  But it's -- it's

23   expected that they -- they investigate.

24        Q.  And by it's expected that they investigate,

25   the they you're referring to is the market human



 1   resource managers?

 2       A.  Yes.

 3       Q.  Okay.  Are the steps taken to investigate a

 4   report or complaint supposed to be documented by the

 5   market human resource managers?

 6           MR. GABRIELLE:  Object to form and foundation.

 7           THE WITNESS:  I think I mentioned before,

 8   depending on the complaint, the concern, there are

 9   times that it's addressed and resolved fairly quickly.

10   And there may not be a -- a report.  But ideally, yes,

11   it would -- there would be some sort of -- of notes or

12   documentation of the resolution, yes.

13   BY MR. PRATER:

14       Q.  Are there templates or forms that are used

15   during investigations?

16       A.  Depends on where the concern came from or the

17   complaint.  I think I mentioned earlier the Alertline,

18   there's a form.

19       Q.  Okay.  Other than -- other than complaints

20   that come through the Alertline, are there forms or

21   templates that are used in connection with any

22   investigation by HR?

23       A.  There is not currently, no.

24       Q.  Okay.  Have there been that at any time since

25   2022?



```
 1              MR. GABRIELLE:  Object to form.
 2              THE WITNESS:  No.
 3     BY MR. PRATER:
 4         Q.  Okay.  If a witness is interviewed or -- in
 5     connection with an investigation, are there supposed to
 6     be notes that are generated or a record of that
 7     interview?
 8              MR. GABRIELLE:  Objection to form and
 9     foundation.
10              THE WITNESS:  There's a policy that says there
11     should be.  Again, kind of going back to what I said,
12     it just depends on the complexity and what information
13     was gathered if there are notes.
14     BY MR. PRATER:
15         Q.  What's that policy called that you're -- you
16     referred to?
17         A.  I said there is no written policy.
18         Q.  Oh, there is -- I'm sorry.  I thought you said
19     there is.
20         A.  There is no -- no.
21         Q.  Okay.  Thank you.  Understood.  If a former
22     employee complains about conduct that occurred in an
23     individual dealership, should that still be looked into
24     by HR?
25              MR. GABRIELLE:  Objection to form and
```



 1   foundation.
 2          THE WITNESS:  Yes.  Regardless of current
 3   employee or former employee, all complaints are taken
 4   seriously and should be reviewed, investigated.
 5   BY MR. PRATER:
 6       Q.  Is there any type of complaint -- that a
 7   market HR manager receives where they are required to
 8   escalate that to yourself or somebody else in the HR
 9   Department?
10       A.  I have experienced HR managers, so I do leave
11   it to their discretion.  If they feel they need
12   assistance, they can escalate to their senior manager
13   for assistance.
14       Q.  Is there any policy or procedure guidelines
15   regarding HR investigations?
16          MR. GABRIELLE:  Object to form.
17          THE WITNESS:  Can you be more specific?
18   BY MR. PRATER:
19       Q.  Is there anything in writing that explains
20   what HR managers or senior managers are supposed to do
21   in connection with investigations into complaints or
22   reports by employees?
23          MR. GABRIELLE:  Objection.
24          THE WITNESS:  Going back to the Alertline, I
25   believe there are some guidelines for the report



 1  writing for those investigations.  But again,

 2  complaints come in through many avenues.  So no there

 3  are no -- no guidelines for what they should look like.

 4  BY MR. PRATER:

 5      Q.  I'm going to show you another document here,

 6  ma'am.  Do you recognize the document I've shared on my

 7  screen here?

 8      A.  That is the e-mail I mentioned early on that I

 9  reviewed.

10      Q.  Okay.  So this was previously marked as

11  Defendant's Exhibit 8, and it's Plaintiff 00 -- excuse

12  me, Plaintiff 0115 through 116.  It's for my own

13  sanity.  I'll -- I'll mark this as Exhibit 3 to this

14  deposition.

15          (Plaintiff's Exhibit 3 was marked for

16  identification.)

17          MR. GABRIELLE:  Is that all it takes to

18  maintain your sanity is marking exhibits?  That's

19  perfect.

20          MR. PRATER:  I wish.

21  BY MR. PRATER:

22      Q.  Okay.  So looking at -- so the first e-mail

23  here is Sunday, May 14th from JP Navarro to Cary

24  Pacheco.  Do you see that?

25      A.  Yes.



1    Q.   Okay.  And then Ms. Pacheco responded on May
2  15th at 7:16 a.m.; you see that?

3    A.   Yes.

4    Q.   Okay.  At the end of her e-mail, it looks like
5  it's signed, "Best regards, Cary Torres." Does she also
6  go by Cary Torres?

7    A.   She does.  She -- she got married a couple of
8  years back but did not update Pacheco in -- in the
9  address book.

10   Q.   Okay.  So the employee directory still --
11  still lists her as Cary Pacheco?

12   A.   Yes.

13   Q.   Okay.  So Ms. Pacheco's e-mail says, "Good
14  morning.  Thanks for bringing your concerns to my
15  attention.  Please know that AutoNation takes these
16  types of complaints seriously.  I will investigate at
17  the store and respond accordingly." Did that happen?

18        MR. GABRIELLE:  Object to form and foundation.

19        THE WITNESS:  I don't know.

20  BY MR. PRATER:

21   Q.   Did Ms. Pacheco ever discuss this complaint
22  with you?

23   A.   No.  She did not, which is not uncommon.

24   Q.   Okay.  Do you recognize this 305 phone number
25  here at the end of her e-mail?



1      A.  I do not recognize the number, but I would

2   assume it's her cell phone as that's what she uses for

3   business.

4      Q.  Okay.  Are you aware of any documents

5   concerning any investigation by Ms. Pacheco into

6   Mr. Navarro's complaint?

7      A.  No.  As I said, this was not one that was

8   reviewed with me for additional support.  So no, I'm

9   not.

10     Q.  Okay.  And if you want to take a second to

11  reread Mr. Navarro's e-mail --

12          MR. GABRIELLE:  (Audio interruption) hard copy

13  to read just because it's simply easier to work with.

14          MR. PRATER:  No problem.

15          MR. GABRIELLE:  So go ahead and read through

16  both pages of --

17          What'd you -- what'd would you say this was

18  for you?  3, Exhibit 3?

19          MR. PRATER:  Yes.

20          MR. GABRIELLE:  So this has been marked as

21  Defendant's Exhibit 8 and separately as Plaintiff's

22  Exhibit 3.  And then verbally let Mr. Prater know when

23  you're done so he can ask his questions.

24          THE WITNESS:  Completed reading it.

25  BY MR. PRATER:



1       Q.   Okay.  Is the conduct that Mr. Navarro

2  complained of in this May 14th e-mail the type which

3  should be investigated by AutoNation HR?

4       A.   Yes.

5       Q.   Should witnesses have been interviewed?

6       A.   Yes.

7       Q.   Should records have been generated in

8  connection with that investigation?

9            MR. GABRIELLE:  Objection to form.

10            THE WITNESS:  Again, I can't -- I did not

11  conduct the investigation, so I can't speak to that.

12  BY MR. PRATER:

13       Q.   Other than what you've learned from your

14  counsel, are you aware of any findings or results of an

15  investigation, if one occurred, into Mr. Navarro's

16  complaint?

17            MR. GABRIELLE:  Do you understand

18  qualification --

19            MR. PRATER:  I'll -- I'll rephrase.  Sorry.

20            MR. GABRIELLE:  I understood the

21  qualification.  I don't -- I'm not objecting to the

22  question, but if you could just explain to the witness.

23            MR. PRATER:  Yeah.

24  BY MR. PRATER:

25       Q.   I'm saying other than commu -- information you



```
 1   learned from Mr. Gabrielle, okay -- I don't want to
 2   know anything that you guys discussed -- but otherwise,
 3   do you know if an investigation was conducted into
 4   Mr. Navarro's complaint?
 5            MR. GABRIELLE:  And I would ask you to include
 6   Ms. Bilanchone, in-house counsel, as well in your
 7   qualification, please.
 8            MR. PRATER:  Okay.
 9            MR. GABRIELLE:  Do you unders -- sorry to
10   interrupt, but I just -- she's counsel also, so I just
11   want to make sure, you know.
12            MR. PRATER:  Yeah.
13   BY MR. PRATER:
14       Q.  So other than communications with Counsel,
15   which includes Mr. Gabrielle and Ms. Bilanchone,
16   anybody else who's counsel for AutoNation, Inc., or
17   Hollywood Imports Limited, Inc., are you aware of
18   whether an investigation into Mr. Navarro's conduct --
19   or a complaint here was actually conducted?
20       A.  I did -- yes, I am.
21       Q.  And was one conducted?
22       A.  From my understanding from Cary Pacheco, yes.
23       Q.  When did she tell you that?
24       A.  After we received the letter from you, I
25   suppose, I did ask about the situation, and she stated
```



 1  that she did conduct an investigation and did not find

 2  the -- the e-mail to be substantiated.

 3       Q.  What did she do in connection with the

 4  investigation?

 5            MR. GABRIELLE:  Objection to the foundation

 6  and form.

 7            THE WITNESS:  I did not ask further about

 8  details of the investigation.

 9  BY MR. PRATER:

10       Q.  Are there any records from her investigation?

11            MR. GABRIELLE:  Objection.  Foundation.

12            THE WITNESS:  I do not know.

13  BY MR. PRATER:

14       Q.  Did anybody respond to Mr. Navarro regarding

15  the investigation that allegedly occurred?

16            MR. GABRIELLE:  Object to form and foundation.

17            THE WITNESS:  I do not know.

18  BY MR. PRATER:

19       Q.  Was anything put into any -- anybody's

20  personnel file in connection with the investigation

21  that Ms. Pacheco says she did?

22            MR. GABRIELLE:  Objection to form and

23  foundation.

24            THE WITNESS:  I do not know.

25  BY MR. PRATER:



BIBI BICKRAM                                          March 13, 2024
NAVARRO vs HOLLYWOOD IMPORTS LIMITED                          83

1         Q.  Okay.  Other than Mr. Navarro, has anybody

2    else ever complained about Joey Rodriguez's conduct?

3              MR. GABRIELLE:  Objection.  Foundation.

4              THE WITNESS:  Not that I am aware of.

5    BY MR. PRATER:

6         Q.  Are you aware of any complaints regarding Carl

7    Van Der Walker's conduct?

8         A.  I vaguely remember many years ago a complaint

9    about the way he spoke to others.

10        Q.  Other than that one complaint about how he

11   spoke to others, are you aware of any other complaints

12   about Mr. Van Der Walker?

13        A.  No.

14        Q.  Okay.  Who made the complaint about Mr. Van

15   Der Walker that you were referring to?

16        A.  It was many years ago.  I do not know.

17        Q.  Were you involved in that complaint --

18   receiving that complaint or investigating it?

