Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:  23-61772-CIV-SMITH

JUAN NAVARRO,

          Plaintiff,

-vs-

HOLLYWOOD IMPORTS LIMITED, INC., and
AUTONATION, INC.,

          Defendants.
_____/

DEPOSITION OF

MICHAEL L. ELKINS, ESQUIRE

(Pages 1 through 165)

April 29, 2024
10:07 a.m. - 3:12 p.m.

Examination of the witness stenographically taken
before:  Stefanie R. Mensch, FPR
Florida Professional Reporter

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 2

```
 1   APPEARANCES FOR THE PLAINTIFF:

 2   POLLARD PLLC
     BY:  CHRISTOPHER S. PRATER, ESQUIRE
 3        cprater@pollardllc.com
     401 East Las Olas Boulevard, Suite 1400
 4   Fort Lauderdale, Florida 33301
     954.462.9527
 5

 6   APPEARANCES FOR THE DEFENDANTS:

 7   STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
     BY:  ERIC K. GABRIELLE, ESQUIRE
 8        egabrielle@stearnsweaver.com
     200 East Las Olas Boulevard, Suite 2100
 9   Fort Lauderdale, Florida 33301
     954.462.9527
10

11                  INDEX TO EXAMINATIONS

12   WITNESS                                          PAGE

13   Michael L. Elkins, Esq.

14   Direct Examination by Mr. Gabrielle                 4

15   Cross-Examination by Mr. Prater                   141

16   Redirect Examination by Mr. Gabrielle             151

17

18

19

20

21

22

23

24

25
```

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 3

1                        INDEX TO EXHIBITS

2        EXHIBIT                 DESCRIPTION                  PAGE

3        Exhibit 23        Deposition Notice                    6

4        Exhibit 24        Expert Report                       13

5        Exhibit 25        Engagement Letter                   79

6        Exhibit 26        Time List                           79

7

8

9              INDEX TO CERTIFICATES AND LETTERS

10                                                           PAGE

11       CERTIFICATE OF REPORTER                             162

12       CERTIFICATE OF OATH                                 163

13       WITNESS NOTIFICATION LETTER                         164

14       ERRATA SHEET                                        165

15

16

17

18

19

20

21

22

23

24

25

Navarro v. AutoNation                    Michael Elkins 4/29/2024

```
                                                      Page 4
 1   Thereupon,

 2               MICHAEL L. ELKINS, ESQUIRE,

 3   was duly administered the oath:  Do you swear or affirm

 4   that the testimony you are about to give in this cause

 5   will be the truth, the whole truth, and nothing but the

 6   truth?

 7               THE WITNESS:  Yes.

 8                     DIRECT EXAMINATION

 9   BY MR. GABRIELLE:

10        Q.   Sir, please state and spell your full legal

11   name.

12        A.   Michael, M-i-c-h-a-e-l, middle initial L., last

13   name Elkins, E-l-k-i-n-s.

14        Q.   Thank you.  And you have been a member of the

15   Florida Bar since October 19, 2001, correct?

16        A.   Yes.

17        Q.   You are fully familiar with the nature and

18   significance of the oath you just took?

19        A.   Obviously.

20        Q.   Have you ever actually given a deposition

21   before?

22        A.   I have not.

23        Q.   You've taken depositions, though?

24        A.   Yes.

25        Q.   Could you give us an estimate of approximately
```

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 5

1    how many?

2         A.   I could not.  A lot.  It would be --

3         Q.   Would it be more than 100?

4         A.   I hate -- you know, I hate to lock into

5    numbers, but it's been a lot in my career.  It's

6    23 years.  It's a lot.  Probably more than 100, but I

7    really don't know; so I don't want to even be in a range.

8         Q.   Understood.

9         A.   But a lot.

10        Q.   All right.  So I will go through the basic

11   rules with you.  Please wait until I finish with any

12   question before beginning your answer, and I will wait

13   and not ask you another question until you've finished

14   your answer.  Okay?

15        A.   Yes, sir.

16        Q.   You are being deposed in your capacity as a

17   witness to offer opinion testimony, sometimes referred to

18   as an expert in the rules.  Obviously, you are going to

19   be asked about your opinion as well as certain facts.

20   When you are testifying as to your opinion, if you have

21   an opinion about facts I'm asking you about, please

22   indicate that it is your opinion.  Okay?

23        A.   Yes, sir.

24        Q.   I'm going to show you some documents

25   momentarily.  Please take all the time you need to review

Navarro v. AutoNation                     Michael Elkins 4/29/2024

                                                        Page 6

1    them.  Let me know when you're finished, and then I'll

2    ask you some questions.  All right?

3         A.   Yes, sir.

4         Q.   And if I begin asking you a question about the

5    document before you're finished reviewing it, just say

6    so, and I'll stop.  All right?

7         A.   Yes, sir.

8         Q.   If you would like a break at any point, just

9    say the word.  You don't need to wait for me or Chris to

10   suggest one.  Okay?

11        A.   Thank you.

12        (Defendants' Exhibit No. 23 was marked for

13   identification.)

14   BY MR. GABRIELLE:

15        Q.   I'm marking as Exhibit 23 the deposition notice

16   pursuant to which you are appearing today.  Please take a

17   look at it and let me know when you're finished.

18             MR. PRATER:  Just for the record, we're

19         continuing exhibit numbers from a previous

20         deposition.

21             MR. GABRIELLE:  Correct.  Correct.

22   BY MR. GABRIELLE:

23        Q.   There were not 22 exhibits, Mr. Elkins, that I

24   have asked you about that you forgot about.

25        A.   I am familiar with that style of numbering

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 7

1   exhibits in depositions.  Thank you.

2        Q.   I was sure I was not the only person who did it

3   that way.

4        A.   Thank you, though.

5        MR. PRATER:  I apologize in advance for my

6        coughing.  I woke up with a dry cough.  So I'm

7        going to try to distance myself from all.

8        MR. GABRIELLE:  Okay.

9        A.   I've read the document, sir.

10  BY MR. GABRIELLE:

11       Q.   All right.  If you could turn, please, sir, to

12  Exhibit A to Exhibit 23, and in particular the 12

13  categories of items listed there.

14       A.   Yes.

15       Q.   Item No. 1 asks for "Copies of all documents

16  and communications, other than those documents

17  specifically identified in your written report, that

18  identify any facts or data that you considered in forming

19  the opinions set forth in your written report."

20       Have you brought any documents that are not

21  specifically identified in your written report with you?

22       A.   No.

23       Q.   Item No. 2 asks for "Copies of all documents

24  and communications, other than those specifically

25  identified in your written report, that identify any

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 8

1   facts or data that you relied upon in forming the

2   opinions set forth in your written report."

3           Have you brought any documents responsive to

4   that category?

5       A.   No.

6       Q.   Item No. 3 asks for "Copies of all documents

7   and communications, other than those documents

8   specifically identified in your written report, that

9   identify any factual assumptions that you considered in

10  forming the opinions set forth in your written report."

11          Have you brought any documents responsive to

12  that category?

13      A.   No.

14      Q.   Item No. 4 asks for "Copies of all documents

15  and communications, other than those documents

16  specifically identified in your written report, that

17  identify any factual assumptions that you relied upon in

18  forming the opinions set forth in your written report."

19          Have you brought any documents responsive to

20  that category?

21      A.   No.

22      Q.   As the alternative to reading the remainder of

23  these items, I'm going to ask you just item by item.

24          Have you brought any documents with you

25  responsive to Category No. 5, including Parts 5a, b, c,

Navarro v. AutoNation                    Michael Elkins 4/29/2024

                                                        Page 9

1    and d, on Exhibit A to Exhibit 23?

2         A.   No.

3         Q.   Have you brought any documents responsive to

4    Category 6, including Parts 6a, 6b, 6c, and 6d, on

5    Exhibit A to Exhibit 23?

6         A.   No.

7         Q.   It's my understanding that you have brought

8    with you documents responsive to Category No. 7, correct?

9         A.   Yes.

10        Q.   And at least as it concerns the engagement

11   letter, I'm assuming the engagement letter falls within

12   Category 8.  You brought documents responsive to

13   Category 8, correct?

14        A.   Correct.

15        Q.   And you brought documents responsive to

16   Category 9, which overlaps with Category 7, correct?

17        A.   Correct.  To be clear on Category 9, it's

18   records of time spent.  There are no actual billing

19   statements because they don't exist yet.  I just want to

20   make sure we're clear on that.

21        Q.   Understood.  Let me ask you, with respect to

22   Category No. 10, have you provided at any point,

23   beginning April 1, 2004, opinion testimony in a

24   deposition or at trial as a witness proffered to do so

25   pursuant to Federal Rule of Evidence 702 or the

Navarro v. AutoNation                  Michael Elkins 4/29/2024

```
                                              Page 10
 1   comparable provision in the Florida Evidence Code, that

 2   being 90.702, or the comparable evidence rules of any

 3   other jurisdiction?

 4        A.   No.

 5        Q.   Have you ever provided opinion testimony or

 6   expert testimony in a deposition or trial?

 7        A.   No.

 8        Q.   Have you ever been engaged in the capacity to

 9   provide expert testimony or opinion testimony in the

10   past?

11        A.   Yes.

12        Q.   How many times?

13        A.   Including this case?

14        Q.   Sure.

15        A.   Twice.

16        Q.   So on one prior occasion.

17        A.   Correct.

18        Q.   Did you provide a report on that occasion?

19        A.   Yes.

20        Q.   What was the subject matter of the report?

21        A.   I was opining as to the sufficiency of -- or

22   lack thereof, I guess -- an HR investigation in a hostile

23   work environment case.

24        Q.   Was that a case that was pending in any

25   jurisdiction at that time?
```

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 11

1       A.   Yes.  I believe United States District Court

2  for the Southern District of Florida.

3       Q.   What was the case style of that case?

4       A.   I don't remember.  The Wyndham Resorts, I

5  believe, was one of the defendants.  I don't remember the

6  name of the plaintiff.  I certainly could provide that to

7  you if you allow me to look it up.

8       Q.   Approximately how long ago was it?

9       A.   Not long; so I should remember.  Maybe six

10  months.  I could give it to you if you let me look on my

11  phone.

12       Q.   Please.

13       A.   Okay.  Here we go.  Jacklyn -- this is the

14  style of the case.  Jacklyn, J-a-c-k-l-y-n, Knights,

15  K-n-i-g-h-t-s, vs. Wyndham Vacation Ownership, Inc.

16  United States District Court, Middle District of

17  Florida -- so I stand corrected -- Case No.

18  6:23-cv-01104-RBD-DCI.

19       Q.   Thank you.

20       A.   You're welcome.

21       Q.   And in that case, at least to your knowledge,

22  has the court adjudicated any issue concerning the

23  admissibility of the report that you provided?

24       A.   No.

25       Q.   Are you aware of whether any challenge was made

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 12

1    to that report?

2         A.    No challenge was made.  It's my understanding

3    the case resolved.

4         Q.    Okay.  Do you know whether or not that report

5    was filed with the court?

6         A.    I don't know, no.

7         Q.    On which party's behalf did you provide that

8    report, the plaintiff or the defendant?

9         A.    Plaintiff.

10        Q.    Do you generally retain a copy of that report?

11        A.    Yes.

12        Q.    So that is the only prior occasion, other than

13   this case, where you've provided expert services in any

14   capacity?

15        A.    No.

16        Q.    What other instances have you done so?

17        A.    In the past, I've been retained as an expert on

18   attorney's fees.  If you were to ask me, though, what

19   those cases were and when, I would not be able to tell

20   you.  It's been a long time.  But I have done that.

21        Q.    Fair enough.  So other than opining as to --

22   strike that.

23            Those services would be opining to the

24   reasonableness of the fees being incurred and the

25   reasonableness of the amounts being sought, correct?

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 13

1        A.    Yes, sir.

2        Q.    Other than those particular occasions on which

3   you opined as to the reasonableness of attorney's fees,

4   and other than this case and the case you just mentioned

5   in the Middle District of Florida, have you ever provided

6   expert services in the past?

7        A.    No, sir.

8        Q.    Who was counsel for the plaintiff in that case?

9        A.    The Middle District case?

10       Q.    Yes.

11       A.    Pollard, LLC.

12       Q.    The same firm that is using you now?

13       A.    Correct.

14        (Defendants' Exhibit No. 24 was marked for

15   identification.)

16   BY MR. GABRIELLE:

17       Q.    Sir, I've marked as Exhibit 24 the transmittal

18   email and what has been proffered as your expert report

19   in the case, which includes, as its own Exhibit A, your

20   résumé, or curriculum vitae.

21            Take all the time you need to review

22   Exhibit 24.  Let me know when you're finished.

23       A.    Thank you.  I'm okay.  I reviewed it in

24   advance.  I may have to go back to it, obviously, but I'm

25   familiar enough with it.

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 14

1     Q.   Turn, if you will, then, sir, to the first page

2   of Exhibit 24, which identifies the materials reviewed.

3   And that section continues on to the second page.  Did

4   you, in the course of preparing Exhibit 24, review any

5   materials of any type other than those listed in

6   Exhibit 24 under the category or heading of "Materials

7   Reviewed"?

8     A.   Yes.

9     Q.   What else did you review?

10    A.   The only other materials reviewed was document

11  production in this case, I believe, from defendants.

12    Q.   So you did not review any guidelines or

13  standards created by any third-party organization in the

14  course of preparing your report?

15    A.   Correct.

16    Q.   One of the categories or items identified --

17  or, actually, several -- on the second page of Exhibit 24

18  are the deposition transcripts of four individuals, those

19  being Mr. Navarro himself, who is the plaintiff in this

20  case, as well as Carl Vanderwarker, as well as David

21  Losk, as well as Bibi Bickram.

22         Do you see that section?

23    A.   Yes.

24    Q.   Did you review the entirety of each of those

25  deposition transcripts?

Navarro v. AutoNation                    Michael Elkins 4/29/2024

```
                                              Page 15
  1        A.   Yes.

  2        Q.   Were any summaries created for you or provided

  3   to you?

  4        A.   No.

  5        Q.   Is there any information of any type that you

  6   would have wanted or preferred to have to evaluate and

  7   render the opinions covered by your report that you did

  8   not have?

  9        A.   Yes.

 10        Q.   What?

 11        A.   A deposition of Ms. Pacheco.

 12        Q.   And what would be the reason why you would want

 13   to have that?

 14        A.   Ms. Pacheco is, as I understand it, the

 15   individual who supposedly investigated Mr. Navarro's

 16   claims.

 17        Q.   And how would the content of Ms. Pacheco's

 18   deposition bear on the opinions that you've rendered?

 19        A.   I don't know because there was no deposition of

 20   her at the time I rendered the opinion; so I can't say

 21   how it would have or would not have impacted anything.

 22   But certainly, as she is the individual identified as

 23   conducting the investigation, I would have liked to have

 24   seen what she had to say.

 25        Q.   Did you review any other materials or
```

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 16

1   information that you considered with respect to the

2   investigation that may or may not have been conducted by

3   Ms. Pacheco?  In other words, did you have any other

4   information from any source as to the nature and scope of

5   that investigation?

6        A.   I apologize.  Could you repeat that?  I'm

7   sorry.

8        Q.   Sure.  You considered the deposition of

9   Ms. Pacheco something you would have wanted to review

10  prior to rendering your opinion, correct?

11       A.   Yes.

12       Q.   Did you have any information regarding

13  Ms. Pacheco's investigation, even in the absence of her

14  deposition testimony?

15       A.   Yes.

16       Q.   What was it?

17       A.   The information contained in the record in this

18  case.

19       Q.   And what particular information concerning

20  Ms. Pacheco's investigation did you consider?

21       A.   The deposition testimony of Ms. Bickram.

22       Q.   Anything else?

23       A.   The deposition testimony of Mr. Navarro.

24       Q.   Anything else?

25       A.   I can't remember if anything regarding

Page 17

1    Ms. Pacheco in Mr. Vanderwarker --

2    V-a-n-d-e-r-w-a-r-k-e-r -- or Mr. Losk -- L-o-s-k --

3    referenced Ms. Pacheco's investigation or her lack

4    thereof.  It's possible it was in there.  I just, off the

5    top of my head, don't remember, and I don't have their

6    deposition transcripts in front of me.

7        Q.   Now, going to the section, meaning the

8    paragraph, on page 3 of your report, that is Exhibit 24,

9    labeled "Scope of Opinion."  Do you see that?

10       A.   Yes, sir.

11       Q.   It reads, "I am hired to opine on the

12   sufficiency of an investigation by AutoNation, Inc.

13   ("AN") into plaintiff's May 14, 2023, email complaint to

14   Cary Pacheco."

15            That's the first sentence of a two-sentence

16   paragraph, correct?

17       A.   Correct.

18       Q.   Were you comfortable that you had all the

19   information necessary to opine as to the sufficiency of

20   Ms. Pacheco's investigation, even without her deposition,

21   as to what she did in that investigation?

22       A.   Yes.

23       Q.   Why is that?  Why wouldn't you have wanted to

24   consider Ms. Pacheco's deposition before rendering an

25   opinion as to the sufficiency of it?

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 18

1        A.    One of the main issues here is whether or not

2    Ms. Pacheco's investigation was documented via a written

3    report or any writings.  If there were writings or a

4    report, those writings or report would have been already

5    produced.  They were not.  Ms. Bickram testified she

6    wasn't aware of any writings as to Ms. Pacheco's

7    investigation.

8            So I was comfortable that I could opine even

9    absent Ms. Pacheco's deposition.  What I testified to, I

10   believe, was that I would have liked to have seen her

11   deposition, but I don't think it was necessary to render

12   my opinion.  I guess you could call it a want versus a

13   must have.

14       Q.    Go, if you would, please, sir, to the "Expert

15   Opinion" section of Exhibit 24.  Let me make sure I

16   understand the scope of the opinion that you're offering.

17   I'm going to ask you about certain other subjects and ask

18   you whether or not your opinion includes an opinion or

19   study on any of these other subjects.

20           Have you analyzed or are you opining on the

21   adequacy of the defendants' policies regarding workplace

22   harassment?

23       A.    No.

24       Q.    Have you undertaken any study or analysis of

25   that issue?

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 19

```
 1      A.    No.

 2      Q.    Are you opining as to whether or not the

 3  conduct alleged in this case would meet any legal or

 4  other standard for constructive discharge?

 5      A.    No.

 6      Q.    Have you undertaken any study or analysis on

 7  that issue?

 8      A.    No.

 9      Q.    Are you opining on whether or not the conduct

10  alleged in this case would meet the legal standard for

11  sexual harassment or some other type of harassment?

12      A.    No.

13      Q.    Have you undertaken any study or analysis on

14  that issue?

15      A.    No.

16      Q.    Are you opining on whether or not any of the

17  conduct alleged in this case actually occurred?

18      A.    No.  And I believe Footnote 4 of my report

19  makes that clear.

20      Q.    And have you undertaken any study or analysis

21  as to whether or not any of the conduct alleged actually

22  occurred?

23      A.    No.

24      Q.    Are you opining as to whether or not anything

25  alleged by any witness in this case, including
```

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 20

1   Mr. Navarro, Mr. Losk, Mr. Vanderwarker, or Ms. Bickram,

2   is factually correct or incorrect?

3       A.   No.  And, again, I would --

4            MR. PRATER:  Object to the form.

5            THE WITNESS:  I'm sorry?

6            MR. PRATER:  Object to the form.

7       A.   No.  And I would again refer to Footnote 5 in

8   my report and correct my earlier statement when I said I

9   think it's made clear in Footnote 4.  That's a

10  correction.  That should be Footnote 5.

11  BY MR. GABRIELLE:

12      Q.   Okay.

13      A.   Apologies for the mistake.

14      Q.   No problem.

15           Are you opining on whether, if Mr. Navarro

16  failed to complain prior to his email to Ms. Pacheco,

17  which is referenced in your report, that failure was

18  reasonable or unreasonable?

19      A.   No.

20      Q.   Have you undertaken any study or analysis on

21  that issue?

22      A.   No.

23      Q.   Are you opining on whether or not the conduct

24  alleged in this case rises to the level of actionable

25  harassment in terms of its frequency, severity, or other

Navarro v. AutoNation                      Michael Elkins 4/29/2024

Page 21

1    criteria considered in that determination?

2         A.   No.

3         Q.   Have you undertaken any study or analysis on

4    that issue?

5         A.   No.

6         Q.   Are you opining on whether or not the two

7    defendants named in this case were joint employers?

8         A.   No.

9         Q.   Have you undertaken any study or analysis on

10   that issue?

11        A.   No.

12        Q.   Are you opining on whether or not either

13   defendant or both defendants were negligent in

14   supervising or retaining any person, including Joey

15   Rodriguez?

16        A.   No.

17        Q.   Have you undertaken any study or analysis on

18   that issue?

19        A.   No.

20        Q.   What methodology did you apply to reach the

21   opinion you offer in this case?

22        A.   Could you be a little bit clearer about what

23   you mean by "methodology"?

24        Q.   Well, I'm asking you what methodology you used

25   to reach your expert opinion.

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 22

1      A.    I'm a little unclear what you mean by
2    "methodology," but I will attempt to answer.  I've been
3    an attorney for approximately 23 years, primarily, for
4    the entirety of my career, a labor and employment
5    management attorney for the entirety of my 23 years.  I
6    would say that 95 percent of my practice is labor and
7    employment law, and of that 95 percent, 93 is management
8    defense.
9          So based on my years of experience in that
10   field, including my individual experience investigating
11   workplace allegations, both as an attorney representing
12   clients as well as an individual hired as an outside
13   third-party investigator, that experience, knowledge
14   base, was what I used to render my opinion in this case.
15     Q.    So you did not rely on any third-party
16   standards, guidelines, or anything other than your own
17   experience and the materials you reviewed?
18     A.    That's correct.
19     Q.    How many -- and an estimate, sir, is fine.  How
20   many investigations of workplace harassment have you made
21   in the course of your career?
22          MR. PRATER:  Object to the form.
23     A.    If I may break that into two categories.  In
24   terms of being hired as an independent investigator, so
25   by third parties, not with an attorney-client

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 23

1  relationship, there have been -- let me think -- three.

2  It might be two.  Two or three.  Maybe four.

3          And then in the context of the attorney-client

4  relationship, it would be innumerable.  I can't give you

5  an exact number.  It's been a lot over 23 years.  Now, by

6  that, though, I am encompassing matters that might relate

7  solely to client inquiries about certain allegations and

8  maybe asking a few questions of potential witnesses, all

9  the way through to very formal -- you know, very formal

10 investigations.  I won't say they're independent, because

11 I'd be doing them as the lawyer under the attorney-client

12 relationship.  But there have been many.

13     Q.   How do you distinguish between the informal

14 examples that you've given and whatever would constitute

15 a formal investigation?

16     A.   I mean, maybe using "informal" would be the

17 wrong term.  I think not all workplace complaints or

18 allegations are alike.  I talk about that in my report.

19 You know, you might have Sally complains that Joey is

20 mean to her in the break room.  That might necessitate a

21 client call:  "What do we do with this, if anything?"

22 You know, Sally complains.

23          That's very different than a formal email, you

24 know, with very specific allegations that go over time

25 that might impact a number of people.  That might get

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 24

1    treated differently.

2        Q.   Let me ask you, then, to confine your estimate

3    to specific formal investigations, undertaken either in

4    the capacity as an attorney or in the capacity as an

5    independent investigator, where the matter being

6    investigated was alleged or determined to be workplace

7    harassment.  How many such investigations have you

8    conducted?

9        A.   It's tough to give you an exact number over

10   23 years.  It's been a lot.  But certainly I'd be

11   comfortable saying over 20.  I would not be able to give

12   you a ceiling on that.  Certainly, it's not 1,000, but,

13   you know, it's certainly been a lot.

14       Q.   Has any court or other tribunal ever, to your

15   knowledge, determined whether or not any investigation

16   you conducted was sufficient or insufficient?

17           MR. PRATER:  Object to the form.

18       A.   Not to my knowledge, no.  None.

19   BY MR. GABRIELLE:

20       Q.   Has any, to your knowledge, defense or claim

21   based on any investigation you conducted prevailed or

22   failed in a legal proceeding?

23           MR. PRATER:  Object to the form.

24       A.   Well, I did an investigation for the Town of

25   Surfside into allegations of sexual harassment/hostile

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 25

1    work environment.  I generated a report.  I don't know

2    what happened after the report.  I was told -- or I

3    should say I heard -- that there was discipline issued to

4    an employee based on my report and that, at some point,

5    that discipline was overturned, I believe, through

6    negotiations between the employee and the Town.  But I'm

7    not personally aware of it.

8            So I don't know if that claim or that situation

9    ever went to an arbitration relating to the discipline of

10   the employee.  So I don't want to leave that out.  That's

11   the only one that I can think of at the moment.

12   BY MR. GABRIELLE:

13       Q.   Would that investigation fall within the

14   category of investigations you conducted as an attorney

15   or separate from the attorney-client relationship?

16       A.   I was hired as an independent investigator.

17   There was no attorney-client relationship with the Town.

18       Q.   So that would have been one of the two to four

19   investigations you conducted in that capacity?

20       A.   Yes, sir.

21       Q.   Can you recall -- I'm just asking now about

22   investigations conducted in the capacity not as a counsel

23   for the employer --

24       A.   Yes, sir.

25       Q.   -- but independently -- any other employers for

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 26

1    whom you've conducted such investigations?

2         A.    I'm in the middle of an investigation for

3    Port Saint Lucie relating to allegations of hostile work

4    environment.  Many moons ago -- many moons ago.  I

5    believe when I was at Muller Mintz -- I was the associate

6    on an independent investigation relating to allegations

7    of hostile work environment concerning Broward College.

8    I did another independent investigation for the Town of

9    Surfside, although that was not relating to sexual

10   harassment.  I don't know if you were excluding those or

11   not, excluding other stuff.

12              And that's it that I can remember right now.  I

13   feel like there might be one other.  I just can't

14   remember it at this point.

15        Q.    Excluding the ongoing investigation you're

16   working on for Port St. Lucie, do you retain copies of

17   any of the investigative reports or conclusions you

18   reached in the other matters you've identified, the two

19   matters for the Town of Surfside and the matter on which

20   you acted as an associate that involved Broward College?

21        A.    I do not have anything on Broward College.

22   That was, like, 2003, I think, or '2.  That's long gone.

23   And I couldn't even tell you what that was about.  I just

24   remember working on it.

25              Yes.  As to Surfside, I have all those

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 27

1    materials.

2         Q.    Is either matter for the Town of Surfside, to

3    your knowledge, going on in litigation right now?

4         A.    It's my understanding neither matter is in

5    litigation or ever went to litigation, with the exception

6    of the disciplinary issue relating to the employee, if by

7    "litigation" you're including, like, a labor arbitration.

8    I'm just not sure if that ever got there or not.  I don't

9    believe that's happening now.  Something happened and

10   there was a resolution.  I don't know how that came

11   about.

12        Q.    So both matters for the Town of Surfside, if

13   they were ongoing, they are now resolved, correct?

14        A.    Correct.  And to be clear, again, one of those

15   matters was not a sexual harassment or hostile work

16   environment claim.  It was something totally separate.

17   But I didn't know if in asking about when I was hired

18   independently, you had excluded non-hostile work

19   environment claims.  So I just wanted to be complete.

20        Q.    Which one is the hostile work environment

21   claim, the one involving the discipline being issued to

22   the employee or the other?

23        A.    The discipline issued.  The discipline being

24   issued was the hostile work environment claim.

25        Q.    Was that a hostile work environment claim based

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 28

1   on sex or some other criteria?

2       A.   Sex.

3       Q.   So you do retain a copy of the investigation

4   you conducted into alleged sexual harassment, now

5   concluded, for the Town of Surfside?

6       A.   If by "copy of the investigation" you mean a

7   copy of the report, yes.

8       Q.   I'm not going to ask you for the name of the

9   complaining party.  What was the name of the individual

10  who was disciplined?

11      A.   The complaining party.

12      Q.   So the complaining party who made a claim for

13  harassment based on sex was ultimately issued discipline

14  by the Town of Surfside?

15      A.   That's my understanding.  I did not participate

16  in that.  That's what I had heard.

17      Q.   Was that discipline based on any recommendation

18  or conclusion you made?

19      A.   I did not recommend that that employee be

20  disciplined.  I don't know if it was based on any

21  conclusion I made.  And to be clear -- I'm sorry.  I just

22  want to be very clear on this point -- I'm going off of

23  what I had heard had happened.

24      Q.   I understand.

25      A.   So if I'm correct -- it's very possible I'm

Navarro v. AutoNation                    Michael Elkins 4/29/2024

```
                                                    Page 29
 1    incorrect, but that was what I had heard.
 2         Q.   What was the name of the perpetrator or
 3    perpetrators -- alleged perpetrators -- who engaged in
 4    harassment that you investigated for the Town of
 5    Surfside?
 6         A.   The alleged perpetrator was Captain Antonio
 7    Marciante, M-a-r-c-i-a-n-t-e.
 8         Q.   Is that a police captain?
 9         A.   Correct.
10         Q.   Can you tell me what year or years you reached
11    the conclusion?
12         A.   2023.
13         Q.   Okay.
14         A.   I'm sorry.  It might have been 2022.  I'd have
15    to double-check, but I think it was 2023.
16         Q.   Thank you.
17         A.   I could check it on my phone, if you'd like, to
18    give you exact.
19         Q.   That's okay.  That's a sufficiently narrow time
20    frame.  Thank you.
21         A.   You're welcome.
22         Q.   In that investigation of the conduct of
23    Captain Marciante of the Town of Surfside, did you
24    interview the complaining party?
25         A.   I did.
```

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 30

1      Q.   Was the complaining party still employed by the

2  Town of Surfside at the time you conducted the interview?

3      A.   I conducted multiple interviews with the

4  complaining party, and she was employed with the Town

5  during all of those interviews.

6      Q.   So in that particular instance, the complaining

7  party was complaining about harassment, workplace

8  harassment, while still an employee of the Town of

9  Surfside, correct?

10      A.   That is correct.

11      Q.   Do you know whether or not the allegations made

12  by the complaining party ever became public or publicly

13  reported on?

14      A.   It is my understanding that there was some

15  media attention given to her case.  I think that my name

16  appeared in an article from local media about the report.

17  I don't know.  I do a lot of public sector work, but I

18  hardly know everything about the Sunshine Law.  So I

19  don't know if the report is a public record under the

20  Sunshine Law.  I think it is, but I'm not 100 percent

21  certain.  Certainly, I think, if you Google it, there's

22  some stuff out there, but not a lot.

23      Q.   So other than the specific investigation we

24  have now been discussing, that being the allegations of

25  harassment involving the police captain at the Town of

Navarro v. AutoNation                    Michael Elkins 4/29/2024

                                                    Page 31

1   Surfside, have you ever, as an independent non-attorney

2   investigator, investigated harassment at any other

3   employer?

4        A.   Well, certainly anything I do would always be

5   as an attorney.  I don't think you ever step out of those

6   shoes.  But I think --

7        Q.   Let me rephrase the question.

8        A.   I think I understand you.

9        Q.   Let me ask it more clearly just to be clear.

10  You've indicated there are two capacities under which

11  you've conducted investigations, one capacity as an

12  independent investigator not acting as counsel for the

13  employer, and another category where you are acting as

14  part of your attorney-client relationship, correct?

15       A.   Correct.

16       Q.   So right now I'm only asking about that first

17  category, that being where you did not have an

18  attorney-client relationship with the employer that you

19  were investigating conduct, workplace conduct, about.

20            Other than the Town of Surfside and the matter

21  we have just been discussing involving Captain Marciante,

22  have you ever conducted, in a non-attorney-client

23  capacity, an investigation that involved allegations of

24  harassment?

25       A.   Yes.

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 32

1      Q.   When was that?

2      A.   Recently with Port St. Lucie.

3      Q.   But that matter is still ongoing, correct?

4      A.   Yes.  I've submitted a draft report.  I'm

5  waiting to hear back.  So it's close to conclusion.

6      Q.   Do you know whether or not that matter is in

7  litigation?

8      A.   It is not in litigation.

9      Q.   Now, the work you undertook as an associate

10  where the matter involved Broward College, you would not

11  have considered yourself to be providing services at an

12  expert level at that point of your career, correct?

13     A.   Correct.

14     Q.   And now I'm just asking specifically about

15  harassment matters.  Are there harassment matters, in

16  which you acted in the capacity as counsel for the

17  employer when conducting an investigation, that were or

18  became legal disputes in court or before another

19  tribunal?

20     A.   Yes.

21     Q.   In any of those matters, was the adequacy or

22  sufficiency of the investigation you conducted ever

23  determined by a court to be sufficient and adequate or

24  otherwise?

25          MR. PRATER:  Object to the form.

Navarro v. AutoNation                    Michael Elkins 4/29/2024

                                                      Page 33

1       A.   I don't recall any matter where the sufficiency

2    of my investigation was at issue when I'm acting in the

3    capacity as counsel to an employer.

4    BY MR. GABRIELLE:

5       Q.   Do you know whether or not in any -- well, you

6    would.  Strike that.

7            Do you know, in any matter where you, in your

8    capacity as an attorney, conducted the investigation and

9    the matter ultimately was raised in litigation, whether

10   or not any successful claim or defense was based on your

11   investigation?

12           MR. PRATER:  Object to the form.

13      A.   Could you repeat that?  I'm sorry.  I'm not

14   trying to --

15   BY MR. GABRIELLE:

16      Q.   I'll be a little more clear.

17      A.   I'm not trying to be difficult.

18      Q.   There are defenses available to employers, are

19   there not, based on investigations conducted of workplace

20   harassment?

21      A.   That's correct.

22      Q.   Has any such defense, to your knowledge, ever

23   been predicated on any investigation you've conducted?

24      A.   I'm just trying to think.  It's possible.  I

25   don't remember offhand, but it's entirely possible.  I

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 34

1    just don't remember.

2        Q.   So if your opinion in this case was based on

3    the materials you reviewed and your own experience, how

4    would another person with comparable experience replicate

5    or test the conclusions you've reached?

6            MR. PRATER:  Object to the form.

7        A.   I can't speak to what another person would do.

8    I don't know.

9    BY MR. GABRIELLE:

10       Q.   But in terms of the approach, the analysis, the

11   methodology that you engaged in, how would someone test

12   or evaluate the sufficiency of your conclusions?

13       A.   Well, I think --

14           MR. PRATER:  Object to the form.

15       A.   I think certainly, as you're doing today,

16   you're able to inquire about my background, how I got

17   there, how I got to my conclusions, and you'll form your

18   own view as to whether or not I'm qualified to reach

19   those conclusions.  Beyond that, I can't speak to what

20   some other third party would do, or is there some -- it

21   sounds like you're asking if there's, like, a brightline

22   test.  I'm not really aware of that.  But certainly

23   you're free to inquire of me, as you've properly been

24   doing.

25   ///

Navarro v. AutoNation                    Michael Elkins 4/29/2024

                                                        Page 35

1    BY MR. GABRIELLE:

2        Q.    What set of standards or guidelines did you

3    rely upon to reach the conclusions identified in your

4    report?

5        A.    As I testified earlier, I used the breadth of

6    my knowledge as a 23-year labor and employment lawyer,

7    primarily management defense, and as an individual who is

8    hired to conduct workplace investigations, both as an

9    attorney representing a client as well as an independent

10   investigator.  My role as an independent investigator is

11   recent, given that I've crossed a lengthy threshold in my

12   career.  So I'm being either hired or proposed for

13   investigations on a relatively frequent basis these days,

14   and I think the standard I've set in my investigations

15   I've used to apply here.

16       Q.    As I understood your earlier testimony -- and I

17   mean this respectfully, or at least I don't mean it

18   disrespectfully --

19       A.    I don't think you're being disrespectful in any

20   way.

21       Q.    Well, I appreciate that.

22       A.    I understand that you have a job to do, and

23   you're doing it politely.

24       Q.    Your standards and practices with respect to

25   conducting investigations, those have not ever been

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 36

1    judicially tested, have they?

2            MR. PRATER:  Object to the form.

3        A.  Michael Elkins's personal standards and

4    practices are based upon what he has learned -- I don't

5    mean to speak in the third person.  That sounds

6    terrible -- are based upon what I have learned as a

7    practicing 23-year labor and employment attorney, which

8    obviously, I think, comes from what I've seen in cases I

9    have worked on, research I have done in the past 23 years

10   representing employers in hostile work environment or

11   sexual harassment claims, understanding how those claims

12   should be dealt with as primarily a defense attorney for

13   23 years and as an investigator.

14           Has my opinion ever been tested?  No.  I have

15   never been -- I have never been qualified as an expert in

16   court.  My role as an expert is relatively new, for sure.

17   BY MR. GABRIELLE:

18       Q.  The techniques or methodologies that you

19   applied here, though, in reaching the conclusions that

20   you've reached, how would another person approach the

21   evaluation if there were no guidelines or standards other

22   than those you've developed through your own experience?

23           MR. PRATER:  Object to the form.

24       A.  I can't -- respectfully, I can't say how

25   another person would do that.  I know how I reached my

Page 37

1   opinion in this case, and that's the best way I can

2   answer that.

3   BY MR. GABRIELLE:

4        Q.   Do you have any way of evaluating or analyzing

5   what, if any, error rate exists for the methodology or

6   technique that you used here?

7        A.   I guess it would depend on what "error rate"

8   means.  I mean, this is not a mathematical formula.  I

9   certainly understand, you know, if we're dealing in

10  statistics or we're dealing in expert opinion, let's say,

11  relating to front pay or mitigation of damages, or

12  analyzing, let's say, pension contributions, there could

13  be mathematical error rates there.  But I'm not entirely

14  sure I know what you mean by "error rate" here.  Again,

15  this is a little bit more amorphous.

16       Q.   Are you pointing to or identifying anything

17  other than your own personal experience in conducting

18  investigations to determine whether or not the opinions

19  you are rendering here and the conclusions you reached --

20  strike that.

21            Other than your own personal experience, are

22  you relying upon anything else, other than the materials

23  you've reviewed, to reach the conclusions you've reached?

24       A.   No.  But to be clear -- and I think I talked

25  about this earlier -- my own personal experience comes

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 38

1    from being a 23-year labor and employment management

2    defense lawyer who occasionally does handle a plaintiff's

3    case or two.  So that experience in representing

4    employers over the two-plus-decade period in hostile work

5    environment/sexual harassment cases, plus being hired as

6    an independent investigator to conduct those types of

7    investigations, is what I used to form the basis of my

8    opinion.  I did not use any external materials, which I

9    think I mentioned at the very beginning of the deposition

10   today.

11        Q.   So to be clear, are you relying on anything

12   other than your own experience to analyze the materials

13   and information identified in your report?

14             MR. PRATER:  Object to the form.

15        A.   No.

16   BY MR. GABRIELLE:

17        Q.   How did that experience lead to the conclusions

18   that you've reached in your report?