19        A.  It has -- it's been a very, very long time,

20   but the name rings a bell to me.  And I recall issues

21   about just the tone and the way he spoke to others.  I

22   may have visited the store or been involved.  I cannot

23   say for certain.  I was in a different role at that

24   time where my scope was a little bit more limited.  But

25   I can't say for sure if I was -- if I participated in



BIBI BICKRAM                                    March 13, 2024
NAVARRO vs HOLLYWOOD IMPORTS LIMITED                       84

 1   the investigation or not.

 2        Q.  What was your role at the time of that

 3   complaint?

 4        A.  I believe it was regional manager.

 5        Q.  That's regional human resources manager?

 6        A.  Correct.

 7        Q.  For which market?

 8        A.  It would have been for the Florida region at

 9   that time.  And so my scope would have been limited to

10   just the Florida stores.

11        Q.  Okay.  Were any documents created in

12   connection with the complaint about Mr. Van Der Walker?

13            MR. GABRIELLE:  Objection.  Foundation and

14   form.

15            THE WITNESS:  I don't recall.

16   BY MR. PRATER:

17        Q.  Is there anything in Mr. Van Der Walker's

18   personnel file regarding that complaint?

19            MR. GABRIELLE:  Objection to foundation and

20   form.

21            THE WITNESS:  I -- I don't know.

22   BY MR. PRATER:

23        Q.  Do you recall anybody else who was involved

24   in -- in receiving that complaint or investigating it?

25        A.  It -- it would have been Cary Pacheco, I



1  think.  I'm guessing or speculating, trying to kind of

2  get back to the timeline or the year.  I believe it

3  would have been Cary Pacheco, but I cannot say for

4  certain.

5       Q.  Okay.  If not Ms. Pacheco, who else would it

6  have been?

7          MR. GABRIELLE:  Objection to form.

8          THE WITNESS:  I don't remember at the time who

9  the HR manager may have been.  It was a while ago.  I'm

10  sorry.

11  BY MR. PRATER:

12       Q.  It's okay.  You're aware of any complaints or

13  reports regarding Joseph Rey?  It's R-E-Y.

14       A.  No.  I'm not aware of any.

15       Q.  Are you aware of any complaints or reports

16  that have been made regarding any conduct -- any

17  inappropriate conduct at the Hollywood Imports Limited,

18  Inc., store?

19       A.  Can you repeat it?  Am I aware of --

20       Q.  Sure.  Are you aware of any complaints or

21  reports other than Mr. Navarro's e-mail there regarding

22  any conduct at the Hollywood Limited Imports store?

23       A.  The other one would be Carl Van Der Walker,

24  but I vaguely remember knowing about or being involved

25  with many years ago.



1      Q.   Okay.  And that's the one you just told me

2   about?

3      A.   Yeah.

4      Q.   Okay.  Okay.  So other than the complaint

5   about Mr. Van Der Walker and Mr. Navarro's e-mail here,

6   are you aware of any other complaints or reports

7   regarding misconduct occurring at the Hollywood Limited

8   Imports, Inc., dealership?

9      A.   Those are the only two that come to mind for

10  me.

11          MR. PRATER:  Okay.  Give me just a couple of

12  minutes.  I'm probably done.  I just want to go through

13  my notes here.  So let's see what I get 2:30.  If I can

14  get back sooner, I will.

15          MR. GABRIELLE:  Okay.  Thanks.

16          MR. PRATER:  Thanks.

17          THE REPORTER:  And we are now off the record

18  at 2:21 p.m.  Eastern Standard Time.

19          (A recess was taken.)

20          THE REPORTER:  We are now back on the record

21  at 2:31 p.m.  --

22          MR. PRATER:  Okay.

23          THE REPORTER:  -- Eastern Standard Time.  You

24  may proceed.

25          MR. PRATER:  Thank you.



 1  BY MR. PRATER:
 2       Q.  The complaint about Mr. Van Der Walker that
 3  you said about the way the tone and the way he was
 4  speaking to others that we discussed a few minutes ago.
 5  Do you know what --
 6       A.  Yeah.
 7       Q.  -- I'm referring to?
 8       A.  Yeah.
 9       Q.  Okay.  What was the result of that
10  investigation?
11            MR. GABRIELLE:  Objection to form.
12            THE WITNESS:  It was so long ago.  I do not
13  recall if there was any discipline or what was -- I do
14  not know.
15  BY MR. PRATER:
16       Q.  If an employee is -- of a dealership is
17  disciplined in connection with an HR investigation,
18  does -- is that required to go in their personnel file?
19            MR. GABRIELLE:  Object to form.
20            THE WITNESS:  It -- it should go into the
21  personnel file, but again, the dealership is
22  responsible for uploading those pers -- those
23  documents.
24  BY MR. PRATER:
25       Q.  Okay.  So a dealership could choose to not



```
 1   upload disciplinary records into an individual's
 2   personnel file?
 3            MR. GABRIELLE:  Objection to form.
 4            THE WITNESS:  I would hope it's -- I don't
 5   think they would choose not to upload it.  Maybe it
 6   doesn't get uploaded because it wasn't in the right
 7   hands.  But choosing not to upload it just because, I
 8   don't -- I don't think they would choose not to upload
 9   it for no reason.
10   BY MR. PRATER:
11        Q.  Well, while I appreciate you -- your testimony
12   there --
13        A.  Okay.
14        Q.  -- I'm not asking what you think they might
15   do.  I'm asking if they have discretion to not upload
16   disciplinary records into personnel files.
17            MR. GABRIELLE:  Object to form.
18            THE WITNESS:  It is expected they -- they
19   upload the personnel file -- the -- the documents to
20   the personnel file.
21   BY MR. PRATER:
22        Q.  Thank you.  But again, expected.  But is it
23   required that --
24            MR. PRATER:  Objection to form.
25   BY MR. PRATER:
```



 1      Q.  -- that dealerships upload disciplinary

 2   records for their employees into those employees'

 3   personnel files?

 4          MR. GABRIELLE:  Same objection.

 5          THE WITNESS:  Is it -- is it required?  Yes.

 6   Is it written somewhere that it's required?  I don't

 7   know.

 8   BY MR. PRATER:

 9      Q.  Okay.  Why do you say it's required?

10      A.  From an employee perspective, anything that

11   the employee receives -- performance, counseling,

12   discipline -- it's just common practice that it goes

13   into their personnel file.  So it's all personnel file.

14      Q.  Okay.  But the dealerships and the managers of

15   the dealerships have complete discretion with respect

16   to what information goes into a -- an employee's

17   personnel file, correct?

18          MR. GABRIELLE:  Objection to form and

19   foundation.

20          THE WITNESS:  They have the responsibility.  I

21   wouldn't say it's discretion.  It's their

22   responsibility to upload it.  Now, whether they do or

23   don't, I don't know that.  But it's their

24   responsibility.

25   BY MR. PRATER:



1        Q.  So they could choose not to?

2            MR. GABRIELLE:  Objection to form and

3    foundation.

4    BY MR. PRATER:

5        Q.  Correct?

6        A.  I suppose.

7        Q.  Okay.  Would an employee of a dealership

8    having disciplinary -- a -- a disciplinary history

9    impact their ability to be promoted or transferred to

10   another dealership?

11           MR. GABRIELLE:  Objection to form and

12   foundation.

13           THE WITNESS:  Could you repeat the question

14   one more time, please?

15   BY MR. PRATER:

16       Q.  Sure.  If an employee has a disciplinary

17   record through AutoNation, would that disciplinary

18   record impact their ability to be promoted or

19   transferred to another dealership under the AutoNation

20   umbrella?

21           MR. GABRIELLE:  Objection to form and

22   foundation.

23           THE WITNESS:  It would depend.

24   BY MR. PRATER:

25       Q.  On what?



```
 1          MR. GABRIELLE:  Same objections.
 2          THE WITNESS:  It would depend on what the
 3   disciplinary action was for.  It would depend on when
 4   the disciplinary action was handed down and when the
 5   request to go to another dealership was made.
 6   BY MR. PRATER:
 7      Q.  Okay.  The request to transfer to another
 8   dealership in the -- under the AutoNation umbrella,
 9   are -- are those requests made to Eastern Region
10   Management or how are those requests submitted?
11      A.  If an -- if an employee would like to move
12   from one entity to another, they would go apply to an
13   open position.  Their current supervisor would review
14   and approve their request to apply to the other entity.
15   They would meet with and interview with that
16   supervisor.  And if it was granted at that point, then
17   they would go through some -- some on-boarding
18   paperwork into the new entity.
19      Q.  Is Eastern Region Management involved in that
20   process in any way?
21      A.  No.  At times, human resources, if they need a
22   review of personnel file to ensure the transfer
23   eligibility, human resources or someone who has access
24   to the personnel files will review.  But we don't make
25   decisions on -- on moving from one entity to another.
```



1      Q.   Okay.   I'm going to run through a list of

2   some -- some different examples of conduct, and I'd

3   like you to answer whether managers in individual

4   dealerships should report this type of conduct to HR,

5   okay?

6      A.   Okay.

7      Q.   Do you understand what I'm saying?

8      A.   I understand.

9      Q.   Okay.   If an employee is seen to be looking at

10   pornography in the dealership, should that be reported

11   by management to HR?

12          MR. GABRIELLE:   Objection to form and

13   foundation.

14          THE WITNESS:   It should be reported to a

15   superior or to HR or to someone to address it or

16   address directly with the associate.

17   BY MR. PRATER:

18      Q.   Okay.   So what I'm specifically asking about

19   is: Should it be reported to HR, okay?

20      A.   No.   Not necessarily if it's handled by the

21   superior.

22      Q.   Okay.   What if a manager in a dealership is

23   looking at pornography, should that be reported to HR

24   by other managers?

25          MR. GABRIELLE:   Same objections.



1      THE WITNESS:  Same answer.  If it's handled by

2  a superior, it does -- and -- and it stops, there's no

3  reason to involve HR.

4  BY MR. PRATER:

5      Q.  Is having explicit discussions of a sexual

6  nature describing sexual acts or things of that sort,

7  should that be reported by managers to HR?

8      MR. GABRIELLE:  Objections to form and

9  foundation.

10      THE WITNESS:  I think my answer is going to

11  remain the same.  There are -- there are levels of

12  superiors who should and can address the situation.

13  And if it's addressed and the outcome is suitable, then

14  it doesn't need to be reported.  If it is not addressed

15  or if that associate prefers to report it directly to

16  HR, they absolutely can.

17  BY MR. PRATER:

18      Q.  Is there any conduct that must be reported to

19  HR?

20      MR. GABRIELLE:  Objection to form and

21  foundation.