19        A.   Well, for employers dealing with allegations of

20   hostile work environment or sexual harassment, I think

21   it's critical that employers investigate.  I don't think

22   that that is a very far-flung leap in the world of

23   employment defense law.  It can be extremely problematic

24   for an employer to not investigate these things.  As you

25   mentioned, there are certain defenses available to

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 39

1    employers based upon, you know, whether they conduct
2    investigations and things like that.  I'm not saying that
3    that's at play in this case.  Just generally.
4              As I mentioned in my report, not all HR
5    complaints are equal.  I'm certainly not opining that
6    every HR complaint deserves, requires, or needs a written
7    finding.  In this case, however, my understanding of the
8    email -- I don't have the email in front of me so I'm
9    going to go off recollection -- was that Mr. Navarro,
10   post-employment, granted, alleged hostile work
11   environment/sexual harassment.  I think he alleged a
12   battery in there too.  Maybe it was assault.  I'm not
13   100 percent sure.  He also alleged that the conduct at
14   issue was witnessed by, I think, 11 or 12 individuals
15   that, I believe, were still employees, some of which were
16   management.
17             I don't know if that happened or not, but what
18   I do know is that's serious.  Those are serious
19   allegations.  So I believe an employer in that case
20   absolutely should investigate those allegations and
21   should generate a writing, a report, memorializing the
22   efforts it undertook to deal with those allegations.  I'm
23   not saying that the writing has to be 47 pages.  By way
24   of example, if each of those 12 witnesses said, "Yeah, I
25   didn't see any of that," that's a pretty short interview.

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 40

1    You could certainly summarize that.

2            But identifying witnesses interviewed;

3    identifying the dates of the interview, depending upon

4    what the witnesses say; a summary, whether that's in a

5    group summary or individually; interviewing the

6    complainant to get more specifics as to the allegations

7    is entirely appropriate and should be done.

8            The allegations seemed to point to a culture of

9    either accepting or fostering hostile work environment

10   and harassment.  I'm not saying that that's true.  I

11   don't know if that's true.  But I do know that that

12   needs -- that should be looked into.  And as an

13   employment defense lawyer, that's certainly what I would

14   have done.

15           And I don't think -- and the point here would

16   be that there should be something in writing regarding

17   what happened there, and my understanding is that did not

18   happen in this case.

19   Q.   Surely, though, you don't contend that it is

20   necessary for a person to opine in an expert capacity as

21   to whether or not allegations of harassment or battery

22   are serious, correct?

23   A.   I'm sorry.  Ask that again.

24   Q.   You don't contend, do you, that one needs to

25   bring any particular expertise to the analysis of whether

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 41

1   or not allegations of sexual harassment or battery are

2   serious, do you?

3            MR. PRATER:  Object to the form.

4        A.   I'm not ignoring you.  I'm processing your

5   question.  That one needs to opine ...

6   BY MR. GABRIELLE:

7        Q.   In other words, you're familiar, of course, are

8   you not, sir, with the idea that opinion testimony is

9   intended to aid the fact finder in reaching conclusions?

10       A.   I am.

11       Q.   You don't need an expert to tell you that

12   allegations of sexual harassment are serious and should

13   be investigated, correct?

14           MR. PRATER:  Object to the form.

15       A.   You don't need an expert in what context?

16   BY MR. GABRIELLE:

17       Q.   Do you believe a jury would need an expert to

18   evaluate whether or not Mr. Navarro's allegations in the

19   email that he sent to Ms. Pacheco were serious

20   allegations?

21       A.   I think the fact finder can take allegations

22   and make its determinations on them based on whatever is

23   presented to them.

24       Q.   What should be done, in your opinion, if

25   anything, prior to witnesses being interviewed -- strike

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 42

1    that.

2            What should an investigator do prior to

3    interviewing witnesses in order to prepare to interview

4    witnesses in a harassment case?

5        A.   Gather documents.  Preserve evidence.  Speak to

6    the complainant to get the full breadth and scope of the

7    complaint.  Identify witnesses.

8        Q.   And is there a standard or guideline as to the

9    amount of time, minimum amount of time or maximum amount

10   of time, an investigator should allow to elapse before

11   first speaking to a complaining party?

12       A.   Not that I'm aware of.

13       Q.   Would the fact that the complaining party is no

14   longer employed by the employer be a factor in

15   determining how much time an investigator should spend

16   preparing before conducting his or her investigation?

17       A.   I don't know that it's the fact -- I don't know

18   that the fact -- strike that.

19            I don't know that the complainant's state of

20   employment is the big factor there.

21       Q.   So you would not consider allegations of

22   harassment made by an employee who has a current

23   employer-employee relationship to be necessarily

24   investigated more promptly or quickly than allegations

25   made by a former employee?

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 43

```
 1        A.   I didn't say that.

 2        Q.   That's what I'm asking.  Is there a distinction

 3   or a difference that you recognize between allegations of

 4   harassment being made by someone who may still be

 5   experiencing harassment as compared to someone who no

 6   longer works at that employer?

 7        A.   I think those are two --

 8             MR. PRATER:  Object to the form.

 9             THE WITNESS:  Sorry.

10        A.   I think those are really two different issues.

11   In this case, you had allegations that these 12 employees

12   witnessed all this conduct and didn't do anything about

13   it, including managers.  Again, I don't know if that's

14   true or not.

15             And I believe there were other allegations.  I

16   read a declaration from -- excuse me.  Let me get his

17   name -- Mr. Fuentes Baez.  And I believe in the email,

18   there were allegations that the conduct was happening in

19   the moment.

20             So I think the issue for this case is that's

21   conduct that was alleged to be ongoing, and the

22   allegations were that it was essentially sanctioned, or

23   at least unreported.  So I think that's what would

24   matter.

25             I mean, certainly it's different if it's an
```

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 44

1    active employee.  That's a different hypothetical and a

2    different situation.  I'm not opining as to time limits

3    or the distinction between being a current employee or

4    post employee.

5    BY MR. GABRIELLE:

6         Q.   Do you know whether or not Mr. Baez, the person

7    who furnished the declaration you've referred to, was

8    still employed at the time that -- strike that.

9              Do you know whether or not Mr. Baez, the person

10   to whom you just now referred, was still employed at the

11   dealership at the time that Mr. Navarro made his

12   allegations in his email to Ms. Pacheco?

13        A.   I don't remember.

14        Q.   In terms of an investigation that you

15   conducted, would communications between the complaining

16   party and the party or parties about whom he or she was

17   complaining be something that you would want to consider?

18        A.   Communications between the complainant and the

19   alleged harasser?  Is that what you're asking me?

20        Q.   Yes.

21        A.   Of course.

22        Q.   Why?

23        A.   They may provide information relating to the

24   sufficiency of the allegations.

25        Q.   Might they also reflect on the credibility of

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 45

1   the allegations?

2        A.   They might.  That's fair.

3        Q.   Might the absence of complaints made in written

4   communications be relevant as well?

5             MR. PRATER:  Object to the form.

6        A.    In terms of an investigator reaching ultimate

7   conclusions, sure.  But I'm not opining on what the

8   ultimate conclusions any investigator might have reached

9   or how they would -- I'll leave it at that.  I'm not

10  opining on ultimate conclusions of any investigator.  So

11  certainly, yes, but that's really not what my opinion is

12  based on.  That's not the scope of my opinion.

13            MR. PRATER:  When possible, can we take a

14       couple minutes?

15            MR. GABRIELLE:  Sure.

16  BY MR. GABRIELLE:

17       Q.   Mr. Elkins, is there any answer you've given up

18  to this point in your deposition that you'd like to

19  correct, clarify, or change?

20       A.   I can't remember all the answers.  I may want

21  to when reviewing on the errata sheet, but right now, I

22  can't think of anything.

23       Q.   Thank you.

24            MR. GABRIELLE:  Off the record.

25            (Break from 11:09 a.m. to 11:20 a.m.)

Page 46

1   BY MR. GABRIELLE:

2       Q.   The matter involving the Town of Surfside and

3   Captain Marciante that you testified about earlier, the

4   complaining party was Marianne Howard, correct?

5       A.   Correct.

6       Q.   And the complaints that Ms. Howard -- or

7   Officer Howard, I should say -- made against

8   Captain Marciante were found to be not sustained,

9   correct?

10      A.   Correct.

11      Q.   Meaning that you found that there was evidence

12  that would reasonably determine that harassment did not

13  occur, according to the Town policy, correct?

14      A.   Correct.

15      Q.   There had been four harassment investigations

16  conducted in about a 13-month period prior to the

17  completion of your investigation; is that correct?

18      A.   Not that I'm aware of, no.  I don't think that

19  number is right.

20      Q.   Was the complaint by Officer Howard against

21  Captain Marciante the only complaint at that time that

22  you investigated on behalf of the Town of Surfside?

23      A.   Yes.

24      Q.   What factors did you consider in reaching the

25  conclusion in that particular instance -- that being the

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 47

1   matter involving the Town of Surfside, Captain Marciante,

2   and Officer Howard -- when reaching the conclusion that

3   harassment was not substantiated?

4       A.   This will be a lengthy answer, because my

5   report in that case was 25 pages of single-spaced writing

6   plus another 100 and change of exhibits.  This is not in

7   order of importance.

8           Captain Marciante had been the subject of an

9   earlier investigation approximately one to two years

10  prior to the complaint made by Officer Howard.

11  Importantly, Officer Howard made a number of allegations

12  against Captain Marciante.  I want to say there were nine

13  or ten allegations spanning over a four- or five-page

14  written document.  But what I would call the main

15  allegation involved an alleged incident at the Davie Ale

16  House in the parking lot between her and

17  Captain Marciante.  That incident, the time period of it,

18  occurred prior to the earlier investigation into

19  Captain Marciante.  Does that make sense?

20      Q.   Yes.

21      A.   Okay.  That investigation was done by some

22  other third-party human resources firm.  To be clear,

23  again, what I called in my report, I believe, "the Davie

24  Ale House incident" had already occurred at the time

25  Officer Howard was interviewed for that investigation.

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 48

1           I was provided the report of that investigation

2    and Officer Howard's interview notes and summary.

3    Officer Howard not only did not tell the investigator

4    about that incident, she spoke in extraordinarily glowing

5    terms about Captain Marciante.  Maybe he was a sergeant

6    at the time or a lieutenant.  I don't know.

7           Not only did she speak in glowing terms about

8    him, but she took it a step further -- and I think that's

9    language directly from my report -- that, as to the issue

10   of sexual harassment, she noted specifically that

11   Captain Marciante was of Hispanic descent, or whatever it

12   was, and that his culture was to be very touchy with hugs

13   and kisses, and he was careful to respect her culture,

14   which was such that he wouldn't do that with her.  So in

15   her interview after this Davie Ale House incident, there

16   was no mention not only of that but, again, she went this

17   extra step to basically vindicate him on the issue of

18   harassment.  That was problematic to me.

19          But that was not the only problem.

20   Officer Howard identified a number of witnesses that she

21   claimed witnessed certain conduct or conversations.  I

22   interviewed those witnesses.  None of them corroborated a

23   single thing that Officer Howard told me.  In fact, many

24   of them contradicted her.

25          Further, each of the allegations that

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 49

1    Officer Howard raised, whether you looked at them

2    collectively or individually, didn't, in my view, really

3    amount to conduct that would be sufficiently severe or

4    pervasive.  But it ultimately didn't matter because

5    nobody corroborated her version of the events.

6              That is a summary of what was contained in, as

7    I said, a 25-page single-spaced report spanning over

8    several months and interviews with, I think, 11 or 12

9    witnesses.  So there obviously is more material in my

10   report.  But at the end of the day, there just was no

11   evidence to support her claims; so I did not substantiate

12   her allegations.

13        Q.   Just covering some of the things you mentioned.

14   The investigation took several months?

15        A.   I believe so, yes.

16        Q.   And were Officer Howard and Captain Marciante

17   both still going and reporting to work during those

18   months?

19        A.   They were both employed.  I have no idea what

20   they were doing relative to physical reporting to work.

21        Q.   You don't know whether or not they were

22   scheduled for different time frames or whether they were

23   working together?

24        A.   I do not know that.  Or I don't remember, I

25   should say.

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 50

1      Q.   You mentioned that one of the factors you

2   considered in reaching your conclusion was that nobody

3   corroborated Officer Howard's version of events.  Why is

4   that significant?

5      A.   It beared on her credibility.

6      Q.   You also mentioned that one of the -- one of

7   the things you mentioned, I should say, is that

8   Officer Howard had previously spoken, or I guess written,

9   in extraordinarily glowing terms about Captain Marciante.

10  Why was that significant to you?

11     A.   She had spoken, not written.

12     Q.   I see.

13     A.   That was significant because it was post this

14  Davie Ale House incident.  So she had an opportunity to

15  tell an investigator about that incident, and not only

16  did she not do that, she went this extra step, as I

17  mentioned earlier.  And it's in my report.  So I'm

18  certainly not intending to contradict anything in my

19  report.  I don't have my report in front of me.

20          But my memory of that is that it wasn't just

21  "He's a great guy."  It was "Not only is he a great guy,

22  but as to sexual harassment, he's super careful not to do

23  that with me because of these cultural issues."  She just

24  went this extra step that felt, to me, was that's

25  completely opposite of what was alleged in the Davie Ale

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 51

1    House incident.  And that incident had already occurred.

2    So why are you taking that extra step?

3        Q.   Were any of the complaints being made by

4    Officer Howard about the conduct of Captain Marciante

5    alleged to involve events or conduct after she spoke in

6    glowing terms about him?

7        A.   Yes.

8        Q.   Did you consider whether or not -- strike that.

9             Would her statement about those incidents be --

10   strike that.

11            I'll ask this as well as I can.  In the

12   incidents alleged after that time frame, after

13   Officer Howard spoke favorably about Captain Marciante,

14   would you consider her statement then to affect the

15   credibility of her statements later?

16            MR. PRATER:  Object to the form.

17       A.   I'm not ignoring you.  I'm thinking.  I can't

18   testify as to what exactly I was thinking on that point

19   at the time I wrote my report.  So I would defer to my

20   report.

21            I would say that certainly things could be

22   different after her statement.  So it's not out of the

23   realm of possibility that, when she made her statement,

24   things were fine, but that is contradicted by the date of

25   the alleged Davie Ale House incident.  And then later

Navarro v. AutoNation                    Michael Elkins 4/29/2024

                                                         Page 52

1    things happened.  I mean, most of her allegations were

2    post making that statement, and those were thoroughly

3    investigated.

4    BY MR. GABRIELLE:

5        Q.   Did Officer Howard, in her communications with

6    you, ever retract any of her allegations?

7        A.   No.

8        Q.   Did you make any findings or conclusions,

9    either in your report or for yourself as part of making

10   findings or conclusions, that Officer Howard was not

11   being truthful?

12       A.   I never said that.

13       Q.   Did you make any credibility findings about the

14   allegations she made?

15       A.   I did not find them credible.

16       Q.   And that was based on the information provided

17   to you by a third party she had identified as witnesses

18   as well as her own statements; is that correct?

19       A.   As well as documents, yes.

20       Q.   So did you consider any communications, written

21   communications, between Captain Marciante and

22   Officer Howard, in and around the time frame that she was

23   identifying these allegations, to be reflective of

24   credibility?

25       A.   Yes.

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 53

1      Q.   Did Officer Howard make communications or

2   engage in communications with Captain Marciante that were

3   inconsistent with the idea that he was engaging in

4   conduct she found unwelcome?

5      A.   I don't specifically remember that one way or

6   the other.  The investigation contained a lot of material

7   and witnesses.  So I don't want to testify against the

8   report.

9      Q.   Credibility, though, is an important part of

10  determining whether or not improper conduct went on in

11  the context of a workplace allegation, correct?

12     A.   Yes.

13     Q.   Sometimes it's the only information you have.

14     A.   If you're referring to a situation where it's

15  he said/she said?

16     Q.   Yes.

17     A.   Certainly.

18     Q.   And there are often occasions, are there not,

19  where the complaining party and the perpetrator tell very

20  different stories, and there are not corroborating

21  witnesses either way; is that correct?

22     A.   Yes.

23     Q.   Did you consider whether or not -- strike that.

24          Were you aware, even if you were not involved

25  in the investigation, of more than one prior complaint of

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 54

1   harassment being made against employees of the police

2   department at the Town of Surfside?  Even if you weren't

3   involved in the investigation of those, were you aware

4   that those complaints had been made?

5        A.   I was aware of complaints against

6   Captain Marciante.  I was not aware of complaints

7   relating to anybody else.  But as to Captain Marciante,

8   there were -- my understanding or recollection is that

9   the prior investigation, the one that I didn't do, was

10  generated by anonymous complainants, or multiple

11  anonymous complainants.  I don't remember if it was four

12  or five or six or whatever it was.  But I believe he was

13  ultimately exonerated in that investigation as well.

14       Q.   And the complaining party in that matter has

15  been publicly identified as Officer Marianne Howard,

16  correct?

17       A.   Correct.

18       Q.   And you said you still have a copy of the

19  report you provided to the Town of Surfside, correct?

20       A.   Correct.

21       Q.   Have you signed or agreed to any form of

22  confidentiality that would prohibit you from disclosing a

23  copy of that report?

24       A.   No.  But before I disclose -- I'd prefer you

25  get it through a public records request, frankly, just

Navarro v. AutoNation                    Michael Elkins 4/29/2024

                                                        Page 55

1    because I'm not aware of the public record law related to

2    that report.

3          Q.   It, though, would be the best example of a

4    report that you conducted on a harassment investigation?

5          A.   Yes, sir.

6               MR. PRATER:  Object to the form.

7          A.   That's fair.

8    BY MR. GABRIELLE:

9          Q.   Did anybody supervise your investigation?

10         A.   No.

11         Q.   Was Officer Howard, to your knowledge, a member

12   of a union?

13         A.   She was.

14         Q.   Do you remember what union?

15         A.   I do not.  It was either FOP or PBA.  I don't

16   remember which one.

17         Q.   And that's the Fraternal Order of Police or the

18   Police Benevolent Association, correct?

19         A.   Correct.

20         Q.   Have you ever conducted an investigation of

21   harassment where the allegations were made for the first

22   time by a person who was at that time a former employee?

23         A.   Not that I can recall.

24         Q.   Is there a difference, in terms of

25   investigative techniques or standards or any other set of

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 56

1   principles you would apply, between an investigation of

2   harassment based on sex or sexual misconduct as compared

3   to harassment based on some other protected

4   characteristic like race or national origin or

5   disability?

6        A.   No.

7        Q.   Have you ever communicated directly, either

8   verbally or in writing, with Mr. Navarro?

9        A.   No.

10        Q.   Have you ever communicated directly, either

11   verbally or in writing, with Mr. Baez?

12        A.   No.

13        Q.   So all the information you have regarding what

14   Mr. Navarro or Mr. Baez or Mr. Losk or Mr. Vanderwarker

15   or Ms. Bickram have to say is based on your review of

16   documents?

17        A.   Correct.

18        Q.   And you've made very clear you're not making

19   credibility findings in any way regarding those

20   statements made by any of those individuals, correct?

21        A.   That is correct.

22        Q.   Sir, I'm going to show you a document that has

23   been previously produced in this case as Exhibit 8.  It

24   is a document that you, in your report, refer to as "the

25   email complaint."  Indeed, you specifically reference the

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 57

1    exhibit number as well.

2            So take the time you need to look at Exhibit 8,

3    previously marked, which is Plaintiff 0115 and 0116, and

4    let me know when you're finished.

5        A.   I'm comfortable.

6        Q.   You indicated earlier you read Mr. Navarro's

7    complete deposition transcript, correct?

8        A.   Correct.

9        Q.   So you are aware, then, that he has identified

10   things about his email on May 14, 2023, to Ms. Pacheco

11   that were incorrect?

12       A.   I don't remember his --

13            MR. PRATER:  Object to the form.

14       A.   I don't remember his deposition transcript,

15   sitting here.  If I had a copy of it, that's fine, but I

16   just don't remember.  It's possible.

17   BY MR. GABRIELLE:

18       Q.   If you would, please, go to your report.

19   Again, Exhibit 24.

20       A.   Yes.

21       Q.   Drawing your attention to the section labeled

22   "Expert Opinion."

23       A.   Apologies.  For some reason, there's no page

24   numbers.  I'm sorry.

25       Q.   I was trying to figure it out.  Don't worry

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 58

1    about it.  It would be the page corresponding with

2    Footnotes 4 and 5.  How about that?

3         A.   Yes, sir.  Thank you.

4         Q.   You referenced in the fourth paragraph on that

5    particular page, that being the second paragraph under

6    "Expert Opinion," that Mr. Navarro alleged that the

7    conduct of Rodriguez, meaning Joey Rodriguez, was

8    witnessed by the top three managers at Hollywood Imports

9    as well as 12 other Hollywood Imports employees, correct?

10   That's the statement made in your report?

11        A.   That's what the report says.

12        Q.   And what is that statement based on?  What

13   information did you have for that statement?

14        A.   Certainly, the email.  It could have also been

15   from the depositions.  I just don't remember.

16        Q.   Do you recall that Mr. Navarro identified the

17   last two names on Exhibit 8, Asim and the one right above

18   it, Wassem, W-a-s-s-e-m, as being the same person?

19        A.   I'm sorry.  Say that again.

20        Q.   Sure.  In his deposition, Mr. Navarro

21   identified Wassem and Asim as being the same person,

22   correct?

23        A.   Oh, you're referring to the list of

24   individuals?

25        Q.   Yes.

Navarro v. AutoNation                      Michael Elkins 4/29/2024

Page 59

1       A.   I don't remember that.

2       Q.   If, in fact, Mr. Navarro identified Wassem and

3  Asim as being the same individual, then there would be 11

4  persons identified, correct?

5       A.   Correct.

6       Q.   So your opinion is based in part on Mr. David

7  Losk, Mr. Carl Vanderwarker, and Mr. Joe Rey being the

8  top three managers at Hollywood Imports?

9       A.   Not solely, no.

10       Q.   But based in part on that fact, correct?

11       A.   That is a fact, but it is not the sole fact.

12       Q.   Right.  But you did expressly base one sentence

13  of the section of your report labeled "Expert Opinion" on

14  the fact that the conduct attributed to Joey Rodriguez

15  was witnessed by "the top three managers" at Hollywood

16  Imports, correct?

17       A.   Yes, that is in my report.

18       Q.   Is David Losk one of the top three managers, to

19  your understanding?

20       A.   That's my understanding.  That's what I wrote.

21       Q.   And is Carl Vanderwarker one of the top three

22  managers?

23       A.   That's what I wrote.

24       Q.   So if that was true, then David Losk would be

25  ranked higher than Joey Rodriguez, correct?

Navarro v. AutoNation                    Michael Elkins 4/29/2024

```
                                                    Page 60
 1      A.   I would not be able to rank them, sitting here
 2   today.
 3      Q.   Well, does Mr. Navarro's email complaint to
 4   Ms. Pacheco rank those individuals?
 5      A.   Mr. Navarro's email complaint, in referencing
 6   those interviews, says, "People who saw it included the
 7   GM, Joe Rey; GSM, Carl Vanderwarker; and the sales
 8   manager, David Losk; and salesperson," and then lists
 9   names.  I don't know that I'd call that a ranking.  It's
10   a list.  I can't speak to whether he's ranking them or
11   not.
12      Q.   From where did your report get the information
13   that those three individuals -- Joe Rey, Carl
14   Vanderwarker, and David Losk -- were the top three
15   managers at the dealership?
16      A.   I don't remember.
17      Q.   If that statement is in fact correct, that
18   would mean, would it not, that David Losk was ranked
19   higher than Joey Rodriguez?
20           MR. PRATER:  Object to the form.
21      A.   Again, I can't rank them.  So I don't really
22   know how to answer that.
23   BY MR. GABRIELLE:
24      Q.   If, in fact, David Losk was one of the top --
25   strike that.
```

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 61

1              If, in fact, David Losk was not one of the top

2      three managers at the dealership, then that statement in

3      your report would be incorrect.  Agreed?

4          A.   Agreed.

5          Q.   And if, in fact, the individual identified as

6      Wassem and then Asim are the same person, then the

7      statement that there were 12 other employees would have

8      to be corrected to state that there were 11, correct?

9          A.   Correct.

10         Q.   How does any investigation conducted in

11     response to Mr. Navarro's email complaint to Cary Pacheco

12     on May 14, 2023, which is marked as Exhibit 8 -- how

13     would any investigation conducted in response to receipt

14     of that email have prevented Mr. Navarro from being

15     harassed by Mr. Rodriguez?

16              MR. PRATER:  Object to the form.

17         A.   Well, Mr. Navarro's complaint was post

18     employment; so I don't think an investigation would have

19     resulted in preventing any of the conduct alleged.

20     BY MR. GABRIELLE:

21         Q.   So if the investigation, if any, conducted in

22     response to Mr. Navarro's May 14, 2023, email to Cary

23     Pacheco, that is marked as Exhibit A, was not adequate or

24     was insufficient, as you opine, what issue of fact would

25     the adequacy or inadequacy of that investigation be

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 62

1    pertinent to?

2         A.   I can't speak to that.  That's not what I was

3    hired to do.  My role here is to just express an opinion

4    as to the sufficiency of the investigation in this case.

5    How that would fit with any particular fact, that's not

6    for me to decide.

7         Q.   Based on your experience, the experience that

8    you are relying upon for purposes of your opinion in this

9    case, in general, what post-termination investigation

10   conducted in response to a complaint of harassment --

11   strike that.

12         Based on your experience as an employment

13   lawyer for as many years as you've been one, what

14   post-employment investigation sufficiency or

15   insufficiency would bear on any complaint of harassment?

16         MR. PRATER:  Object to the form.

17         A.   Well, I don't think the issue would be how does

18   it bear on the ultimate validity of Mr. Navarro's

19   complaint, if that's what you're asking.  I'm not here to

20   talk about that.

21         What it does bear on, though, is how Human

22   Resources conducts itself and the reasonableness of Human

23   Resources relative to this particular investigation and

24   what it did or did not do.  How that fits in the overall

25   global scheme of this particular case is not for me to

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 63

1    decide.  That's for the fine lawyers in this case and the

2    judge and maybe ultimately a jury to make determinations

3    and for you guys to tussle about.

4    BY MR. GABRIELLE:

5        Q.   Let me ask the question a little bit more --

6        A.   And I'm not trying to be difficult.  I just am

7    not ...

8        Q.   I would let you know if I felt you were trying

9    to be difficult.

10           Have you reached any conclusions as to the

11   adequacy or sufficiency of any investigation that did or

12   should have occurred prior to Mr. Navarro's May 14, 2023,

13   email complaint to Ms. Pacheco, that is marked as

14   Exhibit 8?

15       A.   If the conduct that Mr. Navarro alleged was

16   indeed witnessed by the managers -- I forget their

17   names -- that he identified, then certainly something

18   should have been done.  But that's not -- again, I'm not

19   hired to determine if that's true or not.  I'm not making

20   any determinations on the validity of any facts alleged.

21       Q.   Is any part of your opinion as to whether or

22   not hHuman resources acted in a sufficient or adequate

23   manner based on conduct or statements made prior to

24   May 14, 2023?

25       A.   Everything that my opinion is based on is

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 64

1    contained within my report.  At this time, I don't recall

2    if it's based on anything occurring before the email

3    complaint, other than, I believe, Mr. Navarro has

4    testified that this conduct occurred, that it was

5    witnessed, and nobody did anything about it.  And I think

6    that's in the email as well.  So certainly, if it was

7    witnessed, something should have been done, but I can't

8    say whether that's true or not.  I'm not opining on that.

9        Q.   So you are not opining on whether or not any of

10   the conduct that Mr. Navarro alleged to have occurred

11   while he was still employed should have been

12   investigated?  Is that something you're opining to or

13   not?

14       A.   I'm opining that, in this particular case, the

15   employer should have produced a written report as to

16   whatever it did, if it did anything.  And that is based

17   on Mr. Navarro's allegations, but in particular, the

18   allegations contained in this email.  And whether it's 11

19   employees or the top three managers or just managers in

20   general, he's alleging some pretty serious allegations.

21   He is, at a minimum, implying that the conduct he says

22   happened was witnessed by these individuals, some of

23   which are management, and that nothing was done about it.

24   My opinion is that needed to be investigated, and that

25   there should have been writings and findings relating to

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 65

1    that investigation.

2            So by way of example, you referenced earlier

3    communications between the alleged harasser and the

4    complainant, would those bear on anything.  Of course.

5    And if those existed in this case -- and I think that

6    they did -- they could be or could have been or should

7    have been part of a report, where the HR investigator

8    says, "I interviewed so-and-so.  They told me XYZ."

9            This is hypothetical, but Ms. Pacheco could

10   have said, "Look, I've reviewed these communications.

11   They're attached as Exhibit A.  They do not support

12   Mr. Navarro's allegations.  And I interviewed these

13   witnesses, who didn't corroborate" -- I mean, that's what

14   I'm opining on, that there should have been a writing as

15   to -- if there was an investigation done, there should

16   have been a writing, and that didn't happen here.  And

17   that's not reasonable from an HR perspective.

18           And I'm not opining as to how that is used in

19   the case, what fact that might militate in favor or

20   against.  That's not my job.  I am not the judge.  I am

21   not the jury.  I am just opining as to that specific

22   issue.

23   Q.   Going back to page 3 of your report,

24   Exhibit 24, with particular reference to the paragraph

25   labeled "Scope of Opinion."

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 66

1        A.   Yes.

2        Q.   The second sentence reads, "Additionally, I am

3   hired to opine on whether the failure of management

4   employees to report certain conduct violates HR best

5   practices/standard of care."

6             Do you see that sentence?

7        A.   I do.

8        Q.   What HR best practices or what HR standard of

9   care are you referring to?

10       A.   Well, I believe the testimony indicated from --

11  I'm going to look at their names so that I get that

12  correct -- Mr. Vanderwarker, Mr. Losk, and Ms. Bickram I

13  believe all testified, in some form of fashion, that if

14  management had witnessed any conduct the likes of which

15  Mr. Navarro alleged, that that conduct should be either

16  investigated or reported.  And I believe there are a

17  number of mechanisms that they could use.  I don't

18  remember them all off the top of my head.  So certainly,

19  if they witnessed the conduct and didn't report it, yes,

20  that would be problematic.

21       Q.   But you're not referring now to -- strike that.

22            Your opinion at Exhibit 24 does not refer to

23  the dealership's or AutoNation's own standards.  It

24  refers to HR best practices and standards of care,

25  correct?

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 67

1        A.   I think it refers to both.

2        Q.   Where is the reference to the company's or the

3   dealership's own practices?

4        A.   If you go -- since it's not labeled with page

5   numbers, which is my fault, let's go to -- counting from

6   the first page of the report, one, two, three, four, I

7   believe I specifically reference in paragraph 2 policies

8   that come from AutoNation that are contained in the

9   employee handbook.

10            I talk about in paragraph 3 -- I use "HI" for

11   the dealership.  "If an HI manager receives a complaint

12   of misconduct from a dealership-level employee, the

13   manager is required to report the complaint to ERM,"

14   which I believe is Eastern Region Management.  I also

15   talk about the duty to report extending to misconduct

16   that an HI manager observes and/or hears.

17            So I do think they're referenced herein.

18        Q.   Are you referring to any HR best practices or

19   standard of care from any source other than the

20   dealership's or AutoNation's own policies?

21        A.   Yes.

22        Q.   What are they?

23        A.   My years of experience.  My 23 years of

24   experience as a labor and employment, primarily

25   management defense, lawyer handling these types of

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 68

1   matters.

2       Q.   So the two sources of what you have identified

3   as HR best practices and standards of care are the

4   dealership's or AutoNation's own standards and your

5   experience?

6       A.   Yes, sir.

7       Q.   All right.  So you would consider the

8   dealership's own policies regarding reporting to meet the

9   definition of the phrase "HR best practices" or

10  "standards of care"?

11      A.   I didn't say that.

12      Q.   I think that's exactly what you said.  When I

13  asked you if you were referring to anything other than

14  the dealership's policies and procedures and your own

15  experience, you said no.

16      A.   I think you had originally asked me to point

17  out in the report where I referenced the dealership's HR

18  policies and procedures, and I pointed that out.

19           In reviewing this case and looking at what

20  should have been done or rendering my opinion as to what

21  should have been done, I relied on the own policies and

22  procedures for AutoNation through -- I believe it's

23  Eastern Region Management, that have a requirement that

24  the dealership management report the type of conduct

25  alleged by Mr. Navarro.  And then I also relied upon my

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 69

1    years of experience, which we detailed in this deposition

2    already, in determining what should or should not have

3    been done.

4            So in the context of this case, the policies

5    and procedures from AutoNation require this reporting.  I

6    do think that's appropriate.  And based upon my years of

7    experience, if a manager sees or witnesses the type of

8    conduct alleged by Mr. Navarro, he or she should report

9    that.

10            I cannot opine as to the overall totality of

11   AutoNation or Eastern Region Management's policies and

12   procedures.  It's limited to this scope.  But certainly

13   the requirement to report conduct is absolutely

14   appropriate.

15   Q.   So in terms of determining factually whether or

16   not the management employees failed to report certain

17   conduct and that failure violated HR best practices and

18   standards of care, your opinion is that the two places a

19   fact finder would look would be the dealership's and

20   AutoNation's own policies and the experience that you

21   proffer as your opinion?

22            MR. PRATER:  Object to the form.

23   A.   I don't know what the -- what do you mean about

24   where the fact finder would look?  I'm not sure what that

25   means.

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 70

1    BY MR. GABRIELLE:

2        Q.   So your sentence here in your report under

3    "Scope of Opinion" says, "I am hired to opine on whether

4    the failure of management employees to report certain

5    conduct violates HR best practices and standards of

6    care."

7        A.   Yes, sir, that's what it says.

8        Q.   The HR best practices and standards of care

9    that you are referring to in that specific sentence, what

10   is the source of those?

11       A.   I understand your question.  I'm sorry.

12            It would be, yes, my experience, and AutoNation

13   had its own policies regarding reporting, yes.  Thank

14   you.  Sorry.

15       Q.   With respect to AutoNation's own policies

16   regarding reporting, all one would need to do to reach a

17   conclusion as to whether or not those policies required

18   reporting would be to read those policies and compare

19   what was done in response, correct?

20            MR. PRATER:  Object to the form.

21       A.   Well, no.  To determine whether the policy

22   requires reporting, you only need to read the policy.

23   You don't need to determine what was done.  The policy

24   speaks for itself.

25   ///

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 71

1   BY MR. GABRIELLE:

2       Q.   All right.  So in terms of the conclusion that

3   management employees failed to report certain conduct,

4   that conclusion would be reached based on what the policy

5   required them to report and whether or not they did so,

6   correct?

7       A.   I'm not reaching a conclusion whether

8   management did or did not report conduct, which I think

9   is what you said.  I don't know that.  If they witnessed

10  the conduct -- and I don't know that they did or didn't.

11  That's going to be up to a fact finder.  If they

12  witnessed the conduct, they were required to report it,

13  yes.

14      Q.   And that requirement that exists to report it,

15  the only place that requirement exists, that you've

16  identified, are the written policies and procedures of

17  the dealership and AutoNation, correct?

18      A.   The only writing that I have where it exists

19  comes from the policies and procedures of the dealership.

20  But I certainly think if a management employee witnesses

21  conduct at an employer that is covered under Title VII or

22  the Florida Civil Rights Act, and there isn't a policy

23  and procedure on reporting that conduct, they still need

24  to report it.

25      Q.   But because there is a policy and procedure on

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 72

1    reporting that conduct, that's not an issue, correct?

2           MR. PRATER:  Object to the form.

3    BY MR. GABRIELLE:

4       Q.   You'd agree that there are policies and

5    procedures requiring that the conduct alleged here had to

6    be reported?

7       A.   There are policies and procedures that require

8    that, yes.

9       Q.   Your experience that goes into your opinion, is

10   that based on any other standard of HR best practices or

11   standard of care other than the policies and procedures

12   referenced in your report?

13      A.   Yes.

14      Q.   What is it?

15      A.   It is based upon my experience as a labor and

16   employment lawyer that, if you are an employer and you

17   are covered by Title VII of the Florida Civil Rights Act

18   and you have management employees that are witnessing

19   potentially actionable conduct like that, they need to

20   report that conduct.  That could be problematic if they

21   don't.  I don't think that that is some grand leap of

22   faith in the world of labor and employment law.

23      Q.   And that statement of opinion that you just

24   provided, that would be based on what you view to be what

25   the law requires; is that correct?

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 73

1        A.    It's based upon my years of experience as a

2   labor and employment attorney.  I'm not here opining on

3   the specifics of Title VII or the Florida Civil Rights

4   Act.

5        Q.    Well, we know what the policies and procedures

6   required because those are already in the record and

7   you've reviewed them, correct?

8        A.    Correct.  Well, let me back up.  I'm sorry.  I

9   reviewed the deposition testimony.  I believe the

10  policies and procedures were provided to me.  Just

11  sitting here, I can't remember specifically, but

12  certainly it's in the record.

13       Q.    You reference them in the following page of

14  your opinions.  So wouldn't you have necessarily wanted

15  to review the policies and procedures regarding --

16       A.    Yes.

17       Q.    -- reporting in rendering an opinion in the

18  area you've rendered it?

19       A.    Yes.  And you'll see that I referenced them

20  specifically in the deposition testimony, which you can

21  certainly read to confirm that that was correct.  And I

22  do believe I reviewed them as well.  I just, sitting here

23  today, don't remember what that looked like, if that

24  makes sense.  I just don't want to be untruthful.

25       Q.    And I just want to make sure we understand the

Navarro v. AutoNation                    Michael Elkins 4/29/2024

                                                      Page 74

1    sources of your opinion in the second sentence of the

2    paragraph labeled "Scope of Opinion."

3         A.   Yes.

4         Q.   The sources for your opinion as to HR best

5    practices and standards of care are the policies and

6    procedures of AutoNation and the dealership referenced in

7    your opinion and your cumulative years of experience as a

8    labor and employment lawyer.

9         A.   That is correct.

10        Q.   There are no other sources of authority or

11   information on which you've reached the conclusion in the

12   second sentence of the paragraph labeled "Scope of

13   Opinion"?

14        A.   That is correct.

15        Q.   How would someone measure or evaluate your

16   years of experience as an employment lawyer?

17        A.   I don't know.

18             MR. PRATER:  Object to the form.

19        A.   Yeah, I think that's what, you know, you're

20   here to do today.  I don't know how one would do that.

21             I don't mean to interrupt, but you mentioned

22   you were going to break for lunch because you had a lot

23   of time left.

24   BY MR. GABRIELLE:

25        Q.   Yes.  Just give me ten more minutes, and then

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 75

1   we can break, unless you need a break right this second.

2       A.   No, no.  I wasn't trying to interrupt.  I just

3   wanted to ask.

4       Q.   Do you have any formal training in human

5   resources?

6            MR. PRATER:  Object to the form.

7       A.   No.  I do conduct human resources trainings for

8   clients on occasion, however.

9   BY MR. GABRIELLE:

10      Q.   Are you familiar with some of the various

11  certifications that can be held and achieved by HR

12  professionals?

13      A.   I'm familiar with some.  If you asked me to

14  rattle off a bunch of names, I probably would just tell

15  you.  Like, I know SHRM, Society for Human Resource

16  Management, has certifications, but the specifics I

17  wouldn't be able to tell you.

18      Q.   Are you able to identify any specific

19  certifications or the names of those certifications or

20  the abbreviations for those certifications held by HR

21  professionals?

22      A.   I know that the Society for Human Resource

23  Management has certain certifications, because I've seen

24  the initials on an innumerable number of HR

25  professionals' email signatures.  What those specific

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 76

1    certifications are, I could not tell you.