22      THE WITNESS:  If the general manager of the

23  dealership or the entity needs support assistance with

24  any type of the conducts you -- you mentioned, it

25  should absolutely be reported to HR for us to help



 1   facilitate and get involved.
 2          MR. PRATER:  Eric, do you have a copy of
 3   Mr. Fuentes-Baez's declaration?
 4          MR. GABRIELLE:  Not with me.
 5          MR. PRATER:  Okay.  Fair enough.  I -- I can
 6   pull it up on the screen here and -- and have her
 7   review that.  So --
 8          MR. GABRIELLE:  See if I've got on my laptop.
 9   Hang on.
10          MR. PRATER:  It's okay.  I -- I can do this.
11   She can just tell me when to scroll.
12          MR. GABRIELLE:  [inaudible 02:26:26].  Yeah.
13   I don't have a hard copy of it.
14          MR. PRATER:  No problem.  Okay.
15   BY MR. PRATER:
16      Q.  I'm going to share another document with you,
17   ma'am.  This will be -- I think we're on Exhibit 4.
18          (Plaintiff's Exhibit 4 was marked for
19   identification.)
20   BY MR. PRATER:
21      Q.  Can you see that?
22      A.  I can.
23      Q.  Okay.  I'm going to make --
24      A.  Can you make it just a little bit bigger?
25      Q.  Yep.  Of course, of course.  I'm going to try



1   to get it all on one page here.  All right.  There you

2   go.  Is that better?

3        A.  Yeah.

4        Q.  Okay.  So, like, I just have a question or two

5   about this.  Just let me know as you're reading it when

6   you want me to scroll, okay?

7        A.  Okay.  You can scroll.  You can scroll.  You

8   can scroll.  You can scroll.  You can scroll.  You can

9   scroll.  Okay.  Okay.

10       Q.  Okay.  Have you ever communicated with

11  Ms. Pacheco regarding her communications with

12  Mr. Emanuel Fuentes-Baez?

13            MR. GABRIELLE:  Objection to form and

14  foundation.

15            THE WITNESS:  Not that I recall.

16  BY MR. PRATER:

17       Q.  Okay.  Would you agree that an investigation

18  into the complaints and the conduct detailed herein

19  should have been conducted?

20            MR. GABRIELLE:  Objection to form and

21  foundation.

22            THE WITNESS:  If Cary was aware of these

23  allegations, she should absolutely, yes.

24  BY MR. PRATER:

25       Q.  She should have -- I'm sorry?



BIBI BICKRAM                                      March 13, 2024
NAVARRO vs HOLLYWOOD IMPORTS LIMITED                          96

1        A.   Conducted an investigation.

2        Q.   Okay.  Thank you.  Is Eastern Region

3   Management involved in any way in hiring general

4   managers for the individual dealerships?

5             MR. GABRIELLE:  Object to form.

6             THE WITNESS:  The market president who works

7   under Easton -- Eastern Region, the general managers

8   report in to.  And so he is responsible for hiring and

9   placing general managers, yes.

10  BY MR. PRATER:

11       Q.   Okay.  Who is the market president you are

12  referring to?

13       A.   Benny Dominguez.

14       Q.   Okay.  Is the market president involved in

15  decisions on hiring, promotions, or transfers of any

16  other positions besides general managers within the

17  individual dealerships?

18       A.   No.  Just general managers.

19       Q.   Okay.  And then general managers are -- have

20  the ability to hire or fire sales managers; is that

21  right?

22       A.   Yeah.  The employees at the dealership all

23  report one way, directly or indirectly, to that general

24  manager.

25       Q.   Okay.  And if a general manager observes



 1  misconduct, are they ever required to report it to HR?

 2           MR. GABRIELLE:  Objection to foundation and

 3  form.

 4           THE WITNESS:  I think back to what I was

 5  saying, if they're capable of addressing and handling

 6  it with their associates, if they need support from HR,

 7  they reach out to the HR manager to assist with

 8  handling the -- the misconduct.

 9  BY MR. PRATER:

10       Q.  Who has the authority to discipline employees

11  in individual dealerships?  Does that reside with the

12  general manager or -- I'm sorry, go ahead.

13       A.  Yes.  The general manager.

14       Q.  Okay.  Can HR and your department discipline

15  employees in individual dealerships?

16       A.  We do not.  We -- as I said, we operate in a

17  consultative manner from the associates to the -- the

18  management level.  If -- if a general manager needs

19  help with discipline and corrective action, we will

20  support in helping them put it together.  But it is

21  delivered and requested by that general manager.

22       Q.  Okay.  Does HR and your department make

23  recommendations for disciplinary -- discipline and

24  corrective actions?

25       A.  We do make recommendations.



1      Q.  Okay.  But the general manager has discretion

2  as to whether or not to comply with those

3  recommendations?

4          MR. GABRIELLE:  Objection to form.

5          THE WITNESS:  Ultimately, it's the general

6  manager's decision.

7          MR. PRATER:  Okay.  All right.  No further

8  questions.  Thank you very much for your time, ma'am.

9          THE WITNESS:  No problem.

10                 CROSS-EXAMINATION

11  BY MR. GABRIELLE:

12     Q.  Ms. Bickram, I'm going to refer to the

13  individual that's been identified as Cary Pacheco with

14  that name because that's the way her name appears in

15  the record in this case.  Do you understand that by

16  referring to that individual, I am also encompassing

17  the person named Cary Torres, right?  That's the same

18  person, okay?

19     A.  Yes.

20     Q.  All right.  So I'll just -- I'll call her Cary

21  Pacheco, even if her -- her legal name is Cary Torres.

22  How many years -- and if you don't know for certain,

23  provide an estimate -- have you worked in conjunction

24  with Cary Pacheco?

25     A.  Approximately, nine.  She just had an



```
 1   anniversary.  So I think nine is about right.
 2        Q.  Without providing any specific details, do you
 3   have experience working with or supervising Ms. Pacheco
 4   with respect to her investigation of allegations of
 5   harassment in any particular dealership or dealerships?
 6            MR. PRATER:  Object to the form.
 7            THE WITNESS:  I do.  I've worked side by side
 8   with her on investigations, and she has reported to me
 9   directly and indirectly.
10   BY MR. GABRIELLE:
11        Q.  Prior to Ms. Pacheco becoming affiliated with
12   what we've been calling today the organizations under
13   the umbrella of AutoNation, do you have an
14   understanding as to whether she had experience working
15   in human resources before that?
16            MR. PRATER:  Object to the form.
17            THE WITNESS:  Yes.  She had several years.  I
18   hired her, so she came with quite a bit of human
19   resources experience.
20            MR. GABRIELLE:  Nothing further.
21            MR. PRATER:  Okay.  I don't have anything
22   else.
23            MR. GABRIELLE:  We'll read.
24            MR. PRATER:  All right.  Thank you again for
25   your time.
```



1             MR. GABRIELLE:  Thank you.

2             Why don't I call you about 4:00 if that works.

3             MR. PRATER:  Perfect.  I appreciate it.

4             MR. GABRIELLE:  Okay.  Thanks.

5             THE REPORTER:  Okay.

6             MR. GABRIELLE:  Thank you, everybody.

7             MR. PRATER:  I'm not going to order at this

8    time.

9             THE REPORTER:  No order?

10            MR. PRATER:  I'll let you know, okay?

11            THE REPORTER:  Okay.

12            THE WITNESS:  Can I go?

13            MR. GABRIELLE:  Yeah, go ahead.  You can --

14            MR. PRATER:  Do you need any spellings or

15   anything?

16            (The deposition concluded at 2:55 p.m.)

17

18

19

20

21

22

23

24

25



1                     CERTIFICATE OF OATH

2

3    STATE OF FLORIDA

4    COUNTY OF BROWARD

5

6         I, the undersigned authority, certify that

7    BIBI BICKRAM personally appeared before me and was

8    duly sworn on March 13, 2024.

9         WITNESS my hand and official seal this

10   26th day of March 2024.

11

12   _____

                     Gary Siffort
13                   Notary Commission Florida/HH 328484
                     Commission Expires: November 2, 2026
14

15
     Type of Identification Produced: Driver's License
16

17

18

19

20

21

22

23

24

25



```
 1                  CERTIFICATE OF DIGITAL REPORTER

 2

 3           I, Gary Siffort, a Digital Reporter and

 4    Notary Public within and for the State of Florida,

 5    do hereby certify:

 6

 7           That BIBI BICKRAM, the witness whose

 8    examination is hereinbefore set forth, was first duly

 9    affirmed by me and that said testimony was accurately

10    captured with annotations by me during the proceeding.

11

12           I further certify that I am not related to any

13    of the parties to this action by blood or marriage and

14    that I am in no way interested in the outcome of this

15    matter.

16

17           IN WITNESS THEREOF, I have hereunto set my hand

18    this 26th day of March 2024.

19

20           _____
             Gary Siffort
21           Notary Commission Florida/HH 328484
             Commission Expires: November 2, 2026
22

23

24

25
```



```
1               CERTIFICATE OF TRANSCRIPTIONIST

2

3

4          I,  Richilda Buctuan, Legal Transcriptionist,

5     do hereby certify:

6          That the foregoing is a complete and true

7     transcription of the original digital audio recording

8     of the testimony and proceedings captured in the

9     above-entitled matter.  As the transcriptionist, I

10    have reviewed and transcribed the entirety of the

11    original digital audio recording of the proceeding to

12    ensure a verbatim record to the best of my ability.

13         I further certify that I am neither attorney

14    for nor a relative or employee of any of the parties

15    to the action; further, that I am not a relative or

16    employee of any attorney employed by the parties

17    hereto, nor financially or otherwise interested in the

18    outcome of this matter.

19         IN WITNESS THEREOF, I have hereunto set my

20    hand this 26th day of March 2024.

21

22

23              Richilda Buctuan
                _____
24              Richilda Buctuan

25
```



1              DEPOSITION ERRATA SHEET

2

3   Assignment No. J11052167

4   Case Caption: JUAN NAVARRO vs. HOLLYWOOD IMPORTS LIMITED, INC. and
    AUTONATION, INC.

5

6

7          DECLARATION UNDER PENALTY OF PERJURY

8

9

10       I declare under penalty of perjury that I have

    read the entire transcript of my deposition taken in

11

    the above-captioned matter or the same has been read

12

    to me, and the same is true and accurate, save and

13

    except for changes and/or corrections, if any, as

14

    indicated by me on the DEPOSITION ERRATA SHEET

15

    hereof, with the understanding that I offer these

16

    changes as if still under oath.

17

18

            Signed on the _____ day of _____,

19

    20__.