2         Q.   Okay.  Do you have any particular credential or

3    certificate as an investigator?

4         A.   No.

5         Q.   Are you board certified in labor and employment

6    law?

7         A.   I am not.

8         Q.   Have you ever attempted to become board

9    certified in labor and employment law?

10        A.   I have not.

11        Q.   I'm not even sure if such a certification

12   exists, but I'll ask.

13        A.   Sure.

14        Q.   Are you certified by the American Bar

15   Association in labor and employment law?

16        A.   No.

17        Q.   Are you certified in labor and employment law

18   through any Florida Bar accredited certification plan?

19        A.   I'm not even -- I don't know if any one exists

20   besides board certification, but the answer would be no.

21        Q.   Have you ever been -- strike that.

22             Have you ever provided training pursuant to a

23   consent decree reached between the Equal Employment

24   Opportunity Commission and any employer?

25        A.   No.

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 77

1      Q.   Have you ever been deemed a subject matter

2    expert by the Equal Employment Opportunity Commission in

3    order to provide such training?

4      A.   No.

5           MR. GABRIELLE:  Off the record for lunch.

6           (Break from 12:07 p.m. to 12:46 p.m.)

7    BY MR. GABRIELLE:

8      Q.   Sir, did you look at any documents pertinent to

9    this case during the break?

10     A.   No.

11     Q.   Do you agree with the proposition, as it

12   concerns investigations of harassment, that an

13   investigation is prompt if it's conducted reasonably soon

14   after the employee complains or the employer otherwise

15   has notice of possible harassment?

16     A.   What's the proposition that I'm asked to agree

17   with?

18     Q.   That an investigation would be considered

19   prompt if it's conducted reasonably soon after the

20   employee complains or the employer otherwise has notice

21   of possible harassment.

22     A.   That it's considered prompt?  That's what

23   you're asking me?

24     Q.   Yes.

25     A.   I would agree with that.

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 78

1      Q.   Would you agree with the proposition that an

2   investigation of possible harassment is adequate if it's

3   sufficiently thorough to arrive at a reasonably fair

4   estimate of truth?

5          MR. PRATER:  Object to the form.

6      A.   I would probably add to that:  As long as

7   there's some documentation relating to the sufficiency

8   and the thoroughness of the investigation, yes.

9   BY MR. GABRIELLE:

10     Q.   But by itself, you don't fully agree with that

11   statement?

12     A.   I agree that if an investigation is thorough,

13   that's sufficient.  But how do you test thoroughness

14   without documentation?  So I think that's one of the

15   reasons you would document the investigation, in whatever

16   form or fashion, so that there's a record of the

17   thoroughness of said investigation.  And what that record

18   might look like is a different conversation.

19     Q.   Is there a standard practice for what a record

20   of an investigation should look like?  An official

21   third-party standard, not your own based on experience,

22   but an official standard of what an investigation should

23   look like.

24     A.   Not that I'm aware of.

25   ///

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 79

1        (Defendants' Exhibit Nos. 25 and 26 were marked

2    for identification.)

3    BY MR. GABRIELLE:

4        Q.    I'm just going to mark these, before I forget,

5    as Exhibits 25 and 26.

6            I'm marking as Exhibit 25, sir, what's been

7    offered to me today as your engagement letter with

8    Mr. Navarro's counsel, five pages, including the DocuSign

9    verifications.  Please, if you could, look at Exhibit 25

10   and confirm that it is in fact the, and the only,

11   engagement paperwork you have in place with Mr. Navarro

12   through his counsel.

13       A.    This is accurate, and it is the only engagement

14   that I have in place.

15       Q.    Thank you.  I'm marking as Exhibit 26 what is

16   labeled as "Time List," with today's date and 9:46:35 in

17   the morning, presumably printed right before you came

18   here this morning.

19           Please take a look at what I've marked as

20   Exhibit 26, and confirm for me that this is a complete

21   record of the time you have recorded in this matter and

22   worked on this matter, at least before arriving for your

23   deposition today.

24       A.    Yes, it is accurate.

25       Q.    Is there a reason you have not yet invoiced

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 80

1   Mr. Navarro's counsel for the 10.2 or so hours you

2   reported in the month of March?

3        A.   Yes.

4        Q.   What is that?

5        A.   Generally, in an expert engagement, I just do

6   one invoice at the very end of the engagement.

7        Q.   Do you have any understanding whatsoever,

8   written, verbal, or based on past practice with

9   Mr. Navarro's counsel, as to whether or not the fees

10  you'll be paid are based on the outcome or resolution of

11  the matter?

12       A.   My fees are not based on the outcome or

13  resolution of the matter.

14       Q.   However, they are only paid at the end,

15  generally, of the outcome or resolution of the matter; is

16  that correct?

17       A.   No.  At the end of my performance of services,

18  not the end of this case.

19       Q.   I see.

20       A.   So I will likely send a completed invoice after

21  this deposition, which I would assume would be also an

22  invoice to your office for the deposition time.  And then

23  if there's any work to be done in the future, of course I

24  will charge for that.  But rather than sending multiple

25  invoices, I try to send one or two.  There's no secret

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 81

1    sauce behind that.

2         Q.    Give me those back, if you don't mind.

3         A.    There you go.

4         Q.    All right.  Sir, if we could turn back to your

5    report, please, Exhibit 24.

6         A.    Yes.

7         Q.    Some of this may be overlapping with some of

8    the discussion we've already had today, but I do want to

9    go through the four paragraphs of your expert opinion.  I

10   think the easiest way to do it is probably either in

11   individual sentences or sentences that I've grouped

12   together.  So what I'm going to do is, given that there

13   are four paragraphs there, I'm just going to read the

14   portion of the report into the record, and then I'll ask

15   you the questions about each sentence or group of

16   sentences.

17        A.    Okay.

18        Q.    And I'm just going to ask you to confirm that

19   I've read the -- I may ask you to confirm that I read the

20   portions correctly.

21              Under "Expert Opinion" in Exhibit 24, the first

22   sentence reads, "Regardless of its merit, plaintiff's

23   email complaint raises very serious allegations."  And

24   then you've footnoted "merit" to read, "I am not opining

25   on the merits of any allegations.  That is for the fact

Navarro v. AutoNation                    Michael Elkins 4/29/2024

                                                        Page 82

 1    finder."

 2              So going back to the first sentence that I

 3    read, the fact that the allegations raised in the email

 4    complaint, that was previously marked as Exhibit 8, are

 5    labeled "very serious," is that something you are opining

 6    on as an expert, that the allegations are very serious?

 7        A.   Yes.

 8        Q.   And what are you drawing upon, what expertise

 9    or experience are you drawing upon, to reach the

10    conclusion that they are very serious?

11        A.   My 23 years of experience as a labor and

12    employment management defense lawyer.

13        Q.   Are you adopting or referencing any particular

14    set of standards that would define something as very

15    serious or more or less significant than very serious?

16        A.   I'm sorry.  Could you ask that one more time?

17        Q.   Sure.  "Very serious" is a term, a phrase, that

18    has particular meaning, correct?

19        A.   Correct.

20        Q.   I assume, then, that there is some sort of

21    scale on which the phrase "very serious" would land,

22    correct?

23        A.   Correct.

24        Q.   What reference point or reference points are

25    you using to characterize these allegations in Exhibit 8

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 83

1    as very serious as compared to less serious or more

2    serious?

3        A.   I think that an allegation from a former

4    employee, recently after his or her employment, that a

5    manager touched their ass, grabbed their nipples, kissed

6    them on the neck, told them that they loved them, amongst

7    a few other things in here, and that that type of conduct

8    was witnessed by management as well as a number of other

9    employees, falls under the category of very serious, at

10   least as an allegation.

11            I'm not saying what happened.  I don't know

12   what happened.  But certainly if there was an unwelcome

13   touch on Mr. Navarro's ass, or grabbing of his nipples

14   that was unwelcome, or kiss on his neck, that would

15   potentially be a battery, or a series of batteries, and

16   that would fall under the "very serious" category.

17       Q.   And that's the kind of thing that any person,

18   whether they had legal training, could determine for

19   themselves, correct?

20            MR. PRATER:  Object to the form.

21       A.   I can't speak to what other people would

22   determine.  I can speak to what I determine to be very

23   serious, and I determined that to be very serious.

24   BY MR. GABRIELLE:

25       Q.   Is there any particular expertise that you are

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 84

1    bringing to the conclusion that the kind of conduct you

2    described is very serious as compared to the common

3    experience of an individual person without the background

4    and training you have?

5         A.   Yes.  My experience as a labor and employment

6    attorney, management defense primarily, for 23 years

7    tells me that, when you have even a former employee

8    making allegations such as this with the battery

9    allegations and the breadth of allegations of both these

10   individuals, and both management and other employees

11   witnessed it, that that is very serious.  Again, I can't

12   speak to other people, but certainly, perhaps, a

13   layperson may not understand the gravity of that.  But,

14   again, I can't speak to that in general.

15        Q.   You don't feel a layperson would understand

16   that conduct of the nature described in Exhibit 8 would

17   be very serious?

18        A.   I don't know what a layperson would or would

19   not understand, but maybe they would say, "Well, it's a

20   former employee, so who cares."  I don't know.  That's a

21   guess.  What matters, from my perspective, is what I

22   determined.

23        Q.   What conduct or methodology did you use to

24   reach that particular conclusion?

25        A.   Which particular conclusion?

Navarro v. AutoNation                    Michael Elkins 4/29/2024

                                                    Page 85

1      Q.   That the email complaint raises very serious

2   allegations.

3      A.   I think I said that.  The email complaint has

4   very specific allegations about a manager touching

5   Mr. Navarro's ass, grabbing his nipples, kissing him on

6   the neck, telling him that he loved him.  There are a

7   number of other allegations in here.  These allegations

8   cumulatively are alleged to have been witnessed by

9   management employees as well as a list of other

10  employees.  That is very serious, in my view.

11     Q.   Other than what's written in Exhibit 8, are you

12  relying upon anything for the conclusion that the

13  allegations it makes are very serious?

14     A.   The allegations in the complaint, the pleadings

15  in the case, the deposition testimony, all of which are

16  listed in my report.

17     Q.   What I'm asking now, sir, is just about the

18  first sentence in your expert report.  In your expert

19  opinion, the first sentence says, "Regardless of its

20  merit, the plaintiff's email complaint raises very

21  serious allegations."

22          So right now I'm confining my question to

23  exactly what you've stated there.  Is there anything

24  beyond what is written in Exhibit 8, Mr. Navarro's

25  May 14, 2023, email to Ms. Pacheco, that you can point to

Navarro v. AutoNation                    Michael Elkins 4/29/2024

                                                      Page 86

1    or identify that causes you to reach the conclusion that

2    the allegations are very serious?

3         A.    No.

4         Q.    The next sentence in the opinion of this

5    paragraph reads, "The email complaint alleges, among

6    other things, battery."

7              What definition are you using for the term

8    "battery"?

9         A.    Unwanted or offensive touching.

10        Q.    Is that the civil or the criminal definition or

11   some other definition?

12        A.    I don't know.

13        Q.    So when you identify the physical touchings

14   that are alleged by Mr. Navarro in Exhibit 8, did you

15   compare those physical touchings to any legal definition

16   of battery?

17        A.    No.  I went off of my knowledge as an attorney,

18   that when you hear about somebody being touched in a way

19   that they don't want or that they are indicating is

20   unwanted, that potentially could be a battery.  And

21   certainly I don't think it's a leap of faith for a lawyer

22   to take the position, without researching it, that an

23   allegation that somebody touched their ass, grabbed their

24   nipples, or kissed them, and that those touches were

25   unwanted, might be a battery.

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 87

1      Q.   But whether or not something is a battery is a

2   question of applying the law to the facts alleged,

3   correct?

4      A.   Sure.  And I said these are allegations, and

5   I'm not opining on whether they happened or what they

6   constitute.  They are merely allegations.

7      Q.   Right.  But to reach any conclusion as to

8   whether or not those allegations constitute a battery,

9   one would need to understand the legal definition of

10  "battery," correct?

11          MR. PRATER:  Object to the form.

12     A.   Correct.  But I was not hired to reach those

13  conclusions.

14  BY MR. GABRIELLE:

15     Q.   Okay.  So the allegation or -- strike that.

16          The sentence in your letter, in your opinion,

17  that reads, "The email complaint alleges, among other

18  things, battery," you are not opining to whether or not

19  these allegations reach the legal definition of battery,

20  correct?

21     A.   I am not.

22     Q.   The next sentence reads, "Not all complaints to

23  HR are created equal."

24          What expertise are you bringing to that

25  particular phrase?

Navarro v. AutoNation                    Michael Elkins 4/29/2024

                                                      Page 88

1        A.   My 23 years of experience as a labor and

2    employment, primarily management defense, lawyer.

3        Q.   What methodology did you apply to determine

4    that this particular complaint, that being the one

5    referenced in Exhibit 8 by Mr. Navarro in his May 14,

6    2023, email to Ms. Pacheco, falls on one or another part

7    of that spectrum?

8        A.   This is not what I would call a run-of-the-mill

9    disagreement amongst coworkers type of complaint,

10   something like "Johnny was mean to me by the microwave

11   today," or what you hear a lot of these days, "I'm being

12   bullied because I'm being excluded from meetings" kind of

13   complaint.  This has some very specific allegations

14   particularly relating to the unwanted touchings.  It has

15   very specific allegations as to witnesses, supervisors

16   and the like.

17            So this is not the type of HR complaint that --

18   this should be dealt with.  I think it's reasonable for

19   HR to deal with this by investigating and generating some

20   written documentation to support the sufficiency,

21   thoroughness -- and thoroughness and whatever conclusions

22   are reached from that investigation.  That's what I

23   determined based upon my years of experience in handling

24   these types of matters.

25        Q.   So are you opining as to whether or not the

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 89

1    response to this May 14, 2023, complaint by Human

2    Resources was reasonable?

3        A.   I am.

4        Q.   Are you opining on whether or not the response

5    by Human Resources to this May 14, 2023, email complaint,

6    that's marked as Exhibit 8, exceeded or met or fell below

7    a standard of care that should have been applied here to

8    Human Resources?

9        A.   I am.

10       Q.   What is that conclusion or opinion, again with

11   reference to that standard?  Did the response meet that

12   standard, exceed that standard, or fall below that

13   standard?

14       A.   It fell below.  I think it's contained in my

15   report what my conclusion is.

16       Q.   The next sentence of your report reads, "By way

17   of example, a complaint to HR that one employee was rude

18   to another employee without more is dramatically

19   different than an allegation of hostile work environment

20   that contains an allegation of battery."

21            Do you see that sentence?

22       A.   I do.

23       Q.   So in terms of a response by Human Resources,

24   allegations of verbal conduct that is not sexually

25   related, those would land differently on your scale than

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 90

1    the kind of physical conduct alleged in Exhibit 8?

2         A.    That's not what I wrote.  There could be --

3         Q.    I'm asking, sir, about your overall opinion,

4    though, in terms of characterizing complaints as very

5    serious versus something different when it comes to

6    investigation.

7              MR. PRATER:  Object to the form.

8         A.    So you have to take every factual scenario on a

9    case-by-case basis.  So the statement "verbal conduct,"

10   without more, or "that's not of a sexual nature,"

11   wouldn't fall within -- the seriousness is not accurate.

12   If you had somebody complaining that the verbal conduct

13   was somebody swearing at them every day and telling them,

14   let's say, to go fuck themselves or "fuck you," or using

15   racial slurs against them, or using sexually graphic

16   statements, and it was all verbal, that would be

17   different than "Johnny is mean to me because he excluded

18   me from a meeting and he's bullying me" or "Johnny told

19   me he didn't like my idea, and he said it in a

20   condescending tone."

21             So in both hypotheticals, the conduct is verbal

22   but dramatically different.  So no, I don't agree with

23   your statement regarding verbal conduct versus the email

24   that we have here.

25   ///

Navarro v. AutoNation                    Michael Elkins 4/29/2024

                                                    Page 91

1    BY MR. GABRIELLE:

2         Q.   Is there any standard or measurement criteria,

3    objective standard or measurement criteria, you can refer

4    us to or direct us to that would permit an objective

5    analysis of where on the spectrum or standard particular

6    kinds of conduct fall?

7         A.   This is not paint by number.  Every complaint

8    to Human Resources is unique unto itself.  Sure, some

9    have certain similarities and, yes, there are some rules

10   that I think any competent management defense lawyer

11   would follow.  But generally speaking, each complaint has

12   to be analyzed individually, taking into consideration

13   the nature of the allegations in the complaint, the

14   complainant, the workplace, who is involved, what's

15   happening at that time.  So there isn't a chart or some

16   objective, as I said, paint-by-number thing you can look

17   at and go, "Well, if the complaint says X, you do Y."  At

18   least I'm certainly not aware of that.

19             I think it comes down to if you are a seasoned

20   labor and employment attorney, as I am, you understand

21   how to handle these types of complaints and understand

22   what generally is the best practice for handling

23   different types of complaints and what an employer should

24   or should not do.

25        Q.   How would a person that has the credentials

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 92

1    that you described -- how would they go about applying

2    that experience to reach the conclusions you've reached?

3        A.   I can't testify about what some other person,

4    some hypothetical person who has my credentials, might

5    do.  I can tell you, based upon my years of experience,

6    what I did, or what I did in this case.

7        Q.   Do that, please.  For purposes of all the

8    conclusions that you reached in your expert opinion,

9    other than reading the materials that you've read,

10   explain what your method or methodology was to reaching

11   your conclusions.

12       A.   Certainly.  The allegations in this email --

13   again, not opining on whether they're accurate or not --

14   are pretty specific.  Mr. Navarro talks about some

15   specific instances where he was grabbed from the back by

16   Mr. Rodriguez, Mr. Rodriguez telling him, "I like you so

17   much."  He says that happened multiple times.  He says

18   there were nasty attitudes from management.

19            Then he goes into, you know, trying to call HR

20   at one point, leaving a message.  No one called him back.

21   He stayed quiet, and he said that Mr. Rodriguez talked

22   about what he was doing sexually to him for a month

23   without consent.  So we have sexual contact, although

24   unspecific at that stage of the email.

25            He talks about the multiple witnesses, and then

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 93

1    he speaks specifically about what Rodriguez allegedly

2    did:  grabbed him from the back, touched his ass, grabbed

3    his nipples, kissed him on the neck, told him he loved

4    him.  And as I testified to multiple times today, this

5    was witnessed by management as well as other employees.

6    He talks about the humiliation and disrespect from

7    management.

8          So I think when you see this -- at least when I

9    see this -- there are a lot of issues raised here.  And

10   that's an objective viewpoint.  I don't know if what

11   Mr. Navarro is saying is true, but the fact he's a former

12   employee doesn't really move me in the context of an

13   investigation, because there's a lot of allegations

14   relating to people that are still employed here.  So I

15   think the company would want to, should want to, and

16   should find out what happened.  Did management witness

17   this?  If they did, why didn't they report it?  Did any

18   of these individuals see this?

19         And in order to make sure that the sufficiency

20   and thoroughness of the investigation -- in order to

21   support the sufficiency and thoroughness of an

22   investigation, management or HR should either, A,

23   investigate it themselves and then generate some written

24   documentation of what they did -- and I'm not saying it

25   needs to be this very formalized, perfectly pretty,

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 94

1    put-together tabbed report, but there should be a detail

2    of who was interviewed, when were they interviewed, what

3    did they say.  That could be a group summary.  Could be

4    an individual summary.  Just depends on the specifics.

5            Was Mr. Navarro interviewed?  It's my

6    understanding he wasn't.  If he was interviewed, what did

7    he say?  What are the specifics?  Are there any specifics

8    beyond what was alleged here?  Are there other potential

9    claimants?  And then how HR closes it out, you know, what

10   is their determination and how did they reach it.

11           I don't think that that is at all some

12   far-flung leap of faith or bizarre methodology in any

13   way.  I think that is something that would be done, based

14   upon my years of experience as a labor and employment

15   defense attorney.  "Let's document this.  Let's find out

16   what happened."  Maybe bring in an independent third

17   party, depending on what a company would do.  That's

18   obviously not part of this case, but that's something

19   that employers could consider.

20           So that's the methodology.  It's an analysis of

21   what's the complaint?  What's the potential impact?  How

22   do we find out what happened?

23       Q.   That seems to be, sir, an explanation for what

24   should be done in response to what you've read or

25   summarized from Exhibit 8.  In other words, you've

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 95

1    identified the facts you're discussing and you've

2    identified the conclusions that you've reached.

3          What I'm specifically asking about is how you

4    got from the facts you've identified to the conclusions

5    you've reached.

6    A.   And I've told you today, that's based on my

7    years of experience over two decades as a labor and

8    employment management attorney.  Just applying what I

9    have learned in my 23 years of practice in this specific

10   practice area.  And what I've learned is when you have

11   real serious specific allegations like this, Human

12   Resources should investigate.

13         But what we're talking about here is did they

14   document what they did to support, as you talked about

15   earlier, the thoroughness of their investigation.  And my

16   experience teaches me that they should document it.  How

17   they do that, whether it's through a formal report or

18   through some emails, that's a different conversation.

19   Q.   Are you analyzing whether or not the method, if

20   any, that was used for documentation was sufficient or

21   adequate?

22   A.   I'm not aware of any documentation; so that's

23   inadequate, as far as I'm concerned.

24   Q.   Because you're unaware of it or -- have you

25   reached the conclusion that the documentation is

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 96

1    inadequate simply because you haven't seen it?

2        A.    There is no record of it.  Ms. Bickram

3    testified that she has not seen any record of it.  There

4    is no documentation provided in any of the materials that

5    were produced to me.  Certainly, given the complaint in

6    this case and the discovery requests, that would have

7    been covered, and nothing has been produced.  So I

8    conclude that there is none.

9        If documentation were to show up and I was made

10   aware of it -- it's my understanding Ms. Pacheco hasn't

11   been deposed yet -- I would obviously consider that.  But

12   there is none.  So that's where we are.

13       Q.    Again, at the risk of belaboring the point, how

14   would someone take the investigation that was made

15   available to you, including not just Exhibit 8 but

16   everything you identified -- how would someone else with

17   the years of experience you have -- what process would

18   that person use to check your work or to question your

19   conclusions?

20       A.    I mean, this isn't -- as we talked about, this

21   isn't like a mathematical formula, right, where it's like

22   algebra and you have to show your work, X equals 10, and

23   this is how I got there.  This is an amorphous,

24   case-by-case situation.  So I don't know how somebody

25   would, quote, "check my work."

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 97

1        My work is I have read the materials identified

2    in my report.  I have concluded that Human Resources, it

3    was not reasonable what they did here, or didn't do,

4    given the nature of the allegations.  How one would go

5    about checking that, frankly, is not really for me to

6    say.  That's, I think, up to other people to do.  I don't

7    know what another person would do.

8        Like I said, this isn't a math problem.  I

9    certainly respect and understand the nature of your

10   question, but I have to stand on the same answer I've

11   given before.

12   Q.  If I understood your testimony this morning,

13   your own process and procedure for conducting

14   investigations in any capacity, whether on the two to

15   four occasions that you investigated a matter as an

16   independent investigator or on what I think you

17   identified as the innumerable other occasions that you

18   did so in your capacity as a party's counsel, your own

19   application of the principles and experience you've

20   identified have never been deemed by a tribunal to be

21   sufficient or insufficient, correct?

22   A.  That's correct.

23   Q.  Going to the next paragraph of your opinion,

24   which reads as follows:  "In addition to raising very

25   serious issues like battery, the email complaint also

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 98

1    implicitly alleges that there is a systemic culture at

2    HI" -- which stands for Hollywood Imports in your

3    abbreviation schemes -- "there is a systemic culture at

4    HI that allows Rodriguez's alleged behavior."

5         What does the phrase "implicitly alleges" mean?

6         A.   I don't think the -- the email does not come

7    out and say, "There is a culture that allows this."  My

8    reading of the email, though, is when you have these

9    serious allegations -- the email talks about complaining

10   and then a fear of complaining.  You have an allegation

11   that multiple management members witnessed all of this

12   conduct and didn't do anything, and all these other

13   people witnessed the conduct and didn't do anything,

14   whether it's 11 or 12.  That implies a culture of

15   allowing this to happen.

16        Q.   The phrase "systemic culture," the one that's

17   used in your report in the sentence we just looked at,

18   what meaning does that have, and what is the source of

19   that meaning?

20        In other words, what standard or guideline

21   would we use to determine whether or not allegations rose

22   to the level of fitting the definition of "systemic

23   culture"?

24        A.   I think systemic culture is something that is

25   problematic or continually problematic.  The behavior

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 99

1   alleged by Mr. Navarro was continuing behavior, per his

2   allegations.  Again, he alleges -- could be totally

3   false -- that management witnessed it.  Didn't do

4   anything.  Employees, numerous, 11 or 12, depending on

5   how you're calculating it, witnessed it.  Didn't do

6   anything.  He was afraid to complain.

7              That, to me, seems to imply -- granted,

8   Mr. Navarro did not say that.  Those are my words --

9   seems to imply systemic culture, which I think earlier I

10  just defined as something that was continuing, so

11  systemic.  And in terms of culture, you know, what is

12  happening in the workplace.  What is allowed?  How does

13  the workplace function?

14             These, of course, are amorphous terms that are

15  malleable and subject to interpretation.  Those are the

16  labels I chose to give it from an implied standpoint.  I

17  am not concluding that that is, in fact, the culture.

18  Again, it is what I think the allegations in the email

19  are impliedly raising.

20      Q.   So the phrase "systemic culture," you

21  acknowledge that's an amorphous phrase?

22      A.   I do acknowledge that, yes.

23      Q.   And in terms of the implicit allegation, or the

24  phrase "implicitly alleges," do you have any particular

25  expertise in communication or communication styles that

Page 100

1    would allow you to reach a conclusion that Mr. Navarro is

2    saying anything beyond or other than what he specifically

3    states in the email?

4            MR. PRATER:  Object to the form.

5        A.   Yeah.  I mean, look, I don't have a degree in

6    communications or some communications survey, but I don't

7    think there is any -- I don't think it is a leap to say

8    that, based on what he specifically wrote, the

9    implication is that culturally at this office, or at this

10   dealership, this was allowed.  That's all.  I don't think

11   that that is really too -- I don't think you need a

12   degree in communications to reach that conclusion.

13   BY MR. GABRIELLE:

14       Q.   In fact, you don't need a degree in law to

15   reach that conclusion, do you?

16       A.   You don't.  And I didn't say you did, though.

17       Q.   You don't even need any particular experience

18   to reach the conclusion that there may be more to

19   Mr. Navarro's email than what he expressly states.

20           MR. PRATER:  Object to the form.

21       A.   I can't speak to generally what you do or don't

22   need like that.  I'm just saying, based upon my years of

23   experience, I'm certainly able to read something like

24   this, and although the complainant doesn't specifically

25   identify a culture, as most complainants don't

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 101

1    specifically identify a lot of things, as an experienced

2    labor and employment management defense attorney, I

3    was -- I think I could read the tea leaves on what he was

4    alleging here, which was, impliedly, that the workplace

5    allowed this to go on.

6    BY MR. GABRIELLE:

7        Q.   How would that have been different from the

8    allegations by multiple individuals over a period of time

9    with the Town of Surfside?  How is it that certain

10   allegations, if true, would lead to the conclusion of a

11   systemic culture, whereas other allegations, if true,

12   would not?

13       A.   I couldn't speak to that with Surfside.  I

14   wasn't asked to investigate that, nor was I asked to

15   opine in this case on what constitutes systemic culture.

16       Q.   All right.

17       A.   Surfside -- if I may finish my answer.

18       Q.   Sure.

19       A.   Surfside was limited to a complaint by an

20   individual officer that she was subjected to sexual

21   harassment and hostile work environment by her

22   supervisor, and that's what I investigated.

23       Q.   So you were not asked to opine in this case

24   whether or not Mr. Navarro's allegations reflect a

25   systemic culture at the dealership; is that correct?

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 102

1      A.   I was asked to opine on whether or not what HR

2  did with Mr. Navarro's allegations was reasonable,

3  sufficient, met HR best practices, standard of care,

4  however you want to phrase that.  I think I phrased it as

5  "best practices/standard of care," but certainly

6  reasonableness fits into that.

7           So that's what my opinion is, that based on the

8  allegations and the fact that there's no written

9  documentation of what HR did here, that is not

10  sufficient.

11      Q.   Right.  What I'm trying to determine is whether

12  or not the phrase that you used in your report, the

13  phrase being "systemic culture," is part of your expert

14  opinion or not.

15      A.   It is my opinion that Mr. Pacheco's May 14th

16  email implies that there is a systemic culture that

17  allowed Rodriguez's behavior.

18      Q.   You meant Mr. Navarro.

19      A.   Mr. Navarro's email.  Sorry if I misspoke.

20      Q.   You said Mr. Pacheco.

21      A.   There is no Mr. Pacheco.

22      Q.   There may be a Mr. Pacheco.

23      A.   He's not in this case.

24      Q.   Correct.

25      A.   No.  I meant Mr. Navarro.  I apologize.

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 103

1      Q.   Not a problem.  It happens in depositions, as

2   we all know.

3      A.   And I appreciate you correcting me.

4      Q.   No problem.

5           So again, and then we can move on, is it your

6   opinion that Mr. Navarro's email complaint reflects a

7   systemic culture?  If so, what reference points are you

8   using for that conclusion?

9      A.   That is not my opinion.  I don't know if the

10   facts alleged in Mr. Navarro's email are correct or not.

11   My view of the email is that it alleges impliedly a

12   systemic culture, and that because of that, that's one of

13   the very serious allegations in the email that take this

14   complaint and level it up to HR should investigate and

15   should document the results or document what it does in

16   that investigation.

17           Whether or not there is or isn't a systemic

18   culture is not for me to determine.  I have not

19   determined that.  I have no idea.  I am not a fact

20   finder, as I think I've made clear today.

21      Q.   Going to the last sentence of that paragraph --

22      A.   I'm sorry.  Which paragraph is that?

23      Q.   The paragraph we were looking at, the second

24   paragraph of --

25      A.   Okay.  Yes, sir.

Navarro v. AutoNation                     Michael Elkins 4/29/2024

Page 104

1      Q.    -- the section labeled "Expert Opinion."

2      A.    Yes, sir.

3      Q.    "Management employees are aware of their duty

4  to report any inappropriate conduct that they witness."

5            From where does that conclusion come?

6      A.    You mean the second to last -- I'm sorry.  I

7  thought you said the last sentence.

8      Q.    And if I did, then it was my turn to misspeak.

9      A.    No, I just want to make sure I'm following you.

10 My apologies.

11     Q.    I'll try again.  The second to the last

12 sentence in the second paragraph reads, "Management

13 employees are aware of their duty to report any

14 inappropriate conduct that they witness."

15           From where is that conclusion reached?

16     A.    The deposition testimony.  Hold on.

17     Q.    That's okay.  The deposition testimony of the

18 management officials that were deposed, correct?

19     A.    That's my understanding, yes.

20     Q.    So you agree, then, at least as it concerns the

21 management officials who were deposed here, those being

22 Mr. Losk and Mr. Vanderwarker, they were aware that, if

23 they saw the source of conduct that Mr. Navarro alleges,

24 they were required to report it?

25     A.    I believe that's what they testified to.

Navarro v. AutoNation                    Michael Elkins 4/29/2024

                                                        Page 105

1        Q.   And you've agreed with that conclusion that

2   they were aware, correct?  There's nothing to suggest to

3   you that they were unaware, correct?

4        A.   Their deposition testimony speaks for itself.

5   My recollection of that is the testimony -- and I think I

6   cited at least some of it.  Probably not all of it -- was

7   that each of -- and I just want to make sure I get their

8   names right -- Vanderwarker, Losk, and Bickram testified

9   as to the obligation of management employees that witness

10  problematic conduct, and that they have to report it.  I

11  don't know that there's anything to agree with or

12  disagree with there.  The deposition testimony speaks for

13  itself.

14       Q.   But it is a sentence of your expert opinion.

15  So your expert opinion is based on what they testified

16  to, correct?

17       A.   Correct.

18       Q.   So all one needs to do to reach that particular

19  conclusion would be to listen to or read that deposition

20  testimony.

21            MR. PRATER:  Object to the form.

22       A.   I'm not entirely sure what you're asking.  The

23  deposition testimony -- and I'm not trying to be

24  difficult.  The deposition testimony speaks for itself.

25  I have no reason to -- I didn't see anything that

Navarro v. AutoNation                          Michael Elkins 4/29/2024

Page 106

1    contradicted it.  I think they testified relatively

2    consistently on that point, which is why I probably wrote

3    this sentence.

4    BY MR. GABRIELLE:

5         Q.   I am trying to determine exactly and only the

6    following with respect to this particular question:  if

7    the phrase "Management employees are aware of their duty

8    to report any inappropriate conduct that they witness" is

9    intended to be part of an expert opinion or is simply a

10   summary of the deposition testimony you read.

11        A.   I mean, it's a statement of fact from the

12   deposition testimony.  It's not my opinion.  That's what

13   they testified to.

14        Q.   Okay.

15        A.   I understand it's contained in the "Expert

16   Opinion" section, but it's a piece of factual -- it is a

17   fact that I used.

18        Q.   Understood.

19        A.   So certainly every sentence in here wouldn't be

20   opinion.

21        Q.   I'm sorry?

22        A.   Every sentence in here, like, wouldn't be

23   opinion.  I mean, that's a fact.  It's not my opinion.

24   They testified to it.

25        Q.   Then that's in part what we're trying to do

Navarro v. AutoNation                Michael Elkins 4/29/2024

Page 107

1    here, is determine which sentences in your "Expert

2    Opinion" section of Exhibit 24 are statements of fact and

3    which are summaries of your opinion.

4          A.   Understood.

5          Q.   Last sentence of that specific paragraph:

6    "Therefore, the failure to do so in this case, assuming

7    that plaintiff's allegations are true, is a human

8    resources deficiency."

9               How is the failure, if it occurred, of

10   management employees who witness but do not report

11   inappropriate conduct a human resources deficiency as

12   compared to a deficiency of the managers who fail to

13   report the conduct?

14               MR. PRATER:  Object to the form.

15         A.   I think it's both.  The managers in this case

16   testified, each of them, that they knew that they had to

17   do this.  So if they didn't report it, obviously it's a

18   deficiency for them, but it's also a deficiency in the

19   entire HR process.  I mean, HR has to bear some

20   responsibility for that, too, as far as I can tell.

21               Again, all of that assumes that the plaintiff's

22   allegations are true.  If they didn't witness anything,

23   then there's nothing to report.

24   BY MR. GABRIELLE:

25         Q.   My question, more pointedly, then, is that last

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 108

1    sentence of the paragraph that we just looked at, using

2    the phrase "human resources deficiency," is that part of

3    your expert opinion?

4         A.   It is.

5         Q.   And what guideline, standard, rule, or other

6    marker can we use to determine that management employees

7    who are aware of their obligations but fail to fulfill

8    them have engaged in something that can be called a human

9    resources deficiency?

10        A.   That's my opinion.  It's based on my years of

11   experience.  As I testified to, there's no other

12   materials that I used.  We've talked about that today at

13   length.

14        Q.   You'd agree, though, in general, that simply

15   because not every sentence or obligation of a reporting

16   policy is followed to the letter doesn't automatically

17   lead to the conclusion that the employer has a deficiency

18   in its policy and procedure?

19        A.   I mean, that's a really broad hypothetical.  I

20   don't think I've opined that -- first of all, I'm not

21   opining on the sufficiency of anyone's policies.  The

22   policies speak for themselves.  I wasn't asked to opine

23   on the policies.

24             Broadly, broadly speaking in the grand

25   hypothetical world, I am not opining that a mere policy

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 109

1    violation constituted an HR deficiency.  That is not my

2    opinion and not what I am saying in this case, nor am I

3    opining on the sufficiency of any policies.  I wasn't

4    asked to do that.  And I don't think I talk about that in

5    my report either.

6         Q.   Going to the next, which is the second to last

7    paragraph of your opinion.

8         A.   The bottom paragraph on the second to last

9    page?

10        Q.   There you go.

11        A.   Yes, sir.

12        Q.   The third sentence of that paragraph reads,

13   "Pacheco then should have generated a detailed report

14   summarizing each witness interview, attaching relevant

15   documents, and detailing her findings."

16             Mr. Navarro, in his email complaint in

17   Exhibit 8, specifically makes reference to legal action,

18   does he not?

19        A.   It looks like he does in the second to last

20   paragraph.  "I'm entitled" -- he spells it wrong -- "to

21   take legal action."  Is that what you're referring to, I

22   presume?

23        Q.   Yes.

24        A.   He does make reference to that, yes.

25        Q.   So at least as of the time Ms. Pacheco received

Navarro v. AutoNation                    Michael Elkins  4/29/2024

Page 110

1    this -- and it is undisputed that she did receive it,

2    because she responded to it.

3         A.   Sure.

4         Q.   At least as of the time that Ms. Pacheco

5    received this email from Mr. Navarro, that is marked as

6    Exhibit 8, there was at least a reference to possible

7    future legal action, correct?

8         A.   There is a reference to that.

9         Q.   Is it your opinion that, where legal action is

10   possible or likely, an employer should always, under

11   every circumstance, generate a detailed written report in

12   response to the allegation?

13        A.   I did not say that.

14        Q.   That's what I'm asking you.

15        A.   I did not opine on that.  That's not what I

16   said.  I never said that.

17        Q.   But the sentence reads, "Pacheco then should

18   have generated a detailed report summarizing each witness

19   interview, attaching relevant documents, and detailing

20   her findings."

21             That's a statement of your opinion, correct?

22        A.   That is.

23        Q.   So is it always true that an employer who

24   receives an email complaint like Exhibit 8 should do

25   that?

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 111

1      A.   Is it always true?

2      Q.   Yes.

3      A.   I can't speak to what you would do in other

4   situations because, as I testified earlier, every

5   situation, when you're dealing with human resources

6   complaints, is a unique situation.  I think I said that

7   multiple times before.  So I'm not going to testify what

8   one should always do.  My opinion is limited to what

9   happened in this case, and in this case, my opinion is

10  that she should have done a report.

11         Now, what that looked like or how it would be

12  done is a different story.  Certainly, could the company

13  have hired an outside third party?  I suppose they could

14  have done that too.  But I'm not going to agree as to

15  anything as to what you always should do.  That's a

16  very -- I just can't do that.  I understand the nature of

17  your question, and I'm certainly not trying to be

18  difficult, but I just can't agree to the term "always

19  what you should do."  Every situation is unique.

20      Q.   Isn't the prospect of legal action a factor in

21  whether or not a detailed report summarizing each witness

22  interview, attaching relevant documents, and detailing

23  findings should be done?

24      A.   That could be a factor, but it didn't appear to

25  be one in this case, based upon the materials that I was

Navarro v. AutoNation                    Michael Elkins 4/29/2024

                                                    Page 112

1    provided.

2         Q.   Which do not include testimony or explanations

3    from Ms. Pacheco, correct?

4         A.   Does not include that, that's correct.  But it

5    does include testimony from Ms. Bickram, Ms. Pacheco's

6    supervisor, who testified about her following up, or lack

7    of follow-up, on this issue.  But she did not testify

8    about legal action being a consideration.  But you are

9    correct.  As I testified earlier, I don't have

10   Ms. Pacheco's deposition because, at the time I did this,

11   that deposition had not been taken yet.