20

21

    _____

22

    BIBI BICKRAM

23

24

25



BIBI BICKRAM                                     March 13, 2024
NAVARRO vs HOLLYWOOD IMPORTS LIMITED                      105

```
 1   DEPOSITION ERRATA SHEET

 2   Page No._____Line No._____Change to:_____

 3   _____

 4   Reason for change:_____

 5   Page No._____Line No._____Change to:_____

 6   _____

 7   Reason for change:_____

 8   Page No._____Line No._____Change to:_____

 9   _____

10   Reason for change:_____

11   Page No._____Line No._____Change to:_____

12   _____

13   Reason for change:_____

14   Page No._____Line No._____Change to:_____

15   _____

16   Reason for change:_____

17   Page No._____Line No._____Change to:_____

18   _____

19   Reason for change:_____

20   Page No._____Line No._____Change to:_____

21   _____

22   Reason for change:_____

23

24   SIGNATURE:_____DATE:_____

25            BIBI BICKRAM
```



```
 1   DEPOSITION ERRATA SHEET

 2   Page No._____Line No._____Change to:_____

 3   _____

 4   Reason for change:_____

 5   Page No._____Line No._____Change to:_____

 6   _____

 7   Reason for change:_____

 8   Page No._____Line No._____Change to:_____

 9   _____

10   Reason for change:_____

11   Page No._____Line No._____Change to:_____

12   _____

13   Reason for change:_____

14   Page No._____Line No._____Change to:_____

15   _____

16   Reason for change:_____

17   Page No._____Line No._____Change to:_____

18   _____

19   Reason for change:_____

20   Page No._____Line No._____Change to:_____

21   _____

22   Reason for change:_____

23

24   SIGNATURE:_____DATE:_____

25            BIBI BICKRAM
```



**Exhibits**

**11052167 BI**
**BI.BICKRAM.**
**EXHIBIT1**
  4:4
  41:19,20
**11052167 BI**
**BI.BICKRAM.**
**EXHIBIT2**
  4:5
  43:11,12,
  21
**11052167 BI**
**BI.BICKRAM.**
**EXHIBIT3**
  4:6
  77:13,15
  79:18,22
**11052167 BI**
**BI.BICKRAM.**
**EXHIBIT4**
  4:7
  94:17,18

—————

**0**

**00**
  77:11
**0115**
  14:6
  77:12
**0116**
  14:7
**02:26:26**
  94:12

—————

**1**

**1**
  41:19,20

**100**
  14:16
  31:12
  61:12
**105**
  20:8
  32:3,4
  52:6
  53:10
**116**
  77:12
**12**
  16:18
**12:12**
  41:9
**12:23**
  41:12
**13**
  16:18
**14th**
  77:23
  80:2
**15th**
  78:2
**18**
  16:16
**1:00**
  40:16,24
  62:22
**1:06**
  67:14
**1:45**
  66:25
  67:1
**1:46**
  67:17
**1st**
  33:11,13

—————

**2**

**2**
  43:11,12,
  21
**2012**
  31:18,20
**2017**
  31:18,20
**2022**
  39:4 46:5
  58:15,24
  59:6,11
  60:3
  74:25
**2023**
  59:7 60:4
**2024**
  31:6
**22**
  12:7
  59:15
**23**
  12:7
  58:6,16
  59:2,15
  60:6
**24**
  30:24
**2:21**
  86:18
**2:30**
  86:13
**2:31**
  86:21

—————

**3**

**3**

**77:13,15**
**79:18,22**
**30**
  66:20
**305**
  78:24
**34787**
  11:11
**35**
  66:20

—————

**4**

**4**
  94:17,18
**4020**
  11:10
**4:00**
  100:2

—————

**7**

**7:16**
  78:2

—————

**8**

**8**
  14:6
  77:11
  79:21
**800**
  53:2

—————

**A**

**A-L-I**
  11:15
**a.m.**
  78:2

**AA**
  39:18
**ability**
  34:14
  90:9,18
  96:20
**absolutely**
  43:8
  93:16,25
  95:23
**accept**
  33:9
**acceptable**
  23:12
**access**
  68:12,18,
  19 69:6,
  8,11,14,
  17 91:23
**accurate**
  41:3
**action**
  91:3,4
  97:19
**actions**
  97:24
**acts**
  93:6
**actual**
  45:19
**add**
  69:3
**additional**
  79:8
**address**
  11:9
  53:21
  64:5,13
  65:6,23
  66:4 78:9
  92:15,16



93:12

**addressed**
62:16
63:21,24
64:2
65:1,6
66:4,8
74:9
93:13,14

**addressing**
64:23
65:12,25
66:12
97:5

**affiliated**
99:11

**afternoon**
67:5

**agree**
95:17

**ahead**
30:12
61:22
79:15
97:12
100:13

**Alertline**
52:13,23,
24 53:13,
15 54:14
55:25
62:4 65:3
74:17,20
76:24

**Ali**
11:13

**allegations**
95:23
99:4

**alleged**
13:11

**allegedly**
82:15

**amount**
63:14

**anniversary**
99:1

**anonymously**
53:3

**anti-harassment**
48:23
49:15

**anticipated**
63:3

**anybody's**
82:19

**apologize**
56:20

**appears**
98:14

**apply**
25:17
28:7
91:12,14

**approval**
23:23

**approve**
91:14

**approved**
23:24

**approximately**
32:4
35:11
58:6 59:6
98:25

**area**
11:16
18:12,21
63:7

**areas**
25:8

**arrived**
45:11

**Arts**
39:8

**aspects**
20:20
26:3 29:8
30:15

**assigned**
57:19
58:8,14,
18 59:4,
10,13

**assignments**
57:22,23

**assist**
97:7

**assistance**
76:12,13
93:23

**associate**
21:8
32:21
66:11
92:16
93:15

**associate's**
39:21
52:10
64:25

**associates**
20:21
32:20
47:17
48:24
49:13
50:24
65:8
97:6,17

**assume**
29:23
65:1 70:7
79:2

**assumed**
60:13

**assuming**
53:6

**assumptions**
30:2

**attached**
14:15

**attendance**
25:4

**attended**
45:6

**attention**
17:19
66:8,10
78:15

**Audi**
17:23

**audio**
71:13
79:12

**authority**
97:10

**automotive**
46:13

**Autonation**
11:7
15:17
18:11
19:1,15
21:25
22:1,12,
23 23:15,
22 24:16,
22 25:11,
21 26:4,
12 27:13,

21,25
28:2,5,6
29:2
37:4,5,8,
14 46:15,
23,24
47:23
48:1,19
49:1,4,7,
9,14
51:23
54:2,4,6
72:24
78:15
80:3
81:16
90:17,19
91:8
99:13

**avenue**
65:2

**avenues**
52:9,16
77:2

**aware**
26:5
28:15
45:15
47:4
49:22
65:15
66:3 79:4
80:14
81:17
83:4,6,11
85:12,14,
15,19,20
86:6
95:22

———————

**B**

———————

**BA**
39:19



**Bachelor's**
  39:8

**back**
  23:7
  36:24
  40:22
  41:11,15
  61:18
  67:1,16
  69:5,20
  75:11
  76:24
  78:8 85:2
  86:14,20
  97:4

**Baltimore**
  15:11

**based**
  15:11

**Bates**
  14:3,6

**Bay**
  11:10

**Beach**
  60:1

**beginning**
  46:5
  58:15
  59:6 60:3

**behalf**
  14:21

**behavior**
  39:10

**bell**
  83:20

**benefits**
  20:22
  32:22

**Benny**
  96:13

**Benz**

  18:4,8

**Bibi**
  11:10

**Bickram**
  11:10
  98:12

**bigger**
  94:24

**Bilanchone**
  51:8
  81:6,15

**bit**
  63:3
  83:24
  94:24
  99:18

**book**
  78:9

**bothering**
  34:4

**bottom**
  41:23

**break**
  12:20,22
  40:6,17
  62:22
  63:5,10

**breakdown**
  59:22

**bringing**
  66:9
  78:14

**brings**
  66:7

**broken**
  57:24

**Broward**
  59:25

**business**
  19:25

25:10,14,
16 26:3,7
27:23
28:5,13,
17,21,25
29:9,20
30:16
50:22,23,
25 51:4,
18 64:10
72:24
73:6 79:3

**Bye**
  41:6

---

**C**

**call**
  53:2,15
  60:22
  67:4
  98:20
  100:2

**called**
  35:20
  36:15,17
  75:15

**calling**
  99:12

**calls**
  53:13

**capable**
  97:5

**car-buying**
  28:13

**Carl**
  83:6
  85:23

**Cary**
  13:23
  58:13,20,
  22 59:10

60:1,13
69:16
77:23
78:5,6,11
81:22
84:25
85:3
95:22
98:13,17,
20,21,24

**case**
  11:7
  15:8,9,
  15,18
  16:4
  98:15

**cell**
  79:2

**Central**
  70:14

**CEO**
  34:21,22
  35:4

**certificate
s**
  40:1

**chain**
  13:22,24
  14:12,20
  55:5

**chance**
  62:22
  63:10

**change**
  16:25
  17:10,12
  22:11,18
  23:15
  29:6

**changed**
  16:14

**chart**

19:16

**check-in**
  34:16
  73:20

**Chief**
  33:20
  43:17

**choose**
  87:25
  88:5,8
  90:1

**choosing**
  88:7

**chose**
  52:15

**chosen**
  49:23

**Chris**
  11:5
  13:25
  25:23
  34:3
  42:22
  62:19,20
  67:4

**city**
  11:18

**clarify**
  12:18
  26:23
  27:22
  46:22
  56:6

**clarifying**
  28:20

**clear**
  26:21
  27:18

**closure**
  65:16

**coaching**



20:24

coast
    32:6,9
    37:10,11

code
    22:4 23:8
    25:3,10,
    14,16,20
    26:3,6
    27:23
    28:5,20,
    21,25
    29:8,20
    30:16
    72:23

codes
    47:1,23

collected
    41:24

collectivel
y
    16:16

College
    39:12

command
    55:5

committee
    50:23,25
    51:5,12,
    13,18

common
    89:12

commu
    80:25

communicate
d
    50:8
    95:10

communicati
ons
    72:23

81:14
95:11

companies
    35:15

company
    35:3
    52:24
    53:16,18,
    24 68:24

complain
    53:14
    65:8,19

complained
    80:2 83:2

complains
    75:22

complaint
    61:2,4
    63:21
    64:2,13,
    25 65:23,
    25 66:10
    70:4,7
    71:11
    74:4,8,17
    76:6
    78:21
    79:6
    80:16
    81:4,19
    83:8,10,
    14,17,18
    84:3,12,
    18,24
    86:4 87:2

complaints
    62:3,9
    63:20,23
    64:5,23
    65:12
    66:13
    69:20,23
    72:2
    74:19