12        Q.   Would consideration of legal action and the

13   prospect of that legal action occurring have been a

14   relevant consideration in the response or investigation

15   to Mr. Navarro's complaint at Exhibit 8?

16        A.   I suppose it could be.  I don't have any

17   information to reach that conclusion.  There was no

18   mention in any of the materials that I reviewed that

19   legal action was a consideration relating to

20   Ms. Pacheco's investigation or lack thereof.  And I

21   certainly reviewed carefully the deposition testimony of

22   her direct supervisor.  That did not come up.

23             Now, what that would look like after

24   Ms. Pacheco testifies, I don't know.  I would have to see

25   that after it happened.  Then I could consider the

Navarro v. AutoNation                     Michael Elkins 4/29/2024

                                                        Page 113

 1    specifics.  But hypothetically, I can't really answer

 2    that.

 3         Q.    The last sentence from that paragraph reads,

 4    "My opinion is that Pacheco's investigation, if one was

 5    even done, was completely insufficient and far below HR

 6    best practices."

 7         A.    I'm sorry.  Where are you?  I apologize.

 8         Q.    The last sentence of the third paragraph of the

 9    section labeled "Expert Opinion."

10         A.    Thank you.  Yes.

11         Q.    I'll read it again just so I know you're there.

12         A.    No, I've got it.  I'm there.

13         Q.    "My opinion is that Pacheco's investigation, if

14    one was even done, was completely insufficient and far

15    below HR best practices."

16               What is the source of the HR best practices you

17    are referring to in that sentence?

18         A.    That's the same answer that I think I've

19    previously given, which is my 23 years of experience as a

20    labor and employment, primarily but not exclusively,

21    management defense attorney.

22         Q.    You're not familiar, are you, with how someone

23    with comparable experience would apply his or her own set

24    of standards, are you?  In other words, there's not any

25    sort of a peer database for HR investigations that the

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 114

1    community of experienced labor and employment lawyers

2    share their own findings or approaches, is there?

3            MR. PRATER:  Object to the form.

4        A.   I don't know if there is or is not one; so I

5    can't say if one exists or not.  I am not part of that,

6    but that doesn't mean one might not exist.  I just am not

7    part of it.  If it exists, I am not part of it.  So I

8    don't want to testify that it doesn't exist, because I do

9    not know.

10   BY MR. GABRIELLE:

11       Q.   I understand.  In terms of how you or I or

12   Mr. Prater or any other experienced labor and employment

13   lawyer would apply his or her own standards for an

14   investigation, is there any, to your knowledge, set of

15   guidelines or standards against which we can compare

16   ourselves?

17       A.   Not to my -- not that I'm aware of or that I

18   used in this case, no.  There might be.  I just went off

19   of my experience, as I testified earlier.

20            Can we take three minutes?

21       Q.   Of course.

22            MR. GABRIELLE:  Off the record.

23            (Break from 1:43 p.m. to 1:47 p.m.)

24            MR. GABRIELLE:  Back on the record, please.

25   ///

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 115

1    BY MR. GABRIELLE:

2         Q.   Now we're just going to ask about the very last

3    paragraph on the very last page, not including your CV,

4    not including your résumé.

5         A.   Yes.

6         Q.   You read Ms. Bickram's entire deposition

7    transcript?

8         A.   I did.

9         Q.   She did indicate that she had confidence in

10   Ms. Pacheco's ability to investigate, correct?

11             MR. PRATER:  Object to the form.

12        A.   She did.

13   BY MR. GABRIELLE:

14        Q.   So is it your opinion that, notwithstanding any

15   such confidence that Ms. Bickram at least testified that

16   she had, that she should have still supervised

17   Ms. Pacheco's investigation?

18        A.   Well, I don't have the deposition in front of

19   me.  I do remember her testifying that she had confidence

20   in Ms. Pacheco.  I don't remember the exact words.

21             But confidence in somebody I don't think is the

22   same as making sure that everything that needed to be

23   done was done, especially given the seriousness of these

24   allegations.  So confidence is one thing, but saying,

25   "Hey, where is the report?  What did you do?" is a

Navarro v. AutoNation                    Michael Elkins 4/29/2024

                                                        Page 116

1    totally different thing.

2         Q.   Did you make any analysis of Ms. Pacheco's

3    experience or qualifications, or even have any

4    information in order to do that?

5         A.   Any information I had was in Ms. Pacheco's

6    deposition.  I don't recall rendering any opinion or

7    analysis of her qualifications.

8         Q.   Here again, though, you said Ms. Pacheco's

9    deposition.

10        A.   Are you talking about Ms. Bickram?  I'm sorry.

11        Q.   We all agree Ms. Pacheco has yet to be deposed.

12        A.   Okay.  In Ms. Bickram's deposition, anything I

13   had on her qualifications would have been in that

14   deposition.  But I don't recall impugning or having any

15   issue with her qualifications.  I took issue or opined

16   here that, from a supervisory standpoint, I didn't think

17   it was reasonable, given the nature of these allegations,

18   that she would simply rely on that an investigation was

19   done without following up to see what the documentation

20   was, which I think she testified she did not do.

21        Q.   Where along the line or on the spectrum --

22   strike that.

23             Where on the spectrum does the obligation to

24   supervise fall?  In other words, if Ms. Pacheco was

25   sufficiently qualified, in Ms. Bickram's mind, to conduct

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 117

1    and conclude the investigation on her own, why would

2    Ms. Bickram be responsible for supervising her?

3         A.   Well, she is her supervisor.  And I don't think

4    I said she had to supervise her during the investigation.

5    I think that's a little different.  I believe what I

6    talked about was not following up with Pacheco to ask for

7    the documentation of the investigation.  That's a little

8    bit different.

9              And in terms of the spectrum, I can't speak to

10   the spectrum because, as we talked about earlier, every

11   complaint has its own unique set of facts and

12   circumstances that go with it.  This is not paint by

13   number.

14             But in this case, given the allegations, I do

15   think Ms. Bickram should have followed up to determine

16   what, if any, written memorialization there was of this

17   investigation.  And it's my understanding she did not

18   even follow up.  But I did not speak about general

19   supervision of Ms. Pacheco.  That's something, I think,

20   that's different.

21        Q.   What, if any, standard or guideline are you

22   referring to when it comes to whether or not a supervisor

23   in human resources should or is obliged to follow up on

24   the investigation done by her subordinate?

25        A.   My experience, 23 years of experience as a

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 118

1    labor and employment, primarily though not exclusively,

2    management defense attorney.

3         Q.   Did you analyze, as part of that conclusion,

4    whether or not Ms. Pacheco had sufficient qualifications

5    and experience to conduct and conclude the investigation

6    on her own without follow-up by Ms. Bickram?

7         A.   I did not analyze that, nor did I opine that

8    Ms. Pacheco's experience was insufficient.  I don't think

9    that's part of my report.

10        Q.   You'd agree, would you not, that there are

11   human resource professionals with sufficient experience

12   to conduct, complete, and conclude an investigation

13   entirely on their own without supervision?

14             MR. PRATER:  Object to the form.

15        A.   Again, I can't speak to what other people can

16   or cannot do, nor did I opine about whether Ms. Pacheco

17   had the sufficient experience to conduct this

18   investigation, be it on her own or supervised.  That's

19   not at all what I opined on.  She may very well have

20   completely sufficient experience.  That would be

21   immaterial to me.

22             My point is, since I had not seen any written

23   documentation showing anything she did -- report, email,

24   a note, anything -- that that is not reasonable under the

25   standard of care, the reasonableness for what HR would do

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 119

1   in a situation like this, based on the materials I've

2   reviewed.  In no way did I opine that Ms. Pacheco lacked

3   sufficient qualifications.

4   BY MR. GABRIELLE:

5       Q.   So your conclusion in that paragraph -- and if

6   you could, look at the exhibit.

7       A.   Yes.

8       Q.   You mean to use the word "thorough" rather than

9   "through" in the second to last sentence, correct?

10      A.   Yes.  That is a typo.

11      Q.   I'm going to read it as -- correct it.  "Based

12  on Bickram's testimony, it appears that Bickram did next

13  to nothing to ensure that there was a thorough and

14  complete investigation."

15      A.   "Thorough" should have been the right word,

16  yes.

17      Q.   Right.  Here again, my question is what

18  standard are you applying to determine when the

19  responsibility falls on Bibi Bickram to ensure there is a

20  thorough and complete investigation as compared to the

21  person who reports to her, that being Ms. Pacheco?

22      A.   Again, it's off of my 23 years of experience as

23  a labor and employment -- primarily though not

24  exclusively -- management defense lawyer.  I don't think

25  it is at all a stretch that, and hence I reached my

Navarro v. AutoNation                Michael Elkins  4/29/2024

Page 120

1    opinion, given the nature of these allegations, the

2    supervisor of the individual that conducted the

3    investigation -- I don't think it's a stretch for that

4    person to do some simple follow-up.

5            I don't have Ms. Bickram's testimony in front

6    of me; so I certainly don't want to misquote it.  But my

7    recollection, without it in front of me, is that she

8    didn't do any follow-up whatsoever.  I could be wrong

9    about that.  Again, I don't have it in front of me.  But

10   I don't recall her testifying that she did any follow-up.

11       Q.   In order for Ms. Bickram to have followed up,

12   she would have to be aware, would she not, that the

13   investigation occurred?

14       A.   Yes.  I don't remember what she testified to on

15   that point, but yes.  She's the supervisor.  I would

16   imagine she was aware of it.

17       Q.   But if Bibi Bickram was not aware that

18   Ms. Pacheco was conducting an investigation of the nature

19   that is referenced in your report, your opinion, then

20   Ms. Bickram could not have been deficient in following

21   up, correct?

22            MR. PRATER:  Object to the form.

23       A.   I believe she testified she was aware of the

24   situation.  So I can't really speak to that.  I would

25   have to see the deposition testimony.  I don't want to

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 121

1    get in a situation where I am testifying about what she

2    said and I don't have it.  If you're aware of that

3    testimony, certainly, please, feel free to point me to

4    it.

5            If I may?

6    BY MR. GABRIELLE:

7        Q.   Go ahead.

8        A.   I believe I referenced Bickram's knowledge of

9    Pacheco's investigation on page 81 to 82, lines 20 to 2.

10   I wrote, "According to Bickram, Pacheco investigated the

11   allegations in plaintiff's email complaint," and then I

12   cite to the depo.  I write, "See id. transcript 81 to 82,

13   lines 20 to 2."

14       Q.   Right.  So the testimony you're referencing

15   there begins at page 81, line 14, and it's Mr. Prater

16   that I'm quoting in the middle of that paragraph.  So I'm

17   going to begin with the relevant section.

18           On line 17:  "Are you aware of whether an

19   investigation into Mr. Navarro's conduct or a complaint

20   here was actually conducted?"

21           Ms. Bickram answers at line 20:  "I did.  Yes,

22   I am."

23           And at line 21, Mr. Prater's question:  "And

24   was one conducted?"

25           Line 22:  "From my understanding from Cary

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 122

1    Pacheco, yes."

2           Line 23:  "When did she tell you that?"

3           Line 24, continuing onto page 82:  "After we

4    received a letter from you, I suppose.  I did ask about

5    the situation, and she stated that she did conduct an

6    investigation and did not find the -- the email to be

7    substantiated."

8           So Ms. Pacheco's testimony was that she became

9    aware of Ms. -- strike that.  Now I'm doing it.

10          Ms. Bickram's testimony, in the section we just

11   read, was that she became aware from Cary Pacheco of

12   Mr. Navarro's complaint after the defendants received

13   correspondence from Mr. Prater's office.

14       A.   Okay.

15       Q.   I will represent to you that that was in the

16   month of June of 2023.

17       A.   Okay.

18       Q.   So having learned that, and learned that the

19   first time, according to Ms. Bickram's deposition

20   testimony, she was aware of Mr. Navarro's complaint was

21   not until June of 2023, do you stand by your proposition

22   that Ms. Bickram failed because she did not follow up

23   with Ms. Pacheco, asking for documentation of the

24   investigation?

25       A.   A thousand percent.  My opinion is that she

Navarro v. AutoNation                    Michael Elkins 4/29/2024

                                                        Page 123

1    failed insofar as she did not follow up with Pacheco,

2    asking for documentation.  Once she found out about it,

3    she should have asked for documentation.  I think the

4    next sentence, which you're leaving out, is "Instead,

5    Bickram accepted Pacheco's verbal statement that the

6    allegations in the email complaint were not

7    substantiated."  That's the point.

8            And I think the June notification is

9    problematic.  Depending on when in June, we're talking

10   about a mere month, less than a month.  I mean, we're not

11   talking about six months to a year later.  So certainly

12   there could have been additional follow-up.  I think

13   Ms. Bickram, I'd add, could have said, "Well, if there's

14   no documentation, we probably need to memorialize some of

15   this a little bit."

16           So, yes, I do stand by my opinion, absolutely.

17       Q.   So if I understand what you're explaining,

18   then, you believe that Ms. Bickram, after the company

19   received a demand letter from Mr. Navarro's counsel --

20   and, by the way, after the EEOC charge came in, filed by

21   Mr. Navarro -- that Ms. Bickram was deficient in failing

22   to investigate whether Ms. Pacheco had documented the

23   investigation.  You stand by that?

24       A.   Yes.  She just accepted her -- as I wrote, she

25   accepted Ms. Pacheco's verbal statement that the

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 124

1   allegations were not substantiated.  And I think she

2   testified she didn't follow up to see if there was any

3   documentation.  So, yes, I stand by my opinion.

4          I understand that this is post receipt of an

5   EEOC charge and a demand letter.  I understand that.  But

6   I'm not saying she then should have gone on and conducted

7   an investigation at that point.  I'm saying the timing

8   doesn't change my opinion.  She didn't follow up and ask,

9   "Was there written documentation?"  If she had testified,

10  "Yeah, I asked Ms. Pacheco, 'Okay.  So where are your

11  findings?  Let me see them,'" and then was told there

12  were none, that would be different.  But she didn't even

13  ask that question.

14     Q.   After a demand letter is received by an

15  employer, don't you generally advise that nonprivileged

16  communications be kept to a minimum?

17     A.   I'm not going to --

18          MR. PRATER:  Object to the form.

19     A.   I'm not going to get into anything that

20  I advise, be it general or otherwise.  But there was

21  nothing in Bickram's testimony, or anyone else's

22  testimony, or any of the materials I reviewed, that

23  indicated that the receipt of a demand letter or an EEOC

24  charge or communications with counsel played any factor

25  in how HR acted.

Navarro v. AutoNation                    Michael Elkins 4/29/2024

                                                      Page 125

1    BY MR. GABRIELLE:

2         Q.   My question, though, was a little bit different

3    than that.

4         A.   I understand that.

5         Q.   Have you taken into consideration in any way

6    the fact that, at the time that Ms. Bickram learned of

7    Ms. Pacheco's investigation, there had already been, in

8    the form of an EEOC charge and a demand letter,

9    communications by counsel for Mr. Navarro?

10        A.   I did not.

11        Q.   You would agree, would you not, that that fact

12   has some bearing on how an employer handles internal

13   communications at that point?

14             MR. PRATER:  Object to the form.

15        A.   I can't speak to what generally a hypothetical

16   employer would do.  I would agree that I don't think it

17   really had any bearing on what Pacheco did, which is what

18   the point here is.

19   BY MR. GABRIELLE:

20        Q.   But you don't know because you don't know what

21   she is going to testify about, correct?

22        A.   I can't predict her testimony.  Again, I talked

23   about I don't have her deposition, but certainly, based

24   on the materials I reviewed.

25        Q.   In your experience, though, in your many years

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 126

1    of experience as a labor and employment lawyer, do you

2    not agree that, after a formal claim is asserted in some

3    form, an employer is well advised to be more deliberate

4    about internal communications?

5         A.   I'm not going to get into hypothetical advice

6    in general as to what I might or might not give as a

7    lawyer.

8         Q.   So you are not going to comment on whether or

9    not the formal assertion of a claim should impact your

10   analysis of what internal communications should occur

11   after that assertion is made?

12        A.   I think you asked me if I had considered that

13   as part of my analysis in this case, and I said I did

14   not.

15        Q.   Would that bear on your analysis?

16        A.   It's not something that beared on my analysis

17   in this case.

18        Q.   I understand.  But I'm entitled to ask you --

19        A.   You are.

20        Q.   -- how additional facts would affect your

21   opinion.

22             Would the additional fact of a claim being

23   formally asserted prior to Ms. Bickram learning of the

24   complaint itself that was the source of the formal

25   complaint bear on your analysis as to whether or not

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 127

1    Ms. Bickram acted reasonably?

2       A.   It would not change my opinion that her failure

3    to ask Pacheco, "Did you document anything?" was a

4    problem.  That's simply what I said, was she didn't even

5    follow up with her investigator.  She just accepted as

6    true Pacheco's statement that the allegations were

7    unsubstantiated.  She didn't ask her, "Are there any

8    writings?  What did you do?  How did you do it?"  And I

9    don't know that that's necessarily impacted by the

10   existence of a claim.  I'm just simply saying she's the

11   supervisor.

12          And she didn't indicate, by the way, in her

13   deposition, that the reason she didn't ask her was

14   because of the pending claim.  I believe she testified

15   that it was because she trusts Pacheco, something to that

16   effect.  Again, I don't want to misstate the testimony,

17   but that's my recollection.

18          Can I put this to the side?

19      Q.   Sure.  I'm showing you a document that's been

20   previously marked as Exhibit 1 in the case.  Its

21   authenticity is undisputed.  Mr. Prater will tell me if

22   that assertion is incorrect.

23          This is Mr. Navarro's April 6, 2023, email

24   resignation sent to his supervisor, David Losk.  Would

25   this be the sort of document that would be reasonable for

Navarro v. AutoNation                     Michael Elkins 4/29/2024

Page 128

1    an investigator to take into consideration when

2    evaluating the credibility of allegations of harassment?

3         A.   Yes.

4         Q.   By itself, would Exhibit 1 suggest, at least to

5    some degree, that prior to April 6, 2023, there had been

6    no harassment?

7         A.   I mean, I wasn't hired to reach factual --

8    that's a factual conclusion.  I can't get into that.  The

9    email speaks for itself.  My opinion was not based on,

10   nor did I opine on, the sufficiency of Mr. Navarro's

11   allegations, which is what you're going to here.

12             In terms of considering documents, I think we

13   talked earlier, and I agreed with you, that

14   communications between the complainant and the alleged

15   harasser certainly have their place in an investigator's

16   review of what may or may not have happened.  I can

17   certainly testify to that.

18             But what does this indicate?  I can't testify

19   to that.  That's not my role.  I'm not the fact finder.

20   I'm not the lawyer in the case.  I don't know the case

21   the way that you or Mr. Prater know the case.  So I'm not

22   trying to avoid your question.  I just -- I can't answer

23   it.

24        Q.   Based on the expertise and experience that

25   you've referred to, you do agree, though, that an

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 129

1    investigator would be reasonable in taking Exhibit 1 into

2    account as part of her investigation?

3         A.   Yes.

4         Q.   I'm showing you what has been previously marked

5    as Exhibit 13 to Mr. Navarro's deposition.  As you might

6    imagine, I will make a representation that the last text

7    message in the chain here on Exhibit 13 is one that

8    Mr. Navarro has admitted sending to Mr. Rodriguez on

9    December 22, 2022.

10        Would you agree that it would be reasonable for

11   an investigator to take this text message into account

12   when evaluating whether or not sexual harassment in the

13   workplace occurred as between the two parties to this

14   communication?

15        A.   Yes.

16        Q.   Take a look, please, at what's been previously

17   marked as Exhibit 17, which Mr. Navarro has admitted, in

18   response to a request for admission, is in fact a text

19   message -- the one on the left-hand side, the gray --

20        A.   I'm sorry.  Gray is --

21        Q.   Gray is Mr. Navarro.

22        A.   Thank you.

23        Q.   And green is Mr. Losk, just for your

24   information.

25        A.   Thank you.

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 130

1      Q.   Mr. Navarro has admitted in the request for

2   admission responses that this is authentic, this text

3   message.

4           In sum and substance, Mr. Navarro tendered his

5   resignation on April 6, 2023.  His testimony is that he

6   remained working until April 30, 2023, another 23 days,

7   after tendering that resignation at the request of

8   Mr. Losk.

9           So really the question here is not so much the

10  reason for the text message but the fact that Mr. Navarro

11  remained employed for 23 days after his resignation.

12  Would that fact, the fact that Mr. Navarro remained

13  employed for 23 days after his resignation, be something

14  that a reasonable investigator would take into account

15  when evaluating allegations of harassment?

16     A.   Yes.

17     Q.   Are you aware of whether or not Mr. Baez, the

18  individual who furnished the declaration, was deposed in

19  this case?

20     A.   I was told that he was deposed.

21     Q.   Were you given any summary or description of

22  his deposition testimony?

23     A.   I was not.

24     Q.   So you did not take Mr. Baez's deposition

25  testimony into account when reaching the conclusions in

Navarro v. AutoNation                     Michael Elkins 4/29/2024

Page 131

1   your opinion --

2          A.   I did --

3          Q.   -- correct?

4          A.   I did not.  Sorry.  I didn't mean to answer

5    early.

6          Q.   You did, however, take his declaration into

7    account?

8          A.   I read his declaration.  How much it played a

9    role in my opinion, I really don't remember.  It was a

10   piece of -- it was a material that I listed that I

11   considered.  I mean, yes, it's listed on my report as

12   something I considered.  I don't remember how much it

13   played a role.  It's certainly listed.  I frankly don't

14   recall if I specifically talk about it in the report.  I

15   don't think I do.

16         Q.   Mr. Navarro's complaint, his email complaint,

17   Exhibit 8, doesn't make reference to conduct directed

18   toward anyone other than himself, correct?

19         A.   I don't believe that it does, no.

20         Q.   Give me about seven minutes to look over my

21   notes.  I think we can resume and wrap up.

22              (Break from 2:13 p.m. to 2:25 p.m.)

23   BY MR. GABRIELLE:

24         Q.   If you could just go back to your report there,

25   Exhibit 24.

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 132

1      A.   That's 25.

2           MR. PRATER:  That's the engagement letter.

3    BY MR. GABRIELLE:

4      Q.   Here it is.  Sorry.

5      A.   That's okay.  Thank you.

6      Q.   Turn, if you would, please, sir, to your

7    Exhibit A, your résumé.

8      A.   Yes.

9      Q.   There is a reference on the first page of your

10   résumé, the bottom of the page, to "Media Appearances,

11   Publications, and Conferences."

12     A.   Yes.

13     Q.   One of the obligations of the rule regarding

14   written reports for experts is to disclose a list of all

15   publications authored in the previous ten years.

16          Have you ever authored an article in a

17   professional journal or a law review regarding the

18   subject matter, the general subject matter, of your

19   opinion here?

20     A.   No.

21     Q.   Have you ever authored or participated in the

22   authorship of any type of peer-reviewed publication

23   regarding the subject matter of your testimony?

24     A.   No.

25     Q.   The list of publications on your CV includes

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 133

1    Forbes, what I think is intended to be the Miami Herald,

2    and Daily Business Review, correct?  Or there are perhaps

3    places that you're quoted, correct?

4         A.   Yes.  Are you looking under "Media Appearances,

5    Publications, and Conferences"?

6         Q.   Yes, sir.

7         A.   Yes.  It's mostly media appearances.  So the

8    Daily Business Review, "Landing and Keeping Government

9    Legal Work," that was -- I don't remember what that was,

10   actually.

11            Miami Herald, I think, was a publication.  I

12   don't know if you have a specific question.

13        Q.   I do.  The three Forbes publications, are you a

14   member of some kind of a network or an organization where

15   you are permitted to submit publications or articles to

16   Forbes Magazine?

17        A.   No.  I don't think those are publications.

18   Those are probably interviews -- articles where I'm

19   quoted as an expert.

20        Q.   Have you paid for that status?

21        A.   No.  I'm a national media resource, and I don't

22   pay for a single media appearance.  I am used because of

23   my experience.  I've been told I'm quotable by media

24   people, but I do not pay for any of the media for which

25   I'm in.

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 134

1              I used to, to the extent you want to look, post

2    every media appearance on my website.  And I don't mean

3    this to sound jerky or arrogant in any way, shape, or

4    form.  It just got to be too much.  So now I post

5    those -- I usually reference my media appearances through

6    LinkedIn.  So if you look at my LinkedIn profile, you'll

7    see when I'm quoted.

8              By way of example -- again, I don't mean this

9    to be jerky.  I just want you to evaluate everything --

10   I've been talking to the media a lot about the FTC

11   noncompete rule.  That's not on my website.  It's not

12   posted there.  If you go to my LinkedIn profile, I post

13   them.  It just got out of hand.  But those are not paid

14   appearances.  I do not pay for those.  I'm against that

15   for me.

16        Q.   In terms of your experience, the experience

17   that you're relying on for purposes of your opinion and

18   your qualifications, why should an employer conduct an

19   investigation of allegations made of workplace harassment

20   by a former employee at the time that the allegations are

21   made?

22        A.   Well, in this case, the allegations implicate

23   conduct relating to current employees.  So for this case,

24   when you have a list of current employees that were

25   involved, then I think it would be incumbent upon the

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 135

1    employer to want to know what happened here vis-à-vis

2    those current employees.

3              With respect to a former employee, obviously

4    you don't know what's going to happen in terms of a legal

5    challenge, and it would depend on the particular

6    investigation.  You know, if the former employee's

7    allegation is "Johnny bullied me because he excluded me

8    from meetings" -- we kind of talked about that before,

9    right?  Facially, that's probably not very serious.  I

10   think someone is going to have to look at that.

11             That's very different, though, dramatically

12   different, from the allegations from Navarro.  And, yes,

13   he's a former employee, but it certainly impacts current

14   employees.  And employers need to know what's happening

15   in their workplace in that context.

16       Q.   Can you identify any way that what you consider

17   to be the deficiencies and inadequacies of the

18   defendants' response to Mr. Navarro's email complaint

19   would have impacted Mr. Navarro himself?

20       A.   I wasn't asked to identify that; so I don't

21   think I can testify to that.

22       Q.   Well, I'm entitled to ask you based on -- as an

23   assessment or indication of your experience, I'm entitled

24   to ask you hypothetical questions.

25       A.   Sure.

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 136

1      Q.   And one of them is that.  Can you identify any
2   way that the deficiencies or inadequacies that you have
3   identified in your report -- strike that.
4           Can you identify any way that the deficiencies
5   or inadequacies, that you've identified in your report,
6   of the defendants' response to Mr. Navarro's
7   post-termination email complaint could have impacted
8   Mr. Navarro himself?
9      A.   If it were to come out that Mr. Navarro's
10  allegations were in fact true and that those multiple
11  employees, including management, that he listed witnessed
12  the conduct, yes, that would have adversely impacted him,
13  the fact that they didn't report it.  Sure.
14     Q.   I'm asking now specifically about the
15  investigation that you are opining about, which is the
16  one made, or not made, as you see it, in response to
17  Mr. Navarro's complaint by email that we marked as
18  Exhibit 8.
19     A.   I understand your question.  Obviously, I can't
20  speak for Mr. Navarro.  So to the extent you're asking me
21  if the investigation had been done to the letter of the
22  law post-termination or had never been done at all, what
23  impact does that have on Mr. Navarro, I can't speak for
24  him.  Certainly, it would not have impacted his
25  day-to-day employment because he wasn't working there

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 137

1   anymore.

2            What it may have done to assuage Mr. Navarro of

3   moving forward with this proceeding, I can't speak to

4   that.  But once we're in the hypothetical world, it's

5   certainly possible that, if he had been emailed and told,

6   "We did this investigation and we determined, yes, there

7   was a problem here, and we've taken some action," that

8   could have assuaged him.  I don't know.  That's all very

9   hypothetical.

10           Would it have impacted his day-to-day work

11  life?  No.  Because he wasn't working there anymore.

12  That's obvious.

13       Q.   So in terms of the adequacy or inadequacy or

14  the sufficiency or insufficiency of the investigation

15  that you are opining about, can you identify what part of

16  Mr. Navarro's case your opinion pertains to?

17           MR. PRATER:  Object to the form.

18       A.   Sitting here right now, I cannot.  That's not

19  what I was asked to do.  I'm not the lawyer on the case.

20  I was asked to opine as to the sufficiency of the

21  investigation.  I suppose I could say that it would go

22  to, you know, sort of overall how HR, I guess, functions,

23  or at least functioned as to Mr. Navarro.

24           But what part of his case it impacts?  That's

25  not really for me to decide.  I was hired to do a job.  I

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 138

1   was given materials to review.  I did that.  I was not

2   asked to -- I understand you're asking me now, but

3   sitting here today, I don't think I have the knowledge

4   base to talk about what part of Mr. Navarro's case it

5   impacts.  Yes, I reviewed materials, but I certainly

6   don't know the case as well as you do or as Mr. Prater

7   knows it.  So I would -- you know, I'm not able to

8   specifically identify the part of the case that the

9   report impacts.

10  BY MR. GABRIELLE:

11       Q.   You are, by virtue of your experience in labor

12  and employment law, familiar with the Faragher-Ellerth

13  affirmative defense?

14       A.   I am.

15       Q.   One component of that defense would be remedial

16  steps taken by an employer, correct?

17       A.   Correct.

18       Q.   Were there any remedial steps that the

19  defendants could have taken in response to Mr. Navarro's

20  email complaint that would have had, in your opinion, any

21  impact on Mr. Navarro?

22            MR. PRATER:  Object to the form.

23       A.   I don't really know what you mean by "impact on

24  Mr. Navarro," because if they had done something

25  different -- I don't know what that something would be --

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 139

1   how would that have affected Mr. Navarro post-employment?

2   I mean, he filed an EEOC charge and ultimately filed a

3   lawsuit.  Would that have assuaged him from doing that?

4   I don't know.  I can't answer that.

5            So the phrase, or the question about impacting

6   Mr. Navarro, I think you have to ask Mr. Navarro that.

7   Would it have impacted Mr. Navarro in his day-to-day

8   work?  The answer would be no, because he didn't work

9   there anymore.

10  BY MR. GABRIELLE:

11       Q.   Okay.

12       A.   But how else it would have impacted him?  I

13  can't answer that.

14       Q.   Is there anything that you understand through

15  your analysis to be part of Mr. Navarro's claims to which

16  you understand your expert opinion is relevant to?

17            MR. PRATER:  Object to the form.

18       A.   Can you rephrase that?  Because I don't

19  understand.

20  BY MR. GABRIELLE:

21       Q.   Sure.  I think you understand I'm exploring, or

22  attempting to explore with you, what fact or issue in

23  dispute in this case your opinion is relevant to.  And I

24  realize that it's not your responsibility to argue or

25  advance the issue of relevance.  But given your

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 140

1    experience and the degree to which you've relied upon it,

2    given the undertaking that you've engaged in here, I'm

3    asking if you can identify any fact or issue, legal

4    issue, in dispute in this proceeding, based on what

5    you're aware of, that you believe your opinion would be

6    relevant to.

7              MR. PRATER:  Object to the form.

8        A.   I mean, I would need to go back through the

9    complaint, you know.  I would need to see all the

10   discovery again, the responses, in order to answer that

11   question accurately.  That can't be answered in a vacuum.

12             And because of my years of experience in the

13   innumerable number of cases I've had in federal court in

14   particular, you're talking about cases taking on their

15   own life, you know.  There's tons of nuances, small

16   facts, things that are provided in discovery, that the

17   lawyers know that I just either, A, am not privy to or

18   certainly don't remember at this point.

19             I understand what you're asking me and I get

20   the question, but to answer it with any degree of

21   accuracy would require a full and complete review of the

22   file, which I have not done, and to be able to pinpoint,

23   you know, anything specific.  You're right, it's not my

24   role to determine the relevance or how, even, my report

25   is going to be used.  That's going to be between the fine

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 141

1   attorneys that are litigating this case, and you're both

2   obviously really good at what you do.

3   BY MR. GABRIELLE:

4        Q.   Is that your expert opinion?

5        A.   Well played.  Touché.

6             Obviously, I mean, you're both obviously very

7   professional and very well qualified, and this has

8   obviously been very professional today.

9        Q.   Have you been formally asked, right up until

10  this point, to do any additional work that you have not

11  yet undertaken as part of your engagement with

12  Mr. Navarro's counsel?

13       A.   Are you asking me if I've been asked to do any

14  additional work?

15       Q.   That you haven't yet done.

16       A.   No, sir.

17            MR. GABRIELLE:  I don't have anything further.

18            MR. PRATER:  I do.  Give me just a moment.  We

19        can go off the record for a minute.

20            (Break from 2:41 p.m. to 2:44 p.m.)

21                    CROSS-EXAMINATION

22  BY MR. PRATER:

23       Q.   Good afternoon, Mr. Elkins.

24       A.   Good afternoon.

25       Q.   You talked and referenced throughout your

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 142

1    deposition here your 23-plus years of experience as a

2    labor and employment attorney.  Can you explain how that

3    experience has shaped or impacted your understanding of

4    the kind of standards for human resources and human

5    resource investigations?

6          A.    Yes.  In the past 23 years, I've seen an

7    innumerable number of these, you know, whether it's

8    hostile work environment, sex harassment, or really any

9    kind of allegations of improper workplace conduct.  I've

10   seen a lot of complaints that are dealt with by

11   employers.  And over my time, I've seen it dealt with in

12   all sorts of ways, some great and some just utterly not

13   good at all, and then varying degrees in between.

14         And so through that, whether it's litigating

15   the issue or dealing with those results in litigation --

16   or a lot of the time, it's not litigation.  A lot of the

17   time, it's client management and consultation of what was

18   done, what we are going to do, how we're going to do it.

19   I've learned and experienced over that 23 years sort of

20   like -- almost like a baseline of what HR should and

21   shouldn't be doing in the context of complaints.  Below

22   that baseline is ignorance.  That's sort of at the bottom

23   level:  "We're not going to do anything.  We're just

24   ignoring complaints."  At the top of the chain is the

25   hiring of the outside independent third party to do a

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 143

1   full-blown investigation.

2           I'll give you an example of a piece of

3   litigation I was involved in that was referred to me by

4   Greenberg Traurig as conflict counsel, because they

5   handled the internal investigation.  There was a

6   complaint of sexual harassment against an employer.

7   There was an internal report generated by -- I don't

8   remember if they were actual counsel or -- they were

9   actual counsel.  You know, they did a great job, and we

10  were able to use the report to resolve the case early on

11  because management had vetted the allegations and was

12  able to show through the memorialized report the

13  sufficiency of what they did.  So they interviewed

14  witnesses.  They talked about those witness interviews.

15  They attached documents, you know, whatever the case may

16  be.  So that's just one example of many.

17          I've had sexual harassment/hostile work

18  environment cases where the employer didn't do anything.

19  I don't remember Ellerth-Faragher being implicated,

20  because I don't remember that being an issue but, like,

21  "This is a problem.  Maybe we should have done

22  something," and they didn't.  Some of those cases

23  resolved pretty quickly absent litigation.

24          So my 23 years is sort of like this

25  all-encompassing mosaic of having dealt with this so many

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 144

1    times.  It's a very big part of being a labor and

2    employment lawyer, particularly defense, and having dealt

3    with it a little bit on the plaintiff side as well.

4           So all of that, that entire lifetime, or

5    20-plus years, of experience is how I -- I use that to

6    conduct my own investigations, and I certainly used it

7    here to analyze what happened here, based on the

8    materials that I have been provided.  I don't know if

9    that answers your question.

10       Q.   In line with that issue, talking about HR best

11   practices and the standard of care which you're referring

12   to, and then in your last response, you talk about the

13   baseline.  I also heard you use the term "reasonable"

14   today.

15          Is the baseline effectively what is a

16   reasonable response from an entity?  Or what are we

17   talking about?

18          MR. GABRIELLE:  Object to form.

19   BY MR. PRATER:

20       Q.   When you talk about standard of care and HR

21   best practices, what do you mean by that?

22       A.   That's fair.  I think it is what would a

23   reasonable HR department do, right.  So you can go

24   extreme.  Ignoring an allegation is not reasonable.  I

25   don't know that anyone is going to dispute that.

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 145

1              On the high-end side, hiring an independent

2     third party to investigate and produce a report, probably

3     pretty reasonable.  Internally investigating and

4     documenting those findings, reasonable.  Internally

5     investigating, in particular this case, with no

6     documentation as to what happened I think is problematic

7     given the particular allegations in this case.  Because,

8     yes, you could support the thoroughness of your

9     investigation through testimony but, as we all know,

10    especially in the world of the law, it's much, much

11    better and reasonable to have your findings in writing.

12         Q.   By "problematic," you mean below the standard

13    of care?

14         A.   Yes.  And I'm not saying that the writing or

15    the memorialization has to be this grand, you know,

16    40-page tabbed opus.  We're talking about a written

17    report that memorializes what happened, as I talked about

18    in my report.

19         Q.   You have seen today and previously

20    Mr. Navarro's email, which was dated May 14th.  That's

21    Exhibit 8.

22         A.   Yes, sir.

23         Q.   And Ms. Pacheco's response to that email.

24              MR. PRATER:  Is there a copy of that up here

25         somewhere?  Thank you, sir.

Navarro v. AutoNation                     Michael Elkins 4/29/2024

Page 146

1  BY MR. PRATER:

2      Q.   You have seen a copy of Mr. Navarro's May 14,

3  2023, email to Ms. Pacheco, "Why I resign," the details

4  and issues we've talked about today, right?

5      A.   Yes.

6      Q.   And you saw Ms. Pacheco's response the next

7  day, May 15, 2023, in which she says, "Please know that

8  AutoNation takes these types of complaints seriously.  I

9  will investigate in store and respond accordingly."

10     A.   Yes, I saw that.

11     Q.   Okay.  And I will represent to you that

12  Mr. Navarro's EEOC charge was filed on June 9th, and that

13  a privilege log produced by the defendants in this matter

14  indicates the only materials being withheld in connection

15  with Mr. Navarro's complaint, other than those generated

16  by counsel of record in this case, is an email dated

17  June 15, 2023.

18          Would you consider the first document, other

19  than Ms. Pacheco's response to Mr. Navarro the day after

20  his complaint -- would you consider the first document

21  generated in connection with Mr. Navarro's complaint

22  being generated a month and a couple of days after his

23  email and after the EEOC charge to be reasonable and fall

24  within the standard of care for HR practices?

25          MR. GABRIELLE:  Objection to the form of the

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 147

1        question.

2        A.    No.  I would expect that there would be

3   documents reflecting the investigatory undertakings of

4   Ms. Pacheco that would predate -- I think you said the

5   June 15th email, right?  Or certainly predate the EEOC

6   charge.

7   BY MR. PRATER:

8        Q.    Would it be reasonable to conduct an

9   investigation into Mr. Navarro's allegations, at a

10  minimum contained in the May 14th email, without

11  interviewing Mr. Carl Vanderwarker?

12       A.    I believe he's named in the email.  So no, I

13  don't think that would be reasonable.  Not interviewing

14  him would not be reasonable.