76:3,21
77:2
78:16
83:6,11
85:12,15,
20 86:6
95:18

complete
    48:3
    50:19
    51:18
    89:15

completed
    45:2
    47:12,14
    50:6
    79:24

completing
    49:18

complexity
    54:22
    75:12

comply
    26:3 98:2

computer
    14:17

concern
    32:21
    53:1,5
    73:13
    74:8,16

concerns
    20:22
    78:14

conclusion
    43:5

conduct
    25:15
    28:25
    47:1,23
    72:23
    73:13

75:22
80:1,11
81:18
82:1
83:2,7
85:16,17,
22 92:2,4
93:18
95:18

conducted
    45:18
    81:3,19,
    21 95:19
    96:1

conducts
    93:24

confirm
    14:7 42:4

conjunction
    98:23

connection
    14:20
    69:22
    74:21
    75:5
    76:21
    80:8
    82:3,20
    84:12
    87:17

consultatio
n
    23:18

consultativ
e
    20:12
    97:17

contact
    52:8,11,
    13,19,22

contained
    27:25

Content
    68:23

convey
    61:3

copy
    42:23
    79:12
    94:2,13

corporate
    35:18
    51:1

correct
    39:22
    50:9
    54:17
    57:12
    62:7
    63:22
    65:20,21
    66:1
    67:25
    69:10,19
    71:23
    84:6
    89:17
    90:5

corrective
    97:19,24

counsel
    13:1,5
    14:13,25
    67:18
    80:14
    81:6,10,
    14,16

counseling
    20:24
    89:11

county
    57:23

couple
    31:13
    40:4



62:25
78:7
86:11

**courses**
51:17

**court**
12:10
15:12

**create**
60:17
70:25

**created**
62:2,6
69:22
70:8
84:11

**CROSS-
EXAMINATION**
98:10

**current**
16:6
30:21
35:9
36:24
47:6
55:3,8
67:21
76:2
91:13

**cut**
70:25

―――――――
**D**
―――――――

**date**
13:12
50:7

**day**
50:14,19

**dealer**
53:17
70:14

**dealership**
15:19
21:9,17
23:8,21
24:12
25:4,6
27:7,11
32:1 37:1
47:8,10,
12,16,19
48:2,5,8,
9,19 49:8
53:7
60:16
61:1
68:17
70:5
71:17
72:22
75:23
86:8
87:16,21,
25 90:7,
10,19
91:5,8
92:10,22
93:23
96:22
99:5

**dealership-
level**
49:10
51:17
60:15
61:2
62:10
66:13

**dealerships**
18:19,20,
22,23,25
20:3,6,
10,13
21:3,13
22:11,17,
25 24:16
25:17,19

26:1,2,8,
13 27:3
28:7,22
29:21
32:3,4,6,
17 37:14
46:2,10
49:6
50:8,12,
18 51:23
52:5,25
53:10,14
57:20
58:4
59:18
68:10,13
69:4,18,
22 72:1,
10,14
89:1,14,
15 92:4
96:4,17
97:11,15
99:5

**decision**
98:6

**decisions**
91:25
96:15

**declaration**
94:3

**Defendant's**
14:5
77:11
79:21

**degree**
39:11,21

**degrees**
39:7,15

**delivered**
97:21

**demand**
14:15,20

**demarcation**
59:24

**department**
33:22,25
38:16
50:20
52:14,20
53:19,20,
22,23
54:1,9,
12,15
56:1
60:17
61:4
67:25
68:1,4,8,
19 69:2,
8,24 70:6
72:25
76:9
97:14,22

**departments**
51:24

**depend**
24:8
54:21
90:23
91:2,3

**depending**
40:23
44:19
62:5
70:11
74:8

**depends**
24:12
71:16
74:16
75:12

**depo**
43:5,6

**deposition**
11:20
12:5,25

13:2
15:1,3,5,
20 41:19
43:11
51:9 53:9
77:14

**depositions**
16:2

**Der**
83:7,12,
15 84:12,
17 85:23
86:5 87:2

**describing**
93:6

**description**
33:4,12

**designation**
35:18

**detailed**
95:18

**details**
24:15
62:1 82:8
99:2

**determine**
29:7

**determines**
23:14
25:5

**devices**
71:1

**difficult**
12:12

**dig**
22:3

**direct**
35:12,25
36:5,11,
16 38:2,
21,25



directive
  50:4

directly
  42:1,19
  43:19
  65:2 66:9
  92:16
  93:15
  96:23
  99:9

Director
  31:10,16
  43:18

directory
  78:10

disciplinary
  88:1,16
  89:1
  90:8,16,
  17 91:3,4
  97:23

discipline
  24:25
  25:6,7
  87:13
  89:12
  97:10,14,
  19,23

disciplined
  87:17

discretion
  48:10,17
  49:19,23
  51:16
  62:8
  76:11
  88:15
  89:15,21
  98:1

discretionary
  72:4

discrimination
  49:24

discuss
  15:1
  78:21

discussed
  81:2 87:4

discussions
  93:5

division
  59:21

document
  13:5,7
  42:23
  62:9,15
  63:19
  70:12
  77:5,6
  94:16

documentation
  74:12

documented
  64:6 74:4

documents
  13:4,17
  29:19
  30:9,14
  69:22,25
  70:8
  71:10
  72:2 79:4
  84:11
  87:23
  88:19

Dominguez
  96:13

door
  34:4

dress
  22:4

23:8,11
  25:3

drive
  11:10
  70:14
  71:2

due
  49:16
  50:6,13,
  18,24

duties
  31:23
  32:11,25
  36:19

duty
  61:6,11
  72:10,14
  73:1,4

———————

E

e-mail
  13:8,9,
  10,12,14,
  18,20,21,
  24 14:12,
  20 64:12
  77:8,22
  78:4,13,
  25 79:11
  80:2 82:2
  85:21
  86:5

E-S-P-A-R-
Z-A
  33:18

earlier
  52:7 72:9
  74:17

early
  77:8

ears

72:16

easier
  79:13

East
  32:6,9

Eastern
  16:7,13,
  15,18,22
  17:11,16
  18:1,7
  19:3,10,
  14,17,21
  20:2,4,6,
  9  21:2,12
  27:12
  31:1,5,9
  32:5,7
  33:25
  35:13,17
  36:1,21,
  23  37:18,
  25  38:3,
  12,13,17,
  22  39:1
  41:9,12
  44:4
  46:15,23,
  24  48:1,
  20  49:8,9
  50:3
  52:6,8,
  10,20
  53:7,23
  54:9,23
  55:13,19
  56:8,25
  57:11
  58:10
  65:10
  67:14,17,
  23  86:18,
  23  91:9,
  19  96:2,7

Easton
  96:7

education
  44:5 47:8

Electronic
  68:23

Electronically
  68:21

eligibility
  91:23

Emanuel
  95:12

employed
  16:12
  18:1,15
  35:12,16
  36:1
  41:16

employee
  33:25
  60:15
  61:2 62:2
  71:11
  72:7
  73:7,12
  75:22
  76:3
  78:10
  87:16
  89:10,11
  90:7,16
  91:11
  92:9

employee's
  71:12
  89:16

employees
  47:8,12,
  19  48:2,
  8,18
  49:11,18,
  20,24
  50:19
  51:17



62:10
65:13
66:13
68:9,13
72:3
76:22
89:2
96:22
97:10,15

**employees'**
89:2

**employer**
16:6,17,
19 44:5

**encompassin
g**
98:16

**end**
16:10
78:4,25

**enforce**
41:2

**ensure**
49:17
65:16
91:22

**entail**
32:18

**entire**
31:5
38:21

**entities**
19:15
20:1
37:7,10
49:1,3,14
53:12

**entity**
16:8
23:24
27:12
35:19

36:15
51:1 53:6
54:7
91:12,14,
18,25
93:23

**Eric**
61:14
67:9 94:2

**escalate**
76:8,12

**escaping**
45:21

**Esparza**
33:16,24
34:20
41:15
42:18
43:19

**estimate**
98:23

**ethics**
25:10,14,
16,21
26:3,7
27:23
28:5,21
29:1,9,20
30:16
50:23,25
51:5,18
64:10
72:24
73:6

**examples**
26:15
45:9 92:2

**excuse**
28:21
30:11
49:15
77:11

**Executive**
43:18

**exercise**
49:23

**Exhibit**
14:6
41:19,20
43:11,12,
21 77:11,
13,15
79:18,21,
22 94:17,
18

**exhibits**
43:24
77:18

**expected**
73:23,24
88:18,22

**experience**
99:3,14,
19

**experienced**
76:10

**explain**
80:22

**explains**
22:16
76:19

**explicit**
93:5

**eyes**
72:16

——————————

**F**

——————————

**F-H-E-L-E-
E-Z-A**
11:15

**facilitate**
94:1

**Fair**
94:5

**fairly**
74:9

**falls**
58:2

**February**
30:24
31:6
33:9,11,
13

**Federal**
15:12

**feel**
72:18
76:11

**Fheleeza**
11:13

**field**
39:23,24

**file**
45:10
70:13,16,
19 71:3,
12,18,21,
25 72:7
82:20
84:18
87:18,21
88:2,19,
20 89:13,
17 91:22

**files**
68:9,12,
16,18,20
69:3,9,
14,17
71:7 72:3
88:16
89:3
91:24

**filled**

45:11

**filter**
56:4

**filters**
53:19
54:15

**finance**
28:14

**find**
21:11
82:1

**findings**
80:14

**fine**
34:12
40:13
66:23

**finish**
24:3,5
63:13

**finishing**
40:17

**fire**
96:20

**flexibility**
21:19
22:5

**Florida**
11:11
16:15,19,
21 17:11
18:9,15,
21 32:10
39:14
58:3,8,
14,19
59:5,11,
19 60:12
69:18
84:8,10

**FMLA**



15:7 16:4

**focus**
53:8

**folks**
55:2,3
68:19

**follow**
22:8,25
24:17
27:3,8
28:22

**follow-up**
30:6

**Ford**
18:11

**form**
17:2 19:5
20:15
21:14
22:20
23:2,16
24:7
26:14
27:5 28:8
29:11
30:17
35:5,21
37:6
44:14
45:13
46:18
48:11
50:10
51:19
52:2
53:25
54:5 55:7
57:15
58:25
60:19
62:12
63:25
64:15
65:14

66:2,14
70:1 71:4
72:5,17
73:10
74:6,18
75:1,8,25
76:16
78:18
80:9
82:6,16,
22 84:14,
20 85:7
87:11,19
88:3,17,
24 89:18
90:2,11,
21 92:12
93:8,20
95:13,20
96:5 97:3
98:4
99:6,16

**formal**
56:11
62:5

**forms**
60:22
74:14,20

**Fort**
11:19

**forward**
12:9 24:4

**forwarding**
42:23

**foundation**
19:5 27:6
29:12
30:18
35:5
44:14
45:14
51:20
62:13
71:14

73:11
74:6 75:9
76:1
78:18
82:5,11,
16,23
83:3
84:13,19
89:19
90:3,12,
22 92:13
93:9,21
95:14,21
97:2

**franchise**
20:4 32:1

**free**
67:5

**Fuentes-baez**
95:12

**Fuentes-baez's**
94:3

**full**
11:9 16:8
60:14

**function**
21:8
32:1,14

**functions**
20:25
32:16
37:1

**fuzzy**
15:6 16:4

―――――――――――
          **G**
―――――――――――

**Gabrielle**
13:25
14:5 17:2

19:5
20:15
21:14
22:20
23:2,16
24:1
25:22
26:14,22
27:5,14,
19 28:8
29:11,16,
22 30:4,
10,12,17
34:3,7,
11,13,18
35:5,21
37:6
40:5,9,
12,14,21
41:1,6
42:3,7,
10,13,22
43:1,4,
21,25
44:14
45:13
46:18
48:11
50:10
51:19
52:2
53:25
54:5
55:7,15,
21 57:15
58:25
60:19
61:5,16,
21 62:12,
19,24
63:6,9,
16,25
64:15
65:14
66:2,14,
20,22,25
67:3,7,10