15       Q.    Just to avoid the double negative --

16       A.    You need to -- let me rephrase.  Any HR

17  investigation would necessitate interviewing

18  Mr. Vanderwarker.

19       Q.    And what about interviewing Mr. Losk?

20       A.    Any HR investigation would necessitate

21  interviewing Mr. Losk.

22       Q.    Why would those interviews be necessitated?

23             MR. GABRIELLE:  Objection to form.

24       A.    Those individuals, I believe, were plaintiff's

25  supervisors in some form or fashion.  Certainly senior.

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 148

1   They are identified in the May 14 email as individuals

2   who witnessed the alleged problematic conduct; so of

3   course they should be spoken to.

4   BY MR. PRATER:

5       Q.   You testified earlier regarding the systemic

6   culture that you said was implicit in Mr. Navarro's

7   email.  Do you recall that?

8       A.   Yes.

9       Q.   Beyond what a layperson may or may not

10  recognize when reading Mr. Navarro's letter, do you have

11  an opinion on whether human resources professionals

12  should be recognizing from Mr. Navarro's email a

13  potential systemic cultural issue?

14      A.   Yes, I have an opinion on that, and it is that

15  they should recognize that culture in general is a huge

16  part of employee relations in general.  But one of the

17  major issues that employers face is, or could be, a

18  possible culture that condones behavior that could be

19  problematic.

20           So yes, I would expect that HR professionals

21  can identify complaints that might impact overall

22  workplace culture and understand that some allegations,

23  particularly the ones here in this case, again, at least,

24  are alluding to or implying that there is some sort of

25  culture that is allowing the behavior.  Not commenting on

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 149

1    the sufficiency but more commenting on identifying the

2    issue and looking into it to see if it's real or not.

3         Q.   And being able to identify those issues, that's

4    something that professionals should have the capability

5    of doing?

6              MR. GABRIELLE:  Objection to the form of the

7         question.

8         A.   HR professionals should have the capability of

9    doing that, yes.

10   BY MR. PRATER:

11        Q.   Do you think that that capability is something

12   that laypeople should also have, or is that a

13   professional skill?

14             MR. GABRIELLE:  Objection to form.

15        A.   I mean, look, I can't speak for everybody.

16   It's the same answer a little bit as to earlier.  But,

17   yes, I don't think it's so obvious that you'd expect a

18   layperson to pick up on that.  I think people working in

19   HR that have experience in HR should understand that

20   issue, which is, I believe, a lot different than a

21   layperson, who might be administrative in nature but not

22   have experience in human resources.

23   BY MR. PRATER:

24        Q.   If a member of management witnessed the conduct

25   alleged by Mr. Navarro, do you think that should have

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 150

1    triggered reporting an investigation?

2         A.   Yes.

3         Q.   Why?

4         A.   Well, the conduct alleged by Mr. Navarro is

5    obviously, as we talked about earlier, serious conduct.

6    Putting aside AutoNation's policies, I mean, it's

7    seriously problematic conduct, and if management sees

8    that, they should not be sitting by and allowing that to

9    happen.  So they should have reported it, and once it's

10   reported, it needs to be investigated.

11        And that's not solely limited to the fact that

12   AutoNation has a policy on that.  That's just

13   contextually important relative to the employment

14   discrimination laws we have set up here in Florida and

15   federally, Title VII.

16        Q.   And how does that reporting and investigation

17   that you just talked about there -- where does that fall

18   into the standard of care with respect to human

19   resources?  Is that in line with it?  At the high end?

20   Is that a minimum threshold?

21        A.   I mean, it's a minimum --

22             MR. GABRIELLE:  Objection to form.

23        A.   A minimum threshold of reporting.

24   BY MR. PRATER:

25        Q.   So where does that reporting and investigation

Navarro v. AutoNation                    Michael Elkins 4/29/2024

                                                        Page 151

1    process you just identified fall within the spectrum of

2    the standard of care that we've been discussing?

3               MR. GABRIELLE:  Same objection.

4         A.    I think investigating workplace complaints,

5    thoroughly investigating them, properly documenting them,

6    is part of the basic standard of care and part of a

7    reasonable -- the function of a reasonable HR person.

8               MR. PRATER:  Okay.  I don't have anything else.

9               MR. GABRIELLE:  Brief redirect, please.

10                    REDIRECT EXAMINATION

11   BY MR. GABRIELLE:

12        Q.    Were you engaged to opine as to whether or not

13   human resource professionals should have the capability

14   to identify when there is a systemic culture that would

15   be problematic for the employer?

16        A.    It's not in the scope of my engagement.

17        Q.    So you were comfortable giving an opinion on

18   cross-examination that was outside the scope of your

19   engagement?

20              MR. PRATER:  Object to the form.

21        A.    Yes.  Yes.

22   BY MR. GABRIELLE:

23        Q.    Did you undertake any particular study during

24   the time frame between the direct examination and the

25   cross-examination to give that opinion?

Page 152

1        A.   I did not.

2        Q.   Ultimately, sir, is what you're really opining

3   to here whether or not, at various points and at various

4   levels, the dealership or AutoNation, Inc. met or failed

5   to meet a standard of care?

6             MR. PRATER:  Object to the form.

7        A.   I'm not ignoring you.  I'm processing.  Can you

8   ask me that again, please?  I'm sorry.  I'll listen more

9   carefully.

10  BY MR. GABRIELLE:

11       Q.   Sure.  You were asked multiple times during the

12  cross-examination about a standard of care.  Is

13  ultimately what you are opining to here whether or not

14  the dealership or AutoNation or both together failed to

15  meet a standard of care for human resource practices?

16            MR. PRATER:  Object to the form.

17       A.   As to the situation with Mr. Navarro and the

18  investigation and any documentation of said

19  investigation, I think that falls below the standard of

20  care of human resources practices as I've come to learn

21  and have experienced based on my 23 years of practice as

22  a labor and employment attorney representing management.

23  BY MR. GABRIELLE:

24       Q.   So ultimately, what you are opining to, based

25  on your experience and the analysis you've made, is

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 153

1    whether or not the standard of care was or was not met

2    for human resource practices in this case?

3              MR. PRATER:  Object to the form.

4        A.   Limited to the scope of what's in my report.  I

5    mean, my report has my opinion and it has what I'm

6    opining on.  I don't think it's a general -- I mean,

7    "human resources practices" in this case is a very kind

8    of broad terminology.  I'm not opining on the sufficiency

9    of AutoNation's policies, you know.  That could be part

10   of that.  So I think my opinion is stated in my report

11   and as I testified to earlier.

12   BY MR. GABRIELLE:

13       Q.   So as to the matters encompassed by your

14   report, is ultimately what you are opining to as to those

15   matters whether or not the defendants here met or failed

16   to meet the standard of care?

17       A.   Again, my opinion is stated in my report, and

18   that's what -- that's what I'm relying on.

19       Q.   On cross-examination, multiple times, you were

20   asked a question about standards of care.

21       A.   Yes.

22       Q.   So I need to understand what standard of care

23   it is that you are opining about.

24            MR. PRATER:  Object to the form.

25       A.   I've testified to that earlier, that this is

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 154

1    based upon my 23 years as a labor and employment defense

2    lawyer and what I have come to learn and have experienced

3    that I would expect human resources professionals to do

4    in specific circumstances.  I've been given a specific

5    circumstance in this case, which we're all well aware of,

6    and I reviewed specific materials that I was provided.

7    Based on my review of those materials and the specific

8    facts of this case, I opined as stated in my report.

9    BY MR. GABRIELLE:

10       Q.   And as stated in your report, as explored on

11   cross-examination, are you opining as to whether or not

12   any specific standards of care have not been met?

13       A.   Again, my report speaks for itself as to what

14   my opinion is.  You've repeated the question.  I hear

15   you.  But my report speaks for itself on that.  I've

16   opined as to specifically what I think was not done

17   correctly here.  That's another way of saying it.

18       Q.   Mr. Elkins, on cross-examination, you opined to

19   a number of things that were not contained within your

20   report.

21       A.   And you asked me about them.

22            MR. PRATER:  Object to the form.

23            THE WITNESS:  I'm sorry?

24            MR. PRATER:  There's no question pending.

25   ///

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 155

1   BY MR. GABRIELLE:

2        Q.   Are you opining as to standards of care in this

3   case?  If so, what are they?

4             MR. PRATER:  Object to the form.

5        A.   I am opining as to what is in my report.  I am

6   not going to opine outside of that.

7   BY MR. GABRIELLE:

8        Q.   So anything that you opined to today that was

9   outside your report is not part of your expert opinion in

10  this case?

11       A.   Well, I was asked on cross-examination about

12  what I would expect HR professionals to know, I think

13  specifically about -- I forget the specific reference

14  now.  I think you asked me about it earlier.  What was it

15  again?

16       Q.   You were asked multiple times about standards

17  of care.  You acknowledge that.  It was only a few

18  minutes ago, correct?

19       A.   I do.

20       Q.   Are you opining as to standards of care that

21  are outside the scope of your report?

22       A.   I'm not opining as to what's outside the scope

23  of my report.

24       Q.   So the testimony that you gave on

25  cross-examination as to the questions that were posited

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 156

1    to you on standards of care, is that testimony part of

2    your opinion in this case?

3         A.   I would certainly need to see the testimony.

4    I'm not necessarily sure that the questions that were

5    asked fall completely outside the scope of my report.  I

6    was asked something about what HR professionals should

7    know, but I can't -- I know it was not long ago, but I

8    don't remember the specifics of what that was.  And you

9    asked me if it was outside my report, and I think I said

10   that it was.

11            But as to the rest of it, I would need to read

12   the testimony and see it before I could answer that

13   accurately.  And I don't remember the specific thing that

14   was asked.  I know it was something about what HR

15   professionals should know.  I think it was relating to --

16   well, I don't want to speculate.

17        Q.   Well, the question had to do with systemic

18   culture.

19        A.   Yes.  Thank you.

20        Q.   You were asked a question about whether HR

21   professionals should have the capacity in general to

22   identify when that systemic culture was present, and you

23   indicated, in sum and substance, yes.

24            MR. PRATER:  Object to the form.

25        A.   I think what the question was -- but we

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 157

1   certainly have a record -- was could HR professionals

2   identify when there might be a complaint that would

3   implicate potential systemic cultural issues.  I think

4   that's what I was asked.  And I think HR professionals

5   should be able to identify that.

6           I don't think that that's some dramatic leap

7   from what's in my opinion, nor is that something that

8   would be outside the scope of my years of experience as a

9   labor and employment lawyer.  HR professionals certainly

10  are the ones, oftentimes but not always, that are the

11  frontline receivers of complaints, and they need to

12  identify the severity and scope of those complaints.

13          So I think it's entirely reasonable and

14  appropriate for me to testify that, yes, HR professionals

15  should be able to spot complaints that imply or might

16  impact an issue relating to culture in the workplace so

17  they can figure out if there is a cultural issue

18  happening.  It doesn't mean that there is one.  It's just

19  something they should be able to look at.

20          In this case, again, the issue is that I

21  certainly did not see, nor was I provided, any

22  documentation showing any investigation.  I understand

23  that Ms. Pacheco's deposition has not been taken yet, but

24  one of the problems that I opined about or determined was

25  that Mr. Navarro's email complaint impliedly alleges that

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 158

1    there was, at least in some way, however you want to

2    describe it, acceptance of the conduct he alleges was

3    going on.  I don't know if that conduct was going on.

4    Somebody should have investigated it.

5    BY MR. GABRIELLE:

6        Q.   Are you rendering an expert opinion as to what

7    Mr. Navarro's email complaint impliedly alleges?

8        A.   You asked me that earlier, and I said no.

9        Q.   Okay.  Are you prepared to indicate in your

10   testimony now whether or not you are opining as to any

11   specific standard of care within the scope of your

12   opinion?

13       A.   I think I've already testified to that multiple

14   times today.

15       Q.   To close this out, what specific standards of

16   care do you contend were not met?

17       A.   The standard of care for a reasonable HR

18   person, which I have learned and applied based upon my

19   23 years of experience as a labor and employment defense

20   lawyer, which includes innumerable -- defending employers

21   in innumerable cases involving claims of not only hostile

22   work environment or sexual harassment but run-of-the-mill

23   employment discrimination, as well, which could also be

24   investigated, as well as my role consulting with clients

25   on a day-to-day basis relating to workplace complaints,

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 159

1   my role as an independent third-party investigator, as

2   well as investigating as a lawyer for a client,

3   investigating complaints or assisting in those complaints

4   or guiding HR in those complaints or answering HR's

5   questions as HR is conducting those investigations, which

6   I've done for two-plus decades.

7           So that's where the information comes from.

8   That's what I've developed through my knowledge over the

9   two-plus decades, what I think HR should and/or should

10  not do, depending on the specific circumstances.

11      Q.   And what you've just now summarized is what you

12  referred to as "the all-encompassing mosaic," correct?

13      A.   I believe I've used that term a number of times

14  today, yes.

15      Q.   Most recently in cross-examination.

16          MR. PRATER:  Object to the form.

17      A.   Most recently.

18  BY MR. GABRIELLE:

19      Q.   Ultimately, sir, based on what you just

20  described, the standard of care that you are applying

21  here is your own standard of care; is that correct?

22      A.   I wouldn't agree with that.

23          MR. PRATER:  Object to the form.

24          THE WITNESS:  I'm sorry.

25      A.   I wouldn't agree with that.  I think that it's

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 160

1   not Michael Elkins's standard.  It's what I've seen over

2   the years in the law as what has been problematic for

3   employers or what has worked for employers.

4          I don't think this is like a mystery, either.

5   I think the idea that human resources needs to

6   investigate complaints is on solid ground.  I think the

7   idea that not all HR complaints fall into the same

8   category or are not the same is not unique.  I think the

9   idea that when you have allegations that are very

10  serious -- and we could quibble about the term "very

11  serious," but at the end of the day, I think

12  Mr. Navarro's allegations are that -- that HR should

13  investigate and there should be some memorialization of

14  that investigation.

15         I don't think that that's Michael Elkins's

16  standard of care.  I think that that's something that

17  seasoned labor and employment attorneys would know

18  throughout their years of practice as something that

19  should happen.

20         Now, obviously, you know, there's different

21  situations and different issues with every case.  So as

22  we talked about earlier, this is not paint by number.  So

23  I don't think it's Michael Elkins's standard of care.

24  BY MR. GABRIELLE:

25     Q.  But it's not anything you can identify from any

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 161

1    other source?

2         A.   As we talked about earlier.  And, yes, there's

3    no third-party source that I relied on.  I didn't use a

4    treatise.  I didn't use some other document.  You've

5    asked me that a number of times, and obviously the answer

6    to that is no.  I have not used some other source.

7              MR. GABRIELLE:  Okay.  Nothing further.

8              MR. PRATER:  All right.  He will read.

9         (The reading and signing of this deposition was

10   not waived by the witness.)

11             (Deposition concluded at 3:12 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 162

1                    CERTIFICATE OF REPORTER

2

3            I, STEFANIE MENSCH, Florida Professional

4    Reporter, certify that I was authorized to and did

5    stenographically report the deposition of MICHAEL L.

6    ELKINS, ESQUIRE, pages 1 through 161; that a review of

7    the transcript was requested; and that the transcript is

8    a true and complete record of my stenographic notes.

9            I FURTHER CERTIFY that I am not a relative,

10   employee, attorney, or counsel of any of the parties, nor

11   am I a relative or employee of any of the parties'

12   attorney or counsel connected with the action, nor am I

13   financially interested in the action.

14

15           DATED this 12th day of May, 2024.

16

17

18            _____

              Stefanie Mensch, FPR
19            Florida Professional Reporter

20

21

22

23

24

25

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 163

1                        CERTIFICATE OF OATH

2

3      THE STATE OF FLORIDA:

4              SS.

5      COUNTY OF PALM BEACH:

6

7                    I, STEFANIE MENSCH, Florida Professional

8      Reporter, Notary Public, State of Florida, certify that

9      MICHAEL L. ELKINS, ESQUIRE personally appeared before me

10     and was duly sworn on April 29, 2024.

11                    Signed this 12th day of May, 2024.

12

13

14

15

16

17     _____

                      STEFANIE MENSCH, FPR
18                    Notary Public, State of Florida
                      Commission No.:  HH243700
19                    Commission Expires:  July 21, 2026

20

21

22

23

24

25

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 164

1   May 13, 2024

2

    c/o Christopher Prater, Esquire
3       cprater@pollardllc.com

4   IN RE:     Juan Navarro vs. Hollywood Imports Limited
    CASE NO.:  23-61772-CIV-SMITH
5

6   This letter is to advise that the transcript for the
    above-referenced deposition has been completed and is
7   available for review.  Please contact our office at
    (561)213-1464 to make arrangements for reading and
8   signing, or sign below to waive review of this
    transcript.

9
    It is suggested that the review of this transcript be
10  completed within 30 days of your receipt of this letter.

11  The original of this transcript has been forwarded to the
    ordering party, and your errata, once reviewed, will be
12  forwarded to all ordering parties for inclusion in the
    transcript.

13
    Sincerely,

14

15

16

17
    Stefanie Mensch, FPR
18  Florida Professional Reporter

19  Class Action Court Reporters
    640 Clematis Street
20  Suite 3246
    West Palm Beach, FL 33402

21

22  I do hereby waive my signature.

23  _____

24  MICHAEL L. ELKINS, ESQUIRE

25

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 165

```
 1                        ERRATA SHEET
            DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE
 2        IN RE: JUAN NAVARRO v. HOLLYWOOD IMPORTS LIMITED
                   CASE NO. 23-61772-CIV-SMITH
 3            WITNESS:  MICHAEL L. ELKINS, ESQUIRE
                   TAKEN:  APRIL 29, 2024
 4
        PAGE     LINE        CHANGE           REASON FOR CHANGE
 5      _____

 6      _____

 7      _____

 8      _____

 9      _____

10      _____

11      _____

12      _____

13      _____

14      _____

15      _____

16      _____

17      _____

18      _____

19      _____

20      _____

21      _____

22      Under penalties of perjury, I declare that I have read
        the foregoing document and that the facts stated in it
23      are true.

24
        _____        _____
25      Date                     MICHAEL L. ELKINS, ESQUIRE
```

Navarro v. AutoNation

Michael Elkins 4/29/2024

Page 166

| A | | | | |
|---|---|---|---|---|
| **a.m** 1:15 45:25 45:25 | **acted** 26:20 32:16 63:22 124:25 127:1 | 136:12 | 22:11 23:7,18 23:24 24:25 | 39:10,11,13 43:21 44:19 |
| **abbreviation** 98:3 | **acting** 31:12,13 33:2 | **advice** 126:5 **advise** 124:15,20 164:6 | 26:3,6 30:11 30:24 31:23 | 47:15 50:25 51:5,12,25 |
| **abbreviations** 75:20 | **action** 109:17,21 110:7,9 111:20 | **advised** 126:3 **affect** 51:14 | 38:19 39:19,20 39:22 40:6,8 | 58:6 61:19 63:15,20 64:10 |
| **ability** 115:10 | 112:8,12,13,19 | 126:20 | 40:21 41:1,12 | 65:3 66:15 |
| **able** 12:19 24:11 | 137:7 162:12 | **affirm** 4:3 | 41:18,20,21 | 68:25 69:8 |
| 34:16 60:1 | 162:13 164:19 | **affirmative** | 42:21,24 43:3 | 72:5 85:8 |
| 75:17,18 | **actionable** 20:24 | 138:13 | 43:11,15,18,22 | 86:14 87:2 |
| 100:23 138:7 | 72:19 | **afraid** 99:6 | 44:12,24 45:1 | 90:1 94:8 98:4 |
| 140:22 143:10 | **active** 44:1 | **afternoon** | 47:11,13 48:25 | 99:1 103:10 |
| 143:12 149:3 | **actual** 9:18 | 141:23,24 | 49:12 52:1,6 | 128:14 148:2 |
| 157:5,15,19 | 143:8,9 | **ago** 11:8 26:4,4 | 52:14,23 55:21 | 149:25 150:4 |
| **above-referen...** | **add** 78:6 123:13 | 155:18 156:7 | 64:17,18,20 | **allegedly** 93:1 |
| 164:6 | **addition** 97:24 | **agree** 72:4 77:11 | 65:12 81:23,25 | **alleges** 86:5 |
| **absence** 16:13 | **additional** | 77:16,25 78:1 | 82:3,6,25 84:8 | 87:17 98:1,5 |
| 45:3 | 123:12 126:20 | 78:10,12 90:22 | 84:9,9 85:2,4,7 | 99:2,24 103:11 |
| **absent** 18:9 | 126:22 141:10 | 104:20 105:11 | 85:7,13,14,21 | 104:23 157:25 |
| 143:23 | 141:14 | 108:14 111:14 | 86:2 87:4,6,8 | 158:2,7 |
| **absolutely** 39:20 | **Additionally** | 111:18 116:11 | 87:19 88:13,15 | **alleging** 64:20 |
| 69:13 123:16 | 66:2 | 118:10 125:11 | 89:24 91:13 | 101:4 |
| **acceptance** | **adequacy** 18:21 | 125:16 126:2 | 92:12 93:13 | **allow** 11:7 42:10 |
| 158:2 | 32:21 61:25 | 128:25 129:10 | 95:11 97:4 | 100:1 |
| **accepted** 123:5 | 63:11 137:13 | 159:22,25 | 98:9,21 99:2 | **allowed** 99:12 |
| 123:24,25 | **adequate** 32:23 | **agreed** 54:21 | 99:18 101:8,10 | 100:10 101:5 |
| 127:5 | 61:23 63:22 | 61:3,4 105:1 | 101:11,24 | 102:17 |
| **accepting** 40:9 | 78:2 95:21 | 128:13 | 102:2,8 103:13 | **allowing** 98:15 |
| **account** 129:2 | **adjudicated** | **ahead** 121:7 | 107:7,22 | 148:25 150:8 |
| 129:11 130:14 | 11:22 | **aid** 41:9 | 115:24 116:17 | **allows** 98:4,7 |
| 130:25 131:7 | **administered** | **Ale** 47:15,24 | 117:14 120:1 | **alluding** 148:24 |
| **accredited** 76:18 | 4:3 | 48:15 50:14,25 | 121:11 123:6 | **alternative** 8:22 |
| **accuracy** 140:21 | **administrative** | 51:25 | 124:1 127:6 | **American** 76:14 |
| **accurate** 79:13 | 149:21 | **algebra** 96:22 | 128:2,11 | **amorphous** |
| 79:24 90:11 | **admissibility** | **ALHADEFF** 2:7 | 130:15 134:19 | 37:15 96:23 |
| 92:13 | 11:23 | **alike** 23:18 | 134:20,22 | 99:14,21 |
| **accurately** | **admission** | **all-encompass...** | 135:12 136:10 | **amount** 42:9,9,9 |
| 140:11 156:13 | 129:18 130:2 | 143:25 159:12 | 142:9 143:11 | 49:3 |
| **achieved** 75:11 | **admitted** 129:8 | **allegation** 47:15 | 145:7 147:9 | **amounts** 12:25 |
| **acknowledge** | 129:17 130:1 | 53:11 83:3,10 | 148:22 160:9 | **analysis** 18:24 |
| 99:21,22 | **adopting** 82:13 | 86:23 87:15 | 160:12 | 19:6,13,20 |
| 155:17 | **advance** 7:5 | 89:19,20 98:10 | **alleged** 19:3,10 | 20:20 21:3,9 |
| **Act** 71:22 72:17 | 13:24 139:25 | 99:23 110:12 | 19:17,21,25 | 21:17 34:10 |
| 73:4 | **adversely** | 135:7 144:24 | 20:24 24:6 | 40:25 91:5 |
| | | **allegations** | 28:4 29:3,6 | 94:20 116:2,7 |

Navarro v. AutoNation

Michael Elkins 4/29/2024

Page 167

126:10,13,15
126:16,25
139:15 152:25
**analyze** 38:12
118:3,7 144:7
**analyzed** 18:20
91:12
**analyzing** 37:4
37:12 95:19
**and/or** 67:16
159:9
**anonymous**
54:10,11
**answer** 5:12,14
22:2 37:2
45:17 47:4
60:22 76:20
97:10 101:17
113:1,18
128:22 131:4
139:4,8,13
140:10,20
149:16 156:12
161:5
**answered**
140:11
**answering** 159:4
**answers** 45:20
121:21 144:9
**Antonio** 29:6
**anybody** 54:7
55:9
**anymore** 137:1
137:11 139:9
**anyone's** 108:21
**apologies** 20:13
57:23 104:10
**apologize** 7:5
16:6 102:25
113:7
**appear** 111:24
**appearance**
133:22 134:2
**appearances** 2:1
2:6 132:10

133:4,7 134:5
134:14
**appeared** 30:16
163:9
**appearing** 6:16
**appears** 119:12
**application**
97:19
**applied** 36:19
89:7 158:18
**apply** 21:20
35:15 56:1
88:3 113:23
114:13
**applying** 87:2
92:1 95:8
119:18 159:20
**appreciate** 35:21
103:3
**approach** 34:10
36:20
**approaches**
114:2
**appropriate**
40:7 69:6,14
157:14
**approximately**
4:25 11:8 22:3
47:9
**April** 1:14 9:23
127:23 128:5
130:5,6 163:10
165:3
**arbitration** 25:9
27:7
**area** 73:18 95:10
**argue** 139:24
**arrangements**
164:7
**arrive** 78:3
**arriving** 79:22
**arrogant** 134:3
**article** 30:16
132:16
**articles** 133:15

133:18
**aside** 150:6
**Asim** 58:17,21
59:3 61:6
**asked** 5:19 6:24
68:13,16 75:13
77:16 101:14
101:14,23
102:1 108:22
109:4 123:3
124:10 126:12
135:20 137:19
137:20 138:2
141:9,13
152:11 153:20
154:21 155:11
155:14,16
156:5,6,9,14
156:20 157:4
158:8 161:5
**asking** 5:21 6:4
21:24 23:8
25:21 27:17
31:16 32:14
34:21 43:2
44:19 62:19
77:23 85:17
90:3 95:3
105:22 110:14
122:23 123:2
136:14,20
138:2 140:3,19
141:13
**asks** 7:15,23 8:6
8:14
**ass** 83:5,13 85:5
86:23 93:2
**assault** 39:12
**asserted** 126:2
126:23
**assertion** 126:9
126:11 127:22
**assessment**
135:23
**assisting** 159:3

**associate** 26:5
26:20 32:9
**Association**
55:18 76:15
**assuage** 137:2
**assuaged** 137:8
139:3
**assume** 80:21
82:20
**assumes** 107:21
**assuming** 9:11
107:6
**assumptions** 8:9
8:17
**attached** 65:11
143:15
**attaching** 109:14
110:19 111:22
**attempt** 22:2
**attempted** 76:8
**attempting**
139:22
**attention** 30:15
57:21
**attitudes** 92:18
**attorney** 22:3,5
22:11 24:4
25:14 31:5
33:8 35:9 36:7
36:12 73:2
84:6 86:17
91:20 94:15
95:8 101:2
113:21 118:2
142:2 152:22
162:10,12
**attorney's** 12:18
13:3
**attorney-client**
22:25 23:3,11
25:15,17 31:14
31:18
**attorneys** 141:1
160:17
**attributed** 59:14

**authentic** 130:2
**authenticity**
127:21
**authored** 132:15
132:16,21
**authority** 74:10
**authorized**
162:4
**authorship**
132:22
**automatically**
108:16
**AutoNation** 1:7
17:12 67:8
68:22 69:5,11
70:12 71:17
74:6 146:8
150:12 152:4
152:14
**AutoNation's**
66:23 67:20
68:4 69:20
70:15 150:6
153:9
**available** 33:18
38:25 96:15
164:7
**avoid** 128:22
147:15
**aware** 11:25
18:6 25:7
34:22 42:12
46:18 53:24
54:3,5,6 55:1
57:9 78:24
91:18 95:22
96:10 104:3,13
104:22 105:2
106:7 108:7
114:17 120:12
120:16,17,23
121:2,18 122:9
122:11,20
130:17 140:5
154:5

Navarro v. AutoNation                    Michael Elkins 4/29/2024

**B**

**b** 8:25
**back** 13:24 32:5
  65:23 73:8
  81:2,4 82:2
  92:15,20 93:2
  114:24 131:24
  140:8
**background**
  34:16 84:3
**Baez** 43:17 44:6
  44:9 56:11,14
  130:17
**Baez's** 130:24
**Bar** 4:15 76:14
  76:18
**base** 22:14 59:12
  138:4
**based** 22:9 24:21
  25:4 27:25
  28:13,17,20
  33:10,19 34:2
  36:4,6 39:1
  41:22 45:12
  52:16 56:2,3
  56:15 58:12
  59:6,10 62:7
  62:12 63:23,25
  64:2,16 69:6
  71:4 72:10,15
  72:24 73:1
  78:21 80:8,10
  80:12 88:23
  92:5 94:13
  95:6 100:8,22
  102:7 105:15
  108:10 111:25
  119:1,11
  125:23 128:9
  128:24 135:22
  140:4 144:7
  152:21,24
  154:1,7 158:18
  159:19
**baseline** 142:20

142:22 144:13
  144:15
**basic** 5:10 151:6
**basically** 48:17
**basis** 35:13 38:7
  90:9 158:25
**batteries** 83:15
**battery** 39:12
  40:21 41:1
  83:15 84:8
  86:6,8,16,20
  86:25 87:1,8
  87:10,18,19
  89:20 97:25
**Beach** 163:5
  164:20
**bear** 15:18 62:15
  62:18,21 65:4
  107:19 126:15
  126:25
**beared** 50:5
  126:16
**bearing** 125:12
  125:17
**beginning** 5:12
  9:23 38:9
**begins** 121:15
**behalf** 12:7
  46:22
**behavior** 98:4
  98:25 99:1
  102:17 148:18
  148:25
**belaboring**
  96:13
**believe** 11:1,5
  14:11 18:10
  19:18 25:5
  26:5 27:9
  39:15,19 41:17
  43:15,17 47:23
  49:15 54:12
  64:3 66:10,13
  66:16 67:7,14
  68:22 73:9,22

104:25 117:5
  120:23 121:8
  123:18 127:14
  131:19 140:5
  147:12,24
  149:20 159:13
**Benevolent**
  55:18
**best** 37:1 55:3
  66:4,8,24
  67:18 68:3,9
  69:17 70:5,8
  72:10 74:4
  91:22 102:3,5
  113:6,15,16
  144:10,21
**better** 145:11
**beyond** 34:19
  85:24 94:8
  100:2 148:9
**Bibi** 14:21
  119:19 120:17
**Bickram** 14:21
  16:21 18:5
  20:1 56:15
  66:12 96:2
  105:8 112:5
  115:15 116:10
  117:2,15 118:6
  119:12,19
  120:11,17,20
  121:10,21
  122:22 123:5
  123:13,18,21
  125:6 126:23
  127:1
**Bickram's** 115:6
  116:12,25
  119:12 120:5
  121:8 122:10
  122:19 124:21
**big** 42:20 144:1
**billing** 9:18
**bit** 21:22 37:15
  63:5 117:8

123:15 125:2
  144:3 149:16
**bizarre** 94:12
**board** 76:5,8,20
**bottom** 109:8
  132:10 142:22
**Boulevard** 2:3,8
**breadth** 35:5
  42:6 84:9
**break** 6:8 22:23
  23:20 45:25
  74:22 75:1,1
  77:6,9 114:23
  131:22 141:20
**Brief** 151:9
**brightline** 34:21
**bring** 40:25
  94:16
**bringing** 84:1
  87:24
**broad** 108:19
  153:8
**broadly** 108:24
  108:24
**brought** 7:20 8:3
  8:11,19,24 9:3
  9:7,12,15
**Broward** 26:7
  26:20,21 32:10
**bullied** 88:12
  135:7
**bullying** 90:18
**bunch** 75:14
**Business** 133:2,8

**C**

**c** 8:25
**c/o** 164:2
**calculating** 99:5
**call** 18:12 23:21
  47:14 60:9
  88:8 92:19
**called** 47:23
  92:20 108:8
**capability** 149:4

149:8,11
  151:13
**capacities** 31:10
**capacity** 5:16
  10:8 12:14
  24:4,4 25:19
  25:22 31:11,23
  32:16 33:3,8
  40:20 97:14,18
  156:21
**captain** 29:6,8
  29:23 30:25
  31:21 46:3,8
  46:21 47:1,8
  47:12,17,19
  48:5,11 49:16
  50:9 51:4,13
  52:21 53:2
  54:6,7
**care** 66:5,9,24
  67:19 68:3,10
  69:18 70:6,8
  72:11 74:5
  89:7 102:3,5
  118:25 144:11
  144:20 145:13
  146:24 150:18
  151:2,6 152:5
  152:12,15,20
  153:1,16,20,22
  154:12 155:2
  155:17,20
  156:1 158:11
  158:16,17
  159:20,21
  160:16,23
**career** 5:5 22:4
  22:21 32:12
  35:12
**careful** 48:13
  50:22
**carefully** 112:21
  152:9
**cares** 84:20
**Carl** 14:20 59:7

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 169

59:21 60:7,13
147:11
**Cary** 17:14
61:11,22
121:25 122:11
**case** 1:2 10:13
10:23,24 11:3
11:3,14,17,21
12:3,13 13:4,4
13:8,9,19
14:11,20 16:18
19:3,10,17,25
20:24 21:7,21
22:14 30:15
34:2 37:1 38:3
39:3,7,19
40:18 42:4
43:11,20 47:5
56:23 62:4,9
62:25 63:1
64:14 65:5,19
68:19 69:4
77:9 80:18
85:15 92:6
94:18 96:6
101:15,23
102:23 107:6
107:15 109:2
111:9,9,25
114:18 117:14
126:13,17
127:20 128:20
128:20,21
130:19 134:22
134:23 137:16
137:19,24
138:4,6,8
139:23 141:1
143:10,15
145:5,7 146:16
148:23 153:2,7
154:5,8 155:3
155:10 156:2
157:20 160:21
164:4 165:2

**case-by-case**
90:9 96:24
**cases** 12:19 36:8
38:5 140:13,14
143:18,22
158:21
**categories** 7:13
14:16 22:23
**category** 8:4,12
8:20,25 9:4,8
9:12,13,16,16
9:17,22 14:6
25:14 31:13,17
83:9,16 160:8
**cause** 4:4
**causes** 86:1
**ceiling** 24:12
**certain** 5:19
18:17 23:7
30:21 38:25
48:21 66:4
69:16 70:4
71:3 75:23
91:9 101:9
**certainly** 11:6
15:22 24:10,12
24:13 30:21
31:4 34:15,22
37:9 39:5 40:1
40:13 43:25
45:11 50:18
51:21 53:17
58:14 63:17
64:6 66:18
69:12 71:20
73:12,21 83:12
84:12 86:21
91:18 92:12
96:5 97:9
100:23 102:5
106:19 111:12
111:17 112:21
120:6 121:3
123:11 125:23
128:15,17

131:13 135:13
136:24 137:5
138:5 140:18
144:6 147:5,25
156:3 157:1,9
157:21
**certificate** 3:11
3:12 76:3
162:1 163:1
**CERTIFICA...**
3:9
**certification**
76:11,18,20
**certifications**
75:11,16,19,19
75:20,23 76:1
**certified** 76:5,9
76:14,17
**certify** 162:4,9
163:8
**chain** 129:7
142:24
**challenge** 11:25
12:2 135:5
**change** 45:19
47:6 124:8
127:2 165:4,4
**CHANGES**
165:1
**characteristic**
56:4
**characterize**
82:25
**characterizing**
90:4
**charge** 80:24
123:20 124:5
124:24 125:8
139:2 146:12
146:23 147:6
**chart** 91:15
**check** 29:17
96:18,25
**checking** 97:5
**chose** 99:16

**Chris** 6:9
**Christopher** 2:2
164:2
**circumstance**
110:11 154:5
**circumstances**
117:12 154:4
159:10
**cite** 121:12
**cited** 105:6
**civil** 71:22 72:17
73:3 86:10
**claim** 24:20 25:8
27:16,21,24,25
28:12 33:10
126:2,9,22
127:10,14
**claimants** 94:9
**claimed** 48:21
**claims** 15:16
27:19 36:11,11
49:11 139:15
158:21
**clarify** 45:19
**Class** 164:19
**clear** 9:17,20
19:19 20:9
27:14 28:21,22
31:9 33:16
37:24 38:11
47:22 56:18
103:20
**clearer** 21:22
**clearly** 31:9
**Clematis** 164:19
**client** 23:7,21
35:9 142:17
159:2
**clients** 22:12
75:8 158:24
**close** 32:5
158:15
**closes** 94:9
**Code** 10:1
**collectively** 49:2

**College** 26:7,20
26:21 32:10
**come** 67:8 98:6
104:5 112:22
136:9 152:20
154:2
**comes** 36:8
37:25 71:19
90:5 91:19
117:22 159:7
**comfortable**
17:18 18:8
24:11 57:5
151:17
**comment** 126:8
**commenting**
148:25 149:1
**Commission**
76:24 77:2
163:18,19
**common** 84:2
**communicated**
56:7,10
**communication**
99:25,25
129:14
**communicatio...**
7:16,24 8:7,15
44:15,18 45:4
52:5,20,21
53:1,2 65:3,10
100:6,6,12
124:16,24
125:9,13 126:4
126:10 128:14
**community**
114:1
**company** 93:15
94:17 111:12
123:18
**company's** 67:2
**comparable**
10:1,2 34:4
113:23
**compare** 70:18

Navarro v. AutoNation

Michael Elkins 4/29/2024

86:15 114:15
**compared** 43:5
    56:2 83:1 84:2
    107:12 119:20
**competent** 91:10
**complain** 20:16
    99:6
**complainant**
    40:6 42:6
    44:18 65:4
    91:14 100:24
    128:14
**complainant's**
    42:19
**complainants**
    54:10,11
    100:25
**complaining**
    28:9,11,12
    29:24 30:1,4,6
    30:7,12 42:11
    42:13 44:15,17
    46:4 53:19
    54:14 90:12
    98:9,10
**complains** 23:19
    23:22 77:14,20
**complaint** 17:13
    39:6 42:7
    46:20,21 47:10
    53:25 56:25
    60:3,5 61:11
    61:17 62:10,15
    62:19 63:13
    64:3 67:11,13
    81:23 82:4
    85:1,3,14,20
    86:5 87:17
    88:4,9,13,17
    89:1,5,17 91:7
    91:11,13,17
    94:21 96:5
    97:25 101:19
    103:6,14
    109:16 110:24

112:15 117:11
    121:11,19
    122:12,20
    123:6 126:24
    126:25 131:16
    131:16 135:18
    136:7,17
    138:20 140:9
    143:6 146:15
    146:20,21
    157:2,25 158:7
**complaints**
    23:17 39:5
    45:3 46:6 51:3
    54:4,5,6 87:22
    90:4 91:21,23
    111:6 142:10
    142:21,24
    146:8 148:21
    151:4 157:11
    157:12,15
    158:25 159:3,3
    159:4 160:6,7
**complete** 27:19
    57:7 79:20
    118:12 119:14
    119:20 140:21
    162:8
**completed** 80:20
    164:6,10
**completely**
    50:25 113:5,14
    118:20 156:5
**completion**
    46:17
**component**
    138:15
**concerned** 95:23
**concerning**
    11:22 16:19
    26:7
**concerns** 9:10
    77:12 104:20
**conclude** 96:8
    117:1 118:5,12