70:1,10
71:4,13
72:5,17
73:10
74:6
75:1,8,25
76:16,23
77:17
78:18
79:12,15,
20 80:9,
17,20
81:1,5,9,
15 82:5,
11,16,22
83:3
84:13,19
85:7
86:15
87:11,19
88:3,17
89:4,18
90:2,11,
21 91:1
92:12,25
93:8,20
94:4,8,12
95:13,20
96:5 97:2
98:4,11
99:10,20,
23 100:1,
4,6,13

**Garden**
11:11,16

**gather**
73:13,16

**gathered**
75:13

**gave**
26:15
29:1

**general**
22:1,4,7



23:17
25:7
26:18
47:16
48:4,7,16
49:3,17,
19,22
52:12
73:20
93:22
96:3,7,9,
16,18,19,
23,25
97:12,13,
18,21
98:1,5

**generated**
71:10
75:6 80:7

**geographica
lly**
32:5
57:24

**give**
14:16
17:6
86:11

**Gloria**
36:4,13

**GMS**
51:15,16

**good**
11:4
12:23
78:13

**Goodness**
31:12

**granted**
91:16

**Group**
20:5,7

**guess**

39:18
68:25

**guessing**
85:1

**guidance**
24:15

**guideline**
22:4,7
24:13
25:8 29:4

**guidelines**
22:2,10,
17,24
23:15,21
24:21,23
25:20
26:18
27:8,13,
21,25
28:6,14,
16,17
29:1
76:14,25
77:3

**guys**
34:7
66:19
81:2

―――――――――

**H**

―――――――――

**halfway**
39:3

**handbook**
22:1,2,3,
23 24:23
26:12,24
27:2
28:1,3,5
29:2
61:13
64:7,8
73:6

**handed**
91:4

**handled**
48:5
92:20
93:1

**handling**
97:5,8

**hands**
88:7

**Hang**
94:9

**happen**
73:8
78:17

**happened**
58:23
59:1

**happy**
13:25

**harassment**
13:11
23:4
24:24
49:15,25
50:5,13,
18 99:5

**hard**
79:12
94:13

**head**
12:11
28:19
50:1
64:11

**hear**
34:10

**heard**
34:17

**hearing**
34:7

**hears**
72:23

**held**
30:23
31:13

**helping**
97:20

**hey**
49:14

**high-level**
33:3

**highest**
33:24

**hire**
48:13
96:20

**hired**
47:20
99:18

**hiring**
96:3,8,15

**history**
90:8

**hold**
31:3,11
39:7,17,
25 63:12

**Hollywood**
11:8
18:17
19:3,11,
13,18
58:1
81:17
85:17,22
86:7

**home**
11:9

**honestly**
12:2
15:22

**hope**
88:4

**hostage**
63:12

**HR**
20:11,20,
25 21:5,8
31:21
32:16,25
51:24
52:7,19
53:20
54:16,18
55:23
56:2,3,5,
23 63:19
64:12,22
65:6,11,
18,22
66:12,16
70:25
71:20
72:11,25
73:13,16
74:22
75:24
76:7,8,
10,15,20
80:3 85:9
87:17
92:4,11,
15,19,23
93:3,7,
16,19,25
97:1,6,7,
14,22

**HR's**
73:8

**huh-uh**
12:12

**human**
23:18
31:1,9,
10,15,25



32:13
33:20,22,
25 36:20,
25 37:17
38:3,16,
22 39:1
44:3
52:11,19
54:22
55:13,18
56:2,7,
10,12,15,
16,19,25
57:1,6,
10,13
58:7,9
59:5 61:7
62:7 65:5
66:5
67:22,24,
25 68:3
69:7,13,
24 70:6,
15,18
73:25
74:5 84:5
91:21,23
99:15,18

hurt
32:23

_____

**I**

ideally
74:10

identificat
ion
41:21
43:13
77:16
94:19

identified
98:13

Ignite

45:19,23,
25 46:4,
16 47:1

Illinois
32:8 60:9

impact
90:9,18

implement
22:5 23:6

implies
18:23

important
12:11

Imports
11:8
18:17
19:3,13,
18 58:2
81:17
85:17,22
86:8

in-house
81:6

in-person
45:4,5

inappropria
te
85:17

inaudible
94:12

include
12:13
72:13
81:5

includes
47:22
81:15

indirectly
96:23
99:9

individual
22:24
25:17
26:2,13
43:18
46:2 49:6
51:9,23
52:5
68:9,13
69:4,21
70:5
72:1,10,
14,22
75:23
92:3
96:4,17
97:11,15
98:13,16

individual'
s
88:1

individually
y
70:20

individuals
38:20
57:19
58:12
69:3,17,
23

information
73:13,17
75:12
80:25
89:16

instruct
17:4

instructions
s
44:15

intended
17:4

interfering

34:14

interrupt
24:2
81:10

interruptio
n
71:13
79:12

interview
75:7
91:15

interviewed
75:4 80:5

Intranet
69:1
70:14

investigate
53:21
54:16
73:23,24
74:3
78:16

investigated
d
76:4 80:3

investigating
ng
83:18
84:24

investigation
on
54:19,21
73:14,18
74:22
75:5 79:5
80:8,11,
15 81:3,
18 82:1,
4,8,10,
15,20
84:1
87:10,17
95:17

96:1 99:4

investigatio
ns
32:23
74:15
76:15,21
77:1 99:8

investors.
autonation.
com/
governance/
boardofdire
ctors
43:16

involve
93:3

involved
65:19
83:17,22
84:23
85:24
91:19
94:1
96:3,14

issue
28:6
52:17
53:5
72:19

issued
24:21

issues
20:21
52:7,10
83:20

_____

**J**

jeans
23:9

Jennifer
38:7



Jill
  51:8
  61:14

job
  33:4,12

Joey
  83:2

Johns
  58:13
  59:4,17
  60:2,8

Joseph
  85:13

JP
  77:23

July
  59:2,7

June
  59:2,6

jurisdictio
n
  15:9

—————————
        K
—————————

keepers
  71:24

kind
  50:7 55:4
  57:23
  75:11
  85:1

knowing
  85:24

knowledge
  26:10

Kristy
  36:4,10,
  12 38:7
  39:2

—————————
        L
—————————

L-E-Y
  35:2,3

laptop
  94:8

largely
  23:25
  24:8

late
  25:5,6
  31:18

Lauderdale
  11:19

Law
  11:6

learned
  80:13
  81:1

leave
  76:10

left
  62:25
  63:14

legal
  16:8
  52:13
  53:19,22,
  23 54:1,
  9,12,14
  56:1
  98:21

letter
  14:15,20
  81:24

level
  22:19
  32:2
  47:8,10,
  12,16,20

48:3,9,19
49:9 62:5
97:18

levels
  37:1
  93:11

licenses
  40:1

limited
  11:8
  18:18
  19:4,13,
  18 58:2
  81:17
  83:24
  84:9
  85:17,22
  86:7

link
  68:25

Lisa
  33:16
  42:18

list
  33:1 92:1

listed
  36:22
  45:2

lists
  78:11

LLC
  16:9,11
  17:18
  35:18

locally
  71:1

located
  17:22
  39:13

location
  23:9

73:21

locations
  18:3 20:4

log
  62:9,15
  63:19

login
  45:22

long
  16:12
  31:3
  34:13,14
  64:17
  66:19
  83:19
  87:12

longer
  40:20
  63:3

looked
  13:5,20
  14:1
  75:23

lost
  61:14

lot
  52:9,16

lots
  32:25

lunch
  40:16
  62:21,22
  63:10,15
  66:19

luxury
  23:10

—————————
        M
—————————

M-A-N-L-Y
  35:1

made
  66:3,11
  70:5
  83:14
  85:16
  91:5,9

maintain
  68:8
  70:20
  77:18

maintained
  44:13
  69:25
  70:9

maintaining
  68:15

make
  21:19
  22:18
  23:12,18
  62:21
  65:9
  81:11
  91:24
  94:23,24
  97:22,25

management
  16:7,13,
  15,18,20
  17:11,12,
  16 18:2,
  7,9,15
  19:3,10,
  17,22
  20:3,5,7,
  10,24
  21:3,12
  27:12
  31:6 32:5
  34:1
  35:13,17,
  20 36:1
  38:17
  46:16,23,



25 48:2,
20 49:8,
10 52:8,
20 53:7,
24 54:10,
23 65:11
68:23
91:10,19
92:11
96:3
97:18

**managements**
32:20

**manager**
20:23
23:17
31:21
32:19
36:13
47:16
48:4,7
49:3
52:12
54:23
55:22,23
56:3,5,
11,12,14,
16,18,19,
23 57:2,7
59:5
61:1,3
65:5,7,
18,22
66:5
70:15,18,
25 72:22
73:1,4
76:7,12
84:4,5
85:9
92:22
93:22
96:24,25
97:7,12,
13,18,21
98:1

**manager's**
48:17
49:17
98:6

**managers**
38:11,13,
14 49:19,
22 54:24
57:1,10,
14 58:8
62:8
63:19
64:12,23
65:12
66:12,16
69:13
71:20
72:10,13
74:1,5
76:10,20
89:14
92:3,24
93:7
96:4,7,9,
16,18,19,
20

**Manley**
34:25
43:17

**manner**
20:12
97:17

**manufacture
rs**
46:10,12,
13

**mark**
77:13

**marked**
41:20
43:12
77:10,15
79:20
94:18

**market**
55:23
56:3,12
57:1,6,
13,24,25
58:1,3,5,
7,8,15,19
59:5,11,
13,19
60:12
62:7
63:19
64:12,22
65:11,18,
22 66:12
69:13,18
73:25
74:5 76:7
84:7
96:6,11,
14