**concluded** 28:5
    97:2 161:11
**concluding**
    99:17
**conclusion**
    28:18,21 29:11
    32:5 46:25
    47:2 50:2
    70:17 71:2,4,7
    74:11 82:10
    84:1,24,25
    85:12 86:1
    87:7 89:10,15
    95:25 100:1,12
    100:15,18
    101:10 103:8
    104:5,15 105:1
    105:19 108:17
    112:17 118:3
    119:5 128:8
**conclusions**
    26:17 34:5,12
    34:17,19 35:3
    36:19 37:19,23
    38:17 41:9
    45:7,8,10 52:8
    52:10 63:10
    87:13 88:21
    92:2,8,11 95:2
    95:4 96:19
    130:25
**condescending**
    90:20
**condones** 148:18
**conduct** 19:3,9
    19:17,21 20:23
    29:22 31:19,19
    35:8 38:6 39:1
    39:13 43:12,18
    43:21 48:21
    49:3 51:4,5
    53:4,10 58:7
    59:14 61:19
    63:15,23 64:4
    64:10,21 66:4

66:14,15,19
    68:24 69:8,13
    69:17 70:5
    71:3,8,10,12
    71:21,23 72:1
    72:5,19,20
    75:7 83:7 84:1
    84:16,23 89:24
    90:1,9,12,21
    90:23 91:6
    98:12,13 104:4
    104:14,23
    105:10 106:8
    107:11,13
    116:25 118:5
    118:12,17
    121:19 122:5
    131:17 134:18
    134:23 136:12
    142:9 144:6
    147:8 148:2
    149:24 150:4,5
    150:7 158:2,3
**conducted** 16:2
    24:8,16,21
    25:14,19,22
    26:1 28:4 30:2
    30:3 31:11,22
    32:22 33:8,19
    33:23 44:15
    46:16 55:4,20
    61:10,13,21
    62:10 77:13,19
    120:2 121:20
    121:24 124:6
**conducting**
    15:23 32:17
    35:25 37:17
    42:16 97:13
    120:18 159:5
**conducts** 62:22
**Conferences**
    132:11 133:5
**confidence**
    115:9,15,19,21

115:24
**confidentiality**
    54:22
**confine** 24:2
**confining** 85:22
**confirm** 73:21
    79:10,20 81:18
    81:19
**conflict** 143:4
**connected**
    162:12
**connection**
    146:14,21
**consent** 76:23
    92:23
**consider** 16:20
    17:24 42:21
    44:17 46:24
    51:8,14 52:20
    53:23 68:7
    94:19 96:11
    112:25 135:16
    146:18,20
**consideration**
    91:12 112:8,12
    112:14,19
    125:5 128:1
**considered** 7:18
    8:9 16:1,8 21:1
    32:11 50:2
    77:18,22
    126:12 131:11
    131:12
**considering**
    128:12
**consistently**
    106:2
**constitute** 23:14
    87:6,8
**constituted**
    109:1
**constitutes**
    101:15
**constructive**
    19:4

Navarro v. AutoNation                    Michael Elkins 4/29/2024

consultation
142:17
consulting
158:24
contact 92:23
164:7
contained 16:17
49:6 53:6 64:1
64:18 67:8
89:14 106:15
147:10 154:19
contains 89:20
contend 40:19
40:24 158:16
content 15:17
context 23:3
41:15 53:11
69:4 93:12
135:15 142:21
contextually
150:13
continually
98:25
continues 14:3
continuing 6:19
99:1,10 122:3
contradict 50:18
contradicted
48:24 51:24
106:1
contributions
37:12
conversation
78:18 95:18
conversations
48:21
copies 7:15,23
8:6,14 26:16
copy 12:10 28:3
28:6,7 54:18
54:23 57:15
145:24 146:2
correct 4:15
6:21,21 9:8,13
9:14,16,17

10:17 12:25
13:13 14:15
16:10 17:16,17
20:2,8 22:18
27:13,14 28:25
29:9 30:9,10
31:14,15 32:3
32:12,13 33:21
40:22 41:13
45:19 46:4,5,9
46:10,13,14,17
52:18 53:11,21
54:16,17,19,20
55:18,19 56:17
56:20,21 57:7
57:8 58:9,22
59:4,5,10,16
59:25 60:17
61:8,9 66:12
66:25 70:19
71:6,17 72:1
72:25 73:7,8
73:21 74:9,14
80:16 82:18,19
82:22,23 83:19
87:3,10,12,20
97:21,22
101:25 102:24
103:10 104:18
105:2,3,16,17
110:7,21 112:3
112:4,9 115:10
119:9,11
120:21 125:21
131:3,18 133:2
133:3 138:16
138:17 155:18
159:12,21
corrected 11:17
61:8
correcting 103:3
correction 20:10
correctly 81:20
154:17
correspondence

122:13
corresponding
58:1
corroborate
65:13
corroborated
48:22 49:5
50:3
corroborating
53:20
cough 7:6
coughing 7:6
counsel 13:8
25:22 31:12
32:16 33:3
79:8,12 80:1,9
97:18 123:19
124:24 125:9
141:12 143:4,8
143:9 146:16
162:10,12
counting 67:5
COUNTY 163:5
couple 45:14
146:22
course 14:4,14
22:21 41:7
44:21 65:4
80:23 99:14
114:21 148:3
court 1:1 11:1
11:16,22 12:5
24:14 32:18,23
36:16 140:13
164:19
covered 15:7
71:21 72:17
96:7
covering 49:13
coworkers 88:9
cprater@polla...
2:3 164:3
created 14:13
15:2 87:23
credential 76:2

credentials
91:25 92:4
credibility 44:25
50:5 51:15
52:13,24 53:9
56:19 128:2
credible 52:15
criminal 86:10
criteria 21:1
28:1 91:2,3
critical 38:21
cross-examina...
2:15 141:21
151:18,25
152:12 153:19
154:11,18
155:11,25
159:15
crossed 35:11
cultural 50:23
148:13 157:3
157:17
culturally 100:9
culture 40:8
48:12,13 98:1
98:3,7,14,16
98:23,24 99:9
99:11,17,20
100:25 101:11
101:15,25
102:13,16
103:7,12,18
148:6,15,18,22
148:25 151:14
156:18,22
157:16
cumulative 74:7
cumulatively
85:8
current 42:22
44:3 134:23,24
135:2,13
curriculum
13:20
CV 115:3 132:25

D
d 9:1
Daily 133:2,8
damages 37:11
data 7:18 8:1
database 113:25
date 51:24 79:16
165:25
dated 145:20
146:16 162:15
dates 40:3
David 14:20
59:6,18,24
60:8,14,18,24
61:1 127:24
Davie 47:15,23
48:15 50:14,25
51:25
day 49:10 90:13
146:7,19
160:11 162:15
163:11
day-to-day
136:25 137:10
139:7 158:25
days 35:13 88:11
130:6,11,13
146:22 164:10
deal 39:22 88:19
dealership 44:11
60:15 61:2
67:11 68:24
71:17,19 74:6
100:10 101:25
152:4,14
dealership's
66:23 67:3,20
68:4,8,14,17
69:19
dealership-level
67:12
dealing 37:9,10
38:19 111:5
142:15
dealt 36:12

Navarro v. AutoNation

Michael Elkins 4/29/2024

Page 172

| | | | | |
|---|---|---|---|---|
| 88:18 142:10 142:11 143:25 144:2 | deficiency 107:8 107:11,12,18 107:18 108:2,9 108:17 109:1 | 105:4,12,19,23 105:24 106:10 106:12 112:10 112:11,21 | 24:15 32:23 83:23 84:22 88:23 103:19 137:6 157:24 | 27:23 28:13,17 disciplined 28:10,20 disclose 54:24 |
| decades 95:7 159:6,9 | deficient 120:20 123:21 | 115:6,18 116:6 116:9,12,14 | determining 42:15 53:10 | 132:14 disclosing 54:22 |
| December 129:9 decide 62:6 63:1 137:25 | define 82:14 defined 99:10 | 120:25 122:19 125:23 127:13 129:5 130:22 | 69:2,15 developed 36:22 159:8 | discovery 96:6 140:10,16 discrimination |
| declaration 43:16 44:7 130:18 131:6,8 | definition 68:9 86:7,10,11,15 87:9,19 98:22 | 130:24 142:1 157:23 161:9 161:11 162:5 | difference 43:3 55:24 different 23:23 | 150:14 158:23 discussing 30:24 31:21 95:1 |
| declare 165:22 decree 76:23 deemed 77:1 | degree 100:5,12 100:14 128:5 140:1,20 | 164:6 depositions 4:23 7:1 58:15 | 43:10,25 44:1 44:2 49:22 51:22 53:20 | 151:2 discussion 81:8 dispute 139:23 |
| 97:20 defendant 12:8 21:13 | degrees 142:13 deliberate 126:3 demand 123:19 | 103:1 descent 48:11 describe 158:2 | 78:18 89:19 90:5,17,22 91:23 95:18 | 140:4 144:25 disputes 32:18 disrespect 93:6 |
| defendants 1:8 2:6 11:5 14:11 | 124:5,14,23 125:8 | described 84:2 84:16 92:1 | 101:7 111:12 116:1 117:5,8 | disrespectful 35:19 |
| 21:7,13 122:12 138:19 146:13 153:15 | department 54:2 144:23 depend 37:7 | 159:20 description 3:2 130:21 | 117:20 124:12 125:2 135:11 135:12 138:25 | disrespectfully 35:18 distance 7:7 |
| defendants' 6:12 13:14 18:21 | 135:5 depending 40:3 94:17 99:4 | deserves 39:6 detail 94:1 detailed 69:1 | 149:20 160:20 160:21 differently 24:1 | distinction 43:2 44:3 distinguish |
| 79:1 135:18 136:6 | 123:9 159:10 depends 94:4 | 109:13 110:11 110:18 111:21 | 89:25 difficult 33:17 | 23:13 District 1:1,1 |
| defending 158:20 | depo 121:12 deposed 5:16 | detailing 109:15 110:19 111:22 | 63:6,9 105:24 111:18 | 11:1,2,16,16 13:5,9 |
| defense 22:8 24:20 33:10,22 | 96:11 104:18 104:21 116:11 | details 146:3 determination | direct 2:14 4:8 91:4 112:22 | document 6:5 7:9 14:10 |
| 35:7 36:12 38:2,23 40:13 | 130:18,20 deposition 1:10 | 21:1 94:10 determinations | 151:24 directed 131:17 | 47:14 56:22,24 78:15 94:15 |
| 67:25 82:12 84:6 88:2 | 3:3 4:20 6:15 6:20 9:24 10:6 | 41:22 63:2,20 determine 37:18 | directly 48:9 56:7,10 | 95:14,16 103:15,15 |
| 91:10 94:15 101:2 113:21 | 14:18,25 15:11 15:18,19 16:8 | 46:12 63:19 70:21,23 83:18 | disability 56:5 disagree 105:12 | 127:3,19,25 146:18,20 |
| 118:2 119:24 138:13,15 | 16:14,21,23 17:6,20,24 | 83:22,22 88:3 98:21 102:11 | disagreement 88:9 | 161:4 165:22 documentation |
| 144:2 154:1 158:19 | 18:9,11 38:9 45:18 57:7,14 | 103:18 106:5 107:1 108:6 | discharge 19:4 disciplinary | 78:7,14 88:20 93:24 95:20,22 |
| defenses 33:18 38:25 | 58:20 69:1 73:9,20 79:23 | 117:15 119:18 140:24 | 27:6 discipline 25:3,5 | 95:25 96:4,9 102:9 116:19 |
| defer 51:19 deficiencies 135:17 136:2,4 | 80:21,22 85:15 104:16,17 | determined 24:6 | 25:9 27:21,23 | 117:7 118:23 |

Navarro v. AutoNation

Michael Elkins 4/29/2024

Page 173

| | | | | |
|---|---|---|---|---|
| 122:23 123:2,3 | 65:2 95:15 | **email** 13:18 | 84:7,20 89:17 | **employment** |
| 123:14 124:3,9 | 99:9 111:4 | 17:13 20:16 | 89:18 93:12 | 22:4,7 35:6 |
| 145:6 152:18 | 112:9 114:19 | 23:23 39:8,8 | 134:20 135:3 | 36:7 38:1,23 |
| 157:22 | 117:10 128:13 | 41:19 43:17 | 135:13 148:16 | 40:13 42:20 |
| **documented** | 148:5 149:16 | 44:12 56:25 | 162:10,11 | 61:18 62:12 |
| 18:2 123:22 | 150:5 153:11 | 57:10 58:14 | **employee's** | 67:24 72:16,22 |
| **documenting** | 153:25 155:14 | 60:3,5 61:11 | 135:6 | 73:2 74:8,16 |
| 145:4 151:5 | 158:8 160:22 | 61:14,22 63:13 | **employees** 39:15 | 76:5,9,15,17 |
| **documents** 5:24 | 161:2 | 64:2,6,18 | 43:11 54:1 | 76:23 77:2 |
| 7:15,16,20,23 | **early** 131:5 | 75:25 81:23 | 58:9 61:7 | 82:12 83:4 |
| 8:3,6,7,11,14 | 143:10 | 82:3 85:1,3,20 | 64:19 66:4 | 84:5 88:2 |
| 8:15,19,24 9:3 | **easiest** 81:10 | 85:25 86:5 | 69:16 70:4 | 91:20 94:14 |
| 9:8,12,15 42:5 | **East** 2:3,8 | 87:17 88:6 | 71:3 72:18 | 95:8 101:2 |
| 52:19 56:16 | **Eastern** 67:14 | 89:5 90:23 | 83:9 84:10 | 113:20 114:1 |
| 77:8 109:15 | 68:23 69:11 | 92:12,24 97:25 | 85:9,10 93:5 | 114:12 118:1 |
| 110:19 111:22 | **EEOC** 123:20 | 98:6,8,9 99:18 | 99:4 104:3,13 | 119:23 126:1 |
| 128:12 143:15 | 124:5,23 125:8 | 100:3,19 | 105:9 106:7 | 136:25 138:12 |
| 147:3 | 139:2 146:12 | 102:16,19 | 107:10 108:6 | 142:2 144:2 |
| **DocuSign** 79:8 | 146:23 147:5 | 103:6,10,11,13 | 134:23,24 | 150:13 152:22 |
| **doing** 23:11 | **effect** 127:16 | 109:16 110:5 | 135:2,14 | 154:1 157:9 |
| 34:15,24 35:23 | **effectively** | 110:24 118:23 | 136:11 | 158:19,23 |
| 49:20 92:22 | 144:15 | 121:11 122:6 | **employer** 25:23 | 160:17 |
| 122:9 139:3 | **efforts** 39:22 | 123:6 127:23 | 31:3,13,18 | **encompassed** |
| 142:21 149:5,9 | **egabrielle@st...** | 128:9 131:16 | 32:17 33:3 | 153:13 |
| **double** 147:15 | 2:8 | 135:18 136:7 | 38:24 39:19 | **encompassing** |
| **double-check** | **either** 21:12 | 136:17 138:20 | 42:14 43:6 | 23:6 |
| 29:15 | 24:3 27:2 | 145:20,23 | 64:15 71:21 | **engage** 53:2 |
| **draft** 32:4 | 35:12 40:9 | 146:3,16,23 | 72:16 76:24 | **engaged** 10:8 |
| **dramatic** 157:6 | 52:9 53:21 | 147:5,10,12 | 77:14,20 91:23 | 29:3 34:11 |
| **dramatically** | 55:15 56:7,10 | 148:1,7,12 | 108:17 110:10 | 108:8 140:2 |
| 89:18 90:22 | 66:15 81:10 | 157:25 158:7 | 110:23 124:15 | 151:12 |
| 135:11 | 93:22 109:5 | **emailed** 137:5 | 125:12,16 | **engagement** 3:5 |
| **drawing** 57:21 | 140:17 160:4 | **emails** 95:18 | 126:3 134:18 | 9:10,11 79:7 |
| 82:8,9 | **elapse** 42:10 | **employed** 30:1,4 | 135:1 138:16 | 79:11,13 80:5 |
| **dry** 7:6 | **Elkins** 1:11 2:13 | 42:14 44:8,10 | 143:6,18 | 80:6 132:2 |
| **duly** 4:3 163:10 | 4:2,13 6:23 | 49:19 64:11 | 151:15 | 141:11 151:16 |
| **duty** 67:15 104:3 | 45:17 141:23 | 93:14 130:11 | **employer-emp...** | 151:19 |
| 104:13 106:7 | 154:18 162:6 | 130:13 | 42:23 | **engaging** 53:3 |
| | 163:9 164:24 | **employee** 25:4,6 | **employers** 21:7 | **ensure** 119:13 |
| | 165:3,25 | 25:10 27:6,22 | 25:25 33:18 | 119:19 |
| **E** | **Elkins's** 36:3 | 28:19 30:8 | 36:10 38:4,19 | **ENTER** 165:1 |
| **E-l-k-i-n-s** 4:13 | 160:1,15,23 | 42:22,25 44:1 | 38:21 39:1 | **entire** 107:19 |
| **earlier** 20:8 35:5 | **Ellerth-Farag...** | 44:3,4 55:22 | 94:19 135:14 | 115:6 144:4 |
| 35:16 37:25 | 143:19 | 67:9,12 71:20 | 142:11 148:17 | **entirely** 33:25 |
| 46:3 47:9,18 | **else's** 124:21 | 77:14,20 83:4 | 158:20 160:3,3 | 37:13 40:7 |
| 50:17 57:6 | | | | |

Navarro v. AutoNation

Michael Elkins 4/29/2024

Page 174

| | | | | |
|---|---|---|---|---|
| 105:22 118:13 157:13 | **evaluation** 36:21 | 66:22 79:1,6,9 | 108:11 113:19 | **explain** 92:10 |
| **entirety** 14:24 22:4,5 | **events** 49:5 50:3 51:5 | 79:15,20 81:5 81:21 82:4,25 | 113:23 114:19 116:3 117:25 | 142:2 **explaining** 123:17 |
| **entitled** 109:20 126:18 135:22 135:23 | **everybody** 149:15 **evidence** 9:25 | 84:16 85:11,24 86:14 88:5 89:6 90:1 | 117:25 118:5,8 118:11,17,20 119:22 125:25 | **explanation** 94:23 **explanations** |
| **entity** 144:16 | 10:1,2 42:5 46:11 49:11 | 94:25 96:15 107:2 109:17 | 126:1 128:24 133:23 134:16 | 112:2 **explore** 139:22 |
| **environment** 10:23 25:1 | **exact** 23:5 24:9 29:18 115:20 | 110:6,24 112:15 119:6 | 134:16 135:23 138:11 140:1 | **explored** 154:10 **exploring** |
| 26:4,7 27:16 27:19,20,24,25 | **exactly** 51:18 68:12 85:23 | 127:20 128:4 129:1,5,7,17 | 140:12 142:1,3 144:5 149:19 | 139:21 **express** 62:3 |
| 36:10 38:20 40:9 89:19 | 106:5 **examination** | 131:17,25 132:7 136:18 | 149:22 152:25 157:8 158:19 | **expressly** 59:12 100:19 |
| 101:21 142:8 143:18 158:22 | 1:20 2:14,16 4:8 151:10,24 | 145:21 **exhibits** 3:1 6:23 | **experienced** 101:1 114:1,12 | **extending** 67:15 **extent** 134:1 |
| **environment/s...** 38:5 39:11 | **EXAMINATI...** 2:11 | 7:1 47:6 79:5 **exist** 9:19 114:6 | 142:19 152:21 154:2 | 136:20 **external** 38:8 |
| **equal** 39:5 76:23 77:2 87:23 | **example** 39:24 55:3 65:2 | 114:8 **existed** 65:5 | **experiencing** 43:5 | **extra** 48:17 50:16,24 51:2 |
| **equals** 96:22 **ERIC** 2:7 | 89:17 134:8 143:2,16 | **existence** 127:10 **exists** 37:5 71:14 | **expert** 3:4 5:18 10:6,9 12:13 | **extraordinarily** 48:4 50:9 |
| **ERM** 67:13 **errata** 3:14 | **examples** 23:14 **exceed** 89:12 | 71:15,18 76:12 76:19 114:5,7 | 12:17 13:6,18 18:14 21:25 | **extreme** 144:24 **extremely** 38:23 |
| 45:21 164:11 165:1 | **exceeded** 89:6 **exception** 27:5 | **exonerated** 54:13 | 32:12 36:15,16 37:10 40:20 | |
| **error** 37:5,7,13 37:14 | **excluded** 27:18 88:12 90:17 | **expect** 147:2 148:20 149:17 | 41:11,15,17 57:22 58:6 | **F** |
| **especially** 115:23 145:10 | 135:7 **excluding** 26:10 | 154:3 155:12 **experience** 22:9 | 59:13 77:2 80:5 81:9,21 | **face** 148:17 **Facially** 135:9 |
| **Esq** 2:13 **Esquire** 1:11 2:2 | 26:11,15 **exclusively** | 22:10,13,17 34:3,4 36:22 | 82:6 85:18,18 92:8 102:13 | **fact** 41:9,21 42:13,17,18 |
| 2:7 4:2 162:6 163:9 164:2,24 | 113:20 118:1 119:24 | 37:17,21,25 38:3,12,17 | 104:1 105:14 105:15 106:9 | 48:23 59:2,10 59:11,11,14 |
| 165:3,25 | **excuse** 43:16 **exhibit** 3:2,3,4,5 | 62:7,7,12 67:23,24 68:5 | 106:15 107:1 108:3 113:9 | 60:17,24 61:1 61:5,24 62:5 |
| **essentially** 43:22 **estimate** 4:25 | 3:6 6:12,15,19 7:12,12 9:1,1,5 | 68:15 69:1,7 69:20 70:12 | 133:19 139:16 141:4 155:9 | 65:19 69:19,24 71:11 79:10 |
| 22:19 24:2 78:4 | 9:5 13:14,17 13:19,22 14:2 | 72:9,15 73:1 74:7,16 78:21 | 158:6 **expertise** 40:25 | 81:25 82:3 93:11 99:17 |
| **evaluate** 15:6 34:12 41:18 | 14:4,6,17 17:8 18:15 56:23 | 82:9,11 84:3,5 88:1,23 92:2,5 | 82:8 83:25 87:24 99:25 | 100:14 102:8 103:19 106:11 |
| 74:15 134:9 **evaluating** 37:4 | 57:1,2,19 58:17 61:12,23 | 94:14 95:7,16 96:17 97:19 | 128:24 **experts** 132:14 | 106:17,23 107:2 125:6,11 |
| 128:2 129:12 130:15 | 63:14 65:11,24 | 100:17,23 | **Expires** 163:19 | 126:22 128:19 129:18 130:10 |

Navarro v. AutoNation

Michael Elkins 4/29/2024

130:12,12
136:10,13
139:22 140:3
150:11
**factor** 42:14,20
111:20,24
124:24
**factors** 46:24
50:1
**facts** 5:19,21
7:18 8:1 63:20
87:2 95:1,4
103:10 117:11
126:20 140:16
154:8 165:22
**factual** 8:9,17
90:8 106:16
128:7,8
**factually** 20:2
69:15
**fail** 107:12 108:7
**failed** 20:16
24:22 69:16
71:3 122:22
123:1 152:4,14
153:15
**failing** 123:21
**failure** 20:17
66:3 69:17
70:4 107:6,9
127:2
**fair** 12:21 45:2
55:7 78:3
144:22
**faith** 72:22
86:21 94:12
**fall** 25:13 83:16
89:12 90:11
91:6 116:24
146:23 150:17
151:1 156:5
160:7
**falls** 9:11 83:9
88:6 119:19
152:19

**false** 99:3
**familiar** 4:17
6:25 13:25
41:7 75:10,13
113:22 138:12
**far** 95:23 107:20
113:5,14
**far-flung** 38:22
94:12
**Faragher-Elle...**
138:12
**fashion** 66:13
78:16 147:25
**fault** 67:5
**favor** 65:19
**favorably** 51:13
**fear** 98:10
**federal** 9:25
140:13
**federally** 150:15
**feel** 26:13 84:15
121:3
**fees** 12:18,24
13:3 80:9,12
**fell** 89:6,14
**felt** 50:24 63:8
**field** 22:10
**figure** 57:25
157:17
**file** 140:22
**filed** 12:5 123:20
139:2,2 146:12
**financially**
162:13
**find** 52:15 93:16
94:15,22 122:6
**finder** 41:9,21
69:19,24 71:11
82:1 103:20
128:19
**finding** 39:7
**findings** 52:8,10
52:13 56:19
64:25 109:15
110:20 111:23

114:2 124:11
145:4,11
**fine** 22:19 51:24
57:15 63:1
140:25
**finish** 5:11
101:17
**finished** 5:13 6:1
6:5,17 13:22
57:4
**firm** 13:12 47:22
**first** 14:1 17:15
31:16 42:11
55:21 67:6
81:21 82:2
85:18,19
108:20 122:19
132:9 146:18
146:20
**fit** 62:5
**fits** 62:24 102:6
**fitting** 98:22
**five** 54:12 79:8
**five-page** 47:13
**FL** 164:20
**Florida** 1:1,21
2:4,9 4:15 10:1
11:2,17 13:5
71:22 72:17
73:3 76:18
150:14 162:3
162:19 163:3,7
163:8,18
164:18
**follow** 91:11
117:18,23
122:22 123:1
124:2,8 127:5
**follow-up** 112:7
118:6 120:4,8
120:10 123:12
**followed** 108:16
117:15 120:11
**following** 73:13
104:9 106:6

112:6 116:19
117:6 120:20
**follows** 97:24
**Footnote** 19:18
20:7,9,10
**footnoted** 81:24
**Footnotes** 58:2
**FOP** 55:15
**Forbes** 133:1,13
133:16
**foregoing**
165:22
**forget** 63:16
79:4 155:13
**forgot** 6:24
**form** 20:4,6
22:22 24:17,23
32:25 33:12
34:6,14,17
36:2,23 38:7
38:14 41:3,14
43:8 45:5
51:16 54:21
55:6 57:13
60:20 61:16
62:16 66:13
69:22 70:20
72:2 74:18
75:6 78:5,16
83:20 87:11
90:7 100:4,20
105:21 107:14
114:3 115:11
118:14 120:22
124:18 125:8
125:14 126:3
134:4 137:17
138:22 139:17
140:7 144:18
146:25 147:23
147:25 149:6
149:14 150:22
151:20 152:6
152:16 153:3
153:24 154:22

155:4 156:24
159:16,23
**formal** 23:9,9,15
23:23 24:3
75:4 95:17
126:2,9,24
**formalized**
93:25
**formally** 126:23
141:9
**former** 42:25
55:22 83:3
84:7,20 93:11
134:20 135:3,6
135:13
**forming** 7:18 8:1
8:10,18
**formula** 37:8
96:21
**Fort** 2:4,9
**forth** 7:19 8:2,10
8:18
**forward** 137:3
**forwarded**
164:11,12
**fostering** 40:9
**found** 46:8,11
53:4 123:2
**four** 14:18 23:2
25:18 46:15
54:11 67:6
81:9,13 97:15
**four-** 47:13
**fourth** 58:4
**FPR** 1:20 162:18
163:17 164:17
**frame** 29:20
51:12 52:22
151:24
**frames** 49:22
**frankly** 54:25
97:5 131:13
**Fraternal** 55:17
**free** 34:23 121:3
**frequency** 20:25

Navarro v. AutoNation

Michael Elkins 4/29/2024

Page 176

frequent 35:13
front 17:6 37:11
  39:8 50:19
  115:18 120:5,7
  120:9
frontline 157:11
FTC 134:10
fuck 90:14,14
Fuentes 43:17
fulfill 108:7
full 4:10 42:6
  140:21
full-blown 143:1
fully 4:17 78:10
function 99:13
  151:7
functioned
  137:23
functions 137:22
furnished 44:7
  130:18
further 48:8,25
  141:17 161:7
  162:9
future 80:23
  110:7

**G**

Gabrielle 2:7,14
  2:16 4:9 6:14
  6:21,22 7:8,10
  13:16 20:11
  24:19 25:12
  33:4,15 34:9
  35:1 36:17
  37:3 38:16
  41:6,16 44:5
  45:15,16,24
  46:1 52:4 55:8
  57:17 60:23
  61:20 63:4
  70:1 71:1 72:3
  74:24 75:9
  77:5,7 78:9
  79:3 83:24

87:14 91:1
100:13 101:6
106:4 107:24
114:10,22,24
115:1,13 119:4
121:6 125:1,19
131:23 132:3
138:10 139:10
139:20 141:3
141:17 144:18
146:25 147:23
149:6,14
150:22 151:3,9
151:11,22
152:10,23
153:12 154:9
155:1,7 158:5
159:18 160:24
161:7
Gather 42:5
general 62:9
  64:20 84:14
  108:14 117:18
  124:20 126:6
  132:18 148:15
  148:16 153:6
  156:21
generally 12:10
  39:3 80:5,15
  91:11,22
  100:21 124:15
  125:15
generate 39:21
  93:23 110:11
generated 25:1
  54:10 109:13
  110:18 143:7
  146:15,21,22
generating
  88:19
give 4:4,25 11:10
  23:4 24:9,11
  29:18 74:25
  81:2 99:16
  126:6 131:20

141:18 143:2
151:25
given 4:20 23:14
  30:15 35:11
  45:17 81:12
  96:5 97:4,11
  113:19 115:23
  116:17 117:14
  120:1 130:21
  138:1 139:25
  140:2 145:7
  154:4
giving 151:17
global 62:25
glowing 48:4,7
  50:9 51:6
GM 60:7
go 5:10 11:13
  13:24 18:14
  23:24 39:9
  57:18 67:4,5
  81:3,9 90:14
  91:17 92:1
  97:4 101:5
  109:10 117:12
  121:7 131:24
  134:12 137:21
  140:8 141:19
  144:23
goes 72:9 92:19
going 5:18,24
  7:7 8:23 17:7
  18:17 27:3
  28:8,22 39:9
  49:17 56:22
  65:23 66:11
  71:11 74:22
  79:4 81:12,13
  81:18 82:2
  97:23 103:21
  109:6 111:7,14
  115:2 119:11
  121:17 124:17
  124:19 125:21
  126:5,8 128:11

135:4,10
140:25,25
142:18,18,23
144:25 155:6
158:3,3
good 141:2,23
  141:24 142:13
Google 30:21
Government
  133:8
grabbed 83:5
  86:23 92:15
  93:2,2
grabbing 83:13
  85:5
grand 72:21
  108:24 145:15
granted 39:10
  99:7
graphic 90:15
gravity 84:13
gray 129:19,20
  129:21
great 50:21,21
  142:12 143:9
green 129:23
Greenberg
  143:4
ground 160:6
group 40:5
  81:15 94:3
grouped 81:11
GSM 60:7
guess 10:22
  18:12 37:7
  50:8 84:21
  137:22
guideline 42:8
  98:20 108:5
  117:21
guidelines 14:12
  22:16 35:2
  36:21 114:15
guiding 159:4
guy 50:21,21

guys 63:3

**H**

hand 134:13
handbook 67:9
handle 38:2
  91:21
handled 143:5
handles 125:12
handling 67:25
  88:23 91:22
happen 40:18
  65:16 98:15
  135:4 150:9
  160:19
happened 25:2
  27:9 28:23
  39:17 40:17
  52:1 64:22
  83:11,12 87:5
  92:17 93:16
  94:16,22 111:9
  112:25 128:16
  135:1 144:7
  145:6,17
happening 27:9
  43:18 91:15
  99:12 135:14
  157:18
happens 103:1
harassed 61:15
harasser 44:19
  65:3 128:15
harassment
  18:22 19:11,11
  20:25 22:20
  24:7 26:10
  27:15 28:4,13
  29:4 30:7,8,25
  31:2,24 32:15
  32:15 33:20
  36:11 38:5,20
  39:11 40:10,21
  41:1,12 42:4
  42:22 43:4,5

Navarro v. AutoNation

Michael Elkins 4/29/2024

Page 177

| | | | | |
|---|---|---|---|---|
| 46:12,15 47:3 | Hollywood 1:7 | 151:7 155:12 | 38:13 48:20 | 137:24 138:5,9 |
| 48:10,18 50:22 | 58:8,9 59:8,15 | 156:6,14,20 | 52:17 54:15 | implicate 134:22 |
| 54:1 55:4,21 | 98:2 164:4 | 157:1,4,9,14 | 57:9 58:16,21 | 157:3 |
| 56:2,3 62:10 | 165:2 | 158:17 159:4,5 | 59:2,4 61:5 | implicated |
| 62:15 77:12,15 | hostile 10:22 | 159:9 160:7,12 | 63:17 68:2 | 143:19 |
| 77:21 78:2 | 26:3,7 27:15 | HR's 159:4 | 71:16 95:1,2,4 | implication |
| 101:21 128:2,6 | 27:20,24,25 | huge 148:15 | 96:16 97:1,17 | 100:9 |
| 129:12 130:15 | 36:10 38:4,20 | hugs 48:12 | 97:20 136:3,5 | implicit 99:23 |
| 134:19 142:8 | 39:10 40:9 | human 47:22 | 148:1 151:1 | 148:6 |
| 143:6 158:22 | 89:19 101:21 | 62:21,22 75:4 | identifies 14:2 | implicitly 98:1,5 |
| harassment/h... | 142:8 158:21 | 75:7,15,22 | identify 7:18,25 | 99:24 |
| 24:25 143:17 | hours 80:1 | 89:1,5,8,23 | 8:9,17 42:7 | implied 99:16 |
| hate 5:4,4 | House 47:16,24 | 91:8 95:11 | 75:18 86:1,13 | impliedly 99:19 |
| head 17:5 66:18 | 48:15 50:14 | 97:2 107:7,11 | 100:25 101:1 | 101:4 103:11 |
| heading 14:6 | 51:1,25 | 108:2,8 111:5 | 135:16,20 | 157:25 158:7 |
| hear 32:5 86:18 | Howard 46:4,6 | 117:23 118:11 | 136:1,4 137:15 | implies 98:14 |
| 88:11 154:14 | 46:7,20 47:2 | 142:4,4 148:11 | 138:8 140:3 | 102:16 |
| heard 25:3 | 47:10,11,25 | 149:22 150:18 | 148:21 149:3 | imply 99:7,9 |
| 28:16,23 29:1 | 48:3,20,23 | 151:13 152:15 | 151:14 156:22 | 157:15 |
| 144:13 | 49:1,16 50:8 | 152:20 153:2,7 | 157:2,5,12 | implying 64:21 |
| hears 67:16 | 51:4,13 52:5 | 154:3 160:5 | 160:25 | 148:24 |
| held 75:11,20 | 52:10,22 53:1 | humiliation 93:6 | identifying | importance 47:7 |
| Herald 133:1,11 | 54:15 55:11 | hypothetical | 37:16 40:2,3 | important 53:9 |
| Hey 115:25 | Howard's 48:2 | 44:1 65:9 92:4 | 52:23 149:1 | 150:13 |
| HH243700 | 50:3 | 108:19,25 | ignorance | Importantly |
| 163:18 | HR 10:22 39:4,6 | 125:15 126:5 | 142:22 | 47:11 |
| hHuman 63:22 | 65:7,17 66:4,8 | 135:24 137:4,9 | ignoring 41:4 | Imports 1:7 58:8 |
| HI 67:10,11,16 | 66:8,24 67:18 | hypothetically | 51:17 142:24 | 58:9 59:8,16 |
| 98:2,4 | 68:3,9,17 | 113:1 | 144:24 152:7 | 98:2 164:4 |
| high 150:19 | 69:17 70:5,8 | hypotheticals | imagine 120:16 | 165:2 |
| high-end 145:1 | 72:10 74:4 | 90:21 | 129:6 | improper 53:10 |
| higher 59:25 | 75:11,20,24 | | immaterial | 142:9 |
| 60:19 | 87:23 88:17,19 | **I** | 118:21 | impugning |
| hired 17:11 | 89:17 92:19 | id 121:12 | impact 23:25 | 116:14 |
| 22:12,24 25:16 | 93:22 94:9 | idea 41:8 49:19 | 94:21 126:9 | inadequacies |
| 27:17 35:8,12 | 102:1,3,9 | 53:3 90:19 | 136:23 138:21 | 135:17 136:2,5 |
| 38:5 62:3 | 103:14 107:19 | 103:19 160:5,7 | 138:23 148:21 | inadequacy |
| 63:19 66:3 | 107:19 109:1 | 160:9 | 157:16 | 61:25 137:13 |
| 70:3 87:12 | 113:5,15,16,25 | identification | impacted 15:21 | inadequate |
| 111:13 128:7 | 118:25 124:25 | 6:13 13:15 | 127:9 135:19 | 95:23 96:1 |
| 137:25 | 137:22 142:20 | 79:2 | 136:7,12,24 | inappropriate |
| hiring 142:25 | 144:10,20,23 | identified 7:17 | 137:10 139:7 | 104:4,14 106:8 |
| 145:1 | 146:24 147:16 | 7:21,25 8:8,16 | 139:12 142:3 | 107:11 |
| Hispanic 48:11 | 147:20 148:20 | 14:16 15:22 | impacting 139:5 | incident 47:15 |
| Hold 104:16 | 149:8,19,19 | 26:18 35:3 | impacts 135:13 | 47:17,24 48:4 |

Navarro v. AutoNation

Michael Elkins 4/29/2024

48:15 50:14,15
51:1,1,25
**incidents** 51:9
51:12
**include** 112:2,4
112:5
**included** 60:6
**includes** 13:19
18:18 132:25
158:20
**including** 8:25
9:4 10:13
19:25 21:14
22:10 27:7
43:13 79:8
96:15 115:3,4
136:11
**inclusion** 164:12
**inconsistent**
53:3
**incorrect** 20:2
29:1 57:11
61:3 127:22
**incumbent**
134:25
**incurred** 12:24
**independent**
22:24 23:10
24:5 25:16
26:6,8 31:1,12
35:9,10 38:6
94:16 97:16
142:25 145:1
159:1
**independently**
25:25 27:18
**INDEX** 2:11 3:1
3:9
**indicate** 5:22
115:9 127:12
128:18 158:9
**indicated** 31:10
57:6 66:10
124:23 156:23
**indicates** 146:14

**indicating** 86:19
**indication**
135:23
**individual** 15:15
15:22 22:10,12
28:9 35:7 59:3
61:5 81:11
84:3 94:4
101:20 120:2
130:18
**individually**
40:5 49:2
91:12
**individuals**
14:18 39:14
56:20 58:24
60:4,13 64:22
84:10 93:18
101:8 147:24
148:1
**informal** 23:13
23:16
**information**
15:5 16:1,4,12
16:17,19 17:19
38:13 44:23
52:16 53:13
56:13 58:13
60:12 74:11
112:17 116:4,5
129:24 159:7
**initial** 4:12
**initials** 75:24
**innumerable**
23:4 75:24
97:17 140:13
142:7 158:20
158:21
**inquire** 34:16,23
**inquiries** 23:7
**insofar** 123:1
**instance** 30:6
46:25
**instances** 12:16
92:15