**markets**
69:15

**marking**
77:18

**married**
78:7

**Maryland**
15:11

**materials**
71:12

**matter**
15:5,23
16:1
39:23

**means**
37:10
56:18
63:14

**meet**
91:15

**Melissa**
58:13,20,

21 59:4
60:1,5,8

**mentioned**
74:7,17
77:8
93:24

**Mercedes**
18:4,8

**message**
61:21

**messages**
13:21

**Miami**
59:24

**Michael**
43:17

**middle**
11:12
31:18

**Mike**
34:25

**mind**
12:8
42:23
86:9

**Minnesota**
32:8 60:9

**minutes**
40:4,7,
12,22
41:4
62:25
66:20
86:12
87:4

**misconduct**
24:25
60:16
61:2,7
72:11,15,
19 73:7

86:7
97:1,8

**missed**
25:22

**modificatio
n**
26:8
28:23
29:6

**modified**
26:11,13,
17 29:10

**modify**
22:25
23:21
24:13,17
25:9,19
26:2

**moment**
33:2
45:21
48:15
49:7 50:2

**monitor**
64:22
65:24
66:12

**monitoring**
65:10,11

**morning**
11:4
78:14

**move**
91:11

**moved**
71:6

**moving**
91:25

**multiple**
54:20



**N**

named
73:20
98:17

names
15:14
36:3

nationwide
37:10

nature
54:22
73:8 93:6

Navarro
11:7
13:24
77:23
80:1
82:14
83:1

Navarro's
13:8,21
14:21
79:6,11
80:15
81:4,18
85:21
86:5

necessarily
92:20

needed
22:8

Nick
37:21

noise
34:4

non-franchise
20:4 32:2

north

60:1

northeast
32:8

notation
45:9 65:4

Note
45:13

notes
74:11
75:6,13
86:13

number
14:4 53:2
78:24
79:1

numbered
14:6

**O**

ob
24:1

Object
17:2 19:5
20:15
21:14
22:20
23:2,16
28:8
35:5,21
37:6
44:14
46:18
48:11
52:2
53:25
54:5 55:7
57:15
58:25
63:25
64:15
65:14
66:14

70:1
71:4,13
72:5,17
74:6 75:1
76:16
78:18
82:16
87:19
88:17
96:5
99:6,16

objecting
80:21

objection
24:4,5,7
26:14,22
27:5,19
29:11
30:17
45:13
50:10
51:19
55:15,21
60:19
62:12
66:2
70:10
73:10
75:8,25
76:23
80:9
82:5,11,
22 83:3
84:13,19
85:7
87:11
88:3,24
89:4,18
90:2,11,
21 92:12
93:20
95:13,20
97:2 98:4

objections
17:3 19:6

27:14
29:16,22
61:5 91:1
92:25
93:8

obligation
61:6,11
72:11,14

observe
72:15

observes
72:22
96:25

occupy
67:22

occurred
75:22
80:15
82:15

occurring
86:7

office
11:6
17:20,22
18:2,10,
14 50:17

Officer
33:20
43:18

offices
11:6
17:24
18:10

Ohio
32:8 60:9

on-boarding
91:17

ongoing
44:6

online
44:7,10,

18 45:1,
17 46:7
47:2 53:3

open
91:13

operate
20:12
97:16

order
100:7,9

organization
19:16
32:2,17
37:2

Organizational
39:10

organizations
99:12

orientation
47:19,22
48:3,5,
10,13

Orlando
11:16
17:23
18:4,8,12

outcome
93:13

overheard
73:22

**P**

p.m.
41:9,12
67:14,17
86:18,21



Pacheco
  13:23
  58:13
  59:10,18
  60:1,13
  69:16
  77:24
  78:1,8,
  11,21
  79:5
  81:22
  82:21
  84:25
  85:3,5
  95:11
  98:13,21,
  24 99:3,
  11

Pacheco's
  78:13

pages
  79:16

Palm
  60:1

paperwork
  20:23
  91:18

Park
  39:14

part
  22:13
  28:16
  50:25
  54:9
  59:23
  67:24
  69:8
  73:18

participate
d
  44:13
  83:25

parties

15:14

Partner
  36:14,23

Partners
  30:22
  31:24
  32:12
  33:10,21
  35:10
  36:13
  47:7

party
  15:17

pause
  61:15

pay
  17:18

paychecks
  17:16

pending
  12:21
  15:10
  30:4

people
  30:22
  31:24
  32:12
  33:10,21
  35:10
  36:13,22
  46:1 47:6
  69:2,7

percent
  14:16
  31:12
  61:12

perfect
  28:4 40:8
  42:21
  56:10
  67:6
  77:19

100:3

perform
  32:20

performance
  20:24
  45:19,23,
  25 46:4,
  16 47:1
  89:11

period
  58:19,20

permitted
  25:19
  26:2

pers
  87:22

person
  44:7,10
  53:20
  54:16,18
  56:2
  98:17,18

personnel
  45:10
  68:9,12,
  16,18,19
  69:3,9,
  14,17
  70:13
  71:3,12,
  18,21,24
  72:3,7
  82:20
  84:18
  87:18,21
  88:2,16,
  19,20
  89:3,13,
  17 91:22,
  24

perspective
  17:13
  20:11

21:5
  46:16,23
  73:9
  89:10

Phillips
  36:4,12
  38:7,20
  39:2,5

phone
  60:22
  78:24
  79:2

placing
  96:9

Plaintiff
  14:6
  77:11,12

plaintiff's
  41:20
  43:12
  77:15
  79:21
  94:18

platform
  45:2,17,
  20,23
  46:1,4,17
  47:2

platforms
  46:7,9

PLLC
  11:6

point
  16:15
  18:5 60:6
  91:16

policies
  21:13,18,
  20,23
  22:10,17
  23:15,22
  24:16,20

25:15
  28:2,7,13
  46:25
  47:23

policy
  22:4,9
  24:18
  25:1,4
  29:3,4
  61:25
  75:10,15,
  17 76:14

Pollard
  11:6

popped
  14:17

pornography
  92:10,23

position
  33:9
  36:24
  55:3,8
  60:11
  67:21
  91:13

positions
  55:20
  57:4,5
  67:24
  96:16

positive
  12:3

possibility
  71:5

Possibly
  31:17

posters
  52:25

practice
  89:12

practices



21:16

**Prater**
11:5
14:3,9,11
17:9
19:12
20:16
21:21
22:22
23:13,20
24:10
25:24,25
26:19,25
27:10,17,
20 28:10
29:14,18,
25 30:7,
11,13,20
34:10,16,
19 35:8,
22,24
37:9
40:3,8,
13,19,23
41:3,13,
14,22
42:6,8,
15,17,25
43:2,7,9,
14,23
44:1,2,21
45:16
46:21
48:14
50:11
51:22
52:4
54:3,8
55:9,17,
24 57:18
59:3
60:25
61:9,14,
20,23,24
62:17,23
63:2,8,

11,17
64:3,21
65:17
66:6,18,
21,23
67:2,6,8,
12,19,20
70:3,17
71:9,19
72:8,21
73:15
74:13
75:3,14
76:5,18,
21 78:20
79:14,19,
22,25
80:12,19,
23,24
81:8,12,
13 82:9,
13,18,25
83:5
84:16,22
85:11
86:11,16,
22,25
87:1,15,
24 88:10,
21,24,25
89:8,25
90:4,15,
24 91:6
92:17
93:4,17
94:2,5,
10,14,15,
20 95:16,
24 96:10
97:9 98:7
99:6,16,
21,24
100:3,7,
10,14

**prefers**

93:15

**premium**
23:10

**prepare**
12:25
13:2

**president**
30:22
31:1,9,
14,24
32:12
33:10,21
35:9
36:20
37:17,19,
24 38:3,
22 39:1
44:3 47:6
55:13,18
56:7 58:9
67:22
96:6,11,
14

**previously**
77:10

**prior**
12:7
14:13
15:4,20
16:19
30:25
31:6,8,
13,21
39:4
99:11

**problem**
61:17
63:15
67:2
79:14
94:14
98:9

**procedure**
24:14,18

61:25
76:14

**procedures**
21:13,18
25:15
28:2,7,14
46:25

**proceed**
24:4
41:12
61:19
67:18
86:24

**process**
91:20

**processes**
21:19

**professiona
l**
39:25

**program**
25:14

**promoted**
39:2,5
90:9,18

**promotions**
96:15

**provide**
19:8
20:10,12,
20,25
44:17
98:23

**provided**
13:6
14:13

**providing**
99:2

**provisions**
25:20

**pull**

94:6

**purpose**
61:17

**push**
67:4

**put**
48:8
49:20,23
51:16
71:12
82:19
97:20

_____

**Q**

**qualificati
on**
80:18,21
81:7

**question**
12:17,21
17:6,7
19:7,9,23
22:14
24:3,6
25:23
27:16
30:4,5,6,
8 38:24
42:14
44:16
50:16
51:2
53:11
55:16
70:2
80:22
90:13
95:4

**questions**
63:4
79:23
98:8



**quick**
  60:23

**quickly**
  74:9

**quiet**
  34:5

_____

**R**

**R-E-Y**
  85:13

**random**
  57:23

**ranking**
  33:24

**re-ask**
  30:5

**rea**
  42:7

**reach**
  52:14,16
  97:7

**reached**
  65:5

**read**
  79:13,15
  99:23

**reading**
  42:3,4,
  10,13
  79:24
  95:5

**reason**
  23:3,12
  88:9 93:3

**reasonable**
  23:14

**reassigned**
  58:21
  60:6,8

**recall**
  11:24
  13:12
  15:9,22,
  23 16:1
  58:21
  83:20
  84:15,23
  87:13
  95:15

**receive**
  44:4,6
  62:11
  65:18

**received**
  81:24

**receives**
  61:1 70:6
  76:7
  89:11

**receiving**
  83:18
  84:24

**recent**
  15:21

**recess**
  41:10
  67:15
  86:19

**recognize**
  13:14
  77:6
  78:24
  79:1

**recommendations**
  97:23,25
  98:3

**record**
  17:3 19:7
  40:10
  41:9,11
  45:5,7

**60**:18,21,
  24 67:14,
  16 70:8
  71:1 75:6
  86:17,20
  90:17,18
  98:15

**records**
  44:12
  62:2
  69:25
  70:9 80:7
  82:10
  88:1,16
  89:2

**redirect**
  21:10

**refer**
  29:19
  30:14
  98:12

**referred**
  43:19
  45:10
  61:11
  75:16

**referring**
  37:3
  44:25
  46:12
  52:21
  53:22
  73:25
  83:15
  87:7
  96:12
  98:16

**region**
  16:7,13,
  15,16,18,
  19 17:11,
  16 18:1,
  7,9,15
  19:3,10,

  14,17,21
  20:2,5,7,
  9 21:2,12
  27:12
  31:2,5,9
  32:5 34:1
  35:13,17,
  20 36:1,
  21,23
  37:18,19,
  24,25
  38:4,12,
  13,17,22
  39:1 44:4
  46:15,23,
  25 48:1,
  20 49:8,9
  50:3
  52:6,8,
  10,20
  53:7,23
  54:9,23
  55:14,19
  56:8,25
  57:11
  58:10
  65:11
  67:23
  84:8
  91:9,19
  96:2,7

**Region's**
  35:18

**regional**
  31:15,21
  38:14
  55:22
  56:15,23,
  25 57:10
  84:4,5

**relationship**
  19:2,10

**relative**
  63:7

**remain**
  93:11

**remember**
  15:16
  60:7 83:8
  85:8,24

**renamed**
  45:20

**repeat**
  17:7
  22:13
  25:23
  38:23
  55:16
  70:2
  85:19
  90:13

**repercussions**
  27:11

**rephrase**
  12:18
  80:19

**report**
  33:15
  34:20
  35:10
  37:18
  42:1,19
  53:1,2,4,
  5,15
  54:13
  56:1
  60:18
  61:3,7
  62:5,9
  63:21
  64:13
  65:2,3,9,
  19,23,25
  66:10
  70:4,7,9
  71:11
  72:11,15,