**insufficiency**
62:15 137:14
**insufficient**
24:16 61:24
97:21 113:5,14
118:8
**intended** 41:9
106:9 133:1
**intending** 50:18
**interested**
162:13
**internal** 125:12
126:4,10 143:5
143:7
**Internally** 145:3
145:4
**interpretation**
99:15
**interrupt** 74:21
75:2
**interview** 29:24
30:2 39:25
40:3 42:3 48:2
48:15 109:14
110:19 111:22
**interviewed** 40:2
41:25 47:25
48:22 65:8,12
94:2,2,5,6
143:13
**interviewing**
40:5 42:3
147:11,13,17
147:19,21
**interviews** 30:3
30:5 49:8 60:6
133:18 143:14
147:22
**investigate**
38:21,24 39:20
93:23 95:12
101:14 103:14
115:10 123:22
145:2 146:9
160:6,13

**investigated**
15:15 24:6
29:4 31:2
41:13 42:24
46:22 52:3
64:12,24 66:16
97:15 101:22
121:10 150:10
158:4,24
**investigating**
22:10 31:19
88:19 145:3,5
151:4,5 159:2
159:3
**investigation**
10:22 15:23
16:2,5,13,20
17:3,12,20,21
18:2,7 23:15
24:15,21,24
25:13 26:2,6,8
26:15 28:3,6
29:22 30:23
31:23 32:17,22
33:2,8,11,23
42:16 44:14
46:17 47:9,18
47:21,25 48:1
49:14 53:6,25
54:3,9,13 55:4
55:9,20 56:1
61:10,13,18,21
61:25 62:4,9
62:14,23 63:11
65:1,15 77:13
77:18 78:2,8
78:12,15,17,20
78:22 88:22
90:6 93:13,20
93:22 95:15
96:14 103:16
112:14,20
113:4,13
114:14 115:17
116:18 117:1,4

117:7,17,24
118:5,12,18
119:14,20
120:3,13,18
121:9,19 122:6
122:24 123:23
124:7 125:7
129:2 134:19
135:6 136:15
136:21 137:6
137:14,21
143:1,5 145:9
147:9,17,20
150:1,16,25
152:18,19
157:22 160:14
**investigations**
22:20 23:10
24:3,7 25:14
25:19,22 26:1
31:11 33:19
35:8,13,14,25
37:18 38:7
39:2 46:15
77:12 97:14
113:25 142:5
144:6 159:5
**investigative**
26:17 55:25
**investigator**
22:13,24 24:5
25:16 31:2,12
35:10,10 36:13
38:6 42:2,10
42:15 45:6,8
45:10 48:3
50:15 65:7
76:3 97:16
127:5 128:1
129:1,11
130:14 159:1
**investigator's**
128:15
**investigatory**
147:3

Navarro v. AutoNation                    Michael Elkins 4/29/2024

invoice 80:6,20
  80:22
invoiced 79:25
invoices 80:25
involve 51:5
involved 26:20
  31:23 32:10
  47:15 53:24
  54:3 91:14
  134:25 143:3
involving 27:21
  30:25 31:21
  46:2 47:1
  158:21
issue 11:22
  18:25 19:7,14
  20:21 21:4,10
  21:18 27:6
  33:2 39:14
  43:20 48:9,17
  61:24 62:17
  65:22 72:1
  112:7 116:15
  116:15 139:22
  139:25 140:3,4
  142:15 143:20
  144:10 148:13
  149:2,20
  157:16,17,20
issued 25:3
  27:21,23,24
  28:13
issues 18:1 43:10
  50:23 93:9
  97:25 146:4
  148:17 149:3
  157:3 160:21
item 7:15,23 8:6
  8:14,23,23
items 7:13 8:23
  14:16

___ J ___
J-a-c-k-l-y-n
  11:14

Jacklyn 11:13
  11:14
jerky 134:3,9
job 35:22 65:20
  137:25 143:9
Joe 59:7 60:7,13
Joey 21:14 23:19
  58:7 59:14,25
  60:19
Johnny 88:10
  90:17,18 135:7
joint 21:7
journal 132:17
Juan 1:4 164:4
  165:2
judge 63:2 65:20
judicially 36:1
July 163:19
June 122:16,21
  123:8,9 146:12
  146:17 147:5
jurisdiction 10:3
  10:25
jury 41:17 63:2
  65:21

___ K ___
K 2:7
K-n-i-g-h-t-s
  11:15
Keeping 133:8
kept 124:16
kind 83:17 84:1
  88:12 90:1
  133:14 135:8
  142:4,9 153:7
kinds 91:6
kiss 83:14
kissed 83:5
  86:24 93:3
kisses 48:13
kissing 85:5
knew 107:16
Knights 11:14
know 5:4,7 6:1

6:17 12:4,6
  13:22 15:19
  23:9,19,22,24
  24:13 25:1,8
  26:10 27:10,17
  28:20 30:11,17
  30:18,19 32:6
  33:5,7 34:8
  36:25 37:9,14
  39:1,17,18
  40:11,11 42:17
  42:17,19 43:13
  44:6,9 48:6
  49:21,24 57:4
  60:9,22 63:8
  69:23 71:9,10
  73:5 74:17,19
  74:20 75:15,22
  76:19 83:11
  84:18,20 86:12
  92:19 93:10
  94:9 96:24
  97:7 99:11
  103:2,9 105:11
  112:24 113:11
  114:4,9 125:20
  125:20 127:9
  128:20,21
  133:12 135:1,4
  135:6,14 137:8
  137:22 138:6,7
  138:23,25
  139:4 140:9,15
  140:17,23
  142:7 143:9,15
  144:8,25 145:9
  145:15 146:7
  153:9 155:12
  156:7,7,14,15
  158:3 160:17
  160:20
knowledge
  11:21 22:13
  24:15,18,20
  27:3 33:22

35:6 55:11
  86:17 114:14
  121:8 138:3
  159:8
knows 138:7

___ L ___
L 1:11 2:13 4:2
  4:12 162:5
  163:9 164:24
  165:3,25
L-o-s-k 17:2
labeled 17:9
  57:21 59:13
  65:25 67:4
  74:2,12 79:16
  82:5 104:1
  113:9
labels 99:16
labor 22:4,6
  27:7 35:6 36:7
  38:1 67:24
  72:15,22 73:2
  74:8 76:5,9,15
  76:17 82:11
  84:5 88:1
  91:20 94:14
  95:7 101:2
  113:20 114:1
  114:12 118:1
  119:23 126:1
  138:11 142:2
  144:1 152:22
  154:1 157:9
  158:19 160:17
lack 10:22 17:3
  112:6,20
lacked 119:2
land 82:21 89:25
Landing 133:8
language 48:9
Las 2:3,8
Lauderdale 2:4
  2:9
law 22:7 30:18

30:20 38:23
  55:1 72:22,25
  76:6,9,15,17
  87:2 100:14
  132:17 136:22
  138:12 145:10
  160:2
laws 150:14
lawsuit 139:3
lawyer 23:11
  35:6 38:2
  40:13 62:13
  67:25 72:16
  74:8,16 82:12
  86:21 88:2
  91:10 114:13
  119:24 126:1,7
  128:20 137:19
  144:2 154:2
  157:9 158:20
  159:2
lawyers 63:1
  114:1 140:17
laypeople
  149:12
layperson 84:13
  84:15,18 148:9
  149:18,21
lead 38:17
  101:10 108:17
leap 38:22 72:21
  86:21 94:12
  100:7 157:6
learn 152:20
  154:2
learned 36:4,6
  95:9,10 122:18
  122:18 125:6
  142:19 158:18
learning 126:23
leave 25:10 45:9
leaves 101:3
leaving 92:20
  123:4
left 74:23

Navarro v. AutoNation

Michael Elkins 4/29/2024

left-hand 129:19
legal 4:10 19:3
  19:10 24:22
  32:18 83:18
  86:15 87:9,19
  109:17,21
  110:7,9 111:20
  112:8,12,13,19
  133:9 135:4
  140:3
length 108:13
lengthy 35:11
  47:4
let's 37:10,12
  67:5 90:14
  94:15,15
letter 3:5,13
  9:11,11 79:7
  87:16 108:16
  122:4 123:19
  124:5,14,23
  125:8 132:2
  136:21 148:10
  164:6,10
LETTERS 3:9
level 20:24 32:12
  98:22 103:14
  142:23
levels 152:4
lieutenant 48:6
life 137:11
  140:15
lifetime 144:4
liked 15:23
  18:10
likes 66:14
limited 1:7
  69:12 101:19
  111:8 150:11
  153:4 164:4
  165:2
limits 44:2
line 116:21
  121:15,18,21
  121:23,25

122:2,3 144:10
  150:19 165:4
lines 121:9,13
LinkedIn 134:6
  134:6,12
list 3:6 58:23
  60:10 79:16
  85:9 132:14,25
  134:24
listed 7:13 14:5
  85:16 131:10
  131:11,13
  136:11
listen 105:19
  152:8
lists 60:8
litigating 141:1
  142:14
litigation 27:3,5
  27:5,7 32:7,8
  33:9 142:15,16
  143:3,23
little 21:22 22:1
  33:16 37:15
  63:5 117:5,7
  123:15 125:2
  144:3 149:16
LLC 13:11
local 30:16
lock 5:4
log 146:13
long 11:8,9
  12:20 26:22
  78:6 156:7
longer 42:14
  43:6
look 6:17 11:7
  11:10 57:2
  65:10 66:11
  69:19,24 77:8
  78:18,20,23
  79:9,19 91:16
  100:5 112:23
  119:6 129:16
  131:20 134:1,6

135:10 149:15
  157:19
looked 40:12
  49:1 73:23
  98:17 108:1
  111:11
looking 68:19
  103:23 133:4
  149:2
looks 109:19
Losk 14:21 17:2
  20:1 56:14
  59:7,18,24
  60:8,14,18,24
  61:1 66:12
  104:22 105:8
  127:24 129:23
  130:8 147:19
  147:21
lot 5:2,5,6,9 23:5
  24:10,13 30:17
  30:22 47:16
  53:6 74:22
  88:11 93:9,13
  101:1 134:10
  142:10,16,16
  149:20
loved 83:6 85:6
  93:3
Lucie 26:3,16
  32:2
lunch 74:22 77:5

M
M-a-r-c-i-a-n-...
  29:7
M-i-c-h-a-e-l
  4:12
Magazine
  133:16
main 18:1 47:14
major 148:17
making 52:2,9
  56:18 63:19
  84:8 115:22

malleable 99:15
management
  22:5,7 35:7
  38:1 39:16
  64:23 66:3,14
  67:14,25 68:23
  68:24 69:16
  70:4 71:3,8,20
  72:18 75:16,23
  82:12 83:8
  84:6,10 85:9
  88:2 91:10
  92:18 93:5,7
  93:16,22 95:8
  98:11 99:3
  101:2 104:3,12
  104:18,21
  105:9 106:7
  107:10 108:6
  113:21 118:2
  119:24 136:11
  142:17 143:11
  149:24 150:7
  152:22
Management's
  69:11
manager 60:8
  67:11,13,16
  69:7 83:5 85:4
managers 43:13
  58:8 59:8,15
  59:18,22 60:15
  61:2 63:16
  64:19,19
  107:12,15
manner 63:23
March 80:2
Marcinate 29:7
  29:23 31:21
  46:3,8,21 47:1
  47:8,12,17,19
  48:5,11 49:16
  50:9 51:4,13
  52:21 53:2
  54:6,7

Marianne 46:4
  54:15
mark 79:4
marked 6:12
  13:14,17 57:3
  61:12,23 63:13
  79:1,19 82:4
  89:6 110:5
  127:20 129:4
  129:17 136:17
marker 108:6
marking 6:15
  79:6,15
material 49:9
  53:6 131:10
materials 14:2,5
  14:6,10 15:25
  22:17 27:1
  34:3 37:22
  38:8,12 92:9
  96:4 97:1
  108:12 111:25
  112:18 119:1
  124:22 125:24
  138:1,5 144:8
  146:14 154:6,7
math 97:8
mathematical
  37:8,13 96:21
matter 10:20
  24:5 26:19
  27:2,4 31:20
  32:3,6,10 33:1
  33:7,9 43:24
  46:2 47:1 49:4
  54:14 77:1
  79:21,22 80:11
  80:13,15 97:15
  132:18,18,23
  146:13
matters 23:6
  26:18,19 27:12
  27:15 32:15,15
  32:21 68:1
  84:21 88:24

Navarro v. AutoNation

Michael Elkins 4/29/2024

Page 181

153:13,15
maximum 42:9
mean 21:23 22:1
23:16,20 28:6
35:17,17 36:5
37:8,14 43:25
52:1 60:18
65:13 69:23
74:21 88:10
90:17 96:20
98:5 100:5
104:6 106:11
106:23 107:19
108:19 114:6
119:8 123:10
128:7 131:4,11
134:2,8 138:23
139:2 140:8
141:6 144:21
145:12 149:15
150:6,21 153:5
153:6 157:18
meaning 17:7
46:11 58:7
82:18 98:18,19
means 37:8
69:25
meant 102:18,25
measure 74:15
measurement
91:2,3
mechanisms
66:17
media 30:15,16
132:10 133:4,7
133:21,22,23
133:24 134:2,5
134:10
meet 19:3,10
68:8 89:11
152:5,15
153:16
meeting 90:18
meetings 88:12
135:8

member 4:14
55:11 133:14
149:24
members 98:11
memorializati...
117:16 145:15
160:13
memorialize
123:14
memorialized
143:12
memorializes
145:17
memorializing
39:21
memory 50:20
Mensch 1:20
162:3,18 163:7
163:17 164:17
mention 48:16
112:18
mentioned 13:4
38:9,25 39:4
49:13 50:1,6,7
50:17 74:21
mere 108:25
123:10
merely 87:6
merit 81:22,24
85:20
merits 81:25
message 92:20
129:7,11,19
130:3,10
met 89:6 102:3
152:4 153:1,15
154:12 158:16
method 92:10
95:19
methodologies
36:18
methodology
21:20,23,24
22:2 34:11
37:5 84:23

88:3 92:10
94:12,20
Miami 133:1,11
Michael 1:11
2:13 4:2,12
36:3 160:1,15
160:23 162:5
163:9 164:24
165:3,25
microwave
88:10
middle 4:12
11:16 13:5,9
26:2 121:16
militate 65:19
MILLER 2:7
mind 81:2
116:25
minimum 42:9
64:21 124:16
147:10 150:20
150:21,23
Mintz 26:5
minute 141:19
minutes 45:14
74:25 114:20
131:20 155:18
misconduct 56:2
67:12,15
misquote 120:6
misspeak 104:8
misspoke 102:19
misstate 127:16
mistake 20:13
mitigation 37:11
moment 25:11
43:19 141:18
momentarily
5:25
month 80:2
92:22 122:16
123:10,10
146:22
months 11:10
49:8,14,18

123:11
moons 26:4,4
morning 79:17
79:18 97:12
mosaic 143:25
159:12
move 93:12
103:5
moving 137:3
Muller 26:5
multiple 30:3
54:10 80:24
92:17,25 93:4
98:11 101:8
111:7 136:10
152:11 153:19
155:16 158:13
mystery 160:4

## N

name 4:11,13
11:6 28:8,9
29:2 30:15
43:17
named 21:7
147:12
names 58:17
60:9 63:17
66:11 75:14,19
105:8
narrow 29:19
nasty 92:18
national 56:4
133:21
nature 4:17 16:4
84:16 90:10
91:13 97:4,9
111:16 116:17
120:1,18
149:21
Navarro 1:4
14:19 16:23
20:1,15 39:9
44:11 56:8,14
58:6,16,20

59:2 61:14
63:15 64:3,10
66:15 68:25
69:8 79:11
86:14 88:5
92:14 93:11
94:5 99:1,8
100:1 102:18
102:25 104:23
109:16 110:5
123:21 125:9
129:8,17,21
130:1,4,10,12
135:12,19
136:8,20,23
137:2,23
138:21,24
139:1,6,6,7
146:19 149:25
150:4 152:17
164:4 165:2
Navarro's 15:15
41:18 57:6
60:3,5 61:11
61:17,22 62:18
63:12 64:17
65:12 79:8
80:1,9 83:13
85:5,24 100:19
101:24 102:2
102:19 103:6
103:10 112:15
121:19 122:12
122:20 123:19
127:23 128:10
129:5 131:16
135:18 136:6,9
136:17 137:16
138:4,19
139:15 141:12
145:20 146:2
146:12,15,21
147:9 148:6,10
148:12 157:25
158:7 160:12

necessarily
  42:23 73:14
  127:9 156:4
necessary 17:19
  18:11 40:20
necessitate
  23:20 147:17
  147:20
necessitated
  147:22
neck 83:6,14
  85:6 93:3
need 5:25 6:9
  13:21 41:11,15
  41:17 57:2
  70:16,22,23
  71:23 72:19
  75:1 87:9
  100:11,14,17
  100:22 123:14
  135:14 140:8,9
  147:16 153:22
  156:3,11
  157:11
needed 64:24
  115:22
needs 39:6 40:12
  40:24 41:5
  93:25 105:18
  150:10 160:5
negative 147:15
negligent 21:13
negotiations
  25:6
neither 27:4
network 133:14
never 36:15,15
  52:12 97:20
  110:16 136:22
new 36:16
nine 47:12
nipples 83:5,13
  85:5 86:24
  93:3
non-attorney

31:1
non-attorney-...
  31:22
non-hostile
  27:18
noncompete
  134:11
nonprivileged
  124:15
Nos 79:1
Notary 163:8,18
note 118:24
noted 48:10
notes 48:2
  131:21 162:8
notice 3:3 6:15
  77:15,20
notification 3:13
  123:8
notwithstandi...
  115:14
nuances 140:15
number 23:5,25
  24:9 46:19
  47:11 48:20
  57:1 66:17
  75:24 83:8
  85:7 91:7
  117:13 140:13
  142:7 154:19
  159:13 160:22
  161:5
numbering 6:25
numbers 5:5
  6:19 57:24
  67:5
numerous 99:4

___ O ___

oath 3:12 4:3,18
  163:1
Object 20:4,6
  22:22 24:17,23
  32:25 33:12
  34:6,14 36:2

36:23 38:14
  41:3,14 43:8
  45:5 51:16
  55:6 57:13
  60:20 61:16
  62:16 69:22
  70:20 72:2
  74:18 75:6
  78:5 83:20
  87:11 90:7
  100:4,20
  105:21 107:14
  114:3 115:11
  118:14 120:22
  124:18 125:14
  137:17 138:22
  139:17 140:7
  144:18 151:20
  152:6,16 153:3
  153:24 154:22
  155:4 156:24
  159:16,23
objection 146:25
  147:23 149:6
  149:14 150:22
  151:3
objective 91:3,4
  91:16 93:10
obligation 105:9
  108:15 116:23
obligations
  108:7 132:13
obliged 117:23
observes 67:16
obvious 137:12
  149:17
obviously 4:19
  5:18 13:24
  36:8 49:9
  94:18 96:11
  107:17 135:3
  136:19 141:2,6
  141:6,8 150:5
  160:20 161:5
occasion 10:16

10:18 12:12
  75:8
occasionally
  38:2
occasions 13:2
  53:18 97:15,17
occur 46:13
  126:10
occurred 19:17
  19:22 47:18,24
  51:1 63:12
  64:4,10 107:9
  120:13 129:13
occurring 64:2
  112:13
October 4:15
offensive 86:9
offer 5:17 21:21
offered 79:7
offering 18:16
offhand 33:25
office 80:22
  100:9 122:13
  164:7
officer 46:7,20
  47:2,10,11,25
  48:2,3,20,23
  49:1,16 50:3,8
  51:4,13 52:5
  52:10,22 53:1
  54:15 55:11
  101:20
official 78:20,22
officials 104:18
  104:21
oftentimes
  157:10
Oh 58:23
okay 5:14,22
  6:10 7:8 11:13
  12:4 13:23
  20:12 29:13,19
  47:21 76:2
  81:17 87:15
  103:25 104:17

106:14 116:12
  122:14,17
  124:10 132:5
  139:11 146:11
  151:8 158:9
  161:7
Olas 2:3,8
once 123:2 137:4
  150:9 164:11
ones 148:23
  157:10
ongoing 26:15
  27:13 32:3
  43:21
opine 17:11,19
  18:8 40:20
  41:5 61:24
  66:3 69:10
  70:3 101:15,23
  102:1 108:22
  110:15 118:7
  118:16 119:2
  128:10 137:20
  151:12 155:6
opined 13:3
  108:20 116:15
  118:19 154:8
  154:16,18
  155:8 157:24
opining 10:21
  12:21,23 18:20
  19:2,9,16,24
  20:15,23 21:6
  21:12 39:5
  44:2 45:7,10
  64:8,9,12,14
  65:14,18,21
  73:2 81:24
  82:5 87:5,18
  88:25 89:4
  92:13 108:21
  108:25 109:3
  136:15 137:15
  152:2,13,24
  153:6,8,14,23

Navarro v. AutoNation

Michael Elkins 4/29/2024

154:11 155:2,5
155:20,22
158:10
**opinion** 5:17,19
5:20,21,22
9:23 10:5,9
15:20 16:10
17:9,25 18:12
18:15,16,18,18
21:21,25 22:14
34:2 36:14
37:1,10 38:8
41:8,24 45:11
45:12 57:22
58:6 59:6,13
62:3,8 63:21
63:25 64:24
65:25 66:22
68:20 69:18,21
70:3 72:9,23
73:17 74:1,2,4
74:7,13 81:9
81:21 85:19
86:4 87:16
89:10 90:3
92:8 97:23
102:7,14,15
103:6,9 104:1
105:14,15
106:9,12,16,20
106:23,23
107:2,3 108:3
108:10 109:2,7
110:9,21 111:8
111:9 113:4,9
113:13 115:14
116:6 120:1,19
122:25 123:16
124:3,8 126:21
127:2 128:9
131:1,9 132:19
134:17 137:16
138:20 139:16
139:23 140:5
141:4 148:11

148:14 151:17
151:25 153:5
153:10,17
154:14 155:9
156:2 157:7
158:6,12
**opinions** 7:19
8:2,10,18 15:7
15:18 37:18
73:14
**opportunity**
50:14 76:24
77:2
**opposite** 50:25
**opus** 145:16
**order** 42:3 47:7
55:17 77:3
93:19,20 116:4
120:11 140:10
**ordering** 164:11
164:12
**organization**
14:13 133:14
**origin** 56:4
**original** 164:11
**originally** 68:16
**outcome** 80:10
80:12,15
**outside** 22:12
111:13 142:25
151:18 155:6,9
155:21,22
156:5,9 157:8
**overall** 62:24
69:10 90:3
137:22 148:21
**overlapping**
81:7
**overlaps** 9:16
**overturned** 25:5
**Ownership**
11:15

---
**P**
---
**P.A** 2:7

**p.m** 1:15 77:6,6
114:23,23
131:22,22
141:20,20
161:11
**Pacheco** 15:11
15:14 16:3,9
17:1,14 20:16
41:19 44:12
57:10 60:4
61:11,23 63:13
65:9 85:25
88:6 96:10
102:20,21,22
109:13,25
110:4,17 112:3
112:24 115:20
116:11,24
117:6,19 118:4
118:16 119:2
119:21 120:18
121:10 122:1
122:11,23
123:1,22
124:10 125:17
127:3,15 146:3
147:4
**Pacheco's** 15:17
16:13,20 17:3
17:20,24 18:2
18:6,9 102:15
112:5,10,20
113:4,13
115:10,17
116:2,5,8
118:8 121:9
122:8 123:5,25
125:7 127:6
145:23 146:6
146:19 157:23
**page** 2:12 3:2,10
14:1,3,17 17:8
57:23 58:1,5
65:23 67:4,6
73:13 109:9

115:3 121:9,15
122:3 132:9,10
165:4
**pages** 1:12 39:23
47:5 79:8
162:6
**paid** 80:10,14
133:20 134:13
**paint** 91:7
117:12 160:22
**paint-by-num...**
91:16
**Palm** 163:5
164:20
**paperwork**
79:11
**paragraph** 17:8
17:16 58:4,5
65:24 67:7,10
74:2,12 86:5
97:23 103:21
103:22,23,24
104:12 107:5
108:1 109:7,8
109:12,20
113:3,8 115:3
119:5 121:16
**paragraphs** 81:9
81:13
**parking** 47:16
**part** 31:14 52:9
53:9 59:6,10
63:21 65:7
88:6 94:18
102:13 106:9
106:25 108:2
114:5,7,7
118:3,9 126:13
129:2 137:15
137:24 138:4,8
139:15 141:11
144:1 148:16
151:6,6 153:9
155:9 156:1
**participate**

28:15
**participated**
132:21
**particular** 7:12
13:2 16:19
30:6 40:25
46:25 58:5
62:5,23,25
64:14,17 65:24
76:2 82:13,18
83:25 84:24,25
87:25 88:4
91:5 99:24
100:17 105:18
106:6 135:5
140:14 145:5,7
151:23
**particularly**
88:14 144:2
148:23
**parties** 22:25
44:16 129:13
162:10 164:12
**parties'** 162:11
**Parts** 8:25 9:4
**party** 28:9,11,12
29:24 30:1,4,7
30:12 34:20
42:11,13 44:16
44:16 46:4
52:17 53:19
54:14 94:17
111:13 142:25
145:2 164:11
**party's** 12:7
97:18
**pay** 37:11
133:22,24
134:14
**PBA** 55:15
**peer** 113:25
**peer-reviewed**
132:22
**penalties** 165:22
**pending** 10:24

Navarro v. AutoNation

Michael Elkins 4/29/2024

Page 184

127:14 154:24
**pension** 37:12
**people** 23:25
  60:6 83:21
  84:12 93:14
  97:6 98:13
  118:15 133:24
  149:18
**percent** 22:6,7
  30:20 39:13
  122:25
**perfectly** 93:25
**performance**
  80:17
**period** 38:4
  46:16 47:17
  101:8
**perjury** 165:22
**permit** 91:4
**permitted**
  133:15
**perpetrator** 29:2
  29:6 53:19
**perpetrators**
  29:3,3
**person** 7:2 21:14
  34:4,7 36:5,20
  36:25 40:20
  44:6,9 55:22
  58:18,21 61:6
  83:17 84:3
  91:25 92:3,4
  96:18 97:7
  119:21 120:4
  151:7 158:18
**personal** 36:3
  37:17,21,25
**personally** 25:7
  163:9
**persons** 59:4
**perspective**
  65:17 84:21
**pertains** 137:16
**pertinent** 62:1
  77:8

**pervasive** 49:4
**phone** 11:11
  29:17
**phrase** 68:9
  82:17,21 87:25
  98:5,16 99:20
  99:21,24 102:4
  102:12,13
  106:7 108:2
  139:5
**phrased** 102:4
**physical** 49:20
  86:13,15 90:1
**pick** 149:18
**piece** 106:16
  131:10 143:2
**pinpoint** 140:22
**place** 71:15
  79:11,14
  128:15
**places** 69:18
  133:3
**plaintiff** 1:5 2:1
  11:6 12:8,9
  13:8 14:19
  57:3 144:3
**plaintiff's** 17:13
  38:2 81:22
  85:20 107:7,21
  121:11 147:24
**plan** 76:18
**play** 39:3
**played** 124:24
  131:8,13 141:5
**pleadings** 85:14
**please** 4:10 5:11
  5:21,25 6:16
  7:11 11:12
  18:14 57:18
  79:9,19 81:5
  92:7 114:24
  121:3 129:16
  132:6 146:7
  151:9 152:8
  164:7

**PLLC** 2:2
**plus** 38:5 47:6
**point** 6:8 9:22
  25:4 26:14
  28:22 32:12
  40:8,15 45:18
  51:18 68:16
  82:24 85:25
  92:20 96:13
  106:2 118:22
  120:15 121:3
  123:7 124:7
  125:13,18
  140:18 141:10
**pointed** 68:18
**pointedly**
  107:25
**pointing** 37:16
**points** 82:24
  103:7 152:3
**police** 29:8
  30:25 54:1
  55:17,18
**policies** 18:21
  67:7,20 68:8
  68:14,18,21
  69:4,11,20
  70:13,15,17,18
  71:16,19 72:4
  72:7,11 73:5
  73:10,15 74:5
  108:21,22,23
  109:3 150:6
  153:9
**policy** 46:13
  70:21,22,23
  71:4,22,25
  108:16,18,25
  150:12
**politely** 35:23
**Pollard** 2:2
  13:11
**Port** 26:3,16
  32:2
**portion** 81:14

**portions** 81:20
**posited** 155:25
**position** 86:22
**possibility** 51:23
**possible** 17:4
  28:25 33:24,25
  45:13 57:16
  77:15,21 78:2
  110:6,10 137:5
  148:18
**post** 44:4 50:13
  52:2 61:17
  124:4 134:1,4
  134:12
**post-employm...**
  39:10 62:14
  139:1
**post-terminati...**
  62:9 136:7,22
**posted** 134:12
**potential** 23:8
  94:8,21 148:13
  157:3
**potentially**
  72:19 83:15
  86:20
**practice** 22:6
  78:19 80:8
  91:22 95:9,10
  152:21 160:18
**practices** 35:24
  36:4 66:8,24
  67:3,18 68:3,9
  69:17 70:5,8
  72:10 74:5
  102:3 113:6,15
  113:16 144:11
  144:21 146:24
  152:15,20
  153:2,7
**practices/stan...**
  66:5 102:5
**practicing** 36:7
**Prater** 2:2,15
  6:18 7:5 20:4,6

22:22 24:17,23
  32:25 33:12
  34:6,14 36:2
  36:23 38:14
  41:3,14 43:8
  45:5,13 51:16
  55:6 57:13
  60:20 61:16
  62:16 69:22
  70:20 72:2
  74:18 75:6
  78:5 83:20
  87:11 90:7
  100:4,20
  105:21 107:14
  114:3,12
  115:11 118:14
  120:22 121:15
  124:18 125:14
  127:21 128:21
  132:2 137:17
  138:6,22
  139:17 140:7
  141:18,22
  144:19 145:24
  146:1 147:7
  148:4 149:10
  149:23 150:24
  151:8,20 152:6
  152:16 153:3
  153:24 154:22
  154:24 155:4
  156:24 159:16
  159:23 161:8
  164:2
**Prater's** 121:23
  122:13
**predate** 147:4,5
**predicated**
  33:23
**predict** 125:22
**prefer** 54:24
**preferred** 15:6
**prepare** 42:3
**prepared** 158:9

Navarro v. AutoNation

Michael Elkins 4/29/2024

Page 185

preparing 14:4
  14:14 42:16
present 156:22
presented 41:23
Preserve 42:5
presumably
  79:17
presume 109:22
pretty 39:25
  64:20 92:14
  93:25 143:23
  145:3
prevailed 24:21
prevented 61:14
preventing
  61:19
previous 6:19
  132:15
previously 50:8
  56:23 57:3
  82:4 113:19
  127:20 129:4
  129:16 145:19
primarily 22:3
  35:7 36:12
  67:24 84:6
  88:2 113:20
  118:1 119:23
principles 56:1
  97:19
printed 79:17
prior 10:16
  12:12 16:10
  20:16 41:25
  42:2 46:16
  47:10,18 53:25
  54:9 63:12,23
  126:23 128:5
privilege 146:13
privy 140:17
probably 5:6
  75:14 78:6
  81:10 105:6
  106:2 123:14
  133:18 135:9

145:2
problem 20:14
  48:19 97:8
  103:1,4 127:4
  137:7 143:21
problematic
  38:23 48:18
  66:20 72:20
  98:25,25
  105:10 123:9
  145:6,12 148:2
  148:19 150:7
  151:15 160:2
problems 157:24
procedure 71:23
  71:25 97:13
  108:18
procedures
  68:14,18,22
  69:5,12 71:16
  71:19 72:5,7
  72:11 73:5,10
  73:15 74:6
proceeding
  24:22 137:3
  140:4
process 96:17
  97:13 107:19
  151:1
processing 41:4
  152:7
produce 145:2
produced 18:5
  56:23 64:15
  96:5,7 146:13
production
  14:11
professional
  1:21 132:17
  141:7,8 149:13
  162:3,19 163:7
  164:18
professionals
  75:12,21
  118:11 148:11

148:20 149:4,8
  151:13 154:3
  155:12 156:6
  156:15,21
  157:1,4,9,14
professionals'
  75:25
proffer 69:21
proffered 9:24
  13:18
profile 134:6,12
prohibit 54:22
prompt 77:13,19
  77:22
promptly 42:24
properly 34:23
  151:5
proposed 35:12
proposition
  77:11,16 78:1
  122:21
prospect 111:20
  112:13
protected 56:3
provide 10:9,18
  11:6 12:7
  44:23 77:3
provided 9:22
  10:5 11:23
  12:13 13:5
  15:2 48:1
  52:16 54:19
  72:24 73:10
  76:22 96:4
  112:1 140:16
  144:8 154:6
  157:21
providing 32:11
provision 10:1
public 30:12,17
  30:19 54:25
  55:1 163:8,18
publication
  132:22 133:11
publications

132:11,15,25
  133:5,13,15,17
publicly 30:12
  54:15
purposes 62:8
  92:7 134:17
pursuant 6:16
  9:25 76:22
put 127:18
put-together
  94:1
Putting 150:6

Q

qualifications
  116:3,7,13,15
  118:4 119:3
  134:18
qualified 34:18
  36:15 116:25
  141:7
question 5:12,13
  6:4 31:7 41:5
  63:5 70:11
  85:22 87:2
  96:18 97:10
  106:6 107:25
  111:17 119:17
  121:23 124:13
  125:2 128:22
  130:9 133:12
  136:19 139:5
  140:11,20
  144:9 147:1
  149:7 153:20
  154:14,24
  156:17,20,25
questions 6:2
  23:8 81:15
  135:24 155:25
  156:4 159:5
quibble 160:10
quickly 42:24
  143:23
quiet 92:21

quotable 133:23
quote 96:25
quoted 133:3,19
  134:7
quoting 121:16

R

R 1:20
race 56:4
racial 90:15
raised 33:9 49:1
  82:3 93:9
raises 81:23 85:1
  85:20
raising 97:24
  99:19
range 5:7
rank 60:1,4,21
ranked 59:25
  60:18
ranking 60:9,10
rate 37:5,7,14
rates 37:13
rattle 75:14
reach 21:20,25
  34:18 35:3
  37:23 70:16
  82:9 84:24
  86:1 87:7,12
  87:19 92:2
  94:10 100:1,12
  100:15,18
  105:18 112:17
  128:7
reached 26:18
  29:10 34:5
  36:20,25 37:19
  37:23 38:18
  45:8 63:10
  71:4 74:11
  76:23 88:22
  92:2,8 95:2,5
  95:25 104:15
  119:25
reaching 36:19

Navarro v. AutoNation

Michael Elkins 4/29/2024

Page 186

41:9 45:6
46:24 47:2
50:2 71:7
92:10 130:25
**read** 7:9 43:16
57:6 70:18,22
73:21 81:13,19
81:19,24 82:3
92:9 94:24
97:1 100:23
101:3 105:19
106:10 113:11
115:6 119:11
122:11 131:8
156:11 161:8
165:22
**reading** 8:22
92:9 98:8
148:10 161:9
164:7
**reads** 17:11 66:2
81:22 86:5
87:17,22 89:16
97:24 104:12
109:12 110:17
113:3
**real** 95:11 149:2
**realize** 139:24
**really** 5:7 34:22
43:10 45:11
49:2 60:21
93:12 97:5
100:11 108:19
113:1 120:24
125:17 130:9
131:9 137:25
138:23 141:2
142:8 152:2
**realm** 51:23
**reason** 15:12
57:23 79:25
105:25 127:13
130:10 165:4
**reasonable**
20:18 65:17

88:18 89:2
97:3 102:2
116:17 118:24
127:25 129:1
129:10 130:14
144:13,16,23
144:24 145:3,4
145:11 146:23
147:8,13,14
151:7,7 157:13
158:17
**reasonableness**
12:24,25 13:3
62:22 102:6
118:25
**reasonably**
46:12 77:13,19
78:3 127:1
**reasons** 78:15
**recall** 25:21 33:1
55:23 58:16
64:1 116:6,14
120:10 131:14
148:7
**receipt** 61:13
124:4,23
164:10
**receive** 110:1
**received** 109:25
110:5 122:4,12
123:19 124:14
**receivers** 157:11
**receives** 67:11
110:24
**recognize** 43:3
148:10,15
**recognizing**
148:12
**recollection** 39:9
54:8 105:5
120:7 127:17
**recommend**
28:19
**recommendati...**
28:17

**record** 6:18
16:17 30:19
45:24 55:1
73:6,12 77:5
78:16,17,19
79:21 81:14
96:2,3 114:22
114:24 141:19
146:16 157:1
162:8
**recorded** 79:21
**records** 9:18
54:25
**redirect** 2:16
151:9,10
**refer** 20:7 56:24
66:22 91:3
**reference** 56:25
65:24 67:2,7
73:13 82:24,24
89:11 103:7
109:17,24
110:6,8 131:17
132:9 134:5
155:13
**referenced** 17:3
20:17 58:4
65:2 67:17
68:17 72:12
73:19 74:6
88:5 120:19
121:8 141:25
**referencing** 60:5
82:13 121:14
**referred** 5:17
44:7,10 128:25
143:3 159:12
**referring** 53:14
58:23 66:9,21
67:18 68:13
70:9 109:21
113:17 117:22
144:11
**refers** 66:24
67:1

**reflect** 44:25
101:24
**reflecting** 147:3
**reflective** 52:23
**reflects** 103:6
**regarding** 16:12
16:25 18:21
40:16 56:13,19
68:8 70:13,16
73:15 90:23
132:13,17,23
148:5
**Regardless**
81:22 85:19
**Region** 67:14
68:23 69:11
**relate** 23:6
**related** 55:1
89:25
**relating** 25:9
26:3,6,9 27:6
37:11 44:23
54:7 64:25
78:7 88:14
93:14 112:19
134:23 156:15
157:16 158:25
**relations** 148:16
**relationship**
23:1,4,12
25:15,17 31:14
31:18 42:23
**relative** 49:20
62:23 150:13
162:9,11
**relatively** 35:13
36:16 106:1
**relevance**
139:25 140:24
**relevant** 45:4
109:14 110:19
111:22 112:14
121:17 139:16
139:23 140:6
**relied** 8:1,17

68:21,25 140:1
161:3
**rely** 22:15 35:3
116:18
**relying** 37:22
38:11 62:8
85:12 134:17
153:18
**remainder** 8:22
**remained** 130:6
130:11,12
**remedial** 138:15
138:18
**remember** 11:4
11:5,9 16:25
17:5 26:12,14
26:24 33:25
34:1 44:13
45:20 49:24
53:5 54:11
55:14,16 57:12
57:14,16 58:15
59:1 60:16
66:18 73:11,23
115:19,20
120:14 131:9
131:12 133:9
140:18 143:8
143:19,20
156:8,13
**render** 15:7
18:11 22:14
**rendered** 15:18
15:20 73:18
**rendering** 16:10
17:24 37:19
68:20 73:17
116:6 158:6
**repeat** 16:6
33:13
**repeated** 154:14
**rephrase** 31:7
139:18 147:16
**replicate** 34:4
**report** 3:4 7:17