20,25
73:3,4,5
74:4,10
76:25
92:4
93:15
96:8,23
97:1

**reported**
37:19
60:17
62:4
92:10,14,
19,23
93:7,14,
18,25
99:8

**reporter**
12:10
41:8,11
67:13,16
86:17,20,
23 100:5,
9,11

**reports**
35:12,15,
25 36:5,
11,16
38:2,21,
25 43:19
60:15,21
62:3,10
63:19,23
64:5,23
65:12
66:13
69:21,23
72:3
73:7,12
76:22
85:13,15,
21 86:6

**represent**
13:25

**represents**
11:7

**request**
43:21
91:5,7,14

**requested**
97:21

**requests**
91:9,10

**require**
47:11
48:2
49:6,8,10

**required**
26:20
27:4
47:15
48:4,19,
24,25
49:2,12
61:3 64:5
71:23
72:2,25
76:7
87:18
88:23
89:5,6,9
97:1

**requirement**
62:14,15,
18 63:18,
20,23
64:1,9

**requiring**
47:17

**reread**
79:11

**reside**
97:11

**resolution**
60:23
74:12

**resolved**
74:9

**resource**
56:15
57:1
74:1,5

**resources**
23:19
31:1,9,
10,16
32:1,13
33:20,22,
25 36:20,
25 37:18
38:3,16,
22 39:1
44:4
52:11,19
54:23
55:13,19
56:2,8,
11,12,16,
19,25
57:1,6,
11,13
58:7,9
59:5 61:7
62:8 65:5
66:5
67:23,24,
25 68:3
69:8,13,
24 70:6,
15,18
84:5
91:21,23
99:15,19

**respect**
19:18
27:2
46:24
53:12
89:15
99:4

**respond**
78:17
82:14

**responded**
78:1

**response**
13:23

**responses**
12:11,14

**responsibil
ities**
31:23
32:11
36:20
64:19

**responsibil
ity**
49:17
60:14
71:18
89:20,22,
24

**responsible**
31:25
36:25
47:7
57:20
68:15
87:22
96:8

**rest**
53:9

**result**
87:9

**results**
80:14

**retaliation**
23:5 25:1

**review**
91:13,22,
24 94:7

**reviewed**
76:4 77:9
79:8

**reviews**
53:19
54:12,15

**Rey**
85:13

**rings**
83:20

**Rodriguez's**
83:2

**role**
35:9 44:3
47:6
83:23
84:2

**roles**
64:19

**Rollins**
39:12

**room**
34:4

**Roughly**
20:8

**run**
92:1

———————

S

———————

**S-C-H-N-E-
L-L-E**
37:23

**S-T-R-O-H-
A-U-E-R**
38:9

**sales**
96:20

**Sanford**
18:11



BIBI BICKRAM
NAVARRO vs HOLLYWOOD IMPORTS LIMITED

March 13, 2024
Index: sanity..stops

sanity
   77:13,18

sat
   15:3,21
   16:2

save
   71:1,2,
   17,20
   72:2

saved
   70:13,15,
   18

saving
   71:6

Schnelle
   37:21

scope
   83:24
   84:9

screen
   41:18
   77:7 94:6

scroll
   94:11
   95:6,7,8,
   9

selling
   28:14

send
   43:24

senior
   36:12
   38:11,12,
   14 54:24
   55:22
   56:14,15,
   18,21,25
   57:10
   76:12,20

sense
   62:24

separately
   79:21

Service
   28:16

set
   21:12,17,
   23

sets
   27:21

sexual
   49:15
   50:5 73:8
   93:5,6

shakes
   12:12

share
   41:18
   43:10
   94:16

shared
   13:6
   70:13,23
   71:2,7
   77:6

she'll
   61:17

sheets
   45:11

shift
   16:21

short
   63:5

shortly
   40:17

show
   77:5

shows
   19:17

side
   99:7

Siffort
   12:10

sign-in
   45:11

signed
   78:5

simple
   60:22

simply
   26:16
   28:12
   32:21
   36:13
   79:13

sir
   14:10

sit
   17:23

site
   68:21,22,
   25

situation
   24:9
   47:13
   81:25
   93:12

slight
   29:6

slightly
   23:7

sooner
   86:14

sort
   21:7,17
   45:8
   59:23
   60:21
   62:1 71:2
   72:19
   73:7
   74:11

93:6

sound
   31:19

sounds
   12:23
   31:22

south
   17:23
   18:21
   32:9
   58:3,8,
   14,19
   59:4,10,
   18,23,25
   60:12
   69:18

speak
   27:7
   73:19
   80:11

speaking
   13:1
   26:24
   27:22
   32:6 87:4

specific
   15:19
   16:22
   46:10
   47:14
   57:20
   69:15
   71:11
   76:17
   99:2

specificall
y
   26:24
   48:12,22
   92:18

speculating
   85:1

spell
   11:14
   33:17
   37:22

spelling
   38:8

spellings
   100:14

split
   59:18

spoke
   83:9,11,
   21

standard
   41:9,12
   62:1
   67:14,17
   86:18,23

standards
   21:13
   22:10,17
   28:6
   46:25
   47:24

start
   21:6

started
   11:4

state
   11:9
   15:12

stated
   81:25

states
   37:14
   60:10

steps
   74:3

stops
   93:2



**store**
22:5,19
49:2
78:17
83:22
85:18,22

**stores**
22:24
32:14
84:10

**strict**
22:7,18

**stricter**
22:6,18

**strike**
44:22
51:15

**Strohauer**
38:7,20

**subject**
15:5,23
16:1
27:11
39:9,20,
23

**submitted**
91:10

**substance**
40:10

**substantiat
ed**
82:2

**suit**
23:11

**suitable**
93:13

**Sunday**
77:23

**superior**
65:24
92:15,21

93:2

**superiors**
93:12

**supervising**
99:3

**supervisor**
64:2
91:13,16

**support**
20:3,10,
12,20,23
21:1 33:3
79:8
93:23
97:6,20

**supporting**
31:25
32:13,16
36:25

**supports**
21:3

**suppose**
48:16
49:21
81:25
90:6

**supposed**
24:13
62:2 73:8
74:4 75:5
76:20

**system**
47:2

**systems**
32:22

────────────

**T**

────────────

**takes**
77:17
78:15

**talk**
27:1 40:9

**talking**
52:19

**team**
32:15
47:9,11
48:6
52:21
64:17

**telling**
50:12

**templates**
74:14,21

**ten**
35:11

**Tennessee**
60:9

**testified**
42:18
72:9

**testimony**
26:9 27:2
40:10
88:11

**text**
61:17,21

**thing**
63:1

**things**
12:8,12
21:8
23:4,5,11
25:1,3
26:16
69:3 71:7
93:6

**thinking**
20:18
33:2

**third-party**

52:24
53:16
68:24

**thought**
42:15
75:18

**time**
12:4 25:7
31:5
33:13
36:23
38:8,21,
25 39:3
41:9,12
58:18,21
64:17
65:9
67:14,17
74:24
83:19,24
84:2,9
85:8
86:18,23
90:14
98:8
99:25
100:8

**timeline**
16:22
85:2

**times**
11:23
14:23
25:5 47:9
54:24
58:15
74:9
91:21

**title**
30:21,23,
25 31:3,
8,11,14,
15 33:19
36:6

54:18
56:11

**titled**
38:15

**titles**
36:9
38:10
54:20
55:2,3,
11,19

**today**
12:9,10
51:10
99:12

**today's**
12:25
13:2 15:1
53:9

**told**
52:7 55:1
57:9
66:17
86:1

**tolerance**
25:1

**tone**
83:21
87:3

**top**
28:19
50:1
64:11

**topic**
63:7

**Torres**
78:5,6
98:17,21

**training**
44:4,6,7,
13,18,20,
22 45:1,
2,12,17



46:1,7,9,
17,24
47:3,7,9,
14,15,22
48:9,18
49:12,16,
20,25
50:5,13,
18

trainings
45:4,5
47:11
48:3,21
49:10

transcript
12:13
45:3,10

transcripts
44:19,24,
25

transfer
91:7,22

transferred
90:9,19

transfers
96:15

tremendous
63:14

true
60:3,7

trust
66:16

tweak
22:8,11,
18 23:6
25:9

tweaked
26:16
29:3,10

type
19:25

61:7 76:6
80:2 92:4
93:24

types
46:9
78:16

———————

U

uh-huh
12:12
55:10

Ultimately
98:5

umbrella
18:24
19:1,15,
18 21:17,
23,25
37:8
49:4,14
51:24
54:2
90:20
91:8
99:13

uncommon
78:23

unders
81:9

understand
12:16
17:6
19:7,23
22:15
24:12
26:6
27:15
44:16
50:16
63:15
64:19
73:21

80:17
92:7,8
98:15

understandi
ng
55:4
81:22
99:14

understood
40:11
63:11
75:21
80:20

United
37:13

update
78:8

upload
72:6,7
88:1,5,7,
8,15,19
89:1,22

uploaded
70:12
88:6

uploading
87:22

utilized
46:1

———————

V

vaguely
83:8
85:24

Van
83:7,12,
14 84:12,
17 85:23
86:5 87:2

varied

57:16

variety
20:25

vary
70:11

verbal
12:11
64:18

verbalize
12:14

verbally
79:22

version
45:20

versus
29:9,21
30:16

vice
30:22
31:1,8,
13,24
32:12
33:10,21
35:9
36:20
37:17
38:3,21,
25 44:3
47:6
55:13,18
56:7 58:9
67:22

view
73:5

violate
72:23

violation
73:5

visited
83:22

VP

56:24
57:10

———————

W

Walker
83:12,15
84:12
85:23
86:5 87:2

Walker's
83:7
84:17

warrants
47:13

ways
20:9 21:2
73:16

website
41:23
43:17
53:4

Western
35:18,20

what'd
79:17

Willow
11:10

Winter
11:10,16
39:14

witnesses
73:19,20
80:5

work
11:6 16:7
20:2
36:16
79:13

worked
98:23



```
  99:7              Yun
working                36:4
  68:9,13
  69:4,17
  99:3,14

works
  35:6 96:6
  100:2

worry
  61:18

writing
  22:16
  62:1
  64:4,18
  76:19
  77:1

written
  22:9
  33:4,12
  61:10
  63:24
  75:17
  89:6


      Y


Y-U-N
  36:4

year
  12:6 15:4
  85:2

years
  16:14,16,
  17,18
  17:15
  31:4,13
  57:16
  71:6 78:8
  83:8,16
  85:25
  98:22
  99:17
```