Navarro v. AutoNation

Michael Elkins 4/29/2024

Page 187

| | | | | |
|---|---|---|---|---|
| 7:19,21,25 8:2 | 143:7,10,12 | 71:14,15 | 70:19 89:1,4 | 119:2 124:22 |
| 8:8,10,16,18 | 145:2,17,18 | **requires** 39:6 | 89:11,23 94:24 | 125:24 138:5 |
| 10:18,20 11:23 | 153:4,5,10,14 | 70:22 72:25 | 110:12 112:14 | 154:6 164:11 |
| 12:1,4,8,10 | 153:17 154:8 | **requiring** 72:5 | 129:18 135:18 | **reviewing** 6:5 |
| 13:18 14:14 | 154:10,13,15 | **research** 36:9 | 136:6,16 | 45:21 68:19 |
| 15:7 17:8 18:3 | 154:20 155:5,9 | **researching** | 138:19 144:12 | **Rey** 59:7 60:7,13 |
| 18:4,4 19:18 | 155:21,23 | 86:22 | 144:16 145:23 | **right** 5:10 6:2,6 |
| 20:8,17 23:18 | 156:5,9 162:5 | **resign** 146:3 | 146:6,19 | 7:11 26:12 |
| 25:1,2,4 28:7 | **reported** 30:13 | **resignation** | **responses** 130:2 | 27:3 31:16 |
| 30:16,19 32:4 | 66:16 72:6 | 127:24 130:5,7 | 140:10 | 45:21 46:19 |
| 35:4 38:13,18 | 80:2 150:9,10 | 130:11,13 | **responsibility** | 58:17 59:12 |
| 39:4,21 47:5 | **Reporter** 1:21 | **resolution** 27:10 | 107:20 119:19 | 68:7 71:2 75:1 |
| 47:23 48:1,9 | 3:11 162:1,4 | 80:10,13,15 | 139:24 | 79:17 81:4 |
| 49:7,10 50:17 | 162:19 163:8 | **resolve** 143:10 | **responsible** | 85:22 87:7 |
| 50:19,19 51:19 | 164:18 | **resolved** 12:3 | 117:2 | 96:21 101:16 |
| 51:20 52:9 | **Reporters** | 27:13 143:23 | **responsive** 8:3 | 102:11 105:8 |
| 53:8 54:19,23 | 164:19 | **Resorts** 11:4 | 8:11,19,25 9:3 | 119:15,17 |
| 55:2,4 56:24 | **reporting** 49:17 | **resource** 75:15 | 9:8,12,15 | 121:14 135:9 |
| 57:18 58:10,11 | 49:20 68:8 | 75:22 118:11 | **rest** 156:11 | 137:18 140:23 |
| 59:13,17 60:12 | 69:5 70:13,16 | 133:21 142:5 | **resulted** 61:19 | 141:9 144:23 |
| 61:3 64:1,15 | 70:18,22 71:23 | 151:13 152:15 | **results** 103:15 | 146:4 147:5 |
| 65:7,23 66:4 | 72:1 73:17 | 153:2 | 142:15 | 161:8 |
| 66:19 67:6,13 | 108:15 150:1 | **resources** 47:22 | **résum** 13:20 | **Rights** 71:22 |
| 67:15 68:17,24 | 150:16,23,25 | 62:22,23 63:22 | 115:4 132:7,10 | 72:17 73:3 |
| 69:8,13,16 | **reports** 26:17 | 75:5,7 89:2,5,8 | **resume** 131:21 | **rises** 20:24 |
| 70:2,4 71:3,5,8 | 119:21 132:14 | 89:23 91:8 | **retain** 12:10 | **risk** 96:13 |
| 71:12,14,24 | **represent** | 95:12 97:2 | 26:16 28:3 | **Rodriguez** 21:15 |
| 72:12,20 81:5 | 122:15 146:11 | 107:8,11 108:2 | **retained** 12:17 | 58:7,7 59:14 |
| 81:14 85:16,18 | **representation** | 108:9 111:5 | **retaining** 21:14 | 59:25 60:19 |
| 89:15,16 93:17 | 129:6 | 117:23 142:4 | **retract** 52:6 | 61:15 92:16,16 |
| 94:1 95:17 | **representing** | 148:11 149:22 | **review** 5:25 | 92:21 93:1 |
| 97:2 98:17 | 22:11 35:9 | 150:19 152:20 | 13:21 14:4,9 | 129:8 |
| 102:12 104:4 | 36:10 38:3 | 153:7 154:3 | 14:12,24 15:25 | **Rodriguez's** |
| 104:13,24 | 152:22 | 160:5 | 16:9 56:15 | 98:4 102:17 |
| 105:10 106:8 | **request** 54:25 | **respect** 9:21 | 73:15 128:16 | **role** 35:10 36:16 |
| 107:10,13,17 | 129:18 130:1,7 | 16:1 35:24 | 132:17 133:2,8 | 62:3 128:19 |
| 107:23 109:5 | **requested** 162:7 | 48:13 70:15 | 138:1 140:21 | 131:9,13 |
| 109:13 110:11 | **requests** 96:6 | 97:9 106:6 | 154:7 162:6 | 140:24 158:24 |
| 110:18 111:10 | **require** 69:5 | 135:3 150:18 | 164:7,8,9 | 159:1 |
| 111:21 115:25 | 72:7 140:21 | **respectfully** | **reviewed** 13:23 | **room** 23:20 |
| 118:9,23 | **required** 67:13 | 35:17 36:24 | 14:2,7,10 | **rose** 98:21 |
| 120:19 131:11 | 70:17 71:5,12 | **respond** 146:9 | 22:17 34:3 | **rude** 89:17 |
| 131:14,24 | 73:6 104:24 | **responded** 110:2 | 37:23 65:10 | **rule** 9:25 108:5 |
| 136:3,5,13 | **requirement** | **response** 61:11 | 73:7,9,22 | 132:13 134:11 |
| 138:9 140:24 | 68:23 69:13 | 61:13,22 62:10 | 112:18,21 | **rules** 5:11,18 |

Navarro v. AutoNation

Michael Elkins 4/29/2024

10:2 91:9
**run-of-the-mill**
88:8 158:22

**S**

**S** 2:2
**said/she** 53:15
**Saint** 26:3
**sales** 60:7
**salesperson** 60:8
**Sally** 23:19,22
**sanctioned**
43:22
**sauce** 81:1
**saw** 60:6 104:23
146:6,10
**saying** 24:11
39:2,23 40:10
83:11 93:11,24
100:2,22 109:2
115:24 124:6,7
127:10 145:14
154:17
**says** 58:11 60:6
64:21 65:8
70:3,7 85:19
91:17 92:17,17
146:7
**scale** 82:21
89:25
**scenario** 90:8
**scheduled** 49:22
**scheme** 62:25
**schemes** 98:3
**scope** 16:4 17:9
18:16 42:6
45:12 65:25
69:12 70:3
74:2,12 151:16
151:18 153:4
155:21,22
156:5 157:8,12
158:11
**seasoned** 91:19
160:17

**second** 14:3,17
58:5 66:2 74:1
74:12 75:1
103:23 104:6
104:11,12
109:6,8,19
119:9
**secret** 80:25
**section** 14:3,22
17:7 18:15
57:21 59:13
104:1 106:16
107:2 113:9
121:17 122:10
**sector** 30:17
**see** 14:22 17:9
39:25 50:12
66:6 73:19
80:19 89:21
93:8,9,18
105:25 112:24
116:19 120:25
121:12 124:2
124:11 134:7
136:16 140:9
149:2 156:3,12
157:21
**seen** 15:24 18:10
36:8 75:23
96:1,3 118:22
142:6,10,11
145:19 146:2
160:1
**sees** 69:7 150:7
**send** 80:20,25
**sending** 80:24
129:8
**senior** 147:25
**sense** 47:19
73:24
**sent** 41:19
127:24
**sentence** 17:15
59:12 66:2,6
70:2,9 74:1,12

81:15,22 82:2
85:18,19 86:4
87:16,22 89:16
89:21 98:17
103:21 104:7
104:12 105:14
106:3,19,22
107:5 108:1,15
109:12 110:17
113:3,8,17
119:9 123:4
**sentences** 81:11
81:11,16 107:1
**separate** 25:15
27:16
**sergeant** 48:5
**series** 83:15
**serious** 39:18,18
40:22 41:2,12
41:19 64:20
81:23 82:5,6
82:10,15,15,17
82:21 83:1,1,2
83:9,16,23,23
84:2,11,17
85:1,10,13,21
86:2 90:5
95:11 97:25
98:9 103:13
135:9 150:5
160:10,11
**seriously** 146:8
150:7
**seriousness**
90:11 115:23
**services** 12:13
12:23 13:6
32:11 80:17
**set** 7:19 8:2,10
8:18 35:2,14
55:25 82:14
113:23 114:14
117:11 150:14
**seven** 131:20
**severe** 49:3

**severity** 20:25
157:12
**sex** 28:1,2,13
56:2 142:8
**sexual** 19:11
24:25 26:9
27:15 28:4
36:11 38:20
41:1,12 48:10
50:22 56:2
90:10 92:23
101:20 129:12
143:6,17
158:22
**sexually** 89:24
90:15 92:22
**shape** 134:3
**shaped** 142:3
**share** 114:2
**sheet** 3:14 45:21
165:1
**shoes** 31:6
**short** 39:25
**show** 5:24 56:22
96:9,22 143:12
**showing** 118:23
127:19 129:4
157:22
**SHRM** 75:15
**side** 127:18
129:19 144:3
145:1
**sign** 164:8
**signature** 164:22
**signatures** 75:25
**signed** 54:21
163:11
**significance**
4:18
**significant** 50:4
50:10,13 82:15
**signing** 161:9
164:8
**similarities** 91:9
**simple** 120:4

**simply** 96:1
106:9 108:14
116:18 127:4
127:10
**Sincerely** 164:13
**single** 48:23
133:22
**single-spaced**
47:5 49:7
**sir** 4:10 5:15,23
6:3,7 7:9,11
13:1,7,17 14:1
17:10 18:14
22:19 25:20,24
41:8 55:5
56:22 58:3
68:6 70:7 77:8
79:6 81:4
85:17 90:3
94:23 103:25
104:2 109:11
132:6 133:6
141:16 145:22
145:25 152:2
159:19
**SITTERSON**
2:7
**sitting** 57:15
60:1 73:11,22
137:18 138:3
150:8
**situation** 25:8
44:2 53:14
96:24 111:5,6
111:19 119:1
120:24 121:1
122:5 152:17
**situations** 111:4
160:21
**six** 11:9 54:12
123:11
**skill** 149:13
**slurs** 90:15
**small** 140:15
**so-and-so** 65:8

Navarro v. AutoNation

Michael Elkins 4/29/2024

Page 189

**Society** 75:15,22
**sole** 59:11
**solely** 23:7 59:9
  150:11
**solid** 160:6
**somebody** 86:18
  86:23 90:12,13
  96:24 115:21
  158:4
**soon** 77:13,19
**sorry** 16:7 20:5
  28:21 29:14
  33:13 40:23
  43:9 57:24
  58:19 70:11,14
  73:8 82:16
  102:19 103:22
  104:6 106:21
  113:7 116:10
  129:20 131:4
  132:4 152:8
  154:23 159:24
**sort** 82:20
  113:25 127:25
  137:22 142:19
  142:22 143:24
  148:24
**sorts** 142:12
**sought** 12:25
**sound** 134:3
**sounds** 34:21
  36:5
**source** 16:4
  67:19 70:10
  98:18 104:23
  113:16 126:24
  161:1,3,6
**sources** 68:2
  74:1,4,10
**Southern** 1:1
  11:2
**spanning** 47:13
  49:7
**speak** 34:7,19
  36:5 42:5 48:7

60:10 62:2
83:21,22 84:12
84:14 100:21
101:13 108:22
111:3 117:9,18
118:15 120:24
125:15 136:20
136:23 137:3
149:15
**speaking** 42:11
91:11 108:24
**speaks** 70:24
93:1 105:4,12
105:24 128:9
154:13,15
**specific** 23:24
24:3 30:23
65:21 70:9
75:18,25 85:4
88:13,15 92:14
92:15 95:9,11
107:5 133:12
140:23 154:4,4
154:6,7,12
155:13 156:13
158:11,15
159:10
**specifically** 7:17
7:21,24 8:8,16
32:14 48:10
53:5 56:25
67:7 73:11,20
93:1 95:3
100:2,8,24
101:1 109:17
131:14 136:14
138:8 154:16
155:13
**specifics** 40:6
73:3 75:16
94:4,7,7 113:1
156:8
**spectrum** 88:7
91:5 116:21,23
117:9,10 151:1

**speculate** 156:16
**spell** 4:10
**spells** 109:20
**spend** 42:15
**spent** 9:18
**spoke** 48:4 51:5
51:13
**spoken** 50:8,11
148:3
**spot** 157:15
**SS** 163:4
**St** 26:16 32:2
**stage** 92:24
**stand** 11:17
97:10 122:21
123:16,23
124:3
**standard** 19:4
19:10 35:14
42:8 66:8
67:19 72:10,11
78:19,21,22
89:7,11,12,12
89:13 91:2,3,5
98:20 102:3
108:5 117:21
118:25 119:18
144:11,20
145:12 146:24
150:18 151:2,6
152:5,12,15,19
153:1,16,22
158:11,17
159:20,21
160:1,16,23
**standards** 14:13
22:16 35:2,24
36:3,21 55:25
66:23,24 68:3
68:4,10 69:18
70:5,8 74:5
82:14 113:24
114:13,15
142:4 153:20
154:12 155:2

155:16,20
156:1 158:15
**standpoint**
99:16 116:16
**stands** 98:2
**state** 4:10 42:19
61:8 163:3,8
163:18
**stated** 85:23
122:5 153:10
153:17 154:8
154:10 165:22
**statement** 20:8
51:9,14,22,23
52:2 58:10,12
58:13 60:17
61:2,7 72:23
78:11 90:9,23
106:11 110:21
123:5,25 127:6
**statements** 9:19
51:15 52:18
56:20 63:23
90:16 107:2
**states** 1:1 11:1
11:16 100:3,19
**statistics** 37:10
**status** 133:20
**stayed** 92:21
**STEARNS** 2:7
**Stefanie** 1:20
162:3,18 163:7
163:17 164:17
**stenographic**
162:8
**stenographica...**
1:20 162:5
**step** 31:5 48:8,17
50:16,24 51:2
**steps** 138:16,18
**stop** 6:6
**store** 146:9
**stories** 53:20
**story** 111:12
**Street** 164:19

**stretch** 119:25
120:3
**strike** 12:22 33:6
37:20 41:25
42:18 44:8
51:8,10 53:23
60:25 62:11
66:21 76:21
87:15 116:22
122:9 136:3
**study** 18:19,24
19:6,13,20
20:20 21:3,9
21:17 151:23
**stuff** 26:11 30:22
**style** 6:25 11:3
11:14
**styles** 99:25
**subject** 10:20
47:8 77:1
99:15 132:18
132:18,23
**subjected**
101:20
**subjects** 18:17
18:19
**submit** 133:15
**submitted** 32:4
**subordinate**
117:24
**substance** 130:4
156:23
**substantiate**
49:11
**substantiated**
47:3 122:7
123:7 124:1
**successful** 33:10
**sufficiency**
10:21 17:12,19
17:25 32:22
33:1 34:12
44:24 62:4,14
63:11 78:7
88:20 93:19,21

Navarro v. AutoNation                    Michael Elkins 4/29/2024

108:21 109:3
128:10 137:14
137:20 143:13
149:1 153:8
**sufficient** 24:16
 32:23 63:22
 78:13 95:20
 97:21 102:3,10
 118:4,11,17,20
 119:3
**sufficiently**
 29:19 49:3
 78:3 116:25
**suggest** 6:10
 105:2 128:4
**suggested** 164:9
**Suite** 2:3,8
 164:20
**sum** 130:4
 156:23
**summaries** 15:2
 107:3
**summarize** 40:1
**summarized**
 94:25 159:11
**summarizing**
 109:14 110:18
 111:21
**summary** 40:4,5
 48:2 49:6 94:3
 94:4 106:10
 130:21
**Sunshine** 30:18
 30:20
**super** 50:22
**supervise** 55:9
 116:24 117:4
**supervised**
 115:16 118:18
**supervising**
 21:14 117:2
**supervision**
 117:19 118:13
**supervisor**
 101:22 112:6

112:22 117:3
117:22 120:2
120:15 127:11
127:24
**supervisors**
 88:15 147:25
**supervisory**
 116:16
**support** 49:11
 65:11 88:20
 93:21 95:14
 145:8
**suppose** 111:13
 112:16 122:4
 137:21
**supposedly**
 15:15
**sure** 7:2 9:20
 10:14 16:8
 18:15 27:8
 36:16 37:14
 39:13 45:7,15
 58:20 69:24
 73:25 76:11,13
 82:17 87:4
 91:8 93:19
 101:18 104:9
 105:7,22 110:3
 115:22 127:19
 135:25 136:13
 139:21 152:11
 156:4
**Surely** 40:19
**Surfside** 24:25
 26:9,19,25
 27:2,12 28:5
 28:14 29:5,23
 30:2,9 31:1,20
 46:2,22 47:1
 54:2,19 101:9
 101:13,17,19
**survey** 100:6
**sustained** 46:8
**swear** 4:3
**swearing** 90:13

**sworn** 163:10
**systemic** 98:1,3
 98:16,22,24
 99:9,11,20
 101:11,15,25
 102:13,16
 103:7,12,17
 148:5,13
 151:14 156:17
 156:22 157:3

---
                 **T**
**tabbed** 94:1
 145:16
**take** 5:25 6:16
 13:21 41:21
 45:13 57:2
 79:19 86:22
 90:8 96:14
 103:13 109:21
 114:20 128:1
 129:11,16
 130:14,24
 131:6
**taken** 1:20 4:23
 112:11 125:5
 137:7 138:16
 138:19 157:23
 165:3
**takes** 146:8
**talk** 23:18 62:20
 67:10,15 109:4
 131:14 138:4
 144:12,20
**talked** 37:24
 92:21 95:14
 96:20 108:12
 117:6,10
 125:22 128:13
 135:8 141:25
 143:14 145:17
 146:4 150:5,17
 160:22 161:2
**talking** 95:13
 116:10 123:9

123:11 134:10
140:14 144:10
144:17 145:16
**talks** 92:14,25
 93:6 98:9
**tea** 101:3
**teaches** 95:16
**technique** 37:6
**techniques**
 36:18 55:25
**tell** 12:19 26:23
 29:10 41:11
 48:3 50:15
 53:19 75:14,17
 76:1 92:5
 107:20 122:2
 127:21
**telling** 85:6
 90:13 92:16
**tells** 84:7
**ten** 47:13 74:25
 132:15
**tendered** 130:4
**tendering** 130:7
**term** 23:17
 82:17 86:7
 111:18 144:13
 159:13 160:10
**terminology**
 153:8
**terms** 20:25
 22:24 34:10
 44:14 45:6
 48:5,7 50:9
 51:6 55:24
 69:15 71:2
 89:23 90:4
 99:11,14,23
 114:11 117:9
 128:12 134:16
 135:4 137:13
**terrible** 36:6
**test** 34:5,11,22
 78:13
**tested** 36:1,14

**testified** 18:5,9
 35:5 46:3 64:4
 66:13 93:4
 96:3 104:25
 105:8,15 106:1
 106:13,24
 107:16 108:11
 111:4 112:6,9
 114:19 115:15
 116:20 120:14
 120:23 124:2,9
 127:14 148:5
 153:11,25
 158:13
**testifies** 112:24
**testify** 51:18
 53:7 92:3
 111:7 112:7
 114:8 125:21
 128:17,18
 135:21 157:14
**testifying** 5:20
 115:19 120:10
 121:1
**testimony** 4:4
 5:17 9:23 10:5
 10:6,9,9 16:14
 16:21,23 35:16
 41:8 66:10
 73:9,20 85:15
 97:12 104:16
 104:17 105:4,5
 105:12,20,23
 105:24 106:10
 106:12 112:2,5
 112:21 119:12
 120:5,25 121:3
 121:14 122:8
 122:10,20
 124:21,22
 125:22 127:16
 130:5,22,25
 132:23 145:9
 155:24 156:1,3
 156:12 158:10

Navarro v. AutoNation

Michael Elkins 4/29/2024

| | | | | |
|---|---|---|---|---|
| **text** 129:6,11,18 130:2,10 | 89:14 91:10,19 93:8,15 94:11 | **third-party** 14:13 22:13,15 | 111:7 144:1 152:11 153:19 | **touchy** 48:12 **tough** 24:9 |
| **Thank** 4:14 6:11 | 94:13 97:6,16 | 47:22 78:21 | 155:16 158:14 | **Town** 24:24 25:6 |
| 7:1,4 11:19 | 98:6,24 99:9 | 159:1 161:3 | 159:13 161:5 | 25:17 26:8,19 |
| 13:23 29:16,20 | 99:18 100:7,7 | **thorough** 78:3 | **timing** 124:7 | 27:2,12 28:5 |
| 45:23 58:3 | 100:10,11 | 78:12 119:8,13 | **Title** 71:21 | 28:14 29:4,23 |
| 70:13 79:15 | 101:3 102:4 | 119:15,20 | 72:17 73:3 | 30:2,4,8,25 |
| 113:10 129:22 | 103:20 105:5 | **thoroughly** 52:2 | 150:15 | 31:20 46:2,13 |
| 129:25 132:5 | 106:1 107:15 | 151:5 | **today** 6:16 34:15 | 46:22 47:1 |
| 145:25 156:19 | 108:20 109:4 | **thoroughness** | 38:10 60:2 | 54:2,19 101:9 |
| **them,'** 124:11 | 111:6 113:18 | 78:8,13,17 | 73:23 74:20 | **training** 75:4 |
| **thereof** 10:22 | 115:21 116:16 | 88:21,21 93:20 | 79:7,23 81:8 | 76:22 77:3 |
| 17:4 112:20 | 116:20 117:3,5 | 93:21 95:15 | 88:11 93:4 | 83:18 84:4 |
| **thing** 48:23 | 117:15,19 | 145:8 | 95:6 103:20 | **trainings** 75:7 |
| 83:17 91:16 | 118:8 119:24 | **thought** 104:7 | 108:12 138:3 | **transcript** 57:7 |
| 115:24 116:1 | 120:3 123:3,8 | **thousand** 122:25 | 141:8 144:14 | 57:14 115:7 |
| 156:13 | 123:12 124:1 | **three** 23:1,2 58:8 | 145:19 146:4 | 121:12 162:7,7 |
| **things** 38:24 | 125:16 126:12 | 59:8,15,18,21 | 155:8 158:14 | 164:6,8,9,11 |
| 39:2 49:13 | 128:12 131:15 | 60:13,14 61:2 | 159:14 | 164:12 165:1 |
| 50:7 51:21,24 | 131:21 133:1 | 64:19 67:6 | **today's** 79:16 | **transcripts** |
| 52:1 57:10 | 133:11,17 | 114:20 133:13 | **told** 25:2 48:23 | 14:18,25 17:6 |
| 83:7 86:6 | 134:25 135:10 | **threshold** 35:11 | 65:8 83:6 | **transmittal** |
| 87:18 101:1 | 135:21 138:3 | 150:20,23 | 90:18 93:3 | 13:17 |
| 140:16 154:19 | 139:6,21 | **time** 3:6 5:25 | 95:6 124:11 | **Traurig** 143:4 |
| **think** 18:11 20:9 | 144:22 145:6 | 9:18 10:25 | 130:20 133:23 | **treated** 24:1 |
| 23:1,17 25:11 | 147:4,13 | 12:20 13:21 | 137:5 | **treatise** 161:4 |
| 26:22 29:15 | 149:11,17,18 | 15:20 23:24 | **tone** 90:20 | **trial** 9:24 10:6 |
| 30:15,20,21 | 149:25 151:4 | 29:19 30:2 | **tons** 140:15 | **tribunal** 24:14 |
| 31:5,6,8 33:24 | 152:19 153:6 | 42:9,9,10,15 | **top** 17:5 58:8 | 32:19 97:20 |
| 34:13,15 35:14 | 153:10 154:16 | 44:2,8,11 | 59:8,15,18,21 | **triggered** 150:1 |
| 35:19 36:8 | 155:12,14 | 46:21 47:17,24 | 60:14,24 61:1 | **true** 40:10,11 |
| 37:24 38:9,20 | 156:9,15,25 | 48:6 49:22 | 64:19 66:18 | 43:14 59:24 |
| 38:21 39:11,14 | 157:3,4,6,13 | 51:12,19 52:22 | 142:24 | 63:19 64:8 |
| 40:15 41:21 | 158:13 159:9 | 55:22,22 57:2 | **totality** 69:10 | 93:11 101:10 |
| 43:7,10,20,23 | 159:25 160:4,5 | 64:1 74:23 | **totally** 27:16 | 101:11 107:7 |
| 45:22 46:18 | 160:6,8,11,15 | 79:16,21 80:22 | 99:2 116:1 | 107:22 110:23 |
| 48:8 49:8 | 160:16,23 | 82:16 91:15 | **touch** 83:13 | 111:1 127:6 |
| 61:18 62:17 | **thinking** 51:17 | 101:8 109:25 | 141:5 | 136:10 162:8 |
| 64:5 65:5 67:1 | 51:18 | 110:4 112:10 | **touched** 83:5 | 165:23 |
| 67:17 68:12,16 | **third** 22:25 | 122:19 125:6 | 86:18,23 93:2 | **trusts** 127:15 |
| 69:6 71:8,20 | 34:20 36:5 | 134:20 142:11 | **touches** 86:24 | **truth** 4:5,5,6 |
| 72:21 74:19 | 52:17 94:16 | 142:16,17 | **touching** 85:4 | 78:4 |
| 78:14 81:10 | 109:12 111:13 | 151:24 | 86:9 | **truthful** 52:11 |
| 83:3 85:3 | 113:8 142:25 | **times** 10:12 | **touchings** 86:13 | **try** 7:7 80:25 |
| 86:21 88:18 | 145:2 | 92:17 93:4 | 86:15 88:14 | 104:11 |

Navarro v. AutoNation

Michael Elkins 4/29/2024

Page 192

trying 33:14,17
  33:24 57:25
  63:6,8 75:2
  92:19 102:11
  105:23 106:5
  106:25 111:17
  128:22
turn 7:11 14:1
  81:4 104:8
  132:6
tussle 63:3
Twice 10:15
two 21:6 22:23
  23:2,2 25:18
  26:18 31:10
  38:3 43:7,10
  47:9 58:17
  67:6 68:2
  69:18 80:25
  95:7 97:14
  129:13
two-plus 159:6,9
two-plus-decade
  38:4
two-sentence
  17:15
type 14:5 15:5
  19:11 68:24
  69:7 83:7 88:9
  88:17 132:22
types 38:6 67:25
  88:24 91:21,23
  146:8
typo 119:10

**U**

ultimate 45:6,8
  45:10 62:18
ultimately 28:13
  33:9 49:4
  54:13 63:2
  139:2 152:2,13
  152:24 153:14
  159:19
unaware 95:24

105:3
unclear 22:1
understand
  15:14 18:16
  28:24 31:8
  35:22 37:9
  70:11 73:25
  84:13,15,19
  87:9 91:20,21
  97:9 106:15
  111:16 114:11
  123:17 124:4,5
  125:4 126:18
  136:19 138:2
  139:14,16,19
  139:21 140:19
  148:22 149:19
  153:22 157:22
understanding
  9:7 12:2 27:4
  28:15 30:14
  36:11 39:7
  40:17 54:8
  59:19,20 80:7
  94:6 96:10
  104:19 117:17
  121:25 142:3
understood 5:8
  9:21 35:16
  97:12 106:18
  107:4
undertake
  151:23
undertaken
  18:24 19:6,13
  19:20 20:20
  21:3,9,17 24:3
  141:11
undertaking
  140:2
undertakings
  147:3
undertook 32:9
  39:22
undisputed

110:1 127:21
union 55:12,14
unique 91:8
  111:6,19
  117:11 160:8
United 1:1 11:1
  11:16
unreasonable
  20:18
unreported
  43:23
unspecific 92:24
unsubstantiated
  127:7
untruthful
  73:24
unwanted 86:9
  86:20,25 88:14
unwelcome 53:4
  83:12,14
use 38:8 66:17
  67:10 84:23
  96:18 98:21
  108:6 119:8
  143:10 144:5
  144:13 161:3,4
usually 134:5
utterly 142:12

**V**

v 165:2
V-a-n-d-e-r-w...
  17:2
Vacation 11:15
vacuum 140:11
validity 62:18
  63:20
Vanderwarker
  14:20 17:1
  20:1 56:14
  59:7,21 60:7
  60:14 66:12
  104:22 105:8
  147:11,18
various 75:10

152:3,3
varying 142:13
verbal 80:8
  89:24 90:9,12
  90:16,21,23
  123:5,25
verbally 56:8,11
verifications
  79:9
version 49:5
  50:3
versus 18:12
  90:5,23
vetted 143:11
view 34:18 49:2
  72:24 85:10
  103:11
viewpoint 93:10
VII 71:21 72:17
  73:3 150:15
vindicate 48:17
violated 69:17
violates 66:4
  70:5
violation 109:1
virtue 138:11
vis-à-vis 135:1
vitae 13:20
vs 11:15 164:4
vs- 1:6

**W**

W-a-s-s-e-m
  58:18
wait 5:11,12 6:9
waiting 32:5
waive 164:8,22
waived 161:10
want 5:7 9:19
  15:12 18:12
  25:10 28:22
  44:17 45:20
  47:12 53:7
  73:24,25 81:8
  86:19 93:15,15

102:4 104:9
105:7 114:8
120:6,25
127:16 134:1,9
135:1 156:16
158:1
wanted 15:6
  16:9 17:23
  27:19 73:14
  75:3
wasn't 18:6
  50:20 75:2
  94:6 101:14
  108:22 109:3
  128:7 135:20
  136:25 137:11
Wassem 58:18
  58:21 59:2
  61:6
way 7:3 23:9
  35:20 37:1,4
  39:23 53:5,21
  56:19 65:2
  81:10 86:18
  89:16 94:13
  119:2 123:20
  125:5 127:12
  128:21 134:3,8
  135:16 136:2,4
  154:17 158:1
ways 142:12
we're 6:18 9:20
  37:9,10 95:13
  106:25 115:2
  123:9,10 137:4
  142:18,23,23
  145:16 154:5
we've 81:8
  108:12 137:7
  146:4 151:2
WEAVER 2:7
website 134:2,11
WEISSLER 2:7
welcome 11:20
  29:21

Navarro v. AutoNation                    Michael Elkins 4/29/2024

Page 193

| | | | | |
|---|---|---|---|---|
| **went** 25:9 27:5 | 99:8 113:24 | 165:1 | 69:1,6 73:1 | 163:11 |
| 48:16 50:16,24 | 115:20 116:24 | **writing** 39:21,23 | 74:7,16 82:11 | **13** 3:4 129:5,7 |
| 53:10 86:17 | **work** 10:23 25:1 | 40:16 47:5 | 84:6 88:1,23 | 164:1 |
| 114:18 | 26:3,7 27:15 | 56:8,11 65:14 | 92:5 94:14 | **13-month** 46:16 |
| **weren't** 54:2 | 27:18,20,24,25 | 65:16 71:18 | 95:7,9 96:17 | **14** 17:13 57:10 |
| **West** 164:20 | 30:17 32:9 | 145:11,14 | 100:22 108:10 | 61:12,22 63:12 |
| **whatsoever** 80:7 | 36:10 38:4,20 | **writings** 18:3,3 | 113:19 117:25 | 63:24 85:25 |
| 120:8 | 39:10 40:9 | 18:4,6 64:25 | 119:22 125:25 | 88:5 89:1,5 |
| **withheld** 146:14 | 49:17,20 80:23 | 127:8 | 132:15 140:12 | 121:15 146:2 |
| **witness** 1:20 | 89:19 96:18,22 | **written** 7:17,19 | 142:1,6,19 | 148:1 |
| 2:12 3:13 4:7 | 96:25 97:1 | 7:21,25 8:2,8 | 143:24 144:5 | **1400** 2:3 |
| 5:17 9:24 | 101:21 133:9 | 8:10,16,18 | 152:21 154:1 | **141** 2:15 |
| 19:25 20:5 | 137:10 139:8,8 | 18:2 39:6 45:3 | 157:8 158:19 | **14th** 102:15 |
| 43:9 93:16 | 141:10,14 | 47:14 50:8,11 | 160:2,18 | 145:20 147:10 |
| 104:4,14 105:9 | 142:8 143:17 | 52:20 64:15 | | **15** 146:7,17 |
| 106:8 107:10 | 158:22 | 71:16 80:8 | ___Z___ | **151** 2:16 |
| 107:22 109:14 | **worked** 36:9 | 85:11,24 88:20 | | **15th** 147:5 |
| 110:18 111:21 | 79:22 160:3 | 93:23 102:8 | ___0___ | **161** 162:6 |
| 143:14 154:23 | **working** 26:16 | 110:11 117:16 | **0115** 57:3 | **162** 3:11 |
| 159:24 161:10 | 26:24 49:23 | 118:22 124:9 | **0116** 57:3 | **163** 3:12 |
| 165:3 | 130:6 136:25 | 132:14 145:16 | | **164** 3:13 |
| **witnessed** 39:14 | 137:11 149:18 | **wrong** 23:17 | ___1___ | **165** 1:12 3:14 |
| 43:12 48:21 | **workplace** 18:21 | 109:20 120:8 | **1** 1:12 7:15 9:23 | **17** 121:18 |
| 58:8 59:15 | 22:11,20 23:17 | **wrote** 51:19 | 127:20 128:4 | 129:17 |
| 63:16 64:5,7 | 24:6 30:7 | 59:20,23 90:2 | 129:1 162:6 | **19** 4:15 |
| 64:22 66:14,19 | 31:19 33:19 | 100:8 106:2 | **1,000** 24:12 | |
| 71:9,12 83:8 | 35:8 53:11 | 121:10 123:24 | **1:43** 114:23 | ___2___ |
| 84:11 85:8 | 91:14 99:12,13 | **Wyndham** 11:4 | **1:47** 114:23 | **2** 7:23 26:22 |
| 93:5 98:11,13 | 101:4 129:13 | 11:15 | **10** 9:22 96:22 | 67:7 121:9,13 |
| 99:3,5 136:11 | 134:19 135:15 | | **10.2** 80:1 | **2:13** 131:22 |
| 148:2 149:24 | 142:9 148:22 | ___X___ | **10:07** 1:15 | **2:25** 131:22 |
| **witnesses** 23:8 | 151:4 157:16 | **X** 91:17 96:22 | **100** 5:3,6 30:20 | **2:41** 141:20 |
| 39:24 40:2,4 | 158:25 | **XYZ** 65:8 | 39:13 47:6 | **2:44** 141:20 |
| 41:25 42:3,4,7 | **works** 43:6 | | **11** 39:14 49:8 | **20** 24:11 121:9 |
| 48:20,22 49:9 | **world** 38:22 | ___Y___ | 59:3 61:8 | 121:13,21 |
| 52:17 53:7,21 | 72:22 108:25 | **Y** 91:17 | 64:18 98:14 | **20-plus** 144:5 |
| 65:13 69:7 | 137:4 145:10 | **Yeah** 39:24 | 99:4 | **200** 2:8 |
| 71:20 88:15 | **worry** 57:25 | 74:19 100:5 | **11:09** 45:25 | **2001** 4:15 |
| 92:25 143:14 | **wouldn't** 17:23 | 124:10 | **11:20** 45:25 | **2003** 26:22 |
| **witnessing** 72:18 | 48:14 73:14 | **year** 29:10 | **12** 7:12 39:14,24 | **2004** 9:23 |
| **woke** 7:6 | 75:17 90:11 | 123:11 | 43:11 49:8 | **2022** 29:14 |
| **word** 6:9 119:8 | 106:19,22 | **years** 5:6 22:3,5 | 58:9 61:7 | 129:9 |
| 119:15 | 159:22,25 | 22:9 23:5 | 98:14 99:4 | **2023** 17:13 |
| **words** 16:3 41:7 | **wrap** 131:21 | 24:10 29:10 | **12:07** 77:6 | 29:12,15 57:10 |
| 94:25 98:20 | **write** 121:12 | 36:9,13 47:9 | **12:46** 77:6 | 61:12,22 63:12 |
| | | 62:13 67:23,23 | **12th** 162:15 | |

Navarro v. AutoNation

Michael Elkins 4/29/2024

Page 194

| | | |
|---|---|---|
| 63:24 85:25 | 79:20 | 57:2 58:17 |
| 88:6 89:1,5 | **29** 1:14 163:10 | 61:12 63:14 |
| 122:16,21 | 165:3 | 82:4,25 84:16 |
| 127:23 128:5 | | 85:11,24 86:14 |
| 130:5,6 146:3 | **3** | 88:5 89:6 90:1 |
| 146:7,17 | **3** 8:6 17:8 65:23 | 94:25 96:15 |
| **2024** 1:14 | 67:10 | 109:17 110:6 |
| 162:15 163:10 | **3:12** 1:15 161:11 | 110:24 112:15 |
| 163:11 164:1 | **30** 130:6 164:10 | 131:17 136:18 |
| 165:3 | **3246** 164:20 | 145:21 |
| **2026** 163:19 | **33301** 2:4,9 | **81** 121:9,12,15 |
| **21** 121:23 | **33402** 164:20 | **82** 121:9,12 |
| 163:19 | | 122:3 |
| **2100** 2:8 | **4** | |
| **22** 6:23 121:25 | **4** 2:14 8:14 | **9** |
| 129:9 | 19:18 20:9 | **9** 9:16,17 |
| **23** 3:3 5:6 6:12 | 58:2 | **9:46:35** 79:16 |
| 6:15 7:12 9:1,5 | **40-page** 145:16 | **90.702** 10:2 |
| 22:3,5 23:5 | **401** 2:3 | **93** 22:7 |
| 24:10 36:9,13 | **47** 39:23 | **95** 22:6,7 |
| 67:23 82:11 | | **954.462.9527** 2:4 |
| 84:6 88:1 95:9 | **5** | 2:9 |
| 113:19 117:25 | **5** 8:25 20:7,10 | **9th** 146:12 |
| 119:22 122:2 | 58:2 | |
| 130:6,11,13 | **561)213-1464** | |
| 142:6,19 | 164:7 | |
| 143:24 152:21 | **5a** 8:25 | |
| 154:1 158:19 | | |
| **23-61772-CIV...** | **6** | |
| 1:2 164:4 | **6** 3:3 9:4 127:23 | |
| 165:2 | 128:5 130:5 | |
| **23-plus** 142:1 | **6:23-cv-01104...** | |
| **23-year** 35:6 | 11:18 | |
| 36:7 38:1 | **640** 164:19 | |
| **24** 3:4 13:14,17 | **6a** 9:4 | |
| 13:22 14:2,4,6 | **6b** 9:4 | |
| 14:17 17:8 | **6c** 9:4 | |
| 18:15 57:19 | **6d** 9:4 | |
| 65:24 66:22 | | |
| 81:5,21 107:2 | **7** | |
| 122:3 131:25 | **7** 9:8,16 | |
| **25** 3:5 47:5 79:1 | **702** 9:25 | |
| 79:5,6,9 132:1 | **79** 3:5,6 | |
| **25-page** 49:7 | | |
| **26** 3:6 79:1,5,15 | **8** | |
| | **8** 9:12,13 56:23 | |